**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re:                                                    :    Chapter 11
                                                          :
ORION HEALTHCORP, INC., *et al.*,[1]                      :    Case No. 18-71748
                                                          :
                              Debtors.                    :    (Joint Administration Pending)
                                                          :
------------------------------------------------------------ x

### DECLARATION OF TIMOTHY J. DRAGELIN IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Timothy J. Dragelin, being duly sworn, depose and state as follows:

1.      I am the Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO") of Orion Healthcorp, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors").[2]  I have served as the Debtors' CEO and CRO since October 2017. In my capacity as CEO and CRO, I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.  I am above 18 years of age and I am competent to testify.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141).  The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

[2]  My role as CEO is currently limited to Constellation Healthcare Technologies, Inc. and certain other Debtors, not including Orion Healthcorp, Inc.  I am also the CRO of the subsidiaries of NYNM Acquisition (as defined and described below) which have not filed chapter 11 petitions at this time.

2.      I am a Senior Managing Director in the Corporate Finance and Restructuring practice at FTI Consulting, Inc. ("FTI"), where I lead FTI's Corporate Finance and Restructuring's Healthcare Industry practice and have more than 20 years of experience in restructuring matters, including representing debtors and creditors in bankruptcy and out-of-court restructurings.   My experience includes bankruptcy planning and management, turnaround consultation, interim management, lender advisory, buy-side due diligence, sell-side mandates, valuation, process improvement, forensic investigations, and litigation advisory work.

3.      Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based upon (a) my personal knowledge, (b) my discussions with other members of the Debtors' management team, and the Debtors' advisors, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or (d) my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      On March 16, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York.

5.      Contemporaneously herewith, the Debtors have filed the following motions and application (collectively, the "First Day Motions"):

> a.      Motion of the Debtors for Entry of an Order Directing the Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion");
>
> b.      Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Maintain and File a Consolidated Creditor Matrix and Mailing Matrix; and

(II) Authorizing the Filing of a Consolidated List of Top 75 Unsecured Creditors (the "<u>Consolidated Creditor List Motion</u>");

c.      Motion of the Debtors for Entry of an Order Extending the Debtors' Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "<u>Extension Motion</u>");

d.      Application for an Order Appointing Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and E.D.N.Y. Administrative Order No. 658 *Nunc Pro Tunc* to the Petition Date (the "<u>Claims Agent Retention Application</u>");

e.      Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefit Programs in the Ordinary Course and (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations (the "<u>Wage Motion</u>");

f.      Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing The Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service (the "<u>Utilities Motion</u>");

g.      Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Continue their Insurance Policies and Pay Prepetition and Postpetition Obligations in Respect Thereof (the "<u>Insurance Motion</u>");

h.      Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Authorizing Continued Transfers Among Debtors and (IV) Continued Use of Existing Business Forms (the "<u>Cash Management Motion</u>");

i.      Motion of the Debtors for entry of Interim and Final Orders (A) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (B) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Vendors Obligations (the "<u>Critical Vendor Motion</u>"); and

j.      Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-5 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Super-Priority Administrative Expense Status, (IV) Granting Adequate Protection, (V)

Scheduling a Final Hearing, and (VI) Granting Related Relief (the "DIP Financing Motion").

6.      In addition to the First Day Motions, the Debtors have filed (or intend to soon file) the following extraordinary motions:

  a.    Debtors' Motion for an Order Pursuant to Bankruptcy Rules 2004 and 9014 Directing the Production of Documents and the Examination of Robinson Brog Leinwand Greene Genovese & Gluck PC;

  b.    Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 542(a) and 542(e) Compelling Robinson Brog Leinwand Greene Genovese & Gluck PC to Turnover and Account for Property of the Estate and Recorded Information;

  c.    Debtors' Motion for an Order Pursuant to Bankruptcy Rules 2004 and 9014 Directing the Production of Documents and the Examination of Rosenberg Rich Baker Berman & Company; and

  d.    Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 542(a) and 542(e) Compelling Rosenberg Rich Baker Berman & Company to Turnover Property of the Estate and Recorded Information.

7.      I submit this Declaration, pursuant to E.D.N.Y. LBR 1007-4 and this Court's Guidelines for First Day Motions, in support of the Debtors' chapter 11 petitions and First Day Motions.  I am familiar with the content of each First Day Motion and believe that the relief sought therein allows the Debtors to fulfill their duties as debtors in possession, minimize the possible disruption that may be caused by the chapter 11 filings and achieve a successful reorganization.  The facts set forth in each of the First Day Motions are incorporated herein by reference.  Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to such terms in the relevant First Day Motion.

8.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information

provided to me by management, advisors, employees or other representatives of the Debtors.  If I was called as a witness, I would testify consistently with the facts set forth in this Declaration.

## PRELIMINARY STATEMENT[3]

9.        As discussed in detail below, the Debtors are the victims of a large, complex, and brazen fraud that was subject to a complex and deliberate concealment effort perpetrated by their former management that was years in the making.   After acquiring several of their businesses, the Debtors' former CEO, Parmjit "Paul" Parmar ("Parmar," who previously owned the company) took Constellation Healthcare Technologies, Inc., the parent company of the Debtors (and itself a Debtor), public on the London AIM and then proceeded to raise additional equity for additional acquisitions, many of which are believed to be largely or entirely fictitious. The Debtors borrowed approximately $130 million in debt in connection with a go-private transaction, the majority of which is believed to have been paid to Parmar (as a shareholder, through entities under his control), which is a financial burden the Debtors simply cannot sustain. The Debtors borrowed such funds based upon financials recently discovered by the Debtors' new management and their professionals to be largely fictitious and involving numerous sham companies and fabricated transactions, revenues, and customers.  The Debtors have commenced these chapter 11 cases to (i) market and sell their assets, (ii) wind down certain of their businesses, and (iii) to enable them to ultimately pursue claims against the individuals that put the Debtors in this position for the benefit of all their creditors.

10.        This Declaration, which is organized into three sections, provides an overview of the Debtors and the circumstances leading to the commencement of the Debtors' chapter 11

---

[3] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them elsewhere in this Declaration.

cases.  <u>Section I</u> describes the Debtors' structure and operations.  <u>Section II</u> recounts the events preceding the bankruptcy filings.  <u>Section III</u> affirms and incorporates facts that support the First Day Motions.

## I.    OVERVIEW OF THE DEBTORS' STRUCTURE AND OPERATIONS

### A.  <u>Corporate History</u>

11.     The Debtors are a consolidated enterprise of several companies aggregated through a series of acquisitions, which operate the following businesses:  (a) outsourced revenue cycle management ("<u>RCM</u>") for physician practices, (b) physician practice management, (c) group purchasing services for physician practices, and (d) an independent practice association business, which is organized and directed by physicians in private practice to negotiate contracts with insurance companies on their behalf while such physicians remain independent and which also provides other services to such physician practices.

12.     Debtors Medical Billing Services, Inc., Rand Medical Billing, Inc., RMI Physician Services Corporation, Western Skies Practice Management, Inc., Northeast Medical Solutions, LLC, NEMS West Virginia, LLC, Physician Practice Plus, LLC, Allegiance Consulting Associates, LLC, and Allegiance Billing & Consulting, LLC are in the RCM business.  Debtor Integrated Physician Solutions, Inc. operates the physician practice management business as well as the group purchasing organization.  New York Network IPA, Inc. and New York Premier IPA, Inc. operate the independent practice association business.  The remainder of the Debtors are either (a) holding companies or entities that have either no or minimal current operations, or (b) entities that are the subject of sham acquisitions.[4]

---

[4] The sham acquisitions are discussed below in Section I.E.

### i.     Genesis of the Debtor Entities

13.     The following information was obtained and summarized from various publicly available documents.[5]  According to the AIM Offering Memorandum, the entity that is currently named Orion Healthcorp, Inc. ("Orion") was incorporated in Delaware in 1984 under the name Technical Coatings Incorporated.  On September 10, 1984 its name was changed to Technical Coatings, Inc.  On July 11, 1999, its name was changed to Surgicare, Inc. and, in 1999, it was registered for trading on U.S. exchanges.

14.     In 2004, Surgicare Inc.'s name was changed to Orion Healthcorp, Inc. and it subsequently acquired Integrated Physician Solutions, LLC ("IPS") and Medical Billing Services, Inc. ("MBS").  In 2006, Orion acquired Rand Medical Billing, Inc. ("Rand").  In 2007, Orion delisted from NASDAQ.  In 2008, Orion acquired RMI Physicians Services Corp. ("RMI") and Western Skies Practice Management, Inc. ("Western Skies").

15.     According to the AIM Offering Memorandum, in April 2013, Constellation Healthcare, LLC ("CHLLC"), an entity that is not a debtor in these chapter 11 cases, was formed as an investment vehicle by Parmar and Southport Lane Asset Management, LLC specifically for the purposes of acquiring Orion and its operating subsidiaries and to pursue an acquisition strategy in the RCM market.  On June 17, 2013, the entire issued share capital of Orion was acquired by CHLLC.  Accordingly, as of the date of Parmar's acquisition, Orion was the parent of IPS, MBS, Rand, RMI, and Western Skies.

---

[5]  Such documents include the Application for Admission to AIM (the "AIM Offering Memorandum"), as well as other documents that were publicly filed in connection with CHT's listing on the London Stock Exchange's Alternative Investments Market (together with the AIM Offering Memorandum, the "AIM Filings").  While the documents are no longer available from the London Stock Exchange, the AIM Filings were obtained from http://www.constellationhealthgroup.com and I presume that such documents were publicly filed with AIM (as defined below).  The Debtors have limited documents and knowledge as to their history, which has in part been limited due to the Debtors' prior professionals' refusal to turn over their records.

16.     The following is a timeline of the various subsequent acquisitions discussed below:



17.     On March 31, 2014, NEMS Acquisition LLC ("NEMS Acquisition"), whose sole member is Orion, acquired North East Medical Solutions LLC ("NEMSLLC") and NEMS West Virginia, LLC ("NEMSWV" and together with NEMSLLC, "NEMS").[6]

18.     In June 2014, investment entities managed by Parmar acquired all of the ownership interests of CHLLC.

*ii.     The Going Public Transaction*

19.     According to the AIM Offering Memorandum, on September 3, 2014, Constellation Healthcare Technologies, Inc. ("CHT"), a Debtor in these chapter 11 cases and the direct or indirect parent of all of the remaining Debtors, was formed to become the holding company for Orion and its subsidiaries for the purposes of a public listing on London Stock Exchange's Alternative Investments Market ("AIM").  According to the AIM Offering Memorandum, CHT was to acquire the entire issued share capital of Orion immediately prior to CHT's admission to trading on AIM.  Immediately after its admission to trading on AIM, CHLLC was to become the controlling shareholder of CHT holding approximately 68.1 percent of the voting rights in CHT.

---

[6] According to the AIM Offering Memorandum, on November 28, 2013, NEMS entered into an Asset Purchase Agreement with MCF Corporation, an Ohio corporation, Robert S. Boone, Lori Boone and the MCF Corporation 401(k) Plan pursuant to which NEMS purchase all of the assets of MCF Corporation, which included but were not limited to all equipment, inventory, patents and accounts receivables.

