Thomas R. Califano, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4990
Facsimile: (212) 884-8690
thomas.califano@dlapiper.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
ORION HEALTHCORP, INC., *et al.*,[1]                          :    Case No. 18-71748 (AST)
                                                              :
                        Debtors.                              :    (Joint Administration Pending)
                                                              :
------------------------------------------------------------- x

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION WAGES
AND COMPENSATION AND MAINTAIN AND CONTINUE EMPLOYEE
BENEFIT PROGRAMS IN THE ORDINARY COURSE AND (II)
AUTHORIZING BANKS TO HONOR AND PROCESS CHECKS AND
TRANSFERS RELATED TO SUCH EMPLOYEE OBLIGATIONS**

Orion HealthCorp, Inc. and its affiliated debtors and debtors in possession (collectively,

the "Debtors"), by and through their proposed counsel, DLA PIPER LLP (US), hereby submit this

motion (the "Motion") for entry of interim and final orders (i) authorizing the Debtors to pay

prepetition wages, salaries, and other compensation, taxes and withholdings, and reimbursable

employee expenses; (ii) authorizing the Debtors to honor and continue benefit programs for

employees; and (iii) authorizing the applicable banks and financial institutions at which the

---

[1] The Debtors include all of the affiliated entities that are listed on the **Appendix** attached hereto.  The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

Debtors maintain disbursement and other accounts (collectively, the "Banks") to honor and process checks and transfers related to such employee obligations.  In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over these cases, the Debtors, their estates and this Motion, under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The statutory predicates for the relief requested in this Motion are sections 105(a), 363(b)(1),  363(c)(1),  507(a),  1107,  and  1108  of  title  11  of  the  United  States  Code  (the "Bankruptcy Code") and Rules 4001, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

5.      On March 16, 2018 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code.

6.      The Debtors continue to be in possession of their assets and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases

8.      Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11

cases, is set forth in detail in the *Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions* [D.I. 2] (the "First Day Declaration").

## REQUESTED RELIEF

9.     By this Motion, the Debtors seek to eliminate any personal hardship to their employees (collectively, the "Employees")[2] as a result of the filing of these chapter 11 cases and to minimize the disruption to the Debtors' operations.  As of the Petition Date, certain of the Debtors' prepetition obligations to their Employees or other third parties (collectively, the "Prepetition Employee Obligations"), remain unpaid or not yet provided because, among other things:  (a) the Debtors commenced these chapter 11 cases in the midst of a payroll period, (b) checks previously issued on account of Employee obligations may not have been presented for payment or may not have cleared the banking system, (c) amounts related to prepetition services, while accrued in whole or in part, had not yet become due and payable by the Debtors, and (d) amounts deducted from Employee paychecks were not then due to be paid over to the intended recipient or account, including (i) deductions taken from Employees' paychecks to make payments on behalf of the Employees for or with respect to the Debtors' Employee Benefit Programs (as defined below) or amounts due to third parties in connection therewith and (ii) withholdings from Employees' paychecks on account of various federal, state or local income,

---

[2]     Further, as described in the *Motion of the Debtors for Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Transfers Among Debtors and Non-Debtor Affiliates, and (IV) Continued Use of Existing Business Forms* (the "Cash Management Motion") and the First Day Declaration, Integrated Physician Solutions, Inc. ("IPS"), one of the Debtor entities, is party to three (3) management service agreements ("MSAs") each with a physician group (the "Physician Groups"), which are non-Debtor contract counterparties.  Pursuant to the MSAs, IPS pays certain expenses on behalf of the Physician Groups, including, but not limited to the salaries, benefits, bonuses and other direct costs of certain employees of the Physician Groups.  The Debtors consider these expenses to be expenses of the Physician Groups (the "Physician Expenses").  However, out of abundance of caution, and pursuant to the Cash Management Motion and as provided for in the MSAs, the Debtors seek authority to continue making payments on behalf of the Physician Groups in the ordinary course of business.

state disability, unemployment and other taxes for remittance to the appropriate federal, state or local taxing authority.

10.      By this Motion, the Debtors seek authority to pay or provide as they become due all Prepetition Employee Obligations and the related administrative fees that have already accrued.   The Debtors also request confirmation of their right to continue to perform their obligations with respect to the Employee Benefit Programs (as defined below) during the pendency of these chapter 11 cases.   These programs are an important component of the total compensation offered to the Employees, and are essential to the Debtors' efforts to maintain Employee morale and minimize attrition.   The Debtors believe that the expenses associated with such programs are reasonable and necessary in light of the potential attrition, loss of morale, and loss of productivity that would occur if such programs were discontinued.   Such relief, including any and all authorizations or payments requested herein, shall be subject to and implemented in accordance with the provisions of any orders of this Court approving any debtor in possession financing for, or any use of cash collateral by, the Debtors, including any budget in connection therewith.

