Thomas R. Califano, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
E-mail:  thomas.califano@dlapiper.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
ORION HEALTHCORP, INC., *et al.*,[1]                          :    Case No. 18-71748 (AST)
                                                              :
              Debtors.                                        :    (Joint Administration Pending)
                                                              :
------------------------------------------------------------- x

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION**
**FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2),**
**364(c)(3), 364(d)(1), AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO**
**11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO**
**11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING**
**PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Orion HealthCorp, Inc. and its affiliated debtors and debtors in possession (collectively,

the "Debtors"), by and through their proposed counsel, DLA Piper LLP (US), hereby file this

motion (the "Motion"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United

States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-5 of the Local Bankruptcy

Rules for the Eastern District of New York (the "Local Rules"), for entry of an interim order on

---

[1]  The Debtors include all of the affiliated entities that are listed on the **Appendix** attached hereto.  The corporate
headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown,
NJ 07748.

an expedited basis (the "Interim Order"), substantially in the form annexed hereto as **Exhibit A**, and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"), (i) authorizing the Debtors to (a) enter into that certain Superpriority Secured Debtor-In-Possession Credit Agreement, a copy of which is attached hereto as **Exhibit B** (the "DIP Credit Agreement" and, together with such other documents and agreements entered into in connection therewith, the "DIP Documents"), and (b) use Cash Collateral (as defined below), (ii) granting liens and providing super-priority administrative expense status to DIP Secured Parties (as defined below), (iii) granting adequate protection to the Debtors' prepetition secured lenders, (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (v) granting related relief (the "Motion").[2] In support of this Motion, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1.     In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their businesses.  In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases while working towards a successful sale transaction under section 363 of the Bankruptcy Code.  Postpetition financing, in addition to the use of Cash Collateral, is necessary in order for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper servicing of customers post-petition, and fund working capital needs.  Absent postpetition financing and the use of Cash Collateral, the Debtors will be forced to wind-down their operations due to a lack of funds.  It is, therefore, imperative that the Debtors have access to sufficient liquidity to avoid imminent irreparable harm and successfully consummate one or more sale transactions.

2.     Accordingly, by this Motion, the Debtors are seeking, *inter alia*:

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the DIP Credit Agreement.  To the extent that there is any conflict between this Motion and the Interim Order, the Interim Order shall control.

(a)     authorization for the Debtors to obtain senior secured postpetition financing consisting of a revolving credit facility in a principal amount of up to $7,500,000.00 (the "<u>DIP Facility</u>") in accordance with the DIP Credit Agreement among (i) Orion Healthcorp, Inc., as borrower ("<u>Orion</u>" or the "<u>Borrower</u>"); (ii) the other Debtors, as guarantors thereto; (iii) New York Network Management, L.L.C., Network Management Insurance Brokerage Services LLC ("<u>NYNM Insurance</u>"), New York Network IPA, Inc. ("<u>IPA 1</u>"), New York Premier IPA, Inc. ("<u>IPA 2</u>"), Brooklyn Medical Systems IPA 3, Inc. ("<u>IPA 3</u>"), Brooklyn Medical Systems IPA 4, Inc. ("<u>IPA 4</u>"), and Brooklyn Medical Systems IPA 5, Inc. ("<u>IPA 5</u>" and together with NYNMLLC, NYNM Insurance, IPA 1, IPA 2, IPA 3, and IPA 4, collectively, "<u>NYNM</u>"); (iv) Bank of America, N.A. as administrative agent (the "<u>DIP Agent</u>"), and (v) the lenders from time to time party thereto (each a "<u>DIP Lender</u>" and collectively, the "<u>DIP Lenders</u>" and collectively with the DIP Agent and providers of hedge products and treasury management services secured by the DIP Collateral (as defined below), the "<u>DIP Secured Parties</u>");

(b)     authorization for the Debtors to obtain from the DIP Lenders, during the interim period pending the Final Hearing (as defined below), up to $4,500,000.00 (the "<u>Interim Amount</u>") in accordance with the DIP Credit Agreement and the Interim Order;

(c)     following a final hearing, authorization for the Debtors to use amounts under the DIP Facility to repay the Debtors' outstanding obligations in respect of the Bridge Loan Obligations (as defined below) with such amount constituting an obligation under the DIP Facility;

(d)     authorization for the Debtors to obtain from the DIP Lenders upon entry of the Final Order total advances in an amount not to exceed a maximum outstanding principal amount of $7,500,000.00 (the "<u>Total Commitment</u>") in accordance with the DIP Credit Agreement, the DIP Documents, and the Final Order, which Total Commitment includes the amount necessary to repay the Bridge Loan Obligations;

(e)     authorization for the Debtors to execute and deliver the DIP Credit Agreement and the DIP Documents as well as to perform such other and further acts as may be necessary or  appropriate in connection therewith;

(f)     authorization for the Debtors to grant to the DIP Lenders assurances for the full and timely payment of the Debtors' obligations under the DIP Facility by granting to the DIP Lenders (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a "<u>Superpriority Administrative Expense Claim</u>") having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carveout (as defined

below), and (ii) pursuant to sections 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on, and security interests in, any and all of the DIP Collateral (as defined below), subject only to the Carveout;