20.     The going public transaction was consummated on December 8, 2014 and CHT was admitted to trading on AIM on the London Stock Exchange (the "Going Public Transaction").  At the time of the Going Public Transaction, CHT was the immediate holding company of Orion, which was in turn the direct or indirect parent company of eight (8) subsidiaries that formed the enterprise at that time, including IPS, MBS, Rand, RMI, Western Skies, NEMS Acquisition, NEMSLLC and NEMSWV.

iii.     *Orion's Acquisitions and Secondary Offerings While Publicly Listed on AIM*

a.     *PPP Acquisition*

21.     According to an Acquisition Announcement, dated March 17, 2015 (the "March 17 Announcement") and the Consolidated Financial Statements For the Years Ended December 31, 2015 and 2014 filed with AIM (the "AIM Financial Statements"), CHT acquired Physicians Practice Plus,[7] an RCM business, for a maximum cash consideration of up to $20.0 million, subject to the fulfillment of certain revenue and EBITDA targets being met over a 24 month period.  In connection with this acquisition, Arvind Walia, founder and Chief Executive Officer, joined CHT as the Chief Technology Officer of the enlarged group.  As a result of this transaction, Orion became the holding company for Physicians Practice Plus Holdings, LLC ("PPP HoldCo"), and its operating subsidiary, Physicians Practice Plus, LLC ("PPP OpCo").[8]

---

[7] According to the March 17 Announcement, in November 2014, PPP acquired the business and assets of P.C. Advantage.

[8] According to the March 17 Announcement, Orion acquired an entity called Physician Practice Plus, Inc. and its three operating subsidiaries.  However, I am only aware of PPP HoldCo and PPP OpCo.  The organizational documents for these entities suggest that these entities were formed shortly before the transaction.  The transaction documents indicate that the purchase was structured so that PPP OpCo purchased the assets of Porteck Corporation for $12.8 million, which included cash consideration of $12.3 million plus forgiveness of a $500,000.00 note, plus certain earn out payments that were payable upon the achievement of certain revenue targets and bonuses.

### b. May 2015 Secondary Offering

22.        According to the AIM Financial Statements and an announcement titled "Proposed Placing and Subscription to raise £12.9 million," dated May 13, 2015, in May 2015, pursuant to a secondary placing of its shares, CHT raised approximately $20.0 million. The stated purpose of the secondary offerings was to allow for certain of the acquisitions discussed below.

### c. Northstar Acquisition

23.        According to the AIM Financial Statements and an announcement titled "Acquisition of the business and assets of NorthStar First Health," dated September 16, 2015 (the "September 16 Announcement"), on September 16, 2015, CHT acquired NorthStar First Health, an RCM business, for a maximum consideration of $18.0 million. According to the September 16 Announcement, 64% of the consideration was to be paid in cash and 36% in CHT shares. As a result of this transaction, Orion became the owner of Northstar FHA, LLC ("Northstar FHA"), a holding company, which in turns owns Northstar First Health, LLC ("Northstar FH"), another holding company, which in turn owns Vachette Business Services, LLC ("Vachette"),[9] the operating subsidiary. As discussed in further detail below, upon information belief, the actual purchase price for Vachette was for a maximum consideration of approximately $2.8 million, of which approximately $2.3 million was paid.

### d. Phoenix Health LLC Acquisition

24.        According to the AIM Financial Statements and an announcement titled "Acquisition of the business and assets of Phoenix Health LLC," dated September 18, 2015 (the

---

[9] The AIM Financial Statements and the September 16 Announcement do not identify Vachette, but rather refer to Northstar First Health, which is the name of a holding company.

"September 18 Announcement"), on September 18, 2015, CHT acquired Phoenix Health LLC ("Phoenix"), an RCM business, for a maximum consideration of $14.0 million.  According to the September 18 Announcement, 75% of the consideration was to be paid in cash and 25% in CHT shares.  As a result of this transaction, Orion became the parent company of Phoenix.  However, as discussed below, upon information and belief, Phoenix is an entity created by Parmar that conducted no business and had no assets.

### e.  December 2015 Secondary Offering

25.      In an announcement titled "Proposed Placing & Subscription to raise £30 million at 160 pence per share[;] Conditional Acquisition of MDRX Medical Billing LLC," dated December 11, 2015, CHT announced its intention to conduct a secondary offering. According to the AIM Financial Statements, CHT raised gross proceeds of £30 million (approximately $45.0 million) and received approximately $42.2 million from net proceed from this secondary offering.

### f.  MDRX Medical Billing LLC Acquisition

26.      According to the AIM Financial Statements and an announcement titled "Acquisition of MDRX Medical Billing LLC" dated February 10, 2016, on February 10, 2016, CHT acquired MDRX Billing LLC ("MDRX"), an alleged billing practice management company, for $28.0 million with a further $2.0 million in cash due upon completion of certain targets.  As a result of this transaction, Orion became the parent company of MDRX.  However, as discussed below, upon information and belief, MDRX is an entity created by certain members of the Debtors' former management that conducted no business and had no assets.

### g.  Allegiance Acquisition

27.  According to an announcement titled "Acquisition of VEGA Medial Professionals LLC" dated September 23, 2016 (the "September 23 Announcement"), CHT Acquired Vega Medical Professionals LLC ("Vega"), an RCM business, for a maximum consideration of $24.0 million including certain consideration in the form of earn outs.  78% of the maximum consideration was to be paid in cash and 22% in CHT shares.  As a result of this transaction, Orion became the parent company of Vega, which in turn owns two operating subsidiaries:  Allegiance Consulting Associates LLC ("ACA") and Allegiance Billing & Consulting LLC ("ABC," and together with ACA, "Allegiance").[10]  Upon information and belief, while Allegiance operates a legitimate RCM business, the purchase price was significantly overstated by certain members of the Debtors' former management.[11]

28.  As a result of the foregoing transactions, before the go-private transaction discussed below, CHT was the immediate holding company of Orion, which was in turn the immediate or intermediate holding company of eight (18) subsidiaries that formed the enterprise at that time, which included IPS, MBS, Rand, RMI, Western Skies, NEMS Acquisition, NEMSLLC, NEMSWV, PPP HoldCo, PPP OpCo, Northstar FHA, Northstar FH, Vachette, Phoenix, MDRX, Vega, ACA, and ABC.[12]

### iv.  The Go-Private Transaction

29.  According to a "Publication and [P]osting of Proxy Statement and Notice of

---

[10]  The September 23 Announcement only references Vega, the holding company believed to have been created by Parmar, and does not reference Allegiance, the operating company.  According to the transaction documents, the acquisition of Allegiance occurred on September 1, 2016.

[11] The transaction documents for the Allegiance acquisition indicate that the maximum purchase price for Allegiance was $4.68 million.

[12]  See Exhibit A hereto for a depiction of the Debtors' organizational structure.

General Meeting," dated December 28, 2016, on November 25, 2016, CHT and CHT Holdco, LLC ("CHT Holdco")[13] announced that they had reached agreement on the terms of a recommended acquisition under which CHT Holdco was to acquire CHT at an acquisition price of $2.93 cash and $0.43 in promissory notes per share, pursuant to the terms of an agreement and plan of merger dated November 24, 2016 (the "Merger Agreement") between CHT, CHT Holdco, CHT Mergersub, Inc.[14], Orion, and a private equity firm.[15]

30.     On December 28, 2016, CHT issued a "Publication and [PC ]osting of Proxy Statement and Notice of General Meeting" to its shareholders recommending the approval of the transaction contemplated by the Merger Agreement.  On January 18, 2017, CHT announced that at a general meeting held on that day, CHT's shareholders approved the Merger Agreement.  On January 26, 2017, CHT announced that in connection with the Merger, it requested a suspension of trading of its shares.

31.     On January 30, 2017, CC Capital CHT Holdco, LLC ("Sponsor Holdco"), an affiliate of the Sponsor, obtained a controlling interest in CHT Holdco (CHT's parent) pursuant to the Merger Agreement and a Subscription Agreement (the "Subscription Agreement").  The merger was a "go private transaction" structured such that Sponsor Holdco, a special purpose entity managed by the Sponsor would own a controlling interest in CHT Holdco, with the remaining interest in CHT Holdco owned by Alpha Cepheus, LLC ("Alpha Cepheus"), an entity which is, upon information and belief, controlled by Parmar (the "Merger").  The Merger resulted in the Sponsor owning a controlling interest in CHT (through CHT Holdco).

---

[13] As discussed below, CHT Holdco is owned by entities controlled by CC Capital and Parmar.

[14] As part of the Merger, CHT Mergersub, Inc. merged into CHT.

[15] CC Capital Management, LLC (the "Sponsor") was party to the Merger Agreement for a limited purpose.

32.    To finance the Merger, (i) the Sponsor contributed approximately $82.5 million of cash (as equity) to CHT Holdco, (ii) CHT obtained $130.0 million in financing from the Lenders (plus a $15.0 million commitment) pursuant to the Credit Agreement discussed below, and (iii) CHT issued unsecured promissory notes to its shareholders in the amount of approximately $39.6 million.  Upon information and belief, in connection with the Merger, based on representations made by certain members of the Debtors' former management, the parties valued CHT at $309.4 million, or approximately $3.36 per share.[16]

    *v.    NYNM Acquisition*

33.    In March 2017, Orion, through NYNM Acquisition, LLC ("NYNM Acquisition"), acquired the membership interests in New York Network Management, L.L.C. ("NYNMLLC") and its subsidiaries (a) Network Management Insurance Brokerage Services LLC ("NYNM Insurance"), (b) New York Network IPA, Inc. ("IPA 1"), (c) New York Premier IPA, Inc. ("IPA 2"), (d) Brooklyn Medical Systems IPA 3, Inc. ("IPA 3"), (e) Brooklyn Medical Systems IPA 4, Inc. ("IPA 4"), and (f) Brooklyn Medical Systems IPA 5, Inc. ("IPA 5" and together with NYNMLLC, NYNM Insurance, IPA 1, IPA 2, IPA 3, and IPA 4, "NYNM").[17]  In connection with the NYNM acquisition, the Debtors borrowed approximately $30.0 million under the Prepetition Credit Agreement discussed below, the majority of which was used to finance the NYNM acquisition.

---

[16] Certain entities under Parmar's control contributed shares in CHT to CHT Holdco.  The parties valued the cash portion thereof ($2.93 per share) at $72.8 million.  Upon information and belief, CHT did not distribute any cash on account of such shares.  However, CHT did issue promissory notes to Parmar or entities under his control on account of such shares.  CHT did distribute cash on account of other shares owned by Parmar-controlled entities, including the seized funds discussed below.

[17] NYNM have not filed chapter 11 petitions at this time.

*vi.      Negotiations with and Loan to NACO*

34.      On August 24, 2017, CHT entered into a certain letter of intent (the "NACO LOI") and loan and security agreement (the "NACO Loan Agreement") with National ACO, LLC ("NACO"), a physician services provider.  Pursuant to the NACO LOI, CHT proposed the acquisition, by one of its subsidiaries, of the outstanding equity securities of NACO and National MSO, LLC ("NMSO") (the "NACO Transaction").  The NACO LOI contemplated that the consideration for the proposed NACO Transaction would consist of an initial sum of $9.5 million, plus certain earn-out payments and that the NACO Transaction would close within 90 days after the execution of the NACO LOI.

35.      In connection with the NACO LOI, CHT, NACO and NMSO entered into the NACO Loan Agreement, pursuant to which CHT agreed to lend an aggregate principal amount of up to $4.3 million to be used solely by NACO and NMSO in order to fund security bonds in favor of the Centers of Medicare and Medicaid Services of the U.S. Department of Health and Human Services (the "NACO Loan").  If the NACO Transaction proceeded, the loan would be repaid from the capital contribution to NACO and NMSO.  As security for the loan, NACO and NMSO granted CHT security interests in certain collateral, including, but not limited to receivables, equipment, fixtures, general intangibles, inventory, investment property, deposit accounts, cash, and goods.

36.      In connection with the NACO Loan, NACO executed two warrant instruments in favor of CHT.  In addition, certain shareholders of NACO and NMSO guaranteed the NACO Loan and granted CHT security interests in their shares in NACO and NMSO.  Because the NACO Transaction did not close, the NACO Loan Agreement matures on August 24, 2019.