11.      The Debtors seek authority to pay or honor, in their discretion, the following Prepetition Employee Obligations, subject to the limits in the chart below:

| Prepetition Employee Compensation or Benefits | Amount |
|---|---|
| Professional Employer Organization | $10,000 |
| Unpaid Compensation (including Withholding Taxes and Obligations) | $511,500 |
| Temporary Employees | $3,000 |
| As-Needed Employees | $12,000 |
| Independent Contractors | $65,000 |
| Health Savings Account | $1,000 |

| Business Expenses | $10,000 |
| PTO & Miscellaneous Benefit Policies | $80,000 |
| **Total** | **$692,500** |

12.    The Debtors further request that the Court: (a) authorize the Banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any of the Prepetition Employee Obligations; (b) prohibit the Banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations; and (c) authorize the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

<u>**THE DEBTORS' WORKFORCE, COMPENSATION, AND BENEFITS**</u>

**I.      The PEO**

13.    The Debtors retain ADP TotalSource, Inc. ("<u>ADP</u>"), a professional employer organization ("<u>PEO</u>"), to act as co-employer of the Debtors' Employees[3].  While the Debtors interview, hire and terminate employees, and provide performance reviews for such employees, ADP provides such services as issuing payroll, processing direct deposits, filing W-2 forms and maintaining workers' compensation insurance[4] for the Employees.

14.    In connection with the wages and salaries paid to their Employees, the Debtors are required by law to withhold from their Employees' paychecks certain amounts for federal,

---

[3]   ADP also administers payroll for the Physicians Groups' employees in accordance with the Debtors' payroll cycle.

[4]   In connection with the Debtors' retention of ADP, ADP maintains workers compensation and employers' liability policies with New Hampshire Ins Co., which provides coverage to all of the Debtors' Employees and Physician Groups' employees.

state, and local income taxes and other payments, employee benefits, employee programs, and unemployment insurance (collectively, the "Withholding Taxes and Obligations") and to remit the withheld amounts to the appropriate taxing and other governmental authorities (collectively, the "Authorities"). Further, the Debtors are required by law to garnish approximately 10 Employees' wages (the "Garnishments") and to remit the withheld amounts to the appropriate Authorities. As part of the services provided by ADP, ADP remits the Withholding Taxes and Obligations and Garnishments directly to the appropriate Authorities. The Debtors seek authority through this Motion to continue with this practice.

15.     ADP charges the Debtors a service fee per Employee per payroll cycle, which varies by state and Debtor. The average service fee is 2.15% of gross payroll and the average monthly fee charged by ADP to the Debtors is approximately $25,000, which varies depending on the percentage of gross pay during each payroll cycle. The Debtors are responsible for the Employee Benefits Programs (defined below) and facilitating pre-tax employee elected deductions. Specifically, the Debtors seek to pay any prepetition amounts due and owing to ADP on account of the services provided, which the Debtors estimate to be $10,000, and seek to continue such services post-petition in the ordinary course.

## II.     The Debtors' Workforce

16.     As of the Petition Date, the Debtors' workforce is comprised of a total of approximately 266 Employees[5]. Approximately 67 of the Debtors' Employees are full-time, salaried employees (the "Salaried Employees"), and the remaining 199 are part-time or full-time hourly employees (the "Hourly Employees"). Except as otherwise noted, the benefits described in this Motion are generally limited to the Salaried and Hourly Employees. In addition to the

---

[5]   The Physician Groups' workforce is comprised of approximately 110 employees.

Employees, the Debtors supplement their workforce with six (6) independent contractors (collectively, the "Independent Contractors"), and three (3) as-needed employees (collectively, the "As-Needed Employees"). Further, the Debtors supplement their workforce from time to time with temporary employees. Currently, there is one (1) temporary employee hired directly by the Debtors (the "Debtors' Temporary Employee") and the Debtors utilize the services of Accounttemps, a Robert Half Company (the "Employment Agency") to provide one (1) temporary employee (the "Employment Agency Employee," and together with Debtors' Temporary Employee, the "Temporary Employees").