(g)     authorization to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), and authorization to use the proceeds of the DIP Facility in accordance with a certain budget in form and substance satisfactory to the DIP Lenders, including to fund the costs associated with the Debtors' chapter 11 cases, to fund postpetition operating expenses of the Debtors during the chapter 11 cases, and to repay the Bridge Loan Obligations;

(h)     pursuant to section 362 of the Bankruptcy Code, modification of the automatic stay to the extent set forth in the DIP Credit Agreement and other DIP Documents;

(i)     pursuant to Bankruptcy Rule 4001, to schedule a preliminary hearing on this Motion and obtain authorization, from the entry of the Interim Order until the final hearing (the "<u>Final Hearing</u>"), to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates;

(j)     pursuant to Bankruptcy Rule 4001, to schedule a Final Hearing on this Motion to consider entry of the Final Order authorizing the Debtors to borrow the balance of the DIP Facility on a final basis on the terms and conditions set forth in the DIP Credit Agreement;

(k)     waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order; and

(l)     such further relief as this Court shall deem appropriate.

## <u>JURISDICTION</u>

3.     This Court has jurisdiction over these cases, the Debtors, their estates and this Motion, pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-5.

## BACKGROUND

**A.      General Background.**

6.      On March 16, 2018 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code.

7.      The Debtors continue to be in possession of their assets and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases.

9.      Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions* [D.I. 2] (the "First Day Declaration"),[3] which is fully incorporated in this Motion by reference.

**B.      The Prepetition Secured Indebtedness.**

10.     As part of the overall Merger transaction,[4] Orion entered into that certain Credit Agreement, dated as of January 30, 2017 (as amended, modified or supplemented from time to time, the "Prepetition Credit Agreement"), by and among (i) Orion, as Borrower, (ii) the other

---

[3] Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

[4] A detailed discussion regarding the Merger transaction can be found in section I(A)(iv) of the First Day Declaration.

Debtors and NYNM, as guarantors (the "<u>Guarantors</u>" and collectively with Orion, the "<u>Prepetition Loan Parties</u>"); (iv) Bank of America, N.A., as Administrative Agent (the "<u>Prepetition Agent</u>"); and (v) the lenders from time to time party thereto (the "<u>Prepetition Lenders</u>").

11.    As security for the payment of Orion's obligations under the Prepetition Credit Agreement, the Guarantors jointly and severally guaranteed the obligations thereunder. Additionally, pursuant to that certain Security Agreement, dated January 30, 2017 (as amended, modified or supplemented from time to time, the "<u>Security Agreement</u>"), the Prepetition Loan Parties pledged as collateral first priority liens in all of their property (other than Excluded Property, as such term is defined in the Prepetition Credit Agreement).  Additionally, pursuant to that certain Pledge Agreement, dated January 30, 2017 (the "<u>Pledge Agreement</u>"), the Prepetition Loan Parties pledged as collateral 100% of the equity interests in each of their subsidiaries.

12.    As of the Petition Date, the Prepetition Loan Parties' total secured debt obligations to the Lenders under the Prepetition Credit Agreement and related documents totaled approximately $159.3 million of principal consisting of obligations under the Term Loans and the Bridge Loan (as such terms are defined below) (collectively, the "<u>Senior Debt Obligations</u>"). The Senior Debt Obligations are described in greater detail below.

*i.    Revolving Loans*

13.    Subject to the terms and conditions set forth in the Prepetition Credit Agreement, each of the Prepetition Lenders severally agreed to make loans (the "<u>Revolving Loans</u>") to Orion in an aggregate amount not to exceed $15.0 million (the "<u>Aggregate Revolving Loan Commitment</u>").  The Revolving Loans have a maturity date of January 30, 2022 (the "<u>Maturity Date</u>").

14.     Pursuant to the Second Amendment to the Prepetition Credit Agreement (as defined below), the Aggregate Revolving Loan Commitment of the Prepetition Lenders terminated.  As of the Petition Date, the Prepetition Loan Parties did not owe any amounts to the Lenders on account of the Revolving Loans.

> ii.     *The Term Loans*

15.     In addition to the Revolving Loans, each of the Prepetition Lenders severally agreed to make its portion of a term loan to Orion in an aggregate amount of $130.0 million (the "Initial Term Loan").  Unless accelerated sooner pursuant to the Prepetition Credit Agreement, Orion is obligated to repay the outstanding principal of the Initial Term Loan in quarterly installments, with the outstanding principal balance of the Initial Term Loan payable on the Maturity Date.

16.     On March 10, 2017, in connection with the Debtors' acquisition of NYNM, the Loan Parties, the Prepetition Agent, and certain of the Prepetition Lenders entered into that certain Incremental Term Increase Agreement and Lender Joinder Agreement, pursuant to which certain of the Prepetition Lenders agreed to increase the Initial Term Loan by the amount of $30.0 million (the "Incremental Term Loans" and together with the Initial Term Loan, the "Term Loans").

17.     As of the Petition Date, the total amount owed to the Lenders by the Prepetition Loan Parties on account of the Terms Loans and Incremental Term Loans totaled not less than $156.61 million in outstanding principal and $1.59 million in interest.