37.      On September 1, 2017, NACO and NMSO submitted an Advance Request to

CHT in the amount of $2.0 million, which amount was funded.  On September 30, 2017, NACO and NMSO requested submitted a second Advance Request in the amount of $600,000 to be released on October 2, 2017 (the "Second Advance Request").  On October 17, 2017, CHT indicated to NACO that it was not ready to fund the Second Advance Request.  Subsequently, NACO sent a letter to CHT declaring a breach of the NACO Loan Agreement and cancellation of the NACO LOI.  As of the Petition Date, NACO and NMSO owe CHT not less than $2.0 under the NACO Loan Agreement.

<em>vii.    Sale of Vachette</em>

38.    On February 22, 2018, Vachette sold substantially all of its assets[18] to Ambiorix, LLC, an entity designated by Marko Raich, the former owner of Vachette, for $2.0 million.[19]

### B. Organizational Structure

39.    As a result of the foregoing transactions, and as reflected in the organizational chart attached hereto as **Exhibit A**, CHT, an Delaware corporation, directly owns 100% of the interests in Orion, a Delaware corporation, which in turn owns 100% of the interests in:

(1)    IPS, a Delaware corporation that operates the Debtors' PPM and GPO businesses;

(2)    MBS, a Texas corporation that operates as part of the Orion RCM Business (as defined below);

(3)    Rand, a California corporation that operates as part of the Orion RCM Business;

(4)    RMI, a Texas corporation that operates as part of the Orion RCM Business;

---

[18] Vachette retained approximately $200,000.00 in accounts receivable.

[19] As discussed above, the Debtors initially purchased Vachette for approximately $2.8 million.

(5)     Western Skies, a Colorado corporation that operates as part of the Orion RCM Business;

(6)     NEMS Acquisition, a Delaware limited liability company which acts as a holding company for NEMSLLC and NEMSWV, which are Pennsylvania limited liability companies that operate as part of the Orion RCM Business;

(7)     PPP HoldCo, a Delaware limited liability company which acts as a holding company for PPP OpCo, a Delaware limited liability company that operates as part of the Orion RCM Business,

(8)     Northstar FHA, a Delaware limited liability company which acts as an holding company for Northstar FH, a Delaware limited liability, which in turn acts as a holding company for Vachette, an Ohio limited liability company;

(9)     Phoenix, a Delaware limited company which is, upon information and belief, an entity that was the subject of a sham acquisition;

(10)    MDRX, a Delaware limited liability company which is, upon information and belief, an entity that was the subject of a sham acquisition;

(11)    Vega, a Delaware limited liability company which acts as a holding company for ACA and ABC, which are New York limited liability companies that operate the Allegiance RCM business; and

(12)    NYNM Acquisition, a Delaware limited liability company, which acts as a holding company for NYNM LLC, a New York limited liability company, which in turn owns NYNM Insurance,[20] a New York limited liability company, and IPA 1, IPA 2, IPA 3, IPA 4, and IPA 5, which are all New York corporations that together operate the NYNM IPA Business.[21]

### C.  **The Debtors' Business Lines**

40.     As discussed below and as reflected in the Debtors' organizational chart attached hereto as **Exhibit A**, the Debtors operate several business lines.

---

[20] I have been informed that there is an individual, Lee Bialostok, who is a licensed insurance agent and owns one share in NYNM Insurance, constituting less than one percent of that entity.  However, I have not seen any documentation indicating that Mr. Bialostok has an interest.

[21] The entities directly and indirectly owned by NYNM Acquisition are not filing chapter 11 petitions at this time.

### i. Orion RCM Business

41.     The Debtors operate a revenue cycle management business, which provides hospital-based and office-based physicians with medical billing and services, giving them more time to focus on patient care (the "Orion RCM Business").   These services include coding, reimbursement services, charge entry, claim submission, collection activities, and financial reporting services.   These services are designed to help clients by improving cash flows and reducing administrative costs and burdens.   MBS, Rand, RMI, Western Skies, NEMSWV, NEMSLLC, and PPP OpCo all operate as part of the Orion RCM Business to provide RCM services to physician practices throughout the country.

42.     The Orion RCM Business operates out of 6 locations with operations in: (a) Simi Valley, California, (b) Lakewood, Colorado, (c) Houston, Texas, (d) Monroeville, Pennsylvania, (e) Parkersburg, West Virginia, and (f) Jericho, New York.   Each location manages and services its own customer base and handles its own "front office" operations and relationships.   Institutional knowledge about each customer (and relevant payor rules) rests with each US-based team at each location.   The Orion RCM Business services approximately 170 customers.

43.     The Orion RCM Business provides RCM services on the basis of a percentage of net collections.   Fees range from 5% to 15% of net collections, depending on specialty and size of practice.   All system set up and implementation fees are included in the base rate.

44.     PPP OpCo contracts with Porteck India Infoservices Private Limited ("Porteck India") a company based in India, which exclusively supplies much of the "arms and legs" for the bulk of "back office" of the activities of the Orion RCM Business, such as claims preparation, charge entry, coding, A/R follow-up, denials management, and cash posting.   Upon

information and belief, Porteck India is owned and operated by family members of Arvind Walia, Orion's CEO. Porteck India is compensated at a rate of cost plus eight percent (8%). PPP OpCo previously held an option to purchase Porteck India for nominal consideration, which option expired on March 31, 2017. According to its contract with PPP OpCo, Porteck India was to hold a security deposit of $400,000.00. Porteck India is generally paid by PPP OpCo[22] twice a month. There is an initial funding at the beginning of the month and a true up payment later in the month based on an invoice received from Porteck India. Monthly invoices range from approximately $297,000.00 to $488,000.00 and has averaged approximately $384,000.00 per month.

45.        Challenges with services provided by Porteck India resulted in the loss of approximately 100 clients over the last two years with only a few additions of new customers. Furthermore, certain operational challenges with Porteck India have caused additional strain on the customers and employees of the Orion RCM Business.

### ii.    Allegiance RCM Business

46.        Debtors ACA and ABC operate an RCM business (the "Allegiance RCM Business") similar to Orion RCM Business. The Allegiance RCM Business provides services to hospital-based physician practices only and operates as a standalone RCM business that is not integrated with the rest of the Debtors' businesses.

### iii.    Physician Practice Management Business

47.        Debtor IPS operates a physician practice management ("PPM") business, which provides business and practice management services exclusively to certain primary care and subspecialty pediatric practices (the "PPM Business"). Through this segment, the Debtors

---

[22] The payments are sometimes made from Orion's operating account.

provide accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services, physician credentialing, fee schedule review, training and continuing education, and billing and reimbursement analysis for physician practices.

48.        Specifically, IPS is party to three management service agreements ("MSAs") with three physician groups (the "Physician Groups") that provide services to patients at six (6) locations in Illinois and Ohio.  The MSAs were entered into in 1998 and 1999 and are for a term of forty (40) years.  Pursuant to the MSAs, IPS manages the day-to-day business operations of the Physician Groups, including furnishing the Physician Groups with appropriate facilities, equipment, supplies, support services and administrative support staff.  The physicians are all employed by separate entities.

49.        IPS (through Orion) pays for certain expenses of the Physician Groups, as specified in the MSAs.  Receivables generated by the Physician Groups are billed by IPS.  IPS is entitled to a management fee of fifteen percent (15%) of the Net Operating Income (as defined in the MSAs) of the Physician Group.  The remaining eight-five percent (85%) is distributed to the Physician Groups on the 15th day of the following month, from which the Physician Groups pay certain expenses as specified in the MSAs.  Receivables of the Physician Groups are collected by IPS (typically after monthly expenses are paid and payments are made to the Physician Groups) and the management fee is collected from the excess of collections over expenditures (which should amount to fifteen percent (15%) of Net Operating Income).

### iv.    Group Purchasing Organization Business

50.        IPS also operates the Debtors' group purchasing organization ("GPO") business segment, which allows eligible physicians to participate in discounts for vaccines and

flu shots offered by certain pharmaceutical companies with which IPS has strong relationships. In exchange for IPS connecting the pharmaceutical companies with eligible physicians, IPS receives an administrative fee from the relevant pharmaceutical companies to the Group for administering the GPO, typically being a percentage of net sales achieved. The GPO's primary relationships are with pharmaceutical companies Merck and Sanofi and it provides GPO services to roughly 4,000 physicians.

*v.    NYNM IPA Business*

51.        NYNM operates an independent practice association ("IPA") business (the "NYNM IPA Business"), which is organized and directed by physicians in private practice to negotiate contracts with insurance companies on their behalf while such physicians remain independent and which also provides other services to such physician practices. IPA 1 and IPA 2 (the "NYNM IPAs")[23] contract with insurance companies ("Payors") to maintain a network of physicians to provide services to enrollees of the Payors. The NYNM IPAs in turn contract with independent physicians in New York to provide services to members of the Payors on a negotiated fee basis. The NYNM IPA Business uses a single tax ID, which allows NYNM to negotiate better rates from the Payors for the physicians.

52.        The NYNM IPAs receive reimbursement directly from the Payors on behalf of the physicians.[24] The NYNM IPAs take a fee for such services, typically in the range of approximately ten to twelve percent (10-12%) of the fees collected by the NYNM IPA Business, before remitting the remaining eighty-eight to ninety percent (88-90%) to the physicians. Fees collected by the NYNM IPAs flow up to NYNM LLC.

---

[23] IPA 3, IPA 4, and IPA 5 do not operate.

[24] Certain payments are received by NYNM LLC.

53.    Pursuant to a Claim Services Agreement, NYNM LLC contracts with CareCore National, LLC (known as "eviCore healthcare"), which provides the "back office" services to the NYNM IPA Business, including the submission of claims to providers and facilitating the payments to the physicians.

54.    Pursuant to a Co-Brokerage and Marketing Services Agreement, NYNM Insurance has an arrangement to act as a sub-broker for Alliant Insurance Services, Inc. and to receive 28.5% to 37.5% (depending on the referral) of the commission for certain insurance it sub-brokers.  NYNM Insurance's operations are still in the early stages and NYNM Insurance had no revenue in 2017.

### vi.    Vachette Consulting Business

55.    Debtor Vachette previously operated a consulting business for pathology practices (the "Vachette Business").  The Vachette Business externally managed and audited third-party billing services, negotiated managed care contracts, and assisted with business management.  The Vachette Business did not perform billing services and operated as a standalone business and was not integrated with the rest of the Debtors' businesses.

56.    As set forth above, on February 22, 2018, Vachette sold its assets to Ambiorix, LLC, an entity designated by Marko Raich, the former owner of Vachette, for $2.0 million.

### D.    The Debtors' Prepetition Capital Structure

57.    As part of the overall Merger transaction, Orion entered into that certain Credit Agreement, dated as of January 30, 2017 (as amended, modified or supplemented from time to time, the "Prepetition Credit Agreement"), by and among Orion, as Borrower, the guarantors that are party thereto (which, as of the Petition Date, include the remainder of the Debtors and NYNM) (the "Guarantors" and together with Orion, the "Loan Parties"), the lenders party

thereto from time to time (the "Lenders") and Bank of America, N.A., as Administrative Agent, L/C Issuer and Swingline Lender  ("Bank of America" or "Administrative Agent").

58.     As security for the payment of Orion's obligations under the Prepetition Credit Agreement, the Guarantors jointly and severally guaranteed the obligations thereunder. Additionally, pursuant to that certain Security Agreement, dated January 30, 2017 (the "Security Agreement") the Loan Parties pledged as collateral first priority liens in all of their property (other than Excluded Property, as such term is defined in the Prepetition Credit Agreement).  Additionally, pursuant to that certain Pledge Agreement, dated January 30, 2017 (the "Pledge Agreement"), the Loan Parties pledged as collateral 100% of the equity interests in each of their subsidiaries.