17.     The Independent Contractors play a critical role in both the Debtors' day-to-day operations and ultimate success of the Debtors' reorganization process. The Independent Contractors have varied roles, including, but not limited to, financial consulting, strategic planning, IT support, accounting services and overseeing the Debtors' operations. The Independent Contractors typically invoice the Debtors on a monthly basis and are paid upon the Debtors' receipt and review of the invoice. On average and in the aggregate, the Debtors pay these Independent Contractors approximately $100,000 per month. As of the Petition Date, there is approximately $65,000 due and outstanding with respect to the Independent Contractors. The Debtors seek authority to pay any pre-petition amounts outstanding, up to the statutory cap of $12,850, to each of the Independent Contractors, and seek to continue their services post-petition in the ordinary course.

18.     Further, the Temporary Employees are approved by the Debtors to be employed on a full-time basis for a specified, limited duration, generally not to exceed three months during any one year. The Temporary Employees have varying roles, including providing IT support and accounting support. The Debtors' Temporary Employees are paid on a bi-weekly basis, through

ADP, in accordance with the Debtors' payroll cycle.  Further, the Debtors make payments to the Employment Agency, through an accounts payable account, based on the number of hours worked by the Employment Agency Employees and, in turn, the Employment Agency pays the Employment Agency Employee's wages and other amounts to which the Employment Agency Employees are entitled.  As of the Petition Date, the Debtors estimate that approximately $3,000 remains due and outstanding to the Debtors' Temporary Employees and the Employment Agency on behalf of the Employment Agency Employees to the Debtors.  Accordingly, the Debtors seek authority to pay any pre-petition amounts outstanding, up to the statutory cap of $12,850, to the Debtors' Temporary Employees and the Employment Agency on behalf of the Employment Agency Employees, and seek to continue the services post-petition in the ordinary course.

19.     Lastly, the Debtors utilize the services of the As-Needed Employees to provide additional support staff and are employed for a specified, limited duration, on an "as needed" basis.  The As-Needed Employees are paid on a bi-weekly basis in accordance with the Debtors' payroll cycle.  As of the Petition Date, there is approximately $12,000 due and outstanding with respect to the As-Needed Employees.  The Debtors seek authority to pay any pre-petition amounts outstanding, up to the statutory cap of $12,850, to the As-Needed Employees, and seek to continue employing As-Needed Employees post-petition in the ordinary course.

20.     The Debtors' Employees have the requisite knowledge, skill and experience to ensure that the Debtors remain compliant with applicable rules and regulations.  Put simply, the Debtors' businesses depend on the skills and institutional and specialized knowledge of their Employees, and maintaining the Debtors' workforce is essential to the Debtors' ability successfully to reorganize their operations.   Any delay in payments to the Employees,

Independent Contractors, Temporary Employees and As-Needed Employees would likely cause the Debtors to lose the benefit of their services, which would significantly disrupt certain aspects of the Debtors' operations and cause irreparable harm to the Debtors' business at this critical time. Therefore, by this Motion, the Debtors request authority to pay compensation due and outstanding as of the Petition Date and to maintain the Debtors' various employee benefit policies throughout these chapter 11 cases.

### III.    Prepetition Wages, Salaries, and Other Compensation

#### A.    Unpaid Compensation

21.    In the ordinary course of business, the Debtors pay their Employees on a bi-weekly basis via direct deposit. Paper checks are issued on rare occasions to correct an error in payroll. Certain Employees, including both Salaried and Hourly Employees, (collectively, the "Biweekly One Employees")[6] are paid on alternate weeks from certain other Salaried and Hourly Employees (collectively, "Biweekly Two Employees")[7]. All Employees are paid every other Friday and are paid six days in arrears for the period through and including the previous Saturday. With respect to the Biweekly One Employees, wages, salaries, and other compensation for the weekly payroll cycle for February 18, 2018 through March 3, 2018 were paid by the Debtors on March 9, 2018. With respect to the Biweekly Two Employees, wages, salaries, and other compensation for the weekly payroll cycle for February 25, 2018 through March 10, 2018 were paid by the Debtors on March 16, 2018. The Debtors' first postpetition

---

[6]  The Biweekly One Employees are employed by the following Debtors: Rand Medical Billing, Inc., Western Skies Practice Management, Inc., NEMS West Virginia, LLC, New York Network Management, LLC, Physicians Practice Plus LLC, Allegiance Billing & Consulting, LLC, Northeast Medical Solutions, LLC and Allegiance Consulting Associates LLC.