       *iii.*    *The Letters of Credit*

18.    Pursuant to the Prepetition Credit Agreement, Bank of America, N.A., as the L/C Issuer, agreed to issue certain letters of credit (the "<u>Letters of Credit</u>") for Orion or any of its subsidiaries, provided that, among other things, the amount outstanding under the Letters of Credit together with amounts outstanding under the Revolving Loan and the Swing Line Loans does not exceed $15.0 million.

19.    As of the Petition Date, the total amount owed to the Prepetition Lenders by the Prepetition Loan Parties on account of the Letters of Credit totaled $0.

       *iv.*    *The Swing Line Loans*

20.    In addition to the Revolving Loan, Term Loan and Letters of Credit, Bank of America, N.A., as the Swingline Lender, agreed to make loans to Orion in its sole discretion in an aggregate amount not to exceed $5.0 million (the "<u>Swing Line Loans</u>"), provided that, among other things, the amount outstanding under the Swing Line Loans together with amounts outstanding under the Revolving Loans and the Letters of Credit does not exceed $15.0 million. The Swing Line Loans have a maturity date of the earlier of (a) ten (10) business days after a Swing Line Loan is made and (b) the Maturity Date.

21.    As of the Petition Date, the total amount owed to the Prepetition Lenders by the Prepetition Loan Parties on account of the Swing Line Loans totaled $0.

       *v.*    *The Forbearance Agreement*

22.    As a result of certain defaults under the Prepetition Credit Agreement, on November 10, 2017, the parties to the Prepetition Credit Agreement entered into that certain Forbearance Agreement dated as of November 10, 2017 (the "<u>Forbearance Agreement</u>"), as extended by that certain Forbearance Extension Agreement dated as of December 15, 2017 (the

"First Forbearance Extension Agreement") and that Second Forbearance Extension Agreement dated as of January 30, 2018 (the "Second Forbearance Extension Agreement"), under which the Prepetition Agent and Prepetition Lenders agreed to forbear from exercising their rights and remedies under the Prepetition Credit Agreement during the Forbearance Period (as such term is defined in the Forbearance Agreement, which pursuant to the Second Forbearance Extension Agreement, expired on March 9, 2018) pursuant to the terms and conditions set forth in the Forbearance Agreement.[5]

23.    In connection with the Second Forbearance Extension Agreement and pursuant to the Prepetition Credit Agreement, among other covenants, on or before January 31, 2018, the Loan Parties were required to make a prepayment in an amount equal to $2.9 million in respect of a tax refund received by the Prepetition Loan Parties on or about January 15, 2018. Additionally, the Prepetition Loan Parties agreed, upon request by the Administrative Agent, to, among other things, engage an investment banker reasonably acceptable to the Administrative Agent and Lenders, for the purpose of marketing some or all of the assets of the Prepetition Loan Parties. Due to timing and liquidity constraints, the Debtors were unable to retain an investment banker prior to the Petition Date.

*vi.    The Bridge Loan*

24.    On January 31, 2018 (the "Bridge Loan Closing Date"), after the Borrower requested additional funding, the parties to the Prepetition Credit Agreement entered into that certain Second Amendment to Credit Agreement (the "Second Amendment to Credit Agreement"), pursuant to which Bank of America, N.A. (the "Bridge Lender") agreed to provide

---

[5]   On November 10, 2017, in connection with the Forbearance Agreement, the Prepetition Loan Parties and the Prepetition Agent entered into that certain Amendment to Security Agreement, pursuant to which the Prepetition Loan Parties granted to the Prepetition Agent for the benefit of the Prepetition Lenders a security interest in certain commercial tort claims related to, among other things, the sham acquisitions of Phoenix and MDRX (as such terms are defined in the First Day Declaration).

additional extensions of credit under the Prepetition Credit Agreement in the form of a separate tranche of terms loans in the aggregate principal amount of $1.5 million (the "Bridge Loan Commitment"), the proceeds of which were to be used to finance the short-term working capital needs of Orion (the "Bridge Loan").  The Bridge Loan had a maturity date of March 9, 2018 (the "Bridge Loan Maturity Date").  The Second Amendment to Credit Agreement also contemplated that Vachette Business, Ltd., one of the Debtors, would sell substantially all of its assets for an amount of not less than $1.5 million (the "Vachette Sale").

25.    On February 22, 2018, the parties to the Prepetition Credit Agreement entered into that certain Third Amendment to Credit Agreement (the "Third Amendment to Credit Agreement"), pursuant to which the Bridge Lender agreed to increase the Bridge Loan Commitment to $3.0 million.  Furthermore, the Third Amendment to Credit Agreement provided that the Bridge Loan Commitment shall be automatically reduced to $1.0 million upon the closing of the Vachette Sale.

26.    As of the Petition Date, the total amount owed to the Prepetition Lenders by the Prepetition Loan Parties on account of the Bridge Loan totaled not less than $1.1 million, which is comprised of not less than $1.0 million in principal, $11,000 in interest and $60,000 in fees (the "Bridge Loan Obligations").