59.     As of the Petition Date, the Loan Parties' total secured debt obligations to the Lenders under the Prepetition Credit Agreement and related documents totaled approximately $159.3 million of principal consisting of obligations under the Term Loans and the Bridge Loan (as such terms are defined below) (collectively, the "Senior Debt Obligations").  The Senior Debt Obligations are described in greater detail below.

*i.     Revolving Loans*

60.     Subject to the terms and conditions set forth in the Prepetition Credit Agreement, each of the Lenders severally agreed to make loans (each such loan, a "Revolving Loan") to Orion in an aggregate amount not to exceed $15.0 million (the "Aggregate Revolving Loan Commitment").  The Revolving Loans have a maturity date of January 30, 2022 (the "Maturity Date").

61.     Pursuant to the Second Amendment (as defined below), the Revolving Commitments of the Lenders terminated.  As of the Petition Date, the Loan Parties did not owe

any amounts to the Lenders on account of the Revolving Loans.

### ii. *The Term Loans*

62.     In addition to the Revolving Loans, each of the Lenders severally agreed to make its portion of a term loan to Orion in an aggregate amount of $130.0 million (the "Initial Term Loan").  Unless accelerated sooner pursuant to the Prepetition Credit Agreement, Orion is obligated to repay the outstanding principal of the Initial Term Loan in quarterly installments, with the outstanding principal balance of the Initial Term Loan payable on the Maturity Date.

63.     On March 10, 2017, in connection with the NYNM acquisition, the Loan Parties, the Administrative Agent, and certain of the Lenders (the "Incremental Term Increase Lenders") entered into that certain Incremental Term Increase Agreement and Lender Joinder Agreement (the "Incremental Facility Amendment), pursuant to which the Incremental Term Increase Lenders agreed to increase the Initial Term Loan by the amount of $30.0 million (the "Incremental Term Loans").

64.     As of the Petition Date, the total amount owed to the Lenders by the Loan Parties on account of the Terms Loans and Incremental Term Loans totaled not less than $156.61 million in outstanding principal and $1.59 million in interest.

### iii. *The Letters of Credit*

65.     Pursuant to the Prepetition Credit Agreement, Bank of America agreed to issue certain letters of credit (the "Letters of Credit") for Orion or any of its subsidiaries, provided that, among other things, the amount outstanding under the Letters of Credit together with amounts outstanding under the Revolving Loan and the Swing Line Loans does not exceed $15.0 million.

66.     As of the Petition Date, the total amount owed to the Lenders by the Loan Parties on account of the Letters of Credit totaled $0.

*iv.    The Swing Line Loans*

67.    In addition to the Revolving Loan, Term Loan and Letters of Credit, Bank of America agreed to make loans to Orion in its sole discretion in an aggregate amount not to exceed $5.0 million (the "Swing Line Loans"), provided that, among other things, the amount outstanding under the Swing Line Loans together with amounts outstanding under the Revolving Loan and the Letters of Credit does not exceed $15.0 million.  The Swing Line Loans have a maturity date of the earlier of (a) 10 business days after a Swing Line Loan is made and (b) the Maturity Date.

*v.    The Forbearance Agreement*

68.    As a result of certain defaults under the Prepetition Credit Agreement, on November 10, 2017, the parties to the Prepetition Credit Agreement entered into that certain Forbearance Agreement dated as of November 10, 2017 (as extended by that certain Forbearance Extension Agreement dated as of December 15, 2017 and further extended by that Second Forbearance Extension Agreement dated as of January 30, 2018, the "Forbearance Agreement") under which the Administrative Agent and Lenders (as defined in the Prepetition Credit Agreement) agreed to forbear from exercising their rights and remedies under the Prepetition Credit Agreement during the Forbearance Period (as such term is defined in the Forbearance Agreement, which pursuant to the Second Forbearance Extension Agreement, expired on March 9, 2018) pursuant to the terms and conditions set forth in the Forbearance Agreement.[25]

69.    In connection with the Second Forbearance Extension Agreement and pursuant

---

[25] On November 10, 2017, in connection with the Forbearance Agreement, the Loan Parties and the Administrative Agent entered into that certain Amendment to Security Agreement, pursuant to which the Loan Parties granted to the Administrative Agent for the benefit of the Lenders a security interest in certain commercial tort claims related to, among other things, the sham acquisitions of Phoenix and MDRX.

to the Credit Agreement, among other covenants, on or before January 31, 2018, the Loan Parties were required to make a prepayment in an amount equal to $2.9 million in respect of a tax refund received by the Loan Parties on or about January 15, 2018.   Additionally, the Loan Parties agreed, upon request by the Administrative Agent, to engage an investment banker reasonably acceptable to the Administrative Agent and Lenders, for the purpose of marketing some or all of the assets of the Loan Parties.

*vi.    The Bridge Loan*

70.    On January 31, 2018 (the "Bridge Loan Closing Date"), after the Borrower requested additional funding, the parties to the Prepetition Credit Agreement entered into that certain Second Amendment to Credit Agreement (the "Second Amendment"), pursuant to which the Bank of America (the "Bridge Lender") agreed to provide additional extensions of credit under the Prepetition Credit Agreement in the form of a separate tranche of terms loans in the aggregate principal amount of $1.5 million (the "Bridge Loan Commitment"), the proceeds of which were to be used to finance the short-term working capital needs of Orion (the "Bridge Loan").   The Bridge Loan has a maturity date of March 9, 2018 (the "Bridge Loan Maturity Date").   The Second Amendment contemplated that the Vachette Business would be sold for an amount of not less than $1.5 million.

71.    In exchange for the Bridge Loan, Orion agreed to pay to the Administrative Agent, for the account of the Bridge Lender in accordance an upfront fee in an amount equal to 2.0% of the Bridge Loan (the "Bridge Loan Upfront Fee").   In accordance with the Second Amendment, the Bridge Loan Upfront Fee is due and payable upon the earliest to occur of the Bridge Loan Maturity Date or the acceleration of any Obligations under the Loan Documents.

72.    On February 22, 2018, the parties to the Prepetition Credit Agreement entered

into that certain Third Amendment to Credit Agreement (the "Third Amendment"), pursuant to which the Bridge Lender agreed to increase the Bridge Loan Commitment to $3.0 million. Furthermore, the Third Amendment provides that the aggregate Bridge Loan Commitments shall be automatically reduced to $1.0 million upon the sale of the Vachette Business. Additionally, pursuant to the Third Amendment, the Loan Parties agreed to appoint an additional, independent director over CHT.

73.     In exchange for increasing the Bridge Loan Commitment, Orion agreed to pay to the Administrative Agent, for the account of the Bridge Lender in accordance an upfront fee in an amount equal to 2.0% of the increase of the Bridge Loan Commitment, which is due and payable upon the earliest to occur of the Bridge Loan Maturity Date or the acceleration of any Obligations under the Loan Documents.

74.     As of the Petition Date, the total amount owed to the Lenders by the Loan Parties on account of the Bridge Loan totaled not less than $1.0 million in principal and approximately $11,764 in interest.

### E.  Resignation of Parmar and Subsequent Events and Discoveries

     *i.     Resignation of Parmar and Other Board Members and Retention of Professionals*

75.     At a meeting of the Board of Directors of CHT (the "Board") on September 14, 2017, the Board accepted Parmar's resignation as CEO of CHT and its subsidiaries.

76.     On September 28, 2017 the FTI Investigations Group was retained to conduct a forensic investigation, following questions raised related to CHT's financial condition.

77.     At a subsequent board meeting on September 29, 2017, which was attended by members of FTI's forensic accounting teams, Parmar addressed the Board and stated that MDRX was not performing.

78.     After Parmar addressed the Board's questions, he informed the Board that he would be resigning his position as a director and/or manager of CHT, all of its subsidiaries and CHT Holdco, effective immediately, so the Board could make decisions without his involvement.  Parmar then excused himself from the Board meeting.

79.     At the same meeting, another Board member, Pav Bakshi ("Bakshi") addressed the Board and tendered his resignation effective immediately and excused himself from the Board meeting.   At the September 29 Board meeting, among other resolutions, the Board (i) authorized the retention of Troutman Sanders LLP ("Troutman") as legal counsel and FTI as financial and accounting advisor, (ii) accepted the resignations of Parmar and Bakshi from the Board, and (iii) placed Sotirios "Sam" Zaharis ("Zaharis") and Ravi Chivukula ("Chivukula") on administrative leave pending further investigation.

80.     At a subsequent Board meeting on October 2, 2017, it was decided that CHT would hire Troutman as counsel.  At that same meeting, the Board recommended that the Debtors retain me as interim CEO and CRO.  The Board resolved that among other things, (i) to authorize the retention of Aequum Law, LLC ("Aequum") as legal counsel for the limited purpose of assisting CHT with the engagement and coordination of legal counsel in connection with the investigation, general corporate, restructuring and litigation matters, and (ii) that the Board was authorized to negotiate my engagement as interim CEO and CRO.

81.     On October 2, 2017, CHT retained Troutman as counsel.  On October 3, 2017, Troutman engaged FTI as forensic accountant on behalf of CHT.

82.     At the next Board meeting on October 18, 2017, the Board authorized and ratified my retention as CEO and CRO to CHT and its subsidiaries.

83.     Due to a Troutman conflict issue that could not be resolved, on October 23,

2017, CHT engaged DLA Piper LLP (US) ("DLA") as legal counsel.  On October 23, 2017, DLA, as successor to Troutman, retained FTI as forensic accountant.  On November 7, 2017, CHT engaged Aequum as legal counsel.

84.    After October 23, 2017, Troutman's representation of CHT was limited to appearing in a proceeding in Delaware Chancery Court on behalf of CHT, the Sponsor, and other affiliated parties.

85.    At Board meetings on November 10, 2017 and January 29, 2018, the Board accepted the resignation of three additional Board members, leaving two Board members remaining.

86.    On February 23, 2018, as required by the Credit Agreement (as amended by the Third Amendment), the Board appointed Robert J. Rosenberg as an independent director.

87.    On March 13, 2018, Aequum's withdrew from its representation of the Debtors.  On March 14, 2018, Troutman formally notified CHT it no longer represents CHT.

ii.    *Discoveries After Parmar's Resignation*

88.    After Parmar's disclosure and resignation and the retention of FTI and DLA, the professionals, including a forensic team from FTI (the "FTI Investigations Team"), began an investigation into the Debtors' former management's activities.  This investigation is ongoing and has been limited by the lack of information, including the retention of records that are upon information and belief, held by Robinson Brog Leinwand Greene Genovese & Gluck, P.C. ("Robinson Brog"), former counsel to the Debtors.  As discussed below, based upon information and belief, certain members of the Debtors' former management engaged in multiple fraudulent transactions while CHT was publicly listed and went through great efforts to perpetuate and conceal such activities, including fabricating certain customers and associated revenue, as well as bank statements, of certain entities.  These activities were only recently discovered.  The

following is an overview of certain of the facts discovered by such investigation. My knowledge regarding the results of such investigation is primarily based upon information received from the FTI Investigations Team.

### a. Generally

89.     The investigation has revealed that CHT's financial statements for 2015 and 2016, including those filed with AIM and those provided to the Sponsor and to Sponsor Holdco, were inaccurate. Specifically, revenue and EBITDA were inflated in significant amounts. In addition to the fictitious acquisitions discussed below, the investigation has revealed that a substantial number of the customers and associated revenue of the Orion RCM Business were fabricated. Based upon information and belief, Parmar, Zaharis, and Chivukula, in concert with each other (and, possibly, others), altered documents or created false documents, apparently for the purpose of creating the appearance of actual customers, revenue, and business operations, when, in fact, no such customers, revenue, or business operations existed.