[7]  The Biweekly Two Employees are employed by the following Debtors:  Integrated Physician Solutions, Inc., Medical Billing Services, Inc. and RMI Physician Services Corporation.  For purposes of administering payroll, certain of the Debtors' Employees are coded as Employees of Integrated Physician Solutions, Inc.

scheduled payroll date for their Biweekly One Employees is March 23, 2018, which will cover the period from March 4, 2018 to March 17, 2018.  The Debtors' first postpetition scheduled payroll date for their Biweekly Two Employees is March 30, 2018 and covers March 11, 2018 to March 24, 2018.  On average, the Debtors' gross payroll is approximately $440,000 for Biweekly One Employees and approximately $143,000 for Biweekly Two Employees.  As of the Petition Date, Employees are owed approximately $511,500 in accrued and unpaid compensation (the "Unpaid Compensation")[8].

### B. Bonus Obligations

22.     In the ordinary course of business, the Debtors offer various bonus programs to reward certain Employees for their contributions to the Debtors' business (the "Bonus Obligations").  First, the Debtors offer a commission program to certain Salaried Employees (the "Commission Program").  Under the Commission Program, certain Employees receive a percentage commission payment for generating to new clients once revenue is generated by such client.  All commissions are paid either monthly or quarterly on the last payroll cycle of each month according to the Employees payroll period.  As of the Petition Date, the Debtors believe there are no amounts due and outstanding pursuant to the Commission Program.

23.     The Debtors also maintain a referral bonus program (the "Referral Program").  Under the Referral Program, Employees that refer new clients, through a personal referral, that ultimately become clients of the Debtors are given a bonus based on the projected annual revenue of the said client (the "Referral Bonus").  Employees are paid the Referral Bonus on the first pay period that follows receipt of payment of the first invoice by said client.  As of the

---

[8]     The Unpaid Compensation Amount includes the prorated pre-petition amount due and outstanding for the Biweekly One Employees and Biweekly Two Employees.

Petition Date, there are no outstanding amounts due and outstanding pursuant to the Referral Program.

24.     Lastly, the Debtors provide certain Employees a holiday bonus based on the respective Employee's seniority level and completed years of service (the "Holiday Bonus," and together with the Commission Program and Referral Program, the "Bonus Programs").  The Holiday Bonus is paid in December on the last payroll cycle of the month.  As of the Petition Date, the Debtors believe there are no amounts due and outstanding pursuant to the Holiday Bonus.

25.     Thus, as of the Petition Date, the Debtors believe there are no amounts due and outstanding pursuant to the Bonus Obligations on account of the Bonus Programs.  By this Motion, the Debtors seek authority to continue the Bonus Programs on a post-petition basis in the ordinary course of business.

### C.      Business Expenses

26.     In the ordinary course of business, the Debtors incur various expenses, such as for cell phones, car rentals, hotels and other related business travel expenses.  The Debtors provide certain Employees a monthly allowance for certain expenses (the "Monthly Allowance"), most notably for cell phone service and vehicle allowance.  With respect to Monthly Allowances, the Debtors pay the Monthly Allowance biweekly in accordance with payroll in the aggregate amount of approximately $2,000 per month.  As of the Petition Date, the Debtors do not owe any amounts due to Monthly Allowances.  In addition, certain Employees pay for various business related travel expenses and cell phone service (the "Out of Pocket Expenses", and together with the Monthly Allowances, the "Business Expenses") with the understanding that they will be reimbursed upon the submission of a receipt or claim itemizing such Out of Pocket Expense and

approval from the Employee's supervisor. The Debtors estimate, on average, that approximately $10,000 per month is reimbursed to Employees for Out of Pocket Expenses. As of the Petition Date, the Debtors estimate that Employees are owed approximately $10,000 for Out of Pocket Expenses. As such, the Debtors request authority to reimburse all Business Expenses that were incurred prior to the Petition Date to avoid any potential Employee liability, in an amount not to exceed $10,000 in the aggregate. The Debtors also seek authority, in their discretion, to continue their Business Expenses policy in the ordinary course post-petition.

### IV.    Employee Benefit Programs

27.    In the ordinary course of business, the Debtors maintain various employment benefit plans and policies, including, without limitation, medical plans, dental plans, vision plans, life insurance plans, short term and long term disability plans and other paid time off (collectively, the "Employee Benefits Obligations").[9] The Employee Benefits Obligations are, in each case, available to all full-time Employees (the "Eligible Employees" and, with respect to each plan or program in which they participate, the "Plan Participants").