**C.    Cash Collateral Stipulation.**

27.    The Prepetition Lenders assert an interest in the Debtors' cash and revenue.  The Debtors and the Prepetition Lenders have agreed to the use of cash collateral by the Debtors to pay the Debtors' operating expenses in the ordinary course pursuant to that certain *Stipulated Order (I) Authorizing Use of Cash Collateral and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363* (the "Stipulation"), filed contemporaneously herewith, which allows

for such use and which preserves the Prepetition Lenders' liens to the extent, validity and priority such alleged liens enjoyed prior to the Petition Date. The Debtors have submitted the Stipulation for approval by the Court.

28.    The Stipulation is in the best interests of the estate, is necessary to preserve the status quo and is necessary to avoid irreparable harm to the estates.

**D.    The Debtor in Possession Financing.**

29.    The Debtors' assets are fully encumbered by liens in favor of the Prepetition Secured Lenders. The aggregate amount of debt secured by such liens likely exceeds the value of the Debtors' assets. The Debtors believe that a going-concern sale of their businesses is the best way to maximize value of their estates and to provide the greatest recovery to stakeholders. Accordingly, the Debtors' primary objective in obtaining postpetition financing is to secure adequate liquidity to fund a sale process. Representatives of the Debtors contacted another potential third party lender, however, those discussions failed to produce any firm financing proposals. The Debtors submit that, due to, among other reasons, the short-term maturity date of the proposed financing on account of the proposed sale of the Debtors' assets and the lack of any significant unencumbered assets in which to grant security interest, the DIP Lenders were the only viable financing source. The Debtors, therefore, focused on obtaining the best terms for the financing being offered by the DIP Lenders. Those efforts, which included extensive arm's length negotiations between the DIP Lenders, the Debtors and their representatives, resulted in the DIP Facility proposed under this Motion.

30.    Immediate access to postpetition financing and the use of Cash Collateral is necessary to enhance the Debtors' liquidity, provide necessary working capital during the pendency of these chapter 11 cases, and provide customers, employees, vendors, suppliers, and

other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course while working towards a sale transaction. The Debtors determined that the use of Cash Collateral alone would not provide sufficient liquidity for the Debtors to operate their businesses in an appropriate manner. If the Debtors are unable to access the DIP Facility and use Cash Collateral, the Debtors' business operations, ability to effectively consummate a sale transaction, and ability to satisfy obligations to customers will be irreparably harmed. For the foregoing reasons, the DIP Facility is in the best interest of the Debtors' estates, creditors, and other parties in interest.

### THE DIP FINANCING[6]

31.     The DIP Facility provides the Debtors with up to $7.5 million in availability on a final basis, $4.5 million of which will be available on an interim basis. The Debtors have provided a budget to the DIP Lenders, a copy of which is attached hereto as **Exhibit C**, setting forth in reasonable detail all projected receipts and disbursements of the Debtors through and including June 15, 2018 (the "Budget"). As noted above, the DIP Facility's primary purpose is to fund operating expenses and expenses associated with the chapter 11 cases. The Budget represents a culmination of significant negotiations between the Debtors and the DIP Lenders, and the Debtors believe that the DIP Facility provides sufficient liquidity for the chapter 11 cases.

---

[6]   The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim Order. The Debtors reserve all rights in connection with the Interim Order. Unless otherwise specified, terms used in this section have the same definitions as those in DIP Credit Agreement.

32.    The DIP Facility contemplates a "roll up" of the Bridge Loans Obligations totaling approximately $1,000,000 (the "Roll-Up").  The DIP Lenders would not have agreed to provide the DIP Facility without the Roll-Up.

33.    The pertinent terms of the DIP Credit Agreement and related DIP Orders are as follows:[7]

| SUMMARY OF DIP CREDIT AGREEMENT | |
|---|---|
| **Purpose** | Each Loan Party shall, and shall cause each of its Subsidiaries to, use the proceeds of the Borrowings:<br><br>(a) for working capital and other general corporate purposes of the Loan Parties, including the payment of professional fees and expenses;<br><br>(b) to pay the reasonable fees and expenses of the Administrative Agent and the Prepetition Agent (including reasonable fees and expenses of counsel and financial advisors);<br><br>(c) to pay claims in respect of certain prepetition creditors, which may include, without limitation, employees, taxing authorities and trade vendors in the ordinary course, in each case, to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the DIP Agent and DIP Lenders;<br><br>(d) after entry of the Final Order, to repay the Bridge Loan (under and as defined in the Prepetition Credit Agreement); and<br><br>(e) to make adequate protection payments to the Prepetition Lenders to the extent authorized by orders of the Bankruptcy Court, in each case, in accordance with the Budget.<br><br>*See* DIP Credit Agreement, § 6.11. |
| **Maturity** | "Maturity Date" means the earliest to occur of (a) the date that is six (6) months from the Petition Date and (b) the date upon which any plan of reorganization or liquidation of the Loan Parties becomes effective. |
| **Interest Rates** | Base Rate:  For any day, a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," and (c) the Eurodollar Rate plus 1.00%.<br><br>Interest Rate:  Base Rate plus three percent (3.0%) per annum, compounded on the basis of a 360-day year.  Interest shall be payable monthly in arrears on the |

---

[7]  Capitalized terms not otherwise defined in the summary shall have the meanings ascribed to them in the DIP Credit Agreement.