90.     Specifically, the investigation has revealed that certain of CHT subsidiaries (which are Debtors), which were represented to be operating businesses with their own customers and revenue, are fictitious, in that they have no business operations, employees, customers, or revenue. These fictitious subsidiaries include MDRX, Phoenix, and Northstar, which, upon information and belief, were the subject of sham acquisitions. Each of these purported acquisitions was funded with money raised by CHT in the secondary offerings of its stock through the AIM (that are discussed above). However, rather than funding the purchase of an actual operating business, the money raised by CHT was used for other purposes, including apparent misappropriation and the funding of a scheme to create the impression of revenue from fictitious customers.

91.     During the course of the investigation, the FTI Investigations Team discovered two CHT bank accounts that were previously unknown to the current management. Such accounts were maintained at M&T Bank (collectively, the "M&T Accounts"), including a money market account ("M&T Money Market Account") and a checking account ("M&T Checking Account") and were used for the fraudulent activities discussed below. The M&T Accounts are relevant to the discoveries discussed below.

*b.  Northstar and Phoenix Sham Acquisitions*

92.     The FTI Investigations Team has identified journal entries that were recorded in CHT's general ledger that misrepresent what was actually acquired and created the impression of an acquisition of a significantly larger entity. In May 2015, CHT raised funds through a secondary offering on AIM. $15.8 million of the proceeds of this offering were deposited into the M&T Checking Account. CHT issued a press release on September 16, 2015 announcing its acquisition of Northstar FH for $18 million. The press release describes Northstar FH as an operating company that has 233 employees, 77 clients, and 2014 year end revenue of $7.9 million. However, Northstar FH was formed on June 12, 2015.

93.     On September 2, 2015 – *i.e.*, two weeks prior to the press release announcing the Northstar acquisition – Northstar FH acquired Vachette for $2,785,000. According to CHT's Consolidated Financial Statements for the Year-Ended December 31, 2016, CHT acquired Northstar for a total consideration of $17.4 million in September 2015, almost $15.0 million more than the amount Northstar paid that same month for Vachette, which appears to be the only legitimate business in the Northstar group of companies as of that date.

94.     On September 18, 2015, two days after the announced Northstar transaction, CHT announced its acquisition of Phoenix, describing the company as employing 138 people

and generating revenue of $9.8 million, EBITDA of $2.2 million, with net assets of $1.1 million as of December 31, 2014. CHT's 2016 Financial Statements indicate that CHT "acquired certain Revenue Cycle Management company assets hereinafter Phoenix, based out of New Jersey, USA" for $13.66 million. However, the investigation has revealed that a bank account and EIN for Phoenix were not obtained until after the acquisition.

95.    Journal entries in the CHT general ledger indicate recorded payments of $8.5 million and $7.5 million on September 30, 2015 for the purchase of Northstar and Phoenix, respectively. However, the activity in the bank statements for the M&T Accounts indicates that the $15.8 million in proceeds from the secondary offering were disbursed in multiple transactions over the next six months that do not appear to relate to the purchase of Phoenix or Northstar.

96.    The bank statements for the M&T Accounts provided limited details with respect to each of the transfers of the equity raise proceeds from the M&T Accounts. While some of the specific transferees are identified in the bank statements, the majority of the transfers and withdrawals are non-descriptive. FTI's investigation of the use and destination of these monies is ongoing. However, the FTI Investigations Team has discovered evidence that suggests that what is described as the Phoenix acquisition, may be an acquisition of or payment to Sage Group Consulting Inc. ("Sage"). Upon information and belief, Sage is a consulting firm operated by Salil Sharma ("Sharma"). Upon information and belief, Sage is not an RCM business. CHT has limited knowledge as to the facts and circumstances surrounding the potential Sage acquisition.[26]

---

[26] The asset purchase agreement pursuant to which Phoenix purportedly acquired the assets of Sage states that the purchase price consists of a closing payment of $7.5 million plus certain other consideration.

### c.  MDRX Sham Acquisition

97.        As discussed above, in January 2016, CHT raised funds in a secondary offering, which was earmarked for the acquisition of MDRX.  $36.9 million of proceeds from the equity raise were deposited into the M&T Money Market Account on January 8, 2016 and, on the same day, the balance was transferred to the M&T Checking Account.

98.        CHT announced that it acquired MDRX on February 10, 2016.  The M&T Checking Account statement indicates that the $36.9 million was transferred to various recipients over the next six months, and none of the transfers correlate to the entry in the general ledger indicating that these funds were used for the acquisition payment for the fictitious MDRX. While some of the specific transferees are identified in the bank statements, the majority of the transfers and withdrawals are non-descriptive.  The investigation has revealed that approximately $4.0 million of the above disbursements were used to create fictitious customer revenue through the re-characterization of inter-bank transfers as customer collections.

### d.  Vega/Allegiance Acquisition

99.        During the Summer of 2016, CHT engaged in negotiations with the then-owners of ACA and ABC regarding CHT's acquisition of ACA and ABC.  On September 1, 2016, CHT, through a holding company, Vega, acquired both ACA and ABC for a combined sum of $4.68 million.  Subsequently, CHT reported that it acquired Vega for $24.0 million.

100.        Based on the investigation to date, the ACA/ABC acquisition by Vega appears to be legitimate; however, CHT's acquisition of Vega on the same date appears to be an artificially inflated transaction.

### e.  Non-Existent Customers

101.        To date, the FTI Investigations Team has determined that certain portions and

in some cases all, of the customers and associated revenue of MDRX, Orion, and Phoenix are fictitious - *i.e.*, nonexistent.

### f.    Fictitious Revenue/Customer Receipts

102.    To date, the FTI Investigations Team has determined that the revenue associated with the fictitious MDRX, Phoenix, and Orion entities and customers discussed above totaled approximately $30.9 million for the six month period ended June 30, 2016.  FTI's investigation has revealed that, upon information and belief, Parmar and his associates worked to support the fictitious revenue for the non-existent customers by creating the appearance of collected cash.  This was accomplished in at least two ways:  (1) cash raised from the secondary offerings was transferred from an M&T Account to an operating account and re-characterized as customer receipts; and (2) Orion bank statements were altered to include fictitious entries (i.e., unsupported by any cash transfer) to create the illusion of customer deposits.  In addition, the FTI Investigations Team has discovered that MDRX's bank statements and financial statements were completely fabricated.

### g.    Financial Statement Misrepresentation

103.    In connection with the six-month results for the period ending June 30, 2016 (i.e., Q2 2016) reported to the AIM and subsequently shared with the Sponsor in connection with the Merger, upon information and belief, the financial activity related to fictitious entities and fictitious customers gave rise to a significant overstatement of revenue and EBITDA.

### h.    Seized Funds

104.    Certain of the proceeds of the Merger that were to be paid to Parmar or entities under his control are subject to dispute in the action styled *Destra Targeted Income Unit Investment Trust, on behalf of Unitholders, et al. v. Parmjit Singh Parmar (a.k.a. Paul Parmar),*

*et al.*, Del. Ch. No. 13006-VCL (the "Destra Litigation"), currently pending in the Delaware Court of Chancery (the "Chancery Court"). Specifically, on December 27, 2016, the plaintiffs in the Destra Litigation commenced the Destra Litigation by filing a verified complaint in the Chancery Court seeking (1) a declaratory judgment as to the ownership of certain CHT shares and invalidating certain transfers of CHT shares and any actions taken by Parmar and the other defendants in the Destra Litigation regarding the conveyance, transfer, or encumbrance of CHT's shares; (2) asserting breaches of fiduciary duties and the aid and abetting thereof; (3) asserting breaches of the "CH Group" and CHT operating agreements; and counts of fraudulent transfer, conversion, unjust enrichment, and civil conspiracy and fraud. *See* Verified Complaint, Del. Ch. No. 13006-VCL, (Dkt. No. 1).

105.    By order dated January 25, 2017, the Chancery Court directed Parmar to deposit $55,267,485.28 of the cash proceeds from the Merger (the "YCST Funds")[27] in an escrow account at the law firm Young Conaway Stargatt & Taylor ("YCST").

106.    Upon information and belief, on or about March 15, 2017, the FBI seized approximately $20,100,356.70 from Robinson Brog's IOLA, which upon information and belief, contained certain of the Merger proceeds that were to be paid to Parmar-controlled entities. On December 8, 2017, the FBI obtained a seizure warrant for the YCST Funds. At the request of the Chancery Court, the Sponsor filed a motion to lift the preliminary injunction as to the YCST Funds and to pay the administrative expenses of YCST, which is set for hearing on March 16, 2018. Upon the expected approval of said motion, the federal government will likely execute on

---

[27] Upon information and belief, the YCST Funds were amounts intended for the benefit of Parmar for the equity in CHT-related entities controlled by Parmar: Blue Mountain Healthcare, LLC ("Blue Mountain") ($49,918,984.28) and Alpha Cepheus ($5,348,501), and represented the maximum amount of damages the plaintiffs in the Destra Litigation believed they were entitled to as a result of the Merger transaction.

the YCST Funds.  The Debtors may have an interest in such funds.

*i.   Tax Withholding*

107.    Upon consummation of the Merger, approximately 70% of the cash consideration for the transaction was paid to certain shareholders of CHT (the "Cash-Out Shareholders").  The remaining 30% of the cash consideration, $10,435,097.13 was withheld for potential tax liabilities of the Cash-Out Shareholders and deposited with Capita, the registrar and receiving agent for CHT in connection with the Merger (such funds, the "Withheld Funds").  Upon information and belief, the Withheld Funds were not initially paid to the Cash-Out Shareholders because Capita Registrars, Ltd. (n/k/a Link Market Services Ltd.) ("Capita"), the exchange agent for the Merger, incorrectly believed the withholding was required under the Foreign Investment in Real Property Tax Act of 1980, 26 U.S.C. § 1445, which mandates that a percentage of the consideration paid for certain transactions be withheld and deposited with the IRS, to which foreign shareholders may then submit a US tax return and potentially receive a refund.

108.    Upon information and belief, the Withheld Funds should have been remitted by Capita to the IRS shortly after the transaction in February 2017.  However, Capita required certain shareholder information in order to remit the funds to the IRS and, based upon information and belief, requested such information from Parmar and Chivukula.  After those requests went unanswered, Capita decided to transfer the Withheld Funds to CHT so that CHT could remit the funds to the IRS with the requisite shareholder information.

109.    On or around December 29, 2017, wired the Withheld Funds to Orion's main operating account at JPMorgan Chase Bank.

110.    On or around January 16, 2018, to avoid potential liability (including potential

criminal liability), CHT caused Orion to wire the funds to the IRS.  On January 16, 2018, CHT wrote a letter to the IRS stating that CHT and Orion believe that the Withheld Funds are the proceeds of potentially fraudulent transfers and requesting that the IRS refrain from providing any refunds until a court of competent jurisdiction determines the appropriate recipients.

## II.    EVENTS LEADING TO BANKRUPTCY

111.    Due to the foregoing events, namely debt service on approximately $160.0 million in debt with estimated, adjusted, annualized projected aggregate operating cash flow of approximately $7 million to service such debt, as a result of the fraudulent conspiracy, the Debtors have been facing liquidity challenges and operational issues that now threaten their ability to operate as a going concern.  In addition to the unsustainable debt service, among the causes of such issues are:  (a) a lack of integration between the business lines; (c) a lack of management with institutional knowledge of the Debtors' businesses; and (c) litigation brought against the Debtors.

### A.  Burdensome Debt Obligations

112.    As set forth above, upon information and belief, based upon inflated value and operations, certain members of the Debtors' former management caused the Debtors to incur approximately $130.0 million in debt to finance the Merger (which amount was later increased to approximately $160.0 million).  The Debtors, which are generating significantly less revenue and earnings than believed at the time when they entered into the Prepetition Credit Agreement, simply cannot sustain their current debt load.