28.    By this Motion, the Debtors seek authority, in the exercise of their discretion, to pay prepetition claims (if applicable), to honor obligations, and to continue programs, in the ordinary course of business and consistent with prior practice, relating to the Employee Benefit Programs,[10] subject to the Debtors' ability to modify or discontinue any Employee Benefit Programs in their discretion to reduce applicable costs or the benefits provided thereunder.

---

[9]  The descriptions of the Debtors' compensation and benefits programs contained in this Motion are provided for convenience only and are qualified in all respects by the actual terms of such programs. Nothing contained in this Motion shall have the effect of modifying the terms of the compensation and benefits programs or altering any party's rights and obligations thereunder.

[10]  Relief requested in this Motion shall not constitute or be deemed an assumption or an authorization to assume any of such Employee Benefit Programs under section 365(a) of the Bankruptcy Code.

### A.    Health Insurance Plans

29.    The Debtors provide Eligible Employees and their eligible dependents with medical, dental, vision, life, short term disability and long term disability insurance under several different fully insured health plans (collectively, the "Health Insurance Plans") as described in greater detail below.  All of the Health Insurance Plans are administered through ADP.  Also, as noted below, the costs of the Health Insurance Plans are borne primarily by the Debtors, but Plan Participants contribute to the Health Insurance Plans through payroll deductions.  Plan Participants' contributions are deducted from payroll, as applicable, to pay for that month's coverage.  The Debtors seek authorization to continue the Health Insurance Plans and to make any payments on account of any accrued but unpaid amounts owing thereunder.

(a) Medical Insurance Plans:  The Debtors offer five fully insured plan through United Healthcare (collectively, the "Medical Insurance Plans").  The average cost per month is approximately $120,000 and the Debtors contribute approximately 63% of these costs through payroll deductions.  As of the Petition Date, the Debtors believe there are no amounts due and outstanding under the Medical Insurance Plan.

(b) Dental Insurance Plans:  The Debtors offer two fully insured plan through Aetna (collectively, the "Dental Insurance Plans").  The average cost per month is approximately $11,000 and the Debtors contribute approximately 46% of these costs through payroll deductions.  As of the Petition Date, the Debtors believe there are no amounts due and outstanding under the Dental Insurance Plans.

(c) Vision Plan.  The Debtors offer a fully insured plan through Vision Service Plan (the "Vision Plan").  The average cost per month is $2,300.  The Debtors contribute approximately 49% of these costs through payroll deductions.  As of the Petition Date, the Debtors believe there are no amounts due and outstanding under the Vision Plan.

(d) Life Insurance Plan.  The Debtors offer a fully insured plan through Aetna (the "Life Insurance Plan").  The Debtors average cost per month is approximately $2,200.  The Debtors contribute $0.12 per month per $1,000 of annual salary, which is rounded up to the nearest thousand.  The full cost of the Life Insurance Plan is borne by the Debtors.

(e) Voluntary Life Insurance Plan.  The Debtors offer a fully insured plan through Cigna Health Insurance (the "Voluntary Life Insurance Plan").  The average cost per month is approximately $3,000.  The full cost of the Voluntary Life Insurance Plan is borne by the Eligible Employees.

(f) <u>Short Term Disability Plan</u>.  Debtors offer a fully insured plan through Aetna (the "<u>Short Term Disability Plan</u>").  The average cost per month is approximately $2,300  The full cost of the Short Term Disability Plan is borne by the Debtors.  As of the Petition Date, the Debtors believe there are no amounts due and outstanding under the Short Term Disability Plan.

(g) <u>Long Term Disability Plan</u>.  The Debtors offer a fully insured plan through Aetna (the "<u>Long Term Disability Plan</u>").  The average cost per month is approximately $1,800.  The full cost of the Long Term Disability Plan is borne by the Debtors.  As of the Petition Date, the Debtors believe there are no amounts due and outstanding under the Long Term Disability Plan.

(h) <u>Health Savings Account</u>.   The Debtors contribute $50 each month to Eligible Employees who maintain a high deductible Medical Insurance Plan into to a health savings account (the "<u>Health Savings Account</u>").  As of the Petition Date, the Debtors believe there is approximately $1,000 due and owing under the Health Savings Account.