| | |
|---|---|
| | last business day of each month and on the Termination Date.<br><br>Default Rate:  Base Rate plus the Applicable Rate for Revolving Loans that are Base Rate Loans plus two percent (2.0%).<br><br>*See* DIP Credit Agreement, § 2.08. |
| **Conditions** | Closing Conditions:  Usual and customary conditions to effectiveness of the DIP Facility, including the DIP Lenders' satisfaction with the Budget, entry of the Interim DIP Order and other "first day" orders satisfactory to the DIP Lenders, the continued retention of FTI Consulting, Inc. as the Debtors' chief restructuring officer of the Debtors and the retention of an investment banker.<br><br>Funding Conditions:  Each extension of credit is subject to usual and customary funding conditions, including delivery of notice, accuracy of representations, no events of default, and compliance with the Budget.<br><br>*See* DIP Credit Agreement §§ 4.01 & 4.02. |
| **Fees** | Commitment Fee:  The Borrower shall pay to the Administrative Agent for the account of each Revolving Lender in accordance with its Applicable Revolving Percentage, a commitment fee (the "Commitment Fee") at a rate per annum equal to 0.25% times the actual daily amount by which the Revolving Facility exceeds the Outstanding Amount of Revolving Loans, subject to adjustment as provided in Section 2.15.  For the avoidance of doubt, the Commitment Fee shall be determined based on the full $7,500,000 of Revolving Commitments prior to the entry of the Final DIP Order<br><br>Upfront Fees.  The Borrower shall pay to the Administrative Agent, for the account of each Lender in accordance with its Applicable Percentage, an upfront fee equal to the product of (i) 2.0% times (ii) the Aggregate Commitments (the "Upfront Fee").  The Upfront Fee shall be due and payable upon the entry of the Interim DIP Order.<br><br>*See* DIP Credit Agreement § 2.09. |
| **Liens and Priorities** | All DIP Obligations would at all times:<br><br>(a) pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute joint and several allowed administrative expense claims in the Chapter 11 Cases having superpriority over all administrative expenses of the kind specified in Section 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d) of the Bankruptcy Code;<br><br>(b) pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority Lien on all presently owned and hereafter acquired unencumbered tangible and intangible property and assets of the Borrower, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, Avoidance Actions, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of |

action, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds);

(c) pursuant to Section 364(d)(1) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority, senior priming Lien (the "Priming Lien") on the Prepetition Collateral, which Priming Lien shall prime all Liens securing the Prepetition Facility Obligations and any Liens that are junior thereto, and shall also be senior to any Liens arising after the Petition Date to provide adequate protection in respect of any Liens to which the Priming Lien is senior (collectively, the "Primed Liens");

(d) shall be secured by proceeds of any Avoidance Actions of the Loan Parties; and

(e) pursuant to Section 364(c)(3) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected junior priority Lien on all presently owned and hereafter acquired tangible and intangible property and assets of the Borrower, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, Avoidance Actions, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds) that are subject to (x) valid and perfected Liens in existence on the Petition Date or (y) valid Liens in existence on the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, if any (in each case, other than Liens securing the Prepetition Facility Obligations).

*See* DIP Credit Agreement § 2.16.

| | |
|---|---|
| **Carve-Out** | The DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, the Adequate Protection Superpriority Claim and the Prepetition Liens shall be subject and subordinate to the prior payment of:<br><br>(i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "Case Administration Fees");<br><br>(ii) unpaid professional fees and expenses ("Professional Fees") payable to any legal or other advisors retained by the Debtors or any Creditors' Committee that are permitted under the Approved Budget and incurred or accrued prior to the earlier of the occurrence of (A) the Maturity Date and (B) an Event of Default under the DIP Agreement or (C) cessation of the Debtors' right to use Cash Collateral pursuant to Paragraph 10 (a "Termination Event") upon notice thereof and commencement of the Remedies Notice Period (as defined below) and which Professional Fees are ultimately allowed by the Court pursuant to sections 328, |

<table>
<tr><td>

330, 331 and 503 of the Bankruptcy Code, and (iii) unpaid Professional Fees incurred or accrued on or after the occurrence of a Termination Event in an aggregate amount not to exceed $50,000 (the "Post-Termination Expense Cap") ((i), (ii) and (iii), collectively, the "Carve-Out").  Subject to the immediately preceding sentence, so long as no Termination Event has occurred, upon Court approval, the Debtors shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable under sections 328, 330, 331 and 503 of the Bankruptcy Code, as provided in this Order, the DIP Documents, and the Approved Budget.  Payment of any Professional Fees that are accrued or incurred after the occurrence of a Termination Event shall permanently reduce the Post-Termination Expense Cap on a dollar-for-dollar basis.   The Debtors are authorized to fund payment of Professional Fees to a trust account ("Professional Fee Trust Account") held by Debtors' counsel in the amounts and at the times set forth in the Approved Budget, which funds may be released to the applicable professionals upon Court approval.  Any funds in the Professional Fee Trust Account in excess of the Professional Fees allowed by the Bankruptcy Court shall be returned to the DIP Agent and shall be subject to the DIP Liens, the Adequate Protection Liens and the Prepetition Liens.  Payment by the Debtors to the Professional Fee Trust Account shall reduce the Carve-Out on a dollar-for-dollar basis.  The Carve-Out shall not include, apply to, or be available for any success fee or similar payment to any professionals or other persons payable in connection with a restructuring or asset disposition with respect to any of the Debtors or otherwise, except as set forth in the Approved Budget.