### B.  Lack of Integration Between Business Lines

113.    As discussed above, the Debtors' enterprise constitutes the aggregation of several disparate businesses.  The various business units were never integrated and retained

legacy management, reporting and operating procedures.

114.     The prior corporate management did not implement any true management or operating processes across the Debtors' business units.  Furthermore, the Debtors' business units do not function in a cohesive manner or conduct any cross-selling.  Additionally, the Orion RCM Business has been operating at a loss.

115.     The Debtors' current management sees opportunity to fix these issues. However, the Debtors do not currently have the liquidity to do so.

### C.  <u>Change in Leadership</u>

116.     While the Debtors' current management has been focused on increasing the long-term value of the Debtors' businesses, the historically secretive nature of various transactions and a general lack of financial and legal documentation available to current management and its advisors has caused operational challenges.  Relatedly, as a result of the fraudulent scheme of certain members of the Debtors' former management, the Debtors have hired forensic investigators and other professionals which has caused them to incur additional expenses.

### D.  <u>Litigation</u>

117.     The Debtors have been faced with various legal actions stemming mostly from contractual disputes.  The Debtors do not have the liquidity to litigate or settle these actions.

118.     Additionally, the Debtors have received a Grand Jury Subpoena on January 18, 2018.  The Debtors do not have the funds or resources to respond to the Grand Jury Subpoena.

### III.     FACTS IN SUPPORT OF FIRST DAY MOTIONS

119.     Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions.  The Debtors request that each of the First Day Motions described

below be granted, as they constitute a critical element in ensuring the Debtors' successful reorganization in these chapter 11 cases.

### A. Joint Administration Motion

120.     By the Joint Administration Motion, the Debtors seek entry of an order consolidating, for procedural purposes only, the administration of the Debtors' chapter 11 cases with Debtor Orion as the lead debtor, pursuant to Bankruptcy Rule 1015(b).  In addition, the Debtors request that the Clerk make an entry on the docket of each of the Debtors' cases, other than Orion's case, stating that an order has been entered directing joint administration of the chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made on Orion's docket.

121.     The Debtors are all affiliates and have all filed petitions in the same court.  I understand that a court may order the joint administration of multiple chapter 11 cases where debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.  As reflected in the organizational chart attached hereto as **Exhibit A**, all of the Debtors are direct or indirect subsidiaries of CHT.  Accordingly, I understand that the Debtors are "affiliates" and this Court is authorized to order joint administration of their estates.

122.     I believe that joint administration will be less costly and burdensome than the separate administration of the estates due to the combined docket and combined notice to creditors and parties in interest.  Many applications, motions, orders, hearings and notices will be made in these cases and will affect all of the Debtors.  Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.

123.     In addition, as the Debtors are only seeking administrative consolidation by the Joint Administration Motion, rather than substantive consolidation, I do not believe creditors' interests

will be harmed.

124.    I believe that if each Debtor's case were administered independently, there would be a number of duplicative pleadings and overlapping service.  This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Court's resources.

125.    Therefore, I believe that the Debtors' chapter 11 cases should be jointly administered for procedural purposes only.

## B. Consolidated Creditor List Motion

126.    By the Consolidated Creditor List Motion, the Debtors request authorization to file a consolidated mailing matrix and a consolidated list of their seventy-five (75) largest unsecured creditors.  There are thousands of creditors and parties in interest in these cases, and there may be potential for confusion and/or overlap regarding creditor obligations.  Given the circumstances, the Debtors submit that it is appropriate for them to file a consolidated mailing matrix and a consolidated list of their seventy-five (75) largest unsecured creditors.  The consolidated mailing matrix and the consolidated list of creditors will provide good and sufficient notice to all creditors and parties in interest in an efficient manner.

127.    I believe that authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and to file a consolidated list of the Debtors' seventy-five (75) largest unsecured creditors will promote efficiency and conserve the Debtors' resources.  Therefore, I believe that the relief requested in the Consolidated Creditor List Motion should be granted.

## C. Extension Motion

128.    The Debtors seek an extension of time to file the required Schedules and

Statement of Financial Affairs until May 15, 2018.  The Debtors provided a list to the Claims Agent with several thousand creditors.  The preparation of the Schedules and SOFAs will require time and human resources.  During the days leading up to the Petition Date, the Debtors have worked tirelessly to address critical operational matters and meet the demands and pressures incident to the commencement of a chapter 11 case.  Given the volume of material that must be compiled and reviewed by the Debtors' professionals and the work required to stabilize the Debtors' business operations, the Debtors believe that they should be granted a forty-six (46) day extension (for a total of sixty (60) days from the Petition Date) to file their Schedules and SOFAs.

### D.  Claims Agent Retention Application

129.    Pursuant to the Claims Agent Retention Application, the Debtors seek authorization to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their claims and noticing agent ("Claims and Noticing Agent") with respect to these chapter 11 cases, in accordance with the terms and conditions of that certain Engagement Agreement, dated February 27, 2018, by and between Epiq and the Debtors, effective *nunc pro tunc* to the Petition Date.

130.    Upon information and belief, Epiq is an experienced Claims and Noticing Agent and is frequently used by debtors in large chapter 11 cases, and I believe the professionals at Epiq are well-qualified to provide such services, expertise, consultation and assistance to the Debtors and serve as Claims and Noticing Agent in these chapter 11 cases.  The Debtors believe that Epiq is capable of handling the requisite noticing responsibilities, thereby relieving the Clerk or, in the alternative, the Debtors of such burden.  The employment of Epiq will provide efficient management of the claims and noticing processes in these cases, thereby allowing the Debtors' management and advisors to focus on the Debtors' reorganization efforts.

131.    Additionally, I believe the Debtors' selection of Epiq to serve as Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c)*.    Specifically, the Debtors have solicited and reviewed engagement proposals from at least two (2) other nationally recognized claims and noticing agents to ensure selection through a competitive process.[28]

132.    Accordingly, the Debtors the Claims Agent Retention Application should be approved.

### E.    Wage Motion

133.    Through the Wage Motion, the Debtors seek entry of interim and final orders, among other things, authorizing the Debtors to pay certain prepetition wages and compensation as well as to maintain and continue employee benefits and programs in the ordinary course of business and make prepetition payments in connection therewith.    As of the Petition Date, the Debtors employed approximately 275 persons.

134.    Certain amounts remain due and owing to the Debtors' workforce because amounts related to prepetition services, while accrued in whole or in part, had not yet become due and payable by the Debtors; amounts deducted from employee's paychecks to make payments on behalf of the employees for or with respect to benefit programs or amounts due to third parties in connection therewith have not yet been remitted; and withholdings from employee's paychecks for various federal, state and local income taxes and other payments,

---

[28] Proposals were solicited from Epiq, Donlin Recano & Company, Inc., and Prime Clerk LLC.  Although Prime Clerk LLC does not appear on the list of approved claims and noticing agents for the Eastern District of New York Bankruptcy Court, at the time the solicitations were made, it was contemplated that the Debtors would be filing in a different jurisdiction that includes Prime Clerk LLC as an approved claims and noticing agent.  Prime Clerk LLC is a nationally recognized claims and noticing agent that performs substantially similar services as Epiq and Donlin Recano & Company, Inc.

employee wages, garnishments and unemployment insurance have not yet been remitted. The vast majority of employees rely in large part, if not exclusively, on their compensation and benefits to pay their daily living expenses and support their families and will be exposed to significant financial constraints if the Debtors are not permitted to continue paying compensation, provide employee benefits and maintain existing programs. The Debtors seek to minimize the personal hardship their workforce would suffer if the Debtors' obligations are not honored when due or as expected. The Debtors' business depends on the skills and institutional knowledge of their workforce. It is critical to the Debtors' continued business operations that the Debtors' workforce remain largely unaffected as the result of the filing of these chapter 11 cases.

135.    I believe that the employees provide the Debtors with services critical to conduct the Debtors' business and that absent the payment of the employee compensation and benefits owed to them, the Debtors may experience employee turnover and instability during this critical time. Additionally, I understand that a significant portion of the value of the Debtors' businesses is tied to their workforce, which cannot be replaced without significant efforts. I therefore believe that the payment of the obligations outlined in the Wage Motion is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their employees as they seek to operate their businesses in these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Wage Motion should be granted.

## F.  Utilities Motion

136.    By the Utilities Motion, the Debtors are requesting interim and final orders to (i) prohibit Utility Companies from altering, refusing, or discontinuing service to the Debtors; (ii) deeming the Utility Companies adequately assured of future performance; and (iii)

establishing procedures for determining requests to the Debtors for additional adequate assurance.

137.     In the ordinary course of business, the Debtors obtain utility services, such as gas, telecommunication, electricity, water and sewage, data communications and/or other services from several utility companies (the "Utility Companies").  A list of the Utility Companies and amounts associated therewith is attached to the Utilities Motion as Schedule 1.

138.     I believe that uninterrupted utility services are essential to the ongoing operations of the Debtors, and therefore, to the successful resolution of these cases.  It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

139.     The Debtors propose to provide "assurance of payment" to the Utility Companies within twenty (20) days after the Petition Date by placing a cash deposit equal to two weeks' worth of payments to Utility Companies into a newly created, segregated account (the "Utility Deposit Account") to be held for the exclusive purpose of paying the Utility Companies. The Debtors submit that the establishment of the Utility Deposit Account, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business, constitutes adequate assurance of payment to the Utility Companies.

140.     Further, the Debtors propose to protect the Utility Companies by establishing the procedures provided in the Utilities Motion, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to the Debtors that would merit greater protection.

141.     Therefore, I believe that the Utility Companies have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

### G. **Insurance Motion**

142.     By the Insurance Motion, the Debtors seek entry of interim and final orders, authorizing them to continue their insurance policies, pay prepetition and ongoing ordinary course postpetition obligations in connection with such insurance policies and continue to honor their obligations in connection with certain premium financing arrangements.

143.     In the ordinary course of their business, through various carriers, the Debtors maintain numerous Insurance Policies that provide coverage for, among other things, casualty liability, property damage, umbrella/excess liability, and director and officer liability.   The Insurance Policies are essential for the preservation of the Debtors' businesses and are, in some cases, required by various laws, regulations or contracts that govern such businesses.

144.     Prepayment of insurance policies is not always economically advantageous in that it would reduce the Debtors' working capital.   Therefore, the Debtors finance, and wish to continue to finance, certain of their insurance premiums through premium finance arrangements. Specifically, the Debtors use IPFS Corporation to finance premiums associated with certain of the Debtors' Insurance Policies.

145.     I believe that continuation and renewal of insurance policies and related premium financing arrangements, entry into new insurance policies and premium financing agreements and continuing to pay claims that come due are essential to preserve the value of the Debtors' businesses, properties and assets and are, therefore, in the best interest of the Debtors' estates, their creditors and all other parties in interest.   The relief requested in the Insurance Motion will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

F.     **Cash Management Motion**

146.     Through the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors' continued use of their company-wide Cash Management System, including existing bank accounts.

147.     The Cash Management System, which is described in the Cash Management Motion, is a practical system of integrated bank accounts designed to efficiently collect, transfer and disburse funds for the Debtors. The Debtors use the cash management system in the ordinary course of their business to collect, transfer and disburse funds generated from their operations, manage cash flow to affiliated Debtors and facilitate cash monitoring, forecasting and reporting. I believe that the continuation of the Debtors' cash management system is essential to the Debtors' businesses, and that any disruption in the Debtors' use of the cash management system would severely disrupt, if not cripple, the Debtors' businesses.