**B.     Holidays and Other Paid Time Off ("<u>PTO</u>")**

30.     The Debtors offer PTO to Employees, including vacation, military duty leave, jury duty leave, workers' compensation leave, medical leave and family medical leave, and or other needs that require time off from work, some of which are mandated or encouraged by law and some of which may have pay or benefits components.  The accrual and use of PTO varies depending on, among other things, the Employee's length of service.  All Employees eligible for PTO may carry over unused PTO from the first half of the year into the second half of the year, and from one calendar year to the next, up to a certain number of days based on Employee's seniority or numbers of hours worked per week.  The Debtors also maintain a sick leave policy for Employees that work at certain locations.  The Debtors seek authorization to continue providing PTO in the ordinary course of business and intend to continue PTO postpetition.

31.     In addition to PTO, the Debtors provide Eligible Employees with certain additional leave policies and benefits, including seven (7) corporate holidays.[11]   The Debtors

---

[11]   In addition to these leave policies, certain of the Debtors' Employees may be eligible for additional leave under applicable state law.

seek to continue with these other benefits policies for their Employees in the ordinary course of business.

32.    The Debtors seek authorization to pay all unpaid prepetition wages or salaries.  To the best of the Debtors' understanding, no Employee is owed more than $12,850 in accrued and unpaid prepetition compensation, including PTO.  Further, as of the Petition Date, the Debtors believe that approximately $80,000 is due and outstanding with respect to accrued PTO.  The Debtors seek authorization to make cash-out payments on account of accrued, unused PTO upon termination only to the extent required by applicable state law.

**V.    Severance Obligations**

33.    In the ordinary course of business, the Debtors maintain a severance program (the "Severance Program") that applies to full-time Hourly or Salaried Employees.  The Severance Program generally provides that qualifying terminated Employees are entitled to receive severance pay based on the respective Employee's grade level and completed years of service.  To be eligible to receive payments under the Severance Program, terminated Employees must sign a separation agreement containing a general release of the Debtors.

34.    As of the Petition Date, no former Employees are receiving payments under the Severance Program (the "Severance Obligations"), and the Debtors believe that no prepetition amounts are outstanding.  Therefore, the Debtors do not seek authority to make payments pursuant to the Severance Program at this time, and any such request for authorization to make such payments would be made by a separate motion.

## VI.    The 401(k) Plan

35.    The Debtors provide their Employees with the ability to participate in and contribute to a 401(k) retirement savings plan (the "401(k) Plan")[12], managed by ADP.  The Debtors do not match Employee Contributions to the 401(k) Plan.  Instead, ADP is responsible computing all contributions and paying all administrative fees.  The Debtors pay approximately $15,000 annually for audit services of the 401(k) Plan.  The Debtors seek authority to continue with the 401(k) Plan in the ordinary course.

## <u>ARGUMENT</u>

## I.    The Proposed Payments are Accorded Priority Under Section 507 of the Bankruptcy Code.

36.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, commissions, vacation, sick leave, and employee benefit contributions be accorded priority in payment in an amount not to exceed $12,850 for each employee (to the extent such amounts accrued within 180 days of the Petition Date).  None of the Employees are owed amounts for accrued and unpaid prepetition wages or salaries, including outstanding and uncashed payroll checks, in excess of the statutory caps of Bankruptcy Code sections 507(a)(4) and 507(a)(5).  Granting the relief requested is consistent with the Bankruptcy Code's purpose in ensuring employees are paid in full on account of the priority status of their claims, up to the statutorily imposed limit.  Accordingly, the Debtors submit that no prejudice to creditors or other parties in interest would result from granting the relief requested herein.

---

[12]    Certain of the Physician Groups provide their employees with the ability to participate in and contribute to a 401(k) retirement savings plan and match up to 10% of the employee's contribution.  The Physician Groups fund payments towards such 401(k) plan and pay approximately $5,500 annually for audit services.  The Debtors have recently received a funding from one of the Physician Groups of approximately $37,000 to fund such 401(k) plan for that Physician Group's employees and plan on funding such amount to ADP in the ordinary course.

**II.      Payment of the Prepetition Employee Obligations is Appropriate Under Section 541 of the Bankruptcy Code.**

37.      The Debtors also seek authority to pay certain deductions, withholdings, and payroll taxes to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks.  Indeed, certain deductions, including contributions to various Employee Benefit Programs and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b); *Begier v. IRS*, 496 U.S. 53, 59 (1990) (holding that taxes such as excise taxes, FICA taxes, and withholding taxes are property held by the debtor in trust for another and, as such, do not constitute property of the estate); *see also Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 721 (4th Cir. 1998) (holding that deposits subject to an express trust are excluded from the bankruptcy estate); *City of Farrell v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 41 F.3d 92, 98-103 (3d Cir. 1994) (finding that funds withheld from employees' paychecks may be subject to a trust, and thus are not property of a debtor's estate, even where such funds were commingled with the debtor's other property).  Accordingly, such funds are not available for general distribution to a debtor's creditors.