*See* Credit Agreement, § 6.11, *see also* Interim Order, ¶ 17.

</td></tr>
</table>

### **Highlighted Provisions Pursuant to Financing Guidelines**

34.    Pursuant to Local Rule 4001-5(a)(i)- (iii), the Debtors are required to disclose the

following provisions of the Interim Order and DIP Credit Agreement:

| REQUIRED DISCLOSURES | RESPONSE |
|---|---|
| The absence of any carve-out for professional fees, or provisions that provide treatment for the professionals retained by the debtor that is different than that provided for the professionals retained by a creditors' committee with respect to a professional fee carve-out. | The DIP Credit Agreement reflects the DIP Lenders' willingness to provide funding for professional fees incurred by the Debtors and the Committee, subject to the Budget.  The DIP Lenders have agreed to a $25,000 Carve-Out to investigate matters related to, among other things, the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Prepetition Agent or the Prepetition Lenders.<br><br>*See* DIP Credit Agreement, § 6.11. |
| Provisions that require the debtor to pay the secured creditor's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review | The DIP Credit Agreement requires the Debtors to pay, on the Closing Date, the sum of $500,000 to the Prepetition Agent to reimburse it (in part) for the fees and out-of-pocket expenses of counsel to the |

| | |
|---|---|
| by the Office of the United States Trustee, creditors' committee (if formed), or the Court. | Prepetition Agent, including amounts incurred in retention of the Prepetition Agent's financial advisor retained by counsel on behalf of the Prepetition Agent, subject to the rights of parties in interest to bring actions during the Challenge Period.<br><br>The payment of the Prepetition Lenders' and DIP Lenders' fees and expenses are subject to a notice and review period by the Office of the United States Trustee and Committee.<br><br>*See* Credit Agreement, § 11.04(a); *see also* Interim Order ¶ 11. |
| Provisions that exclude from a carve-out any request for professional fees related to the investigation of whether the secured creditor's lien is valid or properly perfected. | The DIP Lenders have agreed to a $25,000 Carve-Out to investigate matters related to, among other things, the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Prepetition Agent or the Prepetition Lenders.<br><br>*See* Credit Agreement, § 6.11. |

## **BASIS FOR RELIEF**

**A.  THE REQUESTED RELIEF SHOULD BE GRANTED PURSUANT TO SECTIONS 364(c) AND 364(d)(1) OF THE BANKRUPTCY CODE.**

35.    As set forth above, the Debtors' ability to maximize the value of their estates and successfully sell their business operations hinges upon their being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis.  *See* 11 U.S.C. § 364.  Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  *See* 11 U.S.C. § 364(c).

36.     Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

### I.     The Debtors Have Exercised Their Business Judgment in Entering Into the DIP Facility.

37.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *In re AMR Corp.,* 485 B.R. 279, 287 (Bankr. S.D.N.Y.), *aff'd,* 730 F.3d 88 (2d Cir. 2013) ("In determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because

they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

38.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor).  Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."  *Curlew Valley*, 14 B.R. at 513–14.

40.     The Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Credit Agreement.  The use of Cash Collateral alone is insufficient to meet the Debtors' working capital needs to operate their businesses in the ordinary course.  The DIP Credit Agreement contains terms and conditions that are the best available

under the circumstances and provides the Debtors with sufficient liquidity during the period of the Budget.  In addition, the Debtors' repayment of the Bridge Loan Obligations, subject to entry of a Final Order and as set forth in the DIP Credit Agreement, is reasonable and appropriate under the circumstances.   The DIP Lenders would not have agreed to extend postpetition financing without a roll-up or repayment of the Debtors' obligations in connection with the Prepetition Credit Agreement.  In addition, the Interim Order preserves the rights of other parties in interest, including any statutory committee of unsecured creditors, to investigate and challenge the validity, enforceability, perfection, and priority of the liens and security interests granted to the Prepetition Lenders under the Prepetition Loan Agreement.  This Court and other courts have previously approved similar debtor-in-possession financing agreements where the debtor was not able to obtain postpetition financing under other conditions.  *See, e.g.*, *In re Personal Communications Devices, LLC, et al*., Case No. 13-74303 (Bankr. E.D.N.Y. August 21, 2013), *In re Global Aviation Holdings, Inc., et al.,* Case No. 12-40783 (Bankr. E.D.N.Y March 1, 2012)*, In re SDI Solutions LLC, et al.*, Case No. 16-10627 (Bankr. D. Del. May 3, 2016); *In re Imris, Inc., et al.*, Case No. 15-11133 (Bankr. D. Del. May 25, 2015); *In re Cal Dive Int'l, Inc., et al.*, Case No. 15-10458 (Bankr. D. Del. April 20, 2015); *In re Digital Domain Media Group, Inc., et al.*, Case No. 12-12568 (BLS) (Bankr. D. Del. Nov. 7, 2012); *In re Real Mex Restaurants, Inc. et al.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011).