148.     In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices).  The majority of the Debtors' Bank Accounts are managed electronically and do not use paper forms.  However, the Debtors may use limited preprinted letterhead checks and related documents (the "Preprinted Forms").  By virtue of the nature and scope of the Debtors' business operations, it is important that the Debtors be permitted to continue to use the Preprinted Forms without alteration or change and without the "Debtor in Possession" designation.  Otherwise, the estates would be required to bear a potentially significant expense which the Debtors respectfully submit is unwarranted.  To the extent the Debtors' checks are preprinted, once such preprinted checks are depleted, the Debtors will then seek to replace them with forms containing the "Debtor in Possession" designation.

149.     As parties that presently conduct business with the Debtors likely will be aware

of the Debtors' status as debtors in possession, the alteration of the Debtors' Preprinted Forms would be unnecessary and unduly burdensome.

150.     Based on the above, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

### G.     Critical Vendor Motion

151.     Through the Critical Vendors Motion, the Debtors seek authority to pay prepetition claims of certain critical vendors ("Critical Vendors").  The amounts the Debtors seek to pay on an interim and final basis are set forth in the Critical Vendor Motion.

152.     The Debtors' ongoing business is dependent upon their ability to service their customers.  Disruption from, or losses of, Critical Vendors would immediately put the Debtors' relationships with their customers in serious jeopardy.  It is quite possible that the Debtors' customers would find an alternative service provider to the detriment of the Debtors and their estates, should the flow of the Debtors' services be disrupted.

153.     The need for the flexibility to pay Critical Vendors is particularly acute in the period immediately following the Petition Date.  During this period, the Debtors and their advisors will be focusing on stabilizing operations and working towards the reorganization of the Debtors.  After the filing, the Debtors will need to satisfy certain Critical Vendors that could attempt to assert their leverage by halting the delivery of services, suddenly and without notice if not paid, which could completely cripple the Debtors' operations.  Accordingly, I respectfully submit that the Critical Vendor Motion should be granted.

H.    **DIP Financing Motion**

154.    By the DIP Financing Motion, the Debtors request the entry of an Interim Order and a Final Order, among other things, (i) authorizing the Debtors to (a) enter into the DIP Credit Agreement, and (b) use Cash Collateral, (ii) granting liens and providing super-priority administrative expense status, (iii) granting adequate protection to the Debtors' prepetition secured lenders, (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (v) granting related relief.

155.    The DIP Facility consists of a $7,500,000 revolving credit facility, up to $4,500,000 of which the Debtors are seeking on an interim basis, on the terms set forth in the DIP Credit Agreement, the pertinent terms of which are set forth in the DIP Financing Motion. The proceeds of the DIP Facility will be used to pay operating expenses and the costs and expenses of administering these chapter 11 cases subject to and in accordance with a Budget and subject to entry of a final order approving the DIP Facility.  The DIP Facility contemplates a "roll up" of the prepetition Bridge Loans (the "Roll-Up").  The DIP Lenders would not have agreed to provide the DIP Facility without the Roll-Up.

156.    In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their businesses.  In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases while working towards a potential sale transaction.  Postpetition financing, in addition to the use of cash collateral, is necessary in order for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper servicing of customers post-petition, and fund working capital needs.  Absent postpetition financing and the use of cash collateral, the Debtors will be forced to wind-down their operations due to a lack of funds.  I believe that it is imperative that the Debtors have access to sufficient liquidity to avoid imminent irreparable harm and

successfully consummate a sale transaction.

157.     Representatives of the Debtors contacted one other potential third party lender.  No other entity offered to provide financing on terms more favorable than those being provided by the DIP Lenders.  The DIP Facility adequately addresses the Debtors' working capital needs, and the DIP Facility will provide the Debtors' various constituencies, including customers, employees, and vendors with confidence in the Debtors' ability to maintain operations while working towards a sale.

158.     The Interim Order also sets forth certain stipulations and agreements by the Debtors regarding, *inter alia*, among other things, the validity, perfection, and amount of liens held by the Prepetition Lenders and the Debtors' obligations under the Prepetition Credit Agreement.  Each of the stipulations and agreements set forth in the Interim Order are true and correct to the best of my knowledge.

159.     I believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtors, their estates and their creditors, and absent such relief, the Debtors will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

### Schedules Pursuant To E.D.N.Y. LBR 1007-4

160.     Attached hereto and incorporated herein by reference are various schedules setting forth information required under E.D.N.Y. LBR 1007-4.  Capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meanings ascribed to them in this Declaration.

## **<u>CONCLUSION</u>**

For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions.  I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 16, 2018

/s/ *Timothy J. Dragelin*

By: <u>Timothy J. Dragelin</u>

Title: <u>Chief Restructuring Officer</u>

<u>**EXHIBIT A**</u>

**Corporate Organizational Chart**



## SCHEDULE 1[1]

Pursuant to E.D.N.Y. LBR 1007-4(a)(i), the Debtors are not small business debtors within the meaning of Bankruptcy Code § 101(51D).

---

[1] Capitalized terms used in the these schedules that are not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").  The information required by E.D.N.Y. LBR 1007-4(a)(ii) is set forth in the body of the First Day Declaration.

**SCHEDULE 2**

**List of Committees Formed Prior to the Petition Date**

Pursuant to E.D.N.Y. LBR 1007-4(a)(iv), and to the best of the Debtors' knowledge, no committees were organized prior to the Petition Date.

# SCHEDULE 3

### Consolidated List of the Holders of the
### Seventy-Five (75) Largest Unsecured Claims on a Consolidated Basis

Pursuant to E.D.N.Y. LBR 1007-4(a)(v) in conjunction with the Court's Guidelines for First Day Motions (which allows the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors), I incorporate by reference the list of the holders of the seventy-five (75) largest unsecured claims against the Debtors on a consolidated basis, excluding insiders, which is attached to the Debtors' chapter 11 petitions (the "<u>Consolidated Top 75 List</u>").

The information contained in the Consolidated Top 75 List shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed in the Consolidated Top 75 List is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.   In the event of any inconsistencies between the summaries set forth in the Consolidated Top 75 List and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The Consolidated Top 75 List includes estimates outstanding claim amounts as of the Petition Date.  The Debtors have excluded from the Top 75 List any claims that will be addressed by the First Day Motions filed in connection with these chapter 11 cases.

# SCHEDULE 4

## Consolidated List of the Holders of the Five (5) Largest Secured Claims

Pursuant to E.D.N.Y. LBR 1007-4(a)(vi), the following lists the creditors holding, as of the Petition Date, the five largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt, including the right to challenge any lien.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

In addition to the parties listed below, the Debtors may have unliquidated and/or contingent claims as a result of parties asserting a security interest against the Debtors' assets through UCC filings.

|   | Creditor | Contact, Mailing Address & Telephone Number/Fax Number | Amount of Claim | Collateral Description and Value |
|---|---|---|---|---|
| 1. | Bank of America, N.A., as Administrative Agent | Bank of America, N.A. Credit Services TX1-492-14-11 901 Main St. Dallas TX 75202-3714 Attention: Ryan Miller E-mail:  rmiller24@baml.com | Approximately $159.3 million | Collateral:  First lien on substantially all assets of the Debtors.<br><br>Collateral Value: Uncertain |
| 2. | U.S. Bank Equipment Finance | Ashton Nelson 1310 Madrid Street, Suite 101 Marshall, MN 56258-4002 (800)-328-5371 ext. 5328420 | Approximately $143,000 | Collateral:  14 Savin copiers or similar machines, as set forth in the applicable financing statement<br><br>Collateral Value: Unknown[1] |

---

[1] While the Debtors have other equipment financing and/or leasing arrangements, the Debtors have not identified any other active UCC filings with respect to equipment.

## SCHEDULE 5

### Summary of the Debtors' Assets and Liabilities

Pursuant to E.D.N.Y. LBR 1007-4(a)(vii), the following financial data (unaudited and subject to change) is the latest available information and reflects the Debtors' financial conditions, as consolidated as of the Petition Date.

The following financial data shall not constitute an admission of liability by the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a contingent, unliquidated or disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

**<u>Assets</u>**

Working Capital Assets:  Approximately $6.9 million, excluding NYNM
           Approximately $7.7 million, including NYNM

Going Concern Value:   Undetermined

Claims Against Third Parties: Could exceed $100 million

**<u>Liabilities</u>**

Total Liabilities:     Approximately $245.9 million

# SCHEDULE 6

## Schedule of Publicly Held Securities

Pursuant to E.D.N.Y. LBR 1007-4(a)(viii), there are no shares of the Debtors' stock, debentures and other securities that are publicly held.

## SCHEDULE 7

### List of Debtors' Property In the Possession of Third Parties

Pursuant to E.D.N.Y. LBR 1007-4(a)(ix), the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgage, pledge, assignee of rents, secured creditor, or agent for any such entity:

Upon information and belief, certain of the Debtors' records are in the possession of Robinson Brog Leinwand Greene Genovese & Gluck PC, the Debtors' former counsel, and Rosenberg Rich Baker Berman & Company, the Debtors' former auditors.  The Debtors intend to seek turnover of such records.

## SCHEDULE 8

### Summary of Property From Which the Debtors Operate Their Business

Pursuant to E.D.N.Y. LBR 1007-2(a)(x), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

The following list is solely intended to provide the Court with information as to the premises from which the Debtors operate their businesses, and includes the locations of the Physician Groups (as defined in the First Day Declaration). The Debtors reserve all rights, including, but not limited, under section 365 of the Bankruptcy Code. The Debtors make no admission as to the contractual relationship or enforceability of any lease agreement and further reserve all rights in connection therewith.

| Debtor | Premises Address | Leased/ Owned/Other |
|---|---|---|
| Allegiance Billing & Consulting LLC | Warwick Center<br>36 Copperfield Circle<br>Lititz, PA 17543 | Leased |
| Allegiance Billing & Consulting LLC | 333 Jericho Turnpike<br>Suite 102<br>Jericho, NY 11753 | Leased |
| Allegiance Consulting Associates LLC | 2 Broad Street<br>3rd Floor<br>Bloomfield, NJ 07003 | Leased |
| Integrated Physicians Solutions, Inc. (Leased by Children's Medical Center, Inc., a Physician Group) | 331 North Breiel Blvd.<br>Middletown, OH 45042 | Leased by non-Debtor contract counterparty |
| Medical Billing Services Inc. | 3200 Wilcrest Drive<br>Suite 550<br>Houston, TX 77042 | Leased |
| New York Network Management, L.L.C [3] | 2901 4th Ave.<br>1st Floor<br>Brooklyn, NY 11209 | Leased |
| North East Medical Solutions WV, LLC | 417 Grand Park Drive<br>Suite 204<br>Parkersburg, WV 26105 | Leased |
| North East Medical Solutions, LLC | 3824 Northern Pike<br>Suite 600<br>Monroeville, PA 15146 | Leased |
| Integrated Physicians Solutions, Inc. | 368 W. Pike St.<br>Suite 103<br>Lawrenceville, GA 30046 | Leased |
| Orion HealthCorp, Inc. | One Arin Park<br>1715 Route 35 North<br>Suite 303<br>Middletown, NJ 07748 | Leased |

---

[3] New York Network Management, L.L.C. has not filed a chapter 11 petition at this time.

| Debtor | Premises Address | Leased/ Owned/Other |
|---|---|---|
| Orion HealthCorp, Inc. | One Arin Park 1715 Route 35 North Suite 301 & 302 Middletown, NJ 07748 | Leased |
| Integrated Physicians Solutions, Inc. (Leased by Pediatric Associates of Dayton, Inc., a Physician Group) | 5450 Far Hills Ave Kettering, OH 45429 | Leased by non-Debtor contract counterparty |
| Integrated Physicians Solutions, Inc. (Leased by Pediatric Associates of Dayton, Inc., a Physician Group) | 3140 Dayton-Xenia Rd Ste C Beavercreek, OH 45432 | Leased by non-Debtor contract counterparty |
| Integrated Physicians Solutions, Inc. (Leased by Pediatric Associates of Dayton, Inc., a Physician Group) | 9000 North Main Street Ste. 332 Dayton, OH 45415 | Leased by non-Debtor contract counterparty |
| Integrated Physicians Solutions, Inc. (Relates to premises upon which a Physician Group operates) | 1625 Avenue of the Cities Moline, IL 61265 | Leased |
| Physicians Practice Plus, LLC | 100 Jericho Quadrangle Suite 235 Jericho, NY 11753 | Leased |
| Rand Medical Billing, Inc. | 1633 Erringer Road 1st Floor Simi Valley, CA 93065 | Leased |
| Western Skies Practice Management | 7175 West Jefferson Ave. Suite 2500 Lakewood, CO 80235 | Leased |

# SCHEDULE 9

## Location of the Debtors' Assets, Books and Records

Pursuant to E.D.N.Y LBR 1007-4(a)(xi), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors have working capital assets nationwide, with substantial assets in Jericho, NY, Lawrenceville, GA, Litiz, PA, Houston, TX, Parkersburg, WV, Monroeville, PA, Simi Valley, CA, and Lakewood, CA.[4]

### Books and Records

The Debtors' books and records are located in Middletown, NJ, Jericho, NY, Lawrenceville, GA, Litiz, PA, Houston, TX, Parkersburg, WV, Monroeville, PA, Simi Valley, CA, and Lakewood, CA.[5]

### Debtors' Assets Outside the United States (if applicable)

The Debtors do not have assets outside of the United States.