38.      Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks.  *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. State of Mich. (In re DuCharmes & Co.)*, 852

F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).

39.     Because the deductions and payroll taxes are not property of the Debtors' estates, the Debtors request that this Court authorize them to transmit the deductions and payroll taxes to the proper parties.

### III.    The Proposed Payments Are Appropriate Under Sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code, and the Doctrine of Necessity.

#### A.    Valid Business Justification Under Section 363(b)

40.     Under section 363(b) of the Bankruptcy Code, after notice and a hearing, a bankruptcy court may authorize a chapter 11 debtor to use property of the estate other than in the ordinary course of business.   Under the same section, a court should authorize non-ordinary course business transactions where the debtor has articulated a valid business justification for the requested use of estate assets.   *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authority to pay prepetition wages) (section 363(b) gives the court "broad flexibility" to make payments outside of ordinary course of business as long as the debtor articulates a business justification); *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business").

41.     The payment of the Prepetition Employee Obligations serves the sound business purpose of maximizing the value of the Debtors' estates.   The Debtors' success in these chapter 11 cases hinges in large part on the morale and continued efforts of the Employees.   Through the payment of the Prepetition Employee Obligations, the Debtors seek to motivate and encourage the Employees to continue to support the Debtors' reorganization.   Accordingly, this Court should grant the requested relief under section 363 of the Bankruptcy Code.

### B.    Sound Exercise of the Debtors' Fiduciary Duties

42.    The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.* Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.* The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

43.    Payment of the Prepetition Employee Obligations meets each element of the *CoServ* court's standard. As described above, the Employees likely maintain priority claims against the Debtors for the Prepetition Employee Obligations. In addition, any failure by the Debtors to pay the Prepetition Employee Obligations would negatively impact the morale of the Debtors' Employees at a critical time for the Debtors and their businesses. In short, the potential harm and economic disadvantage that would stem from the failure to pay the Prepetition

Employee Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid.

44.     With respect to the Employees, the Debtors have examined other options short of payment of the Prepetition Employee Obligations and have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of such obligations.   Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Prepetition Employee Obligations.

### C.     Proper Application of the Doctrine of Necessity

45.     Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  A Bankruptcy Court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175; *see also Czyewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017)  (noting that courts are authorized to approve orders allowing payment of prepetition claims, which is necessary for the debtors to have a successful reorganization).   Moreover, "[u]nder Section 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177).  The authority to pay such prepetition obligations is known as the "necessity of payment" rule (also referred to as the "doctrine of necessity").

46.     The doctrine of necessity "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is

essential to the continued operation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

47.    The doctrine of necessity is an accepted component of modern bankruptcy jurisprudence.  *See Just For Feet*, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. at 175; *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994).  Moreover, courts have recognized the applicability of the doctrine of necessity with respect to the payment of prepetition employee compensation and benefits.  *See*, *e.g.*, *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–89 (S.D.N.Y. 1987) (under "necessity of payment" doctrine, it is appropriate for bankruptcy court to defer to Debtors' business judgment in permitting payment of certain workers' compensation claims); *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176 ("This rule recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor.").

48.     Therefore, the relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under the applicable authority.  Paying prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' to continue business operations postpetition.  Indeed, the Debtors believe that without the relief requested herein being granted, their Employees may seek alternative opportunities. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' goals in chapter 11.

49.     Courts in this and other jurisdictions have routinely has approved the payment of prepetition claims of employee wages, salaries, expenses and benefits in various chapter 11 cases.  *See*, *e.g.*, *In re Cenveo, Inc.*, Case No. 18-22178 (RDD) [D.I. 182] (Bankr. S.D.N.Y. March 8, 2018) (authorizing the debtors to pay prepetition wages, compensation, and maintain and continue benefits in the ordinary course); *In re CGG Holding (U.S.) Inc.*, Case No. 17-11637 (MG) [D.I. 107] (Bankr. S.D.N.Y. July 14, 2017) (same); *In re Personal Communications Devices, LLC*, Case No. 13-74303 (AST) [D.I. 103] (Bankr. E.D.N.Y. September 10, 2013) (same); *In re Interfaith Medical, Inc.*, Case No. 12-48226 (CEC) [D.I. 146] (Bankr. E.D.N.Y. January 18, 2013) (same); *In re Global Aviation Holdings Inc.*, Case No. 12-40783 (CEC) [D.I. 196] (Bankr. E.D.N.Y. March 8, 2012) (same).