41.    The funds provided by the DIP Facility are essential to enable the Debtors to continue to operate during the course of these chapter 11 cases while working towards a sale transaction that is in the best interest of the estates.  Indeed, failure to obtain approval of the DIP Facility will lead to a wind-down of the Debtors' business operations which, in turn, will

preclude any sale of the Debtors' assets and adversely affect the value ultimately received by stakeholders.

42.     Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to obtain financing from the DIP Lenders on the terms set forth in the DIP Credit Agreement.

## II.     The DIP Facility Represents the Best Financing Available.

43.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. *See*, *e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

44.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support

conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

45.     The Debtors and their advisors solicited both financing and sale proposals from various parties.  The Debtors have determined that the terms and conditions of the DIP Facility are the best available under the circumstances and address the Debtors' working capital needs, and no other entity was willing to provide financing on any better terms.  Postpetition financing is not otherwise available without granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code (in each case subject to the Carveout and Permitted Liens).  The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable than those provided by the DIP Facility.  Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

**III.    The DIP Facility Is Necessary to Maintain the Debtors' Ongoing Business Operations and to Successfully Consummate a Sale of the Debtors' Assets in These Chapter 11 Cases.**

46.     The DIP Facility, if approved, will provide essential working capital, allowing the Debtors to maintain the value of their assets and their ongoing business operations while working towards a sale of the Debtors' assets in these chapter 11 cases.  In addition, the DIP Facility will provide the Debtors' various constituencies, including customers, employees, vendors, and service providers, with confidence in the Debtors' ability to maintain operations while working towards a sale transaction.

47.     If the relief sought in this Motion is denied or delayed, the Debtors likely will experience business disruptions, the Debtors' ability to properly service customers will be hindered, and the Debtors' ability to consummate a sale transaction and maximize value for the estates may be irreparably damaged.   Accordingly, the DIP Facility is necessary to maximize value for the Debtors' estates and inures to the benefit of creditors and all parties in interest.

### IV.    The Terms of the DIP Facility Are Fair, Reasonable, and Adequate Under the Circumstances.

48.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.   *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).   The appropriateness of a proposed financing facility should also be considered in light of current market conditions.   *See Transcript of Record* at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

49.     The terms and conditions of the DIP Facility were negotiated in good faith and at arm's length among the parties, culminating in the DIP Credit Agreement that is designed to provide the Debtors with essential working capital and maintain the Debtors' ongoing business operations while working towards a sale of the Debtors' assets.   Indeed, when viewed in its totality, the DIP Facility reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and is supported by fair consideration.

#### V.       Section 364(e) Protections Should Apply to the DIP Facility.

50.       The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the Court should find that each of the DIP Lenders is a "good faith" lender within the meaning of Bankruptcy Code section 364(e), and is entitled to all of the protections afforded by that section.

### B.       THE DEBTORS' REQUEST FOR USE OF CASH COLLATERAL
###         AND THE PROPOSED ADEQUATE PROTECTION IS APPROPRIATE.

51.       The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

52.       Under section 363(c)(2), a debtor may not use cash collateral unless an entity that has an interest in it consents or such use is authorized by the court after notice." *In re Cerrico Realty Corp.*, 127 B.R. 319, 321 (Bankr. E.D.N.Y. 1991).  "Cash collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest."  11 U.S.C. § 363(a).

53.       The Debtors have an urgent need for the immediate use of the Cash Collateral pending the final hearing on this Motion and seek to use Cash Collateral existing on or after the Petition Date in accordance with the Interim Order and DIP Credit Agreement.  The Debtors require the use of the Cash Collateral to, among other things, fund payroll, maintain their

ongoing business operations and to pay the costs and expenses associated with the administration of these chapter 11 cases.  Absent the use of Cash Collateral, the Debtors' ability to perform under their various contracts and agreements would be diminished and the value of the Debtors' business as a going concern would be irreparably impaired.

54.      In addition, the DIP Lenders are the only party holding a security interest in the Cash Collateral and has consented to the use of Cash Collateral as requested herein, subject to their receipt of the adequate protection provided for in the Interim Order.  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

55.      Courts have also held that adequate protection may be demonstrated by showing that the secured creditor's interest in the collateral is preserved by the debtor's use of the cash collateral in a manner that maintains or enhances the collateral's value.  *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105–06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); *accord in re Atrium Dev. Co.*, 159 B.R. 464, 471 (Bankr.

E.D. Va. 1993) ("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest."); *McCombs Props. VI, Ltd. V. First Tex. Sav. Ass'n (In re McCombs Props. VI, Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that committing to use cash collateral for operating expenses substantially eliminated the risk of diminution in the secured creditor's interest in the collateral).