---

[4] The substantial assets of NYNM are located in Brooklyn, NY.

[5] The books and records of NYNM are located in Brooklyn, NY.

**SCHEDULE 10**

**Summary of Legal Actions Against the Debtors**

Pursuant to E.D.N.Y. LBR 1007-4(a)(xii), the following is a list of the nature and present status of each material action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| | Litigation Matter | Plaintiff(s) | Defendant(s) | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|---|---|---|
| 1. | *American Express Travel Related Services Company, Inc. v. Constellation Healthcare Technologies, Inc.* **(Index No. 657592/2017)** | American Express Travel Related Services Company, Inc. | Constellation Healthcare Technologies, Inc. | 12/28/17 | Supreme Court of New York, County of New York | Breach of contract | Pending |
| 2. | *Kolb Radiology, PC v. Orion Healthcorp. Inc. d/b/a Porteck, LLC* **(Case No. 1:16-cv-07824-GHW)** | Kolb Radiology, PC ("Kolb") | Orion Healthcorp. d/b/a Porteck, LLC | 10/1/16 | SDNY | Breach of contract and conversion | Pending |
| 3. | *Parkersburg Radiology Services, Inc. v. Orion Healthcorp, Inc.* **(Civil Action No. 17-C-291)** | Parkersburg Radiology Services, Inc. ("PRS") | Orion<br><br>North West Medical Solutions WV, LLC (*note: party improperly identified—should be NEMS West Virginia, LLC ("NEMS WV")*) | 8/12/17 | Circuit Court of Wood County, WV | Breach of contract, breach of fiduciary duty, negligent misrepresentation, and unjust enrichment | Pending |

| | Litigation Matter | Plaintiff(s) | Defendant(s) | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|---|---|---|
| 4. | ***GeBBS Healthcare Solutions, Inc. v. Orion HealthCorp, Inc.* (Index No. 650346/2018)** | GeBBS Healthcare Solutions, Inc. ("GeBBS") | Orion HealthCorp, Inc. | 1/23/18 | NY Supreme, County of NY | Breach of contract | Pending |
| 5. | ***Criterions, LLC v. Visient Corp., et al.* (Index No. 601569/16)** | Criterions, LLC | Visient Corp.<br><br>Arvind Walia<br><br>Constellation Healthcare Technologies<br><br>Physicians Practice Plus | 3/9/16 | New York Supreme Court— Nassau County | Breach of contract | Pending |
| 6. | ***Steel Valley Emergency Physicians, LLC v. North East Medical Solutions, LLC, et al.* (Docket No. GD-16-01479)** | Steel Valley Emergency Physicians, LLC ("SVEP") | North East Medical Solutions, LLC ("NEMS")<br><br>Orion Healthcorp, Inc ("Orion") | 8/16/16 | Court of Common Pleas, Allegheny County, PA | Breach of contract and breach of duty of loyalty | Pending |
| 7. | ***Cohen, et al. v. Porteck Corporation, et al.* (Index No. 617280/2017)** | Christine Cohen<br><br>Ronald Cohen | Porteck Corporation ("Porteck")<br><br>Visient Corp.<br><br>Orion Healthcorp, Inc. ("Orion") | 9/6/17 | Supreme Court of the State of NY, County of Suffolk | Breach of contract | Pending |

| | Litigation Matter | Plaintiff(s) | Defendant(s) | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|---|---|---|
| 8. | *GSS Infotech v. Orion HealthCorp, Inc. and Constellation Health, LLC* **(Cause No. 2014-45701/ 2016/45701)** | GSS Infotech ("GSS") | Orion HealthCorp, Inc. ("Orion")<br><br>Constellation Health, LLC ("Constellation Health") | 10/1/16 | District Court of Harris County, TX | Breach of contract, quantum meruit, and unjust enrichment | Pending |
| 9. | *Singh-Narayan and Yamraj v. Orion Healthcorp, Inc* **(Index No. 709520/17)** | Rookminee Singh-Narayan<br><br>Jairaj Yamrajthank | Orion HealthCorp, Inc. ("Orion")<br><br>Physicians Practice Plus, LLC ("PPP") | 7/13/17 | Supreme Court of the State of NY, County of Queens | Unpaid wages | Pending |
| 10. | *Orion HealthCorp, Inc. and RMI Physicians Services Corp. v. John G. McBride, et al.* **( Case No. 2014-01758)**<br><br>**(Court of Appeals Number: 01-17-00131-CV)** | Orion HealthCorp, Inc. ("Orion")<br><br>RMI Physicians Services Corp. ("RMI") | John G. McBride<br><br>Alan R. Nottingham<br><br>Chi T. Luu<br><br>On Q Operating Company, LLC<br><br>On Q Contact Center S.A | 1/15/14 | District Court of Harris County, TX<br><br>Court of Appeals, First District | Breach of contract and fraud | Settlement pending. |
| 11. | *Ferrer, Claudio v. RMI Physician Services Corporation d/b/a Orion-RMI* **(Case No. 15-CA-2537)** | Ferrer, Claudio | RMI Physician Services Corporation | 9/30/15 | Circuit Court of 20th Judicial Circuit in Lee County, Florida | Class action for statutory damages | Settlement pending. |

| | Litigation Matter | Plaintiff(s) | Defendant(s) | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|---|---|---|
| 12. | ***1805 Old Alabama Road, LLC v. Orion Healthcorp, Inc.*, 16-EV-000241** | 1805 Old Alabama Road LLC | Orion Healthcorp, Inc. | 1/2016 | State Court of Fulton County, State of Georgia | Breach of contract | Final judgment entered for $227,473.59. |
| 13. | ***Cockerell Dermatopathology, P.A. v. Medical Billing Services, Inc. d/b/a Orion MBS, et al.* (Cause No. DC-1602365)** | Cockerell Dermatopathology, P.A. ("Cockerell") | Medical Billing Services, Inc. ("MBS")<br><br>Orion HealthCorp, Inc. ("Orion")<br><br>Joseph A. Seale<br><br>Dale Brinkman<br><br>Arvind Walia<br><br>Ravi Sankar Chivukula | 2/29/16 | District Court of Dallas County, TX | Breach of contract and negligence | Case settled.<br><br>Dismissal papers not yet filed. |

## SCHEDULE 11

### Senior Management

Pursuant to E.D.N.Y. LBR 1007-4(a)(xiii), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name/Position | Relevant Experience and Responsibilities | Tenure |
|---|---|---|
| Timothy J. Dragelin<br><br>*Chief Restructuring Officer and Chief Executive Officer* [1] | Mr. Dragelin is the Chief Restructuring Officer of the Debtors and the Chief Executive Officer of certain of the Debtors. As such, Mr. Dragelin's responsibilities include overseeing the day to day operations of the Debtors. Mr. Dragelin also leads FTI's Corporate Finance and Restructuring's Healthcare Industry practice and has more than twenty (20) years of experience in restructuring matters, including representing debtors and creditors in bankruptcy and out-of-court restructurings. Mr. Dragelin's experience includes bankruptcy planning and management, turnaround consultation, interim management, lender advisory, buy-side due diligence, sell-side mandates, valuation, process improvement, forensic investigations, and litigation advisory work. | Approximately six (6) months |
| Arvind Walia<br><br>*Chief Executive Officer, Orion HealthCorp, Inc.* | Mr. Walia is the Chief Executive Officer of Orion HealthCorp, Inc. As such, Mr. Walia's responsibilities include overseeing the day-to-day operations of the Orion RCM Business. Mr. Walia's experience spans more than twenty-five (25) years in information technology, consulting and professional services. | Approximately three (3) years (since the Debtors purchased the assets of a business owned by Mr. Walia) |

---

[1] Mr. Dragelin's position as Chief Executive Officer is limited to certain of the Debtors.

| Melodie Kraljev<br><br>*Chief Operating Officer, Orion HealthCorp, Inc.* | Ms. Kraljev is the Chief Operating Officer of Orion HealthCorp, Inc.  As such, Ms. Kraljev's responsibilities include executing the day-to-day operations of the Orion RCM business. | Approximately three (3) years (since the Debtors purchased the assets of a business where Ms. Kraljev worked) |
|---|---|---|

# SCHEDULE 12

## Payroll

Pursuant to E.D.N.Y. LBR 1007-4(a)(xiv)-(xv), the following provides the estimated amount of weekly payroll to be paid to the Debtors' employees (not including officers and directors) and the estimated amount to be paid to officers, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the chapter 11 petitions.

| Payments to Employees, Officers and Directors | |
| --- | --- |
| Weekly Payroll to Employees (Not Including Officers and Directors) | **Excluding NYNM:**  Approximately $1,409,000 in the aggregate for the 30 day period following the filing<br><br>**Including NYNM:**  Approximately $1,465,000 in the aggregate for the 30 day period following the filing |
| Estimated Payments to Officers and Directors | **Excluding NYNM:**  Approximately $67,500<br><br>**Including NYNM:**  Approximately $92,500 |

| Payments to Financial and Business Consultants[1] | |
| --- | --- |
| Allegiance Consulting Associates, LLC[2] | Approximately $35,900 |
| Sessler Macklin LLP (relates to NYNM) | Approximately $8,000 |
| Benson Consulting, Inc. (relates to NYNM) | Approximately $6,250 |
| Kaylee Ilarraza (relates to NYNM) | Approximately $2,500 |
| EK & Associates | Approximately $1,500 |

---

[1] This list excludes payments paid to entities owned by officers, which are included in the amount above. This list does not include independent contractors that provide information technology related services.

[2] Owned by executive vice presidents of the Allegiance RCM Business.

## SCHEDULE 13

### Cash Receipts and Disbursements,
### Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to E.D.N.Y. LBR 1007-4(xvi), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash increase or decrease, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, on a consolidated basis.

|  | Including NYNM | Excluding NYNM |
|---|---|---|
| Cash Receipts[1] | $4,000,000 | $3,709,000[2] |
| Cash Disbursements | $4,370,000 | $4,046,000 |
| Net Cash Decrease | $370,000 | $337,000 |
| Unpaid Obligations | $680,000 | $545,000 |
| Unpaid Receivables | $1,906,000 | $1,780,000 |

---

[1] This amount does not include debtor in possession financing or tax refunds that may be received by the Debtors in the relevant period.

[2] Assumes amounts upstreamed from NYNM.