50.     Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for granting the relief requested herein.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

51.     Bankruptcy Rule 6003(b) provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise

incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003(b).  This Motion requests extraordinary relief as defined in the Local Bankruptcy Rules for the Eastern District of New York and the Guidelines for First Day Motions adopted by the Board of Judges for the United States Bankruptcy Court for the Eastern District of New York and in accordance with Rule 9077-1 of the Local Bankruptcy Rules for the Eastern District of New York.  For reasons discussed above, authorizing the Debtors to pay Prepetition Employee Obligations; authorizing the Banks, at the Debtors' instruction, to receive, honor, process and pay, to the extent of funds on deposit, any and all checks or electronic funds transfers to the extent that such checks or transfers relate to any Employee obligations; and granting the other relief requested herein is integral to the Debtors' ability to continue their operations during these chapter 11 cases.  Failure to receive such authorization and other relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## <u>WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)</u>

52.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

53.    Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute any claim; or (c) an approval or assumption of any agreement under section 365 of the Bankruptcy Code.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to the interim order or final order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim at a later date.

## NOTICE

54.    Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the Eastern District of New York; (ii) the United States Attorney for the Eastern District of New York; (iii) the parties included on the Debtors' consolidated list of seventy-five (75) largest creditors; (iv) the Banks; (v) counsel to Bank of America; (vi) counsel to BMO Harris Bank, N.A.; (vii) counsel to Keybank National Association; (viii) counsel to Stifel Bank & Trust; (ix) counsel to Woodforest National Bank; (x) the Internal Revenue Service; and (xi) all other parties required to receive service under Rules 2002-2 of the Local Bankruptcy Rules for the Eastern District of New York and the Guidelines for First Day Motions adopted by the Board of Judges for the United States Bankruptcy Court for the Eastern District of New York.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter an interim order, substantially in the form attached hereto as **Exhibit A,** granting the relief requested in this Motion, (ii) schedule a final hearing on the Motion and thereafter enter a final order substantially in the form attached hereto as **Exhibit B**, and (iii) grant such other and further relief as the Court may deem proper.

Dated:  March 19, 2018        Respectfully submitted,
New York, New York

**DLA PIPER LLP (US)**

*/s/ Thomas R. Califano*
Thomas R. Califano (6144)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
E-mail:  thomas.califano@dlapiper.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**APPENDIX**

| # | Debtor Name | Case No. | Last 4 Digits of EIN |
|---|---|---|---|
| 1. | Orion HealthCorp, Inc. | 18-71748(AST) | 7246 |
| 2. | Constellation Healthcare Technologies, Inc. | 18-71749(AST) | 0135 |
| 3. | NEMS Acquisition, LLC | 18-71750(AST) | 7378 |
| 4. | Northeast Medical Solutions, LLC | 18-71751(AST) | 2703 |
| 5. | NEMS West Virginia, LLC | 18-71752(AST) | unknown |
| 6. | Physicians Practice Plus, LLC | 18-71753(AST) | 4122 |
| 7. | Physicians Practice Plus Holdings, LLC | 18-71754(AST) | 6100 |
| 8. | Medical Billing Services, Inc. | 18-71755(AST) | 2971 |
| 9. | Rand Medical Billing, Inc. | 18-71756(AST) | 7887 |
| 10. | RMI Physician Services Corporation | 18-71757(AST) | 7239 |
| 11. | Western Skies Practice Management, Inc. | 18-71758(AST) | 1904 |
| 12. | Integrated Physician Solutions, Inc. | 18-71759(AST) | 0543 |
| 13. | NYNM Acquisition, LLC | 18-71760(AST) | unknown |
| 14. | Northstar FHA, LLC | 18-71761(AST) | unknown |
| 15. | Northstar First Health, LLC | 18-71762(AST) | unknown |
| 16. | Vachette Business Services, Ltd. | 18-71763(AST) | 4672 |
| 17. | MDRX Medical Billing, LLC | 18-71764(AST) | 5410 |
| 18. | VEGA Medical Professionals, LLC | 18-71765(AST) | 1055 |
| 19. | Allegiance Consulting Associates, LLC | 18-71766(AST) | 7291 |
| 20. | Allegiance Billing & Consulting, LLC | 18-71767(AST) | 7141 |
| 21. | Phoenix Health, LLC | 18-71789(AST) | 0856 |