56.    The proposed adequate protection is typical and appropriate under the circumstances.  Specifically, as adequate protection for the Prepetition Lenders with respect to, and solely to the extent of, any diminution of value in the prepetition collateral from and after the Petition Date, the Prepetition Lenders shall receive (i) a superpriority claim immediately junior to the claims under Section 364(c)(1) of the Bankruptcy Code held by the Administrative Agent and the Lenders in respect of the DIP Obligations; (ii) a co-extensive second priority replacement lien on such assets of the Debtors to be encumbered in favor of the Administrative Agent for the benefit of the Lenders, which adequate protection lien shall have a priority immediately junior to the priming and other liens to be granted in favor of the Administrative Agent in respect of the DIP Obligations; (iii) payment on the Closing Date of the sum of $500,000 to the Prepetition Agent to reimburse it (in part) for the fees and out-of-pocket expenses of counsel to the Prepetition Agent, including amounts incurred in retention of the Prepetition Agent's financial advisor retained by counsel on behalf of the Prepetition Agent, subject to the rights of parties in interest to bring actions during the Challenge Period; (iv) a waiver of any rights to pursue the collateral of the Prepetition Agent or the Prepetition Lenders for any amounts pursuant to Section 506(c) of the Bankruptcy and a wiver of the exceptions under sections 552(b)(1) and (2); and (v) copies of all financial statements, projections and reports furnished to the Administrative Agent,

the Lenders or their agents by the Debtors under the DIP Loan Documents Prepetition Lenders have consented to these forms of adequate protection.  Accordingly, the Debtors should be authorized to use Cash Collateral as set forth herein.

**C.      MODIFICATION OF THE AUTOMATIC STAY ON A LIMITED BASIS IS WARRANTED.**

57.      The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, the DIP Credit Documents, the Interim Order, and the Final Order, after five (5) business days' notice thereof, and to take various actions without further order of or application to the Court.

58.      Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Credit Agreement and DIP Credit Documents and the proposed DIP Orders.

**D.      INTERIM APPROVAL AND SCHEDULING OF FINAL HEARING.**

59.      As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of Cash Collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

60.     Absent relief on an interim basis pursuant to the Interim Order, the Debtors will be unable to satisfy their immediate and projected payment obligations, including payroll and other operating expenses.  Given the immediate and irreparable harm to be suffered by the Debtors absent interim relief, the Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and (a) authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral, and (b) schedule the Final Hearing.

**E.      WAIVER OF BANKRUPTCY RULES 6004(a) AND (h).**

61.     The Debtors believe an efficient and expeditious approval and implementation of the DIP Facility is in the best interests of their creditors and other parties in interest, including patients.  Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**NOTICE**

62.     No trustee, examiner, or statutory committee of unsecured creditors has been appointed in these chapter 11 cases.  Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the Eastern District of New York; (b) the United States Attorney for the Eastern District of New York; (c) the parties included on the Debtors' consolidated list of seventy-five (75) largest creditors; (d) counsel to Bank of America, N.A.; (e) counsel to BMO Harris Bank, N.A.; (f) counsel to Keybank National Association; (g) counsel to Stifel Bank & Trust; (h) counsel to Woodforest National Bank; (i) the Internal Revenue Service; any and all known parties that may be asserting a lien against the DIP Collateral; and (j) all other parties required to receive service under Rules 2002-2 of the Local Bankruptcy Rules for the Eastern

District of New York and the Guidelines for First Day Motions adopted by the Board of Judges for the United States Bankruptcy Court for the Eastern District of New York.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

**<u>CONCLUSION</u>**

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the proposed Interim Order attached hereto as **<u>Exhibit A</u>**, (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court, and (iii) grant such other and further relief as this Court deems just and proper.

Dated:  March 20, 2018
      New York, New York

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/  Thomas Califano*
Thomas R. Califano (6114)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
E-mail: thomas.califano@dlapiper.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**APPENDIX**

| # | **Debtor Name** | **Case No.** | **Last 4 Digits of EIN** |
|---|---|---|---|
| 1. | Orion HealthCorp, Inc. | 18-71748 (AST) | 7246 |
| 2. | Constellation Healthcare Technologies, Inc. | 18-71749 (AST) | 0135 |
| 3. | NEMS Acquisition, LLC | 18-71750 (AST) | 7378 |
| 4. | Northeast Medical Solutions, LLC | 18-71751 (AST) | 2703 |
| 5. | NEMS West Virginia, LLC | 18-71752 (AST) | unknown |
| 6. | Physicians Practice Plus, LLC | 18-71753 (AST) | 4122 |
| 7. | Physicians Practice Plus Holdings, LLC | 18-71754 (AST) | 6100 |
| 8. | Medical Billing Services, Inc. | 18-71755 (AST) | 2971 |
| 9. | Rand Medical Billing, Inc. | 18-71756 (AST) | 7887 |
| 10. | RMI Physician Services Corporation | 18-71757 (AST) | 7239 |
| 11. | Western Skies Practice Management, Inc. | 18-71758 (AST) | 1904 |
| 12. | Integrated Physician Solutions, Inc. | 18-71759 (AST) | 0543 |
| 13. | NYNM Acquisition, LLC | 18-71760 (AST) | unknown |
| 14. | Northstar FHA, LLC | 18-71761 (AST) | unknown |
| 15. | Northstar First Health, LLC | 18-71762 (AST) | unknown |
| 16. | Vachette Business Services, Ltd. | 18-71763 (AST) | 4672 |
| 17. | MDRX Medical Billing, LLC | 18-71764 (AST) | 5410 |
| 18. | VEGA Medical Professionals, LLC | 18-71765 (AST) | 1055 |
| 19. | Allegiance Consulting Associates, LLC | 18-71766 (AST) | 7291 |
| 20. | Allegiance Billing & Consulting, LLC | 18-71767 (AST) | 7141 |
| 21. | Phoenix Health, LLC | 18-71789 (AST) | 0856 |