Thomas R. Califano, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone:   (212) 335-4500
Facsimile:   (212) 335-4501
E-mail:        thomas.califano@dlapiper.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| | : | |
| Debtors. | :x | (Jointly Administered) |

-------------------------------------------------------------------

**(Bidding Procedures and Sale Motion)**

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS (A)(I) APPROVING BIDDING PROCEDURES RELATING TO THE SALE OF CERTAIN OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (IV) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; (V) SCHEDULING A HEARING ON THE PROPOSED SALE; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

Orion HealthCorp, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submit this motion (the "Motion") and respectfully represent as follows:

**RELIEF REQUESTED**

By this Motion, the Debtors are seeking entry of two orders, as described below, pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Bankruptcy Rules for the Eastern District of New York (the "Local Bankruptcy Rules") and the Sale Guidelines, adopted as Administrative Order No. 557 of the United States Bankruptcy Court for the Eastern District of New York (the "Sale Guidelines").

The Debtors request the entry of a first order, substantially in the form annexed hereto as Exhibit A (the "Bidding Procedures Order"), (i) approving bidding procedures (the "Bidding Procedures") substantially in the form attached to the Bidding Procedures Order as Annex 1, (ii) approving the bid protections as set forth in the asset purchase agreement (the "Agreement")[1] annexed to this Motion as Exhibit B between the Debtors and Medical Transcription Billing, Corp. (the "Stalking Horse" or "Purchaser"), with respect to the proposed sale (the "Sale") of

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

substantially all of the assets of the Debtors, (iii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iv) approving the form and manner of notice of an auction for the Purchased Assets (as defined herein) (the "Auction"), (v) establishing procedures to determine cure amounts ("Cure Amounts") and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors, and (vi) granting related relief.

Relatedly, the Debtors request that, pursuant to the Bidding Procedures Order, the Court approve:

- the form and sufficiency of the Auction and Hearing Notice attached as Annex 2 to the proposed Bidding Procedures Order;

- the Assignment Procedures attached as Annex 3 to the proposed Bidding Procedures Order;

- the form and sufficiency of the Assignment Notice attached as Annex 4 to the proposed Bidding Procedures Order;

- the form and sufficiency of the Auction Results Notice attached as Annex 5 to the proposed Bidding Procedures Order;

- the form and sufficiency of the Creditor Notice attached as Annex 6 to the proposed Bidding Procedures Order; and

- the form and sufficiency of the Further Assignments Notice attached as Annex 7 to the proposed Bidding Procedures Order.

The Debtors also request the entry of a second order, substantially in the form annexed hereto as Exhibit C (the "Sale Order"), (i) authorizing and approving the Agreement (or such other asset purchase agreement as may be selected at the Auction as the highest or best offer); (ii) authorizing the sale of substantially all of the Debtors' assets free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement; (iii) authorizing the assumption and assignment of the Assumed Contracts and Leases; and (iv) granting related relief.

In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008, and Local Bankruptcy Rule 6004-1.

## BACKGROUND

### A.      General Background

4.      On March 16, 2018 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code.  These chapter 11 cases are jointly administered for procedural purposes only [D.I. 34].

5.      The Debtors continue to be in possession of their assets and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On April 4, 2018, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 82].  As of the date hereof, no trustee or examiner has been appointed in the Debtors' chapter 11 cases.

7.      Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions* [D.I. 2] (the "First Day Declaration").

### B.    Overview of the Proposed Sale

8.    As discussed in the First Day Declaration, the Debtors are a consolidated enterprise of several companies aggregated through a series of acquisitions, which operate the following businesses:  (a) outsourced revenue cycle management ("RCM") for physician practices, (b) physician practice management, and (c) a group purchasing services for physician practices.   The Debtors' non-Debtor subsidiaries (referred to as "NYNM") operate an independent practice association business.

9.    By this Motion, (a) Debtors Orion HealthCorp, Inc., Medical Billing Services, Inc., Rand Medical Billing, Inc., RMI Physician Services Corporation, Western Skies Practice Management, Inc., Physician Practice Plus Holdings, LLC, Physician Practice Plus, LLC, NEMS Acquisition, LLC, Northeast Medical Solutions, LLC, and NEMS West Virginia, LLC are seeking to sell their assets associated with their RCM business (referred to as the "Orion RCM Business"), (b) Debtors Vega Medical Professionals, LLC, Allegiance Consulting Associates, LLC, and Allegiance Billing & Consulting, LLC seek to sell their assets associated with their RCM business (referred to as the "Allegiance RCM Business"), and (c) Debtor Integrated Physician Solutions, Inc. seeks to sell its assets associated with its physician practice management business and its group purchasing organization business.

10.    The Debtors are not seeking to sell their equity interests in or the assets of their non-Debtor subsidiaries that operate an independent physician association pursuant to this Motion.  The Debtors may seek a sale of the NYNM-related assets separately and believe that if they proceed with such a sale, it will generate substantial additional proceeds for their estates.

### C.    The Sale Process

11.    The Debtors believe that a sale of their assets offers the highest potential recovery for all stakeholders and the best prospects for the continued operation of the Debtors' business in

some form (in the hands of new ownership). To this end, the Debtors retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to undertake a search to identify potential buyers. Houlihan Lokey performed a review of the marketplace and identified and contacted 69 potential buyers to date. While the sale process is still underway, so far 17 potential buyers expressed sufficient interest to execute non-disclosure agreements and conduct preliminary due diligence.

12.    On April 10, 2018, the Debtors received a non-binding letter of intent (the "LOI") from the Stalking Horse for the purchase of certain of their assets. Since receiving the LOI, the Debtors and the Stalking Horse have engaged in extensive negotiations regarding the details of a transaction whereby the Stalking Horse would acquire certain of the Debtor's assets subject to higher and/or better bids pursuant to section 363 of the Bankruptcy Code.

13.    While the Debtors have received other offers for their assets, following the review and analysis of the Stalking Horse bid by the Debtors and their legal and financial advisors, the Debtors determined that based on value indications to date, the bid submitted by the Stalking Horse was the highest and best offer in terms of value for the estates from those specific assets to date.

14.    As a result of these negotiations, on May 4, 2018, the Debtors and the Stalking Horse have agreed to pursue a sale and purchase of certain of the Debtors' assets (the "Purchased Assets," and as defined in the Agreement, the "Target Assets"), subject to and pursuant to the Agreement and the Bidding Procedures detailed herein.

15.    In order to assure that the highest and/or best transaction is achieved, once the Bidding Procedures Order is entered, the Debtors will continue to market the Purchased Assets to other potential purchasers prior to the Debtors' proceeding with an auction and sale hearing before the Court.

### D.    The Proposed Timeline and Deadlines

16.    As further discussed below, the Debtors request that the Court set the following timeline and deadlines in connection with the proposed Sale process:[2]

| | |
|---|---|
| **Bidding Procedures Hearing** | **May 24, 2018 at 10:00 a.m. ET** |
| **Sale Objection Deadline** | **June 14, 2018 at 4:00 p.m. ET** |
| **Contract/Lease Objection Deadline** | **June 14, 2018 at 4:00 p.m. ET** |
| **Bid Deadline** | **June 14, 2018 at 4:00 p.m. ET** |
| **Auction** | **June 18, 2018 at 10:00 a.m. ET** |
| **Supplemental Objection Deadline** | **June 21, 2018 at 4:00 p.m. ET** |
| **Sale Hearing** | **June 25, 2018 at 10:00 a.m. ET** |

17.    The Debtors submit that, in light of the marketing process already undertaken and the additional efforts that will be made going forward during the proposed sale process, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to either the Stalking Horse under the terms of the Agreement or, alternatively, to a higher and better bidder for the Purchased Assets.  Further, the Debtors believe that the proposed timetable for the sale is reasonable by minimizing exposure of the Debtors' businesses to the uncertainties associated with bankruptcy, while at the same time providing an adequate opportunity for competing bids to be solicited.

---

[2] All dates proposed herein are subject to the Court's availability.

18.    The Purchaser has also imposed certain deadlines on the Debtors under the Agreement in order to accomplish the sale.  The principal deadlines set forth in the Agreement are summarized below:

- Filing of this Motion within five (5) Business Days after the execution of the Agreement requesting that the Bankruptcy Court (i) schedule a hearing on the Bidding Procedures Order on a date no later than fourteen (14) days following the filing of this Motion, (ii) enter the Bidding Procedures Order no later than twenty-one (21) days following the filing of this Motion and (iii) enter the Sale Order at the final hearing on the Sale Motion (the "Sale Hearing") on a date no later than fifty-two (52) days following the filing of this Motion;

- Filing of a motion, contemporaneous with the filing of this Motion (which may be included in this Motion) for an order authorizing the assumption and assignment of the Assigned Contracts to Purchaser pursuant to Section 365 of the Bankruptcy Code;

- Entry of an order approving the Bidding Procedures by no later than 21 days after the filing of this Motion; and

- Deadline to submit competing bids by no later than 4:00 p.m. Eastern Time at least three (3) Business Days prior to the Auction.

19.    The Debtors believe that the sale process provides sufficient time to fully expose the Assets for sale in the hope of achieving a competitive bidding process.

**E.    The Proposed Sale**

20.    The Debtors believe that it is in the best interests of their estates to enter into the Agreement.  The following sub-paragraphs summarize key provisions of the Agreement, but are qualified in their entirety by reference to the actual Agreement:

(a) Purchase Price.    The aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be an amount equal to the greater of (a) $10,000,000.00 and (b) the Base Purchase Price.[3]

(b) Purchased Assets.    The Purchased Assets include all the assets, properties, business and rights, of every kind and description (whether real, personal or

---

[3] The Base Purchase Price is calculated pursuant to a formula described in the Agreement.  Pursuant to the Agreement, Purchaser shall provide Sellers with a calculation of the Base Purchase Price at least four (4) Business Days prior to the Auction.

mixed, tangible or intangible) and wherever situated, which are owned, used or held for use by Sellers as of the date of the Agreement in connection with the Target Business, except for the Excluded Assets and, in any event, shall include, without limitation, all of the following assets, as such assets relate to the Target Business: (i) all work in progress, accounts receivable and other rights to payment from customers of Sellers and the full benefit of all security for such accounts or rights to payment, and any claim, remedy or right related to the foregoing; (ii) all rights of Sellers in, to and under the Assigned Contracts; (iii) all rights of Sellers in the Intellectual Property material to the Target Business or that is used in the Target Business, a complete list of which is attached as <u>Schedule 4.13</u> to the Agreement, along with all income, royalties, damages and payments due or payable on or after the Closing Date (including damages and payments for past, present or future infringements or misappropriations thereof, the right to sue and recover for past, present or future infringements or misappropriations thereof and any and all corresponding rights that now or hereafter may be secured throughout the world, and all copies and tangible embodiments thereof)(collectively "<u>Transferred Intellectual Property</u>"); (iv) all Licenses set forth on <u>Schedule 1.1.4</u> to the Agreement, to the extent such Licenses are freely transferable ("<u>Transferred Licenses</u>"); (v) all records, data, know-how, software, and media content, whether in hard copy, digital, electronic or magnetic format or otherwise, including copies of all accounting and operating ledgers, asset ledgers, records, budgets, customer lists, customer account information, customer medical billing and accounts receivable information, information used for the performance of services for the customers, supplier lists, technical data, employee files, sales literature, advertising or promotional materials, web site software and content, research and development records, engineering records, systems and methods of supply, design, manufacture or distribution, referral sources, service and warranty records, correspondence, computer printouts, books, notes, files, and all other accounting and operating records and other operating and financial information and materials, in each case, to the extent related to the Target Business or Target Assets; (vi) all causes of action, judgments, claims and demands against third parties, whether known or unknown, except those described in <u>Section 3.1.3</u> and Section 3.1.11 of the Agreement; (vii) the goodwill associated with the Target Assets and the Target Business as a going concern; (viii) all insurance proceeds, claims and causes of action of any kind with respect to the Target Assets in each case relating to casualty losses occurring at any time prior to Closing, except as described in Sections 3.1.10 and 3.1.17 of the Agreement; and (ix) all other assets, property, inventory and rights owned or held by Sellers and used in or necessary for the operation of the Target Business; <u>provided</u>, <u>however</u>, that none of the Target Assets shall in any event be deemed to include any asset expressly designated as an Excluded Asset pursuant to <u>Section 3.1</u> of the Agreement.

(c) <u>Assumed Liabilities</u>.  Under the Agreement, the Stalking Horse will assume the following liabilities (the "<u>Assumed Liabilities</u>"): (i) the obligations of Sellers under the Assigned Contracts to the extent such obligations are applicable to and accrue solely with respect to an Assigned Contract with respect to periods

subsequent to the Effective Time[4]; (ii) Taxes that relate to the ownership or operation of the Target Assets with respect to any Tax period beginning after the Closing Date; (iii) the obligations of Sellers for any accrued and unused vacation or paid time off for the Hired Active Business Employees; (iv) all Assumed Cure Amounts; (v) all Liabilities with respect to Transferred Licenses to the extent such Liabilities arise after the Closing Date; (vi) all Liabilities arising from the ownership of the Target Assets or operation of the Target Business arising after the Closing Date; and (vii) Taxes arising out of the ownership or operation of the Target Assets or the Target Business with respect to any Tax period (or portion thereof) beginning after the Closing Date.

(d) <u>Excluded Assets</u>.  Excluded Assets consist of the following (i) any cash on hand, in banks, and any cash equivalents; (ii) all of Seller's interest in any Intellectual Property used exclusively in the Excluded Business; (iii) all claims, rights and causes of action of Sellers arising under or relating to Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date), including, without limitation, any such claims and actions arising under Sections 544, 545, 547, 548, 549 or 551 of the Bankruptcy Code, and commercial tort claims; (iv) Sellers' rights under this Agreement (including the right to receive the Purchase Price) and under any of the ancillary agreements to be entered into in connection with the transactions contemplated hereby; (v) all shares of capital stock or other equity interests of Sellers or any of their Affiliates, all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of Sellers or any of their Affiliates, and all securities owned and held by Sellers, whether equity or debt or a combination thereof; (vi) all Tax Returns and Tax records of Sellers and their Affiliates; (vii) all Tax refunds, credits, abatements or similar offsets against Taxes of Sellers and their Affiliates that relate to Specifically Excluded Liabilities; (viii) all Tax attributes of the Sellers and its Affiliates; (ix) the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Sellers or any of their Affiliates, any other books and records exclusively related to the Excluded Business and all personnel records or other records of the Sellers that are required by Law to be retained; (x) all claims arising on or prior to the Closing Date under any directors and officers liability insurance policies owned by Sellers; (xi) all claims and causes of action arising on or before the Closing Date that Sellers have against any Affiliate, insider of any Seller or any third party (and any recovery on account thereof), including rights of recoupment and avoidance, except to the extent that such claims or causes of action (1) may constitute a counterclaim, defense, offset, or recoupment right with respect to affirmative claims (if any) that such third party may assert against Purchaser or its Affiliates, (2) arise under any rights under warranties (express or implied), representations and guarantees made by any third

---

[4] Pursuant to the Agreement, Purchaser shall not be liable for any accounts payable for goods or services due prior to the Effective Time and such payables shall be the responsibility of Seller.

party to Sellers in connection with the Target Assets or the Target Business, (3) arise under the Assigned Contracts assumed and assigned to Purchaser, (4) arise under any Transferred Licenses, or (5) relate to the Target Assets; provided, however, nothing in Section 3.1.11 of the Agreement shall in any event be deemed to eliminate from the Excluded Assets any other asset expressly designated as such pursuant to this Article 3; (xii) professional retainers paid by Sellers; (xiii) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Sellers; (xiv) all customer deposits; (xv) any assets related exclusively to the Excluded Business; (xvi) all Benefit Plans, and any other "employee benefit plan" (as defined in ERISA) or any other employee benefit plan, program or arrangement, including, in each case, any underlying assets, agreements, policies and rights in connection therewith; (xvii) all insurance policies (except to the extent relating to the Target Assets), all directors and officers liability insurance policies and errors and omissions insurance policies and all rights to assert claims with respect to any such policies; all unearned insurance premiums and all accrued insurance refunds or rebates; all unearned insurance premiums and all accrued insurance refunds or rebates; (xviii) all Contracts that are not Assigned Contracts, all Licenses that are not Transferred Licenses and all Intellectual Property that is not Transferred Intellectual Property and all Contracts, Licenses and Intellectual Property that have terminated or expired prior to the Closing in the Ordinary Course of Business; (xix) any documents or communications of Sellers that are subject to Sellers' attorney-client privilege and/or the work-product immunity doctrine; and (xx) those assets, if any, listed on Schedule 3.1.20 to the Agreement.

(e)  Excluded Liabilities.  Sellers shall retain all liabilities and obligations that are not Assumed Liabilities, as described in the Agreement.

(f)  Books and Records.  Certain records are Purchased Assets.  However, organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Sellers or any of their Affiliates, any other books and records exclusively related to the Excluded Business and all personnel records or other records of Sellers that are required by Law to be retained are Excluded Assets.  Moreover, pursuant to Section 6.4.6 of the Agreement, Purchaser shall make available to Sellers copies of all books, files, documents and records included as part of the Target Assets as Sellers may reasonably request for a period of eighteen (18) months post-Closing. If Sellers desire copies of any of such documents or records, all copying costs shall be borne by Sellers.  Additionally, pursuant to section 6.9 of the Agreement, so long as the Bankruptcy Cases are pending, following the Closing, Purchaser shall provide Sellers and Sellers' counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents and records relating to the Target Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of Sellers' professionals to copy,

at Sellers' expense, such documents and records as Sellers or Sellers' may request in furtherance of the purposes described above, and (b) Purchaser's copying and delivering to Sellers or Sellers' professionals such documents or records as Sellers or Sellers' professionals may request, but only to the extent Sellers or Sellers' professionals furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and Sellers reimburse Purchaser for the reasonable costs and expenses thereof.

(g) <u>Closing and Other Deadlines</u>.  The Closing is subject to certain customary conditions.  *See* Agreement, Articles 7 and 8.

(h) <u>Termination</u>.  The rights of Sellers and the Stalking Horse to terminate the Agreement are set forth in Article 10 of the Agreement.

(i) <u>Liquidated Damages</u>.  Within forty-eight (48) hours of the entry of a Bidding Procedures Order providing for the payment of a Break-up Fee and Expense Reimbursement, Purchaser will execute and deliver to Sellers and an escrow agent mutually acceptable to Sellers and Purchaser (the "<u>Escrow Agent</u>") an escrow agreement among Purchaser, Sellers and the Escrow Agent (the "<u>Escrow Agreement</u>") and, upon execution and delivery of the Escrow Agreement by each of the other parties thereto, Purchaser will deliver to the Escrow Agent, pursuant to the terms of the Escrow Agreement, an amount equal to One Million U.S. Dollars ($1,000,000.00) in immediately available funds (the "<u>Cash Deposit</u>").  If this Agreement is terminated by Sellers by reason of a material breach of the Agreement by Purchaser and Sellers are not then in breach of Sellers' obligations pursuant to the Agreement, the Escrow Agent shall deliver the Cash Deposit, together with all accrued investment income thereon, in accordance with the terms of the Escrow Agreement and if such deposit is delivered to, or becomes deliverable to, anyone other than Purchaser such deposit will constitute liquidated damages.

(j) <u>Non-Solicitation</u>.  The Agreement does not provide limitations on the Debtors' ability to solicit offers for the Purchased Assets.

21.    The Debtors believe that the Sale will provide the best means to maximize value for all of their constituencies.  Upon approval of the Bidding Procedures, the Debtors will continue to market their assets to and negotiate with all potential purchasers, including the Stalking Horse, in an effort to achieve maximum value for the benefit of all of their constituents.

22.    The Debtors, after efforts to maximize value, a review of various reorganization, liquidation and sale options and discussions with their professionals, determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the

Debtors' estates for the benefit of all stakeholders would be (i) to enter into the Agreement subject to higher and better bids and (ii) to proceed with the Sale process.

23.     The Debtors have had discussions with both their prepetition and post-petition financing lenders and the Committee regarding the marketing process and proposed Sale and believe that these constituencies support the Sale of the Purchased Assets.

24.     Moreover, the Orion RCM Business is operating at a loss of approximately $4 million annually (including overhead costs).  Even if the Debtors were to shut down the Orion RCM Business, the Debtors estimate that the wind-down costs would be approximately $2 million.  A sale of the Orion RCM Business will therefore reduce the Debtors' post-petition financing needs.  Accordingly, the Debtors believe that the proposed Sale will maximize the value of the Debtors' assets for all stakeholders.

### F.     **Proposed Bidding Procedures**

25.     The Bidding Procedures (as summarized below) were developed consistent with the objective of promoting active bidding that will result in the highest or best offer for the Purchased Assets while affording appropriate protection for the Stalking Horse.  Moreover, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Debtors' assets by financially-capable, motivated bidders who are likely to close the transaction.

26.     The Debtors seek to conduct an open sales process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Agreement, for the purchase of substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, with such liens, claims and encumbrances attaching to the sale proceeds.

27.     Attached as <u>Annex 1</u> to the Bidding Procedures Order are the proposed Bidding Procedures.  The following paragraphs in this section summarize key provisions of the Bidding Procedures, but are qualified in their entirety by reference to the actual Bidding Procedures.

<u>Qualified Bid</u>.  To participate in the bidding process and to have a bid considered by the Debtor, each Potential Bidder must deliver a written offer or offers satisfying the below criteria.  A "<u>Qualified Bidder</u>" is a Potential Bidder that delivers a binding bid that in the Debtor's discretion (after consultation with the Committee and Bank of America, N.A., the administrative agent in connection with the Debtors' prepetition and post-petition financing facilities (the "<u>DIP Agent</u>")) satisfies the following criteria (a "<u>Qualified Bid</u>").[5]

(a)  <u>Bid Deadline</u>.  Each Bid Package (defined below) must be delivered in written and electronic form (where available) to: (a) counsel to the Debtors, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn:  Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]); and (c) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]), **so as to actually be received no later than June 14, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline")**.

(b)  <u>Bid Package</u>.  Each bid must include (collectively, the "<u>Bid Package</u>"): (i) a written and signed irrevocable and binding offer letter (w) stating that the Potential Bidder offers to consummate a transaction on terms and conditions no less favorable than those found in the Agreement and in an amount at least equal to the Minimum Bid (as defined below), (x) confirming that the bid will remain irrevocable and binding until five business days following the entry of the Sale Order, (y) confirming that the Potential Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representations except as expressly set forth in the Modified Agreement (defined below), and (z) agreeing that the Potential Bidder shall, if designated as such in accordance with these procedures, serve as the Backup Bidder (defined below) until the consummation of the transaction pursuant to the Successful Bid; (ii) an executed copy of the Agreement as modified by the Potential Bidder in accordance with its bid ("<u>Modified Agreement</u>"); (iii) an electronic markup of the Agreement showing the revisions in the Modified Agreement, along with a clean copy of the Modified Agreement

---

[5] The Stalking Horse will be deemed a Qualified Bidder and the Stalking Horse's bid will be deemed a Qualified Bid.

(formatted as a Microsoft Word document). The Debtors, in consultation with the Committee and the DIP Agent, shall determine whether any Modified Agreement that modifies the Agreement in any respect beyond the identity of the purchaser and the purchase price under the Agreement is a Qualified Bid.

(c) <u>Minimum Bid</u>. The amount of the purchase price in any bids for the Purchased Assets must provide for consideration in cash, and/or a valid credit-bid by a secured creditor of the Debtors, that is at least $250,000, in the aggregate, more than the Purchase Price stated in the Agreement, plus the amount required to satisfy the Bid Protections ($600,000.00) (the "<u>Minimum Bid</u>").

(d) <u>Aggregate Bids</u>. In the event that the Debtors receive bids for less than all of the assets that are proposed to be sold pursuant to the Agreement, the Debtors may aggregate such bids so that the combined bids meet the Minimum Bid. In the event that the Debtors aggregate bids pursuant to this provision, such aggregate bids may together be deemed a Qualified Bid if such bids meet the remainder of the criteria set forth herein (other than each individual bid not being in the amount of the Minimum Bid).

(e) <u>Financial Information</u>. The Bid Package must contain such financial and other information that will allow the Debtors, in consultation with the Committee and the DIP Agent, to make a determination as to the Potential Bidder's financial wherewithal and its ability to consummate the transactions contemplated by the Modified Agreement, including evidence of adequate financing, any proposed conditions to closing and adequate assurance of such bidder's ability to perform under any of the Assumed Contracts and Leases. Any counterparty to an unexpired lease or executory contract that is scheduled to be assumed and assigned to the buyer may request adequate assurance information from Debtors' counsel, and Debtors' counsel may provide such information to contract counterparties, provided that any party receiving adequate assurance information from the Stalking Horse or any other Qualified Bidder is required to maintain the confidentiality of such information.

(f) <u>Regulatory Approvals</u>. The Bid Package must describe all regulatory approvals the Potential Bidder will need and provide evidence of the Potential Bidder's ability to obtain all necessary regulatory approvals in a timely manner, if applicable.

(g) <u>Executory Contracts and Unexpired Leases</u>. The Modified Agreement must identify with particularity each and every proposed Assumed Contract and Lease.

(h) <u>Additional Bid Protections</u>. The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment, or propose to modify any of the Bidding Procedures.

(i) <u>Identity of Bidders</u>.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, including the names and addresses of any members or individuals with an interest in the entity, and the complete terms of any such participation, as well as disclose the organization form and the business conducted by each entity. Any Potential Bidder shall be required to provide such additional information as the Debtors may require regarding a Potential Bidder's ability to satisfy the requirements of the applicable regulatory authorities.

(j) <u>Due Diligence</u>.  The bid must not contain any due diligence or financing contingencies of any kind, and must affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith.

(k) <u>Consents</u>. Each Potential Bidder must represent that it has obtained all necessary organizational approvals to make its competing bid and to enter into and perform the Modified Agreement and include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

(l) <u>Deposit</u>. A Potential Bidder for the Purchased Assets (other than the Purchaser) must deposit **no less than $500,000** (the "<u>Deposit</u>") with Debtors' counsel in the form of a certified check or wire transfer at least three business days before the Auction. The Potential Bidder shall forfeit the Deposit if (i) the Potential Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein, (ii) the bidder is the Backup Bidder and withdraws the bid prior to the consummation of the Sale contemplated by the Successful Bid, or (iii) the bidder is the Successful Bidder and (x) withdraws the bid before the consummation of the sale contemplated by the Successful Bid, or (y) breaches the Agreement (or Modified Agreement, as applicable) associated with such bid. The Deposit shall be returned to the Potential Bidder (unless such Potential Bidder has forfeited its Deposit) (i) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder; (ii) if the Potential Bidder is determined to not be the Successful Bidder or the Backup Bidder at the Auction, no later than five (5) business days following conclusion of the Auction; or (iii) if the Potential Bidder is determined to be the Backup Bidder, no later than five (5) business days after consummation of the Sale to the Successful Bidder. The Deposit will not be required to be maintained in an interest-bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

28.     The Debtors shall have the right, after consultation with the Committee and the DIP Agent, to determine whether a bid meeting the requirements set forth in the Bidding Procedures is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids, as soon as possible, and prior to the Auction.  For the avoidance of doubt, the Stalking Horse is a Qualified Bidder and the Agreement constitutes a Qualified Bid.  After the Debtors determine which bids are Qualified Bids, the Debtors shall so notify the Stalking Horse.

29.     The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid.

30.     Without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid during the period that such Qualified Bid remains binding as specified herein; *provided that* any Qualified Bid may be improved at the Auction, as set forth in the Bidding Procedures.

31.     In the event that the Debtors timely receive more than one Qualified Bid (other than the Purchaser's Agreement), the Debtors shall conduct the Auction with respect to the Purchased Assets.  The Auction will take place at the offices of Debtors' counsel, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, starting at 10:00 a.m. (prevailing Eastern Time) on June 18, 2018, or at such other place, date and time as may be designated by the Debtors, in consultation with the Committee and the DIP Agent, at or prior to the Auction.  The Debtors may adopt rules for the Auction at any time that the Debtors, in consultation with the Committee and the DIP Agent, reasonably determine to be appropriate to promote a spirited and robust auction.  Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Agreement (as may be consensually modified at the Auction)

without the consent of the Purchaser. The Auction shall be governed by the following procedures:

(a) <u>Participation</u>. Qualified Bidders shall be entitled to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction, or through a duly authorized representative. At least one day prior to the commencement of the Auction, each Qualified Bidder must confirm in writing that it will participate in the Auction; *provided, however*, that in the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith. Representatives of the Committee, the United States Trustee, the Debtors' prepetition and post-petition secured lenders and their respective advisors shall be permitted to attend the Auction.

(b) <u>Anti-Collusion</u>. At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with any other Qualified Bidder with respect to the bidding or the Sale, *provided, however*, that bids may be aggregated to constitute a Qualified Bid as set forth above.

(c) <u>Conduct of Auction</u>. The Auction will be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid.

(d) <u>Bidding</u>. Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders for all of the Purchased Assets may then submit successive bids in increments of $250,000 (the "<u>Bid Increment</u>"). Any bid submitted after the conclusion of the Auction shall not be considered for any purpose. At the Auction, Purchaser shall be entitled to credit-bid in an amount equal to the Bid Protections for any subsequent bid(s) it submits at the Auction.

(e) <u>Successful Bid</u>. If an Auction is conducted, it shall continue until the Debtors determine, in consultation with the Committee and the DIP Agent, which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (such bid or bids, as applicable, the "<u>Successful Bid</u>"); *provided, however*, that when evaluating any bid submitted by the Purchaser, such bid shall be deemed to include the full amount of the Bid Protections; *provided further* that in the event the Purchaser's last bid is higher or otherwise better than the last bids submitted by all other Qualified Bidders, the Purchaser's last bid shall be deemed to be the Successful Bid. The Qualified Bidder submitting such Successful Bid shall become the "<u>Successful Bidder</u>," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Agreement, as applicable, together with any changes made thereto by the Successful Bidder at the Auction. Within one business day after the conclusion of the Auction, but in any event prior to the commencement of the Sale Hearing

(as defined below), the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Within five (5) hours following the conclusion of the Auction, the Debtors shall file a notice of the selection of the Successful Bidder, substantially in the form of <u>Annex 5</u> to the Bidding Procedures Order, with the Court and shall serve such notice on all counterparties to Assumed Leases and Contracts that are proposed to be assigned to the Successful Bidder by electronic mail or facsimile transmission if the Debtors have such contact information, or otherwise by overnight delivery service.

(f)   <u>Backup Bid</u>.  At the conclusion of the Auction, the Debtors will also announce, the second-highest or otherwise second-best bid from among the Qualified Bids submitted at the Auction (the "<u>Backup Bid</u>").  The Qualified Bidder submitting such Backup Bid shall become the "<u>Backup Bidder</u>," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Agreement, together with any changes made thereto by the Backup Bidder at the Auction.  ***The Backup Bid shall remain open and irrevocable until the consummation of the Sale of the Purchased Assets pursuant to the Successful Bid***, provided that the Backup Bid shall only remain open until the Outside Date (as defined below).  In the event the Backup Bidder fails to comply with the requirements of this paragraph, it will be deemed to have forfeited its Deposit. The Backup Bidder's Deposit will be returned by the Debtors upon the earlier of the following:  (i) the Outside Date, or (ii) immediately following consummation of the Successful Bid.  Notwithstanding any other provision contained herein, the Purchaser or any other bidder shall remain as Backup Bidder only through the earlier of (i) August 1, 2018 (the "<u>Outside Date</u>"), or (ii) the consummation of the Sale pursuant to the Successful Bid.

**G.    <u>Notice of Auction and Sale Hearing</u>**

32.    As noted above, the Debtor proposes that the Auction occur on **June 18, 2018**, and that the Sale Hearing occur on **June 25, 2018**.  The Debtor proposes that objections, if any, to the Sale Motion be filed on or before 4:00 p.m. on **June 14, 2018** (prevailing Eastern Time).

33.    The Debtors request that the Court approve the manner of the notice of the proposed sale of the Purchased Assets (the "<u>Auction and Hearing Notice</u>"), attached as <u>Annex 2</u> to the Bidding Procedures Order, which the Debtor will serve, together with the Bidding Procedures Order and the Bidding Procedures, no later than two business days following entry of the Bidding Procedures Order by first class mail, postage prepaid on the following parties:

(a) the Office of the United States Trustee for the Eastern District of New York; (b) counsel to the Committee; (c) counsel to the Debtors' prepetition and post-petition lenders; (d) all taxing authorities having jurisdiction over any of the Purchased Assets subject to the sale, including the Internal Revenue Service and the Securities and Exchange Commission; (e) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (f) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bidding Procedures Order; (g) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Purchased Assets; (h) all counterparties to executory contracts or unexpired leases with the Debtors; (i) counsel to the Stalking Horse; (j) all Attorneys General for the states in which the Debtors conduct business; and (k) all potential bidders previously identified or otherwise known to the Debtors (collectively, the "Notice Parties").

34.    In addition, the Debtors request that the Court approve the form of the notice to creditors (the "Creditor Notice"), attached as Annex 6 to the Bidding Procedures Order. Within two business days of entry of the Bidding Procedures Order, the Debtors will serve copies of the Creditor Notice upon all other known creditors and parties in interest. The Creditor Notice will provide that any party that has not received a copy of the Motion, the Agreement, the Bidding Procedures, the Assignment Procedures, or any other document referenced in the Creditor Notice can obtain such copies on the Court's website at www.ecf.nyeb.uscourts.gov or (without charge) at http://dm.epiq11.com/orionhealthcorp.

35.    Within five (5) days after entry of the Bidding Procedures Order, the Debtors will also cause the Creditor Notice to be published on the website of the Debtors' claims and noticing agent and once in The New York Times, national edition.

### H.    <u>Sale Hearing</u>

36.    The Successful Bid and the Backup Bid (or the Purchaser's Agreement in the event the Auction is not held) will be subject to approval by the Court at the Sale Hearing free and clear of all liens, claims, interest, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the liens and interests permitted under the Agreement) with all such liens, claims, interests, and encumbrances to attach to the proceeds of the Sale of the Purchased Assets, except as otherwise provided with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the Sale.  Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the earlier of (i) consummation of the Sale pursuant to the Successful Bid or (ii) the Outside Date.

37.    The Debtors request that the Court schedule the Sale Hearing on **June 25, 2018**. The Debtors further request that Objections, if any, to the Sale (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures) and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) counsel to the Debtors, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq.

[davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, Bryan Cave Leighton Paisner LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Keith M. Aurzada [keith.aurzada@bclplaw.com]), and (i) any other party requesting notice in this case (collectively, the "Objection Parties"), so that it is actually received by each of the foregoing parties by 4:00 p.m. (prevailing Eastern Time) on June 14, 2018 (the "Sale Objection Deadline").

38.     In the event the Debtors choose a Successful Bidder or Backup Bidder other than the Purchaser at the Auction, or the terms of the proposed Sale are modified at the time of the Auction, the Debtors request that the objection deadline solely with respect to the Debtors' choice of such alternative Successful Bidder or Backup Bidder, the modifications to the terms of the Sale to the Successful Bidder, or adequate of assurance of future performance by the alternative Successful Bidder or Backup Bidder shall be on **June 21, 2018 at 4:00 p.m.**  Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties.

## I.     Procedures for the Assumption and Assignment of Assigned Contracts

39.     Pursuant to the Agreement, the Assumed Contracts and Leases consist of certain executory contracts (the "Assumed Contracts") and unexpired leases (the "Assumed Leases" and

together with the Assumed Contracts, the "<u>Assumed Contracts and Leases</u>") designated to be assumed by the Debtors and assigned to the Purchaser.

40.    In order to ensure the orderly assignment of the Assumed Contracts and Leases and the timely resolution of objections thereto, the Debtors seek approval of certain assignment procedures.  The following is a summary of certain provisions of the Assignment Procedures, which are attached as <u>Annex 3</u> to the Bidding Procedures Order (the "<u>Assignment Procedures</u>"):[6]

(a)  <u>Initial Notice of Assumed Contracts and Leases</u>.  Within two business days after entry of the Bidding Procedures Order, the Debtors will serve by first-class mail an omnibus notice (the "<u>Assignment Notice</u>") on each Counterparty to an agreement that is or may be an Assumed Contract or Assumed Lease, substantially in the form attached as <u>Annex 4</u> to the Bidding Procedures Order (and such party's attorney, if such attorney has filed a notice of appearance in the Debtors' chapter 11 proceedings) at the last known address available to the Debtors.  The Assignment Notice shall include an exhibit that identifies (i) the name and address of the Counterparty, (ii) the specific Assumed Contract or Assumed Lease at issue, (iii), for each Assumed Lease, the premises relating to the Assumed Lease, and (iv) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "<u>Cure Amount</u>").

The Assignment Notice shall also include (i) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Assumed Contracts and/or Assumed Leases ("<u>Purchaser's Adequate Assurance</u>"), (ii) the date of the Contract/Lease Objection Deadline (defined below), (iii) the date of the Auction, and (iv) the date of the Sale Hearing.

The Assignment Notice shall also be served upon counsel to the Purchaser, Bryan Cave Leighton Paisner LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Keith M. Aurzada [keith.aurzada@bclplaw.com]).

(b)  <u>Initial Objections</u>.  To the extent that any interested party wishes to object to any matter pertaining to the sale of the Purchased Assets or the assumption and assignment of an Assumed Contract or Assumed Lease, including, without limitation, Purchaser's Adequate Assurance or the Cure Amount designated in the Assignment Notice, then such interested party must file a written objection (the "<u>Contract/Lease Objection</u>") with the Court no later than June 14, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Contract/Lease Objection Deadline</u>"), and simultaneously serve such Contract/Lease Objection on the following parties

---

[6] To the extent that there are any inconsistencies between the summary description of the Assignment Procedures contained herein and the Assignment Procedures, the terms of the Assignment Procedures control.

(the "Objection Parties"): (a) counsel to the Debtors, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, Bryan Cave Leighton Paisner LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Keith M. Aurzada [keith.aurzada@bclplaw.com]), and (i) any other party requesting notice in this case, so that it is **actually received** by each of the foregoing parties by the Contract/Lease Objection Deadline.

To the extent that any Counterparty does not timely serve a Contract/Lease Objection as set forth above, such Counterparty will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed Lease; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any, and agreed that payment of that Cure Amount is sufficient to cure any monetary or non-monetary default under the applicable Assumed Contract or Assumed Lease; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

(c) <u>Supplemental Notice of Assumed Contracts and Leases</u>.  Within five (5) hours following the conclusion of the Auction, the Debtors will file an omnibus notice (the "<u>Auction Results Notice</u>"), substantially in the form attached as <u>Annex 5</u> to the Bidding Procedures Order, and will serve such notice on all Counterparties (and their attorneys, if an attorney has filed a notice of appearance in the Debtors' chapter 11 proceeding) by electronic mail or facsimile transmission if the Debtors have such contact information, or otherwise by overnight delivery service at the last known address available to the Debtors.  The Auction Results Notice shall, *inter alia*, identify the successful bidder (the "<u>Successful Bidder</u>") and the backup

bidder (the "Backup Bidder")[7] chosen at the Auction in accordance with the Bidding Procedures and such other information as hereinafter provided.

The Auction Results Notice shall include, to the extent the Successful Bidder or Backup Bidder is not the Purchaser, a description of the Successful Bidder and the Backup Bidder and, upon request, the Debtors will provide a statement as to the ability of the Successful Bidder or the Backup Bidder to perform the Debtors' obligations under the Assumed Contracts and Assumed Leases (the "Successful Bidder's Adequate Assurance" or the "Backup Bidder's Adequate Assurance") and such statement shall be kept confidential to the extent required by the Successful Bidder or the Backup Bidder.

(d) Supplemental Objections.  To the extent that any Counterparty wishes to object to (i) the Successful Bidder's or the Backup Bidder's Adequate Assurance designated in the Auction Results Notice, if the Successful Bidder or Backup Bidder is not the Purchaser; or (ii) the selection of an alternative purchaser as a result of the Auction, such party shall file its objection (the "Supplemental Sale Objection") with the Court no later than **June 21, at 2018 4:00 p.m.** (the "Supplemental Objection Deadline").  Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties by the Supplemental Objection Deadline.

To the extent that any Counterparty does not timely serve a Supplemental Sale Objection as set forth above, such Counterparty will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed Lease; (ii) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (iii) hereof.

(e) Further Assignments.  Without limiting any rights of the Purchaser set forth in the Agreement, during the period between the entry of the Bidding Procedures Order and the Sale Hearing, the Purchaser or the Successful Bidder may designate additional executory contracts or unexpired leases for assumption by the Debtors and assignment to the Purchaser or Successful Bidder (the "Further Assignments").  The Debtors shall serve by first-class mail an omnibus notice (the "Further Assignments Notice") on each Counterparty to the Further Assignments, substantially in the form attached as Annex 7 to the Bidding Procedures Order.  To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (a "Further Assignment Objection") with the Court no later

---

[7] After entry of the Sale Order, all references in the Assignment Procedures to the Purchaser shall refer to the Successful Bidder.  In the event that the Backup Bidder is substituted for the Successful Bidder pursuant to the Sale Order, all references to the Purchaser shall refer to the Backup Bidder.  Similarly, after entry of the Sale Order, all references herein to the Agreement shall refer to the bid submitted by the Successful Bidder.

than at **4:00 p.m. (prevailing Eastern Time) on the fifteenth day after service of the Further Assignments Notice**.  In the event a Further Assignment Objection is filed, such objections will be heard at a hearing to be scheduled by the Bankruptcy Court.

(f)  <u>Resolution and Adjudication of Objections</u>.  Upon filing of an objection by a Counterparty, the Debtors and/or the Purchaser will contact the objecting Counterparty to attempt to consensually resolve any timely served objection.  If the Debtors and/or the Purchaser are unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections relate to the adequate assurance of future performance by the Purchaser or Successful Bidder (each an "<u>Adequate Assurance Objection</u>"), such objections will be heard at the Sale Hearing (except in the case of an Adequate Assurance Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Bankruptcy Court) or (ii) to the extent such objections relate to a Cure Amount (a "<u>Cure Objection</u>"), such objections will be heard at the Sale Hearing (except in the case of a Cure Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Bankruptcy Court).

In the event an objection is solely a Cure Objection, then such objecting party will be deemed to consent to the assumption of the related executory contract or unexpired lease and its assignment to the Purchaser, notwithstanding such objection.  In the event the Debtors and/or the Purchaser are unable to resolve the Cure Objection prior to the hearing on such objection, the Purchaser may elect not to request assumption and assignment of the related executory contract or unexpired lease as part of the Sale.

At the Closing or as promptly thereafter as is practical, the Cure Amounts as to which no objections have been filed, or to which the Purchaser and applicable Counterparties have agreed, shall be paid pursuant to the Agreement.

Payment of the Cure Amounts shall be deemed to discharge the obligation of the Debtors and the Purchaser to: (i) cure any defaults under the Assumed Contracts and Leases; and (ii) compensate, or provide adequate assurance that the Debtors will promptly compensate, any non-Debtor party to the Assumed Contracts and Leases for any actual pecuniary loss resulting from any default thereunder.

41.    The Debtors and/or the Purchaser or Successful Bidder shall be responsible for payment of all Cure Amounts per the terms of the Agreement.  The Purchaser or the Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assigned Contract.  Objections to the adequate

assurance of future performance of a Successful Bidder may be raised in accordance with the procedures set forth above and considered at the Sale Hearing.

42.     Except to the extent otherwise provided in the Agreement or the agreement entered into with the Successful Bidder, subject to the payment of any Cure Amounts, the assignee of the Assumed Contract or Assumed Lease will not be subject to any liability to the assigned contract Counterparty that accrued or arose before the closing date of the sale of the Purchased Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

### J.     Break-Up Fee and Expense Reimbursement

43.     In recognition of the Stalking Horse's substantial expenditure of time, energy and resources, and the benefits to the Debtors' estates of securing a "stalking horse" or guaranteed minimum bid, the Debtors seek approval to pay (a) a breakup fee (the "Break-Up Fee") of $400,000.00 to the Stalking Horse in the event that the Stalking Horse is not the Successful Bidder at the Auction and the Debtors consummate an Alternative Transaction, and (b) an expense reimbursement not to exceed $200,000.00 (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections") if the Agreement is terminated for that reason or otherwise as provided for in the Agreement (except in the event of termination by Sellers by (i) mutual consent of the parties under Section 10.1.1, (ii) Sellers pursuant to Section 10.1.6 as a result of Purchaser's breach of this Agreement or (iii) Purchaser pursuant to Section 10.1.3 in the event that Closing has not occurred by July 31, 2018).

44.     The Break-Up Fee and Expense Reimbursement are required by the Agreement. The Debtors believe that the Break-Up Fee and Expense Reimbursement are fair and reasonable, given the benefits to the estates of having a definitive Agreement and the risk to the Stalking

Horse that a third-party offer ultimately may be accepted, and are necessary to preserve and enhance the value of the Debtors' estates.

45.    The Agreement and the Stalking Horse's monetary offer will form the basis upon which other bids will be submitted and evaluated.  The establishment of the Break-Up Fee and Expense Reimbursement permits the Debtors to insist that competing bids for the Purchased Assets be higher or otherwise better than the purchase price under the Agreement, which is a clear benefit to the Debtors' estates.  Thus, even if the Stalking Horse is ultimately not the Successful Bidder, and is paid the Break-Up Fee and Expense Reimbursement, the Debtors will still have benefited significantly from the Agreement, due to the floor established by the Stalking Horse leading to an improved bid and increasing the likelihood that the Purchased Assets will be sold at the highest value to the Debtors' estates.

**K.**    **Closing**

46.    The closing shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Court at the Sale Hearing.

**L.**    **Corporate Action**

47.    The Debtors request that no further corporate action of the Debtors or approval of any Debtor's equity security holders shall be required to authorize the Debtors to consummate the transactions contemplated by the Agreement.  Except as expressly permitted by any Orders granting this Motion, the Debtors request that all holders of claims against and interests in, and equity security holders of the Debtors be forever barred, estopped and enjoined from commencing, prosecuting or continuing in any manner any action or other proceeding of any kind against the Debtors' employees, officers or directors, or their professionals and advisors, on account of or related to the Agreement or the transactions contemplated thereby, *provided*, *however*, that nothing in any Order granting this Motion shall prevent any administrative

agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

**BASIS FOR RELIEF REQUESTED**

**I.    THE BIDDING PROCEDURES ORDER SHOULD BE ENTERED**

      **A.    The Bidding Procedures Should be Approved**

48.    The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtors' estates receive the greatest benefit available from the sale of the Acquired Assets.  The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Purchased Assets while allowing the Debtors the flexibility to select the bid or bids that provide the greatest overall value to the Debtors' estates.  Finally, the Bidding Procedures set out a time frame that will allow potential purchasers sufficient time to construct and submit informed Qualified Bids, while still providing for the expeditious sale of the Purchased Assets.

49.    The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors' estates receive the maximum benefit available from the sale of the Purchased Assets, and therefore warrant Court approval.

      **B.    The Break-Up Fee and Reimbursement**
              **Amount are Reasonable and Appropriate**

50.    Bid incentives such as the Break-Up Fee and Expense Reimbursement encourage a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process.  The Debtors submit that approval of the Break-Up Fee and Expense Reimbursement are justified by the facts and circumstances of these cases,

whether considered under the business judgment rule or as an administrative expense of the estates.

51.     Courts in this Circuit have approved break-up fees under the "business judgment rule," which proscribes judicial second-guessing of good-faith decisions made by a corporation's board of directors exercising its business judgment.  *See*, *e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014); *In re Integrated Resources, Inc.*, 147 B.R. 746, 752 (Bankr. S.D.N.Y. 1992)("[T]he business judgment of the Debtor is the standard applied under the law in this district"); *In re Ray Realty Fulton, Inc.*, No. 1-09-41225-DEM, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009) (break-up fee held reasonable and appropriate under business judgment rule because it offered the best means of maximizing value for benefit of debtor's estate); *see also In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal citation omitted).

52.     Courts in this Circuit have held that break-up fees should be approved as long as three questions are answered in the negative:  (a) is the relationship between the parties who negotiated the fee tainted by self-dealing or manipulation; (b) does the fee discourage bidding; and (c) is the amount of the fee unreasonable relative to the proposed purchase price.  *In re Integrated Resources, Inc.*, 147 B.R. at 657; *In re APP Plus, Inc.*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (citing *Integrated Resources* but adding a fourth factor taking into account "whether the proposed [break-up fee] is unduly burdensome to the estate in view of the specific facts and circumstances of [the] case and whether it is in the best interests of the estate, creditors, and equity holders.").  On this point, courts within the Second Circuit have repeatedly

recognized the benefits to a debtor's estate, yielded by the presence of an established stalking horse bid.  *See, e.g.*, *Gey Assocs. Gen. P'Ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34 (2d Cir. 2003) (noting that presence of stalking horse bid may encourage later bidders, and break-up fee compensates stalking horse "for the risk it shoulders in being first bidder"); *In re APP Plus, Inc.*, 223 B.R. at 874 (discussing rationale for break-up fees); *Metaldyne*, 409 B.R. at 670 ("Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer.").  The Debtors submit that all requisite elements for approval of the Bid Protections are met here.

53.    In this case, the Break-Up Fee and Expense Reimbursement are the product of extensive efforts by the Debtors' investment banker to market the Purchased Assets to all potentially interested buyers, and resulted from arm's-length negotiations conducted in good faith between the Debtors and the Stalking Horse.  The Break-Up Fee and Expense Reimbursement reflect the time spent, efforts made, and resources expended by the Stalking Horse and its advisors in the due diligence and negotiation process that culminated in the Agreement.  In light of the relatively limited interest from the market at large, and the extensive diligence efforts required to value the Purchased Assets, the Bid Protections were essential to securing the Stalking Horse's commitment to participate in the Auction as the "stalking horse bidder."  The amount of the Break-Up Fee ($400,000.00) and Expense Reimbursement (not to exceed $200,000.00) is appropriate in light of the Purchase Price, and is not so high that it would cause any chilling effect on other prospective purchasers.  The Break-Up Fee and Expense Reimbursement are reasonable and within "market" for such fees.

54.     The Debtors' ability to offer the Break-Up Fee and Expense Reimbursement enables the Debtors to ensure the sale of the Purchased Assets to a contractually-committed bidder at a price the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of an even greater return to the estates.   The Debtors and the Stalking Horse are not related, and each has acted in good faith and negotiated at arm's length throughout this process.

55.     Indeed, the Break-Up Fee and Expense Reimbursement induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum floor on which the Debtors, their creditors and other bidders may rely.   Approval of the Bid Protections is all the more appropriate where, as here, the Debtors will be afforded the ability to shop the Purchased Assets for a higher or better offer without risk of losing the Stalking Horse Purchaser.   *In re Global Crossing, Ltd.*, 295 B.R. 726, 745-46 (Bankr. S.D.N.Y. 2003).   The Debtors' ability to do so would be eliminated, however, if the Debtors are not authorized to pay the Break-Up Fee and Expense Reimbursement.   Absent authorization of the payment of the Break-Up Fee and Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest and best available offer for the Purchased Assets and the downside protection that will be afforded by the Agreement.

56.     Courts have considered break-up fees to be administrative expenses of debtors' estates, as they are "an actual and necessary cost and expense of preserving the debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code."   *See In re Ray Realty Fulton, Inc.*, Case No. 09-41225, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009); *see also In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2008) (break-up fee, if triggered, deemed an actual and necessary cost and expense of

preserving the debtors' estates, within the meaning of section 503 of the Bankruptcy Code); *In re Fortunoff Fine Jewelry and Silverware, LLC*, No. 08–10353, 2008 WL 618983, at *2 (Bankr. S.D.N.Y. Feb. 22, 2008) (purchasers granted an allowed administrative claim in the debtors' chapter 11 cases in an amount equal to the break-up fee).

57.    Here, the Debtors' customers and employees will take comfort that the Stalking Horse's bid will ensure the continuation of the Debtors' business.  Moreover, the Stalking Horse has provided a material benefit to the Debtors and their creditors in the form of a baseline value for the Purchased Assets, which increases the likelihood that the Auction will yield the best possible price.  Both the Debtors and the Stalking Horse, as parties to the Agreement, agree that the protections afforded by the Break-Up Fee and Expense Reimbursement are an integral part of the bargain.  Accordingly, approval of the Bidding Procedures, including the Break-Up Fee and Expense Reimbursement, is a bargained-for condition to the Stalking Horse's obligation to proceed with the transaction contemplated in the Agreement.

58.    For the foregoing reasons, the Debtors request (1) that the payment of the Break-Up Fee and the Expense Reimbursement under the conditions set forth in the Agreement be approved as a superpriority administrative expense with priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, and (2) that the Court approve and authorize payment of the Break-Up Fee and Expense Reimbursement pursuant to the terms of the Agreement.

## C.    The Auction and Sale Hearing Notice Should be Approved

59.    Pursuant to Bankruptcy Rules 2002(a) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.  The Auction and Hearing Notice and the Creditor Notice, as applicable, set forth all the information a potential

bidder and any other party in interest should require about the bidding process for the Acquired Assets, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date and location of the Sale Hearing.

60.     The Debtors submit that the Auction and Hearing Notice and the Creditor Notice as proposed comply with Bankruptcy Rule 2002 and the Sale Guidelines, and constitute good and adequate notice of the sale and the proceedings with respect thereto.  Because the Debtors propose to serve the Auction and Hearing Notice upon all Notice Parties and the Creditor Notice upon all other known creditors and parties in interest, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(a)(2) and 6004 are satisfied.  The Debtors also propose to publish the Auction and Sale Notice in The New York Times, national edition, pursuant to Bankruptcy Rule 2002(*l*). Therefore, the Debtors respectfully request that the Court approve the Auction and Hearing Notice and the Creditor Notice and the notice procedures proposed above.

## II.     THE SALE ORDER SHOULD BE ENTERED

### A.     There is a Compelling Business Justification for the Sale Because It Will Maximize Value to the Debtors' Estates

61.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code in turn provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a)

power is proper. *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).

62.     Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and elsewhere hold that the sale or use of property outside the ordinary course of business should be approved where the debtors can articulate a business justification for the transaction.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re CPJFK, LLC*, 496 B.R. 290, 304 (Bankr. E.D.N.Y. 2011) (adopting *Lionel Corp.* standard for sound business justification); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 680 (Bankr. S.D.N.Y. 1989).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  *Lionel*, 722 F.2d at 1071.

63.     The Debtors submit that sound business justification exists to sell the Purchased Assets to the Stalking Horse or the Successful Bidder pursuant to the Bidding Procedures.  As explained in the First Day Declaration, the Debtors commenced these chapter 11 cases to, among other things, effectuate a sale of their assets in the belief that doing so will maximize value for all stakeholders.  As stated above, the Orion RCM Business is operating at a loss of approximately $4 million annually (including overhead costs).  Even if the Debtors were to shut down the Orion RCM Business, the Debtors estimate that the wind-down costs would be approximately $2 million.  Absent a prompt sale of their assets, the Debtors will not have sufficient cash or financing to continue to operate their businesses.  The value of the Purchased Assets would also likely decline absent a prompt sale given the potential lack of financing.  In addition, without a clear exit strategy such as the proposed Sale, the Debtors risk losing the confidence of their

vendors and customers that is vital to the value of their business assets.  Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of all stakeholders.

64.    Under these circumstances, a compelling business justification exists for the expeditious sale of the Purchased Assets outside the ordinary course of business and prior to confirmation of a plan of reorganization.  Accordingly, the Debtors submit that the proposed sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code should be approved.

### B.    The Sale is Proposed in "Good Faith" as Contemplated By Section 363(m) of the Bankruptcy Code

65.    The Agreement is the product of extensive arm's length negotiations between the Debtors and the Stalking Horse.  In addition, the Debtors intend to negotiate any other asset purchase agreement at arm's length and in good faith and, thus, believe that any Successful Bidder, including the Stalking Horse, should be entitled to the protections of section 363(m) of the Bankruptcy Code.

66.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b)…of this section of a sale…of property does not affect the validity of a sale…under such authorization to an entity that purchased…such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale…were stayed pending appeal.

11 U.S.C. § 363(m).

67.    Section 363(m) of the Bankruptcy Code thus protects a good faith purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Purchased Assets.

68.     The Second Circuit instructs that a party would have to show fraud or collusion between a purchaser and the debtor-in-possession or trustee to demonstrate a lack of good faith. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 273 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser's] good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (internal citations omitted); *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998). No such facts exist here.

69.     To the contrary, the Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Agreement was an arm's-length transaction, in which the Successful Bidder acted in good faith. The Auction is an open sale process, with the Purchased Assets to be sold to the bidder who submits the highest and best bid per the terms set forth in the Sale Guidelines, and the Debtors will have their own advisors to negotiate on their behalf throughout the Auction and the Sale. Accordingly, the Debtors request that the Court make the finding at the Sale Hearing that the Successful Bidder has purchased the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**C.     The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Liens, Claims, Interests, and other Encumbrances**

70.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if any of the following criteria are met: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount

of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met); *see also In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

71.    In addition, several courts have held that section 363(f) grants bankruptcy courts the power to convey assets free and clear of all pre-petition claims. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) (collecting cases and discussing need to extinguish pre-petition claims in order to facilitate sale of assets for maximum value). Furthermore, other courts, concluding that section 363(f) does not empower them to convey assets free and clear of pre-petition claims, have nonetheless held that Bankruptcy Code section 105(a) provides them with the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g.*, *In re General Motors Corp.*, 407 B.R. 463, 499-504 (Bankr. S.D.N.Y. 2009) (discussing Second Circuit precedent permitting sale of assets "free and clear" of successor liability claims pursuant to section 363(f) and 105(a)) (internal citations omitted); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

72.    The Debtors expect that proposed sale of the Purchased Assets will satisfy, at minimum, the second and/or fifth requirement of section 363(f) of the Bankruptcy Code, if not

others as well.  Holders of liens, claims or interests in or against the Purchased Assets will be adequately protected because their liens, claims and/or interests will attach to the proceeds of the sale with the same force, effect, and priority as their prior liens, claims and/or interest in the Purchased Assets, subject to any defenses the Debtors may possess with respect thereto. Moreover, such holders of liens, claims or interests may consent to the sale of the Purchased Assets.  Accordingly, sale of the Purchased Assets free and clear of all adverse interests is warranted and the Sale should be approved under section 363(f) of the Bankruptcy Code.

> **D.**  **The Assumption and Assignment of Assumed Contracts and Leases Should be Authorized, and the Assignment Procedures Provide Adequate Notice and Opportunity to Object and Should Therefore be Approved**

73.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See*, *e.g.*, *In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.*, 318 U.S. 523, 549 (1943).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Stable Mews Assoc.*, 41 B.R. at 596.  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy

Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

74.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1993) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

75.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract…only if the trustee assumes such contract…and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See In re Sapolin Paints, Inc.*, 5 B.R. 412, 420–21 (Bankr. E.D.N.Y. 1980); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.*, 56 B.R. at 605-06 (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

76.    Additionally, as set forth above, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11, provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. at 312. Accordingly, pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See*, *e.g.*, *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

77.    The Debtors respectfully submit that the proposed Assignment Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed Contracts and Leases with adequate notice in the form of the Assignment Notice, of the proposed assumption and/or assignment of their respective contract, as well as proposed Cure Amounts, if applicable. Such non-Debtor parties to the Assumed Contracts will then be given an opportunity to object to such notice. The Assignment Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues.

78.    The Assignment Notice and associated Assignment Procedures are necessary to give assurance to the Debtors' vendors, customers, and other contractual counterparties that their interests will not be unduly harmed by these proceedings, and thereby preserve value for the

estates.   Accordingly, the Debtors submit that implementation of the proposed Assignment

Procedures is appropriate in these cases.

## III.   "EXTRAORDINARY PROVISIONS" OF THE SALE UNDER THE SALE GUIDELINES

79.    The Agreement contains certain provisions designated "extraordinary" under the

Sale Guidelines.   In each instance, as explained more fully below, the Debtors believe that the

"extraordinary provisions" are necessary components of the Sale and will serve to ensure that the

Purchased Assets are sold through a process that is both prompt and for the highest possible

value.   The Agreement contains the following "Extraordinary Provisions" as per the Sale

Guidelines:[8]

### A.    Record Retention.

80.    Certain records are Purchased Assets.   However, organizational documents,

qualifications to do business as a foreign corporation, arrangements with registered agents

relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books,

blank stock certificates, and other documents relating to the organization, maintenance and

existence of Sellers or any of their Affiliates, any other books and records exclusively related to

the Excluded Business and all personnel records or other records of Sellers that are required by

Law to be retained are Excluded Assets.   Moreover, pursuant to Section 6.4.6 of the Agreement,

Purchaser shall make available to Sellers copies of all books, files, documents and records

included as part of the Target Assets as Sellers may reasonably request for a period of eighteen

(18) months post-Closing.   Additionally, pursuant to section 6.9 of the Agreement, so long as the

Bankruptcy Cases are pending, following the Closing, Purchaser shall provide Sellers and

---

[8] This list of possible "Extraordinary Provisions" (as such term is defined in the Sale Guidelines) is not intended to be an admission that any of these provisions are unusual relief in sales transactions of this nature conducted pursuant to section 363 of the Bankruptcy Code.

Sellers' counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents and records relating to the Target Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of Sellers' professionals to copy, at Sellers' expense, such documents and records as Sellers or Sellers' may request in furtherance of the purposes described above, and (b) Purchaser's copying and delivering to Sellers or Sellers' professionals such documents or records as Sellers or Sellers' professionals may request, but only to the extent Sellers or Sellers' professionals furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and Sellers reimburse Purchaser for the reasonable costs and expenses thereof.

### B.     No Successor Liability for the Successful Bidder

81.     The Debtors request that the Court enter an order authorizing the Purchased Assets to be sold free and clear of all liens, claims, interests and encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code.  In addition, the Debtors submit that the Purchased Assets may be sold free and clear of claims, including successor liability claims, if any, as no Successful Bidder will, as a result of any action taken in connection with the purchase of the Purchased Assets:  (a) be a successor to the Debtors; (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  To the contrary, as explained in the First Day Declaration, the Debtors have commenced these chapter 11 proceedings for, among other reasons, the purpose of selling all or substantially all of their assets to an outside buyer prior to a liquidation of any remaining Excluded Assets and the wind-up of any remaining operations.  The Purchased Assets will pass to the Successful Bidder and any employees of the Debtors who join

the Successful Bidder following the Sale will do so on terms acceptable to the Successful Bidder and only the Successful Bidder.

82.    The ability to acquire the Purchased Assets free and clear of any successor liability claims is a critical component of the bargain reflected in the Agreement; it will bring stability and finality to the purchase of Purchased Assets via the Sale, and thus enhances the ultimate value of the Purchased Assets to the Successful Bidder, and, by extension, to the estates.

### C.    Any Actions Against the Successful Bidder Arising Out of the Sale Should be Enjoined

83.    The Debtors request that, as part of the Sale Order, the Court order that all persons and entities be forever barred and permanently enjoined from taking any actions against the ultimate buyer or their affiliates (as they existed immediately prior to closing) to recover any claim which such person has against the Debtors.  Notwithstanding the foregoing, the Debtors do not seek any order (1) preventing such persons or entities from pursuing an action against the Successful Bidder under the terms of any applicable agreement or related documents for purchase of the Purchased Assets; or (2) barring any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

84.    The foregoing injunction provisions are an integral part of the bargain reflected in the Agreement.  In in the interests of bringing greater stability and finality to the transfer of the Purchased Assets pursuant to the Sale, the Debtors submit that entry of an order in the form described above is justified in the interest of maximizing the value of the Purchased Assets to the estates.

### D.    The Proposed Sale Does Not Constitute a Fraudulent Transfer

85.    The Debtors request a finding in the Sale Order that the Agreement (or any alternative agreement between the Debtors and a Successful Bidder) was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and that no Debtor or Buyer is entering into the Sale transaction fraudulently.

86.    As set forth herein, the Debtors have structured the proposed Bidding Procedures and sale process to ensure that the resulting Sale will be an arm's-length transaction yielding the highest and best value for the Purchased Assets.  In addition, the Debtors and their advisors have undertaken a comprehensive review of the market to identify all potentially interested buyers so as to ensure the maximum number of participants in the Auction.  Accordingly, the Debtors submit that good cause exists for a finding that the proposed Sale does not constitute a fraudulent transfer.

### E.    The Successful Bid is Fair Consideration for the Purchased Assets and Receipt of the Assumed Contracts and Leases

87.    The Debtors request a finding in the Sale Order that the consideration provided by the Successful Bidder to the Debtors for its purchase of the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act.  As set forth herein, the Debtors have structured the Bidding Procedures and sale process to ensure that the resulting Sale will be an arms-length transaction yielding the highest and best value for the Purchased Assets. The eventual sale price for the Purchased Assets will have been twice subjected to a market check; first by way of Houlihan Lokey's marketing of the Purchased Assets and efforts to identify potential bidders, a process that resulted in the identification of the Stalking Horse and

the negotiation of the Stalking Horse bid, and second, through the open and competitive Auction process.  The Debtors submit that these steps will ensure that the eventual price paid by the Successful Bidder will constitute the highest and best value for the Purchased Assets, and thus fair consideration.

88.    In addition, a finding that the purchase price constitutes fair consideration is an important part of the bargain reflected in the Agreement; it will bring stability and finality to the purchase of the Purchased Assets via the Sale, and thus enhances the ultimate value of the Purchased Assets to the Successful Bidder, and, by extension, to the estates.  For these reasons, the Debtors submit that good cause exists for a finding that the consideration provided by the Successful Bidder to the Debtors for its purchase of the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

## F.    Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h)

89.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  The Debtors hereby request that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) is waived.

90.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."   10 Collier on Bankruptcy 16th Ed. Rev., ¶ 6004.11.

Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

91.     A prompt closing of the Sale is of critical importance to the continued stability of the Debtors' business and the preservation of value for the estates. Based on their experience operating the business, the Debtors believe with good cause that consummating a sale transaction as soon as practicable is necessary to maintain value.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## NO PRIOR REQUEST

92.     No prior Motion for the relief requested herein has been made to this or any other court.

## NOTICE

93.     Notice of this Motion has been given to the following parties:  (a) the Office of the United States Trustee for the Eastern District of New York; (b) counsel to the Committee; (c) counsel to Bank of America, N.A.; (d) counsel to BMO Harris Bank, N.A.; (e) counsel to Keybank National Association; (f) counsel to Stifel Bank & Trust; (g) counsel to Woodforest National Bank; (h) all taxing authorities having jurisdiction over any of the Purchased Assets subject to the sale, including the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (k) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date of the filing of this Motion; (l) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Purchased Assets; (m) all counterparties to executory contracts or unexpired leases with the Debtors; (n) counsel to the Stalking Horse; (o) all Attorneys General for the states in which the

Debtors conduct business; and (p) all potential bidders previously identified or otherwise known to the Debtors.  The Debtors submit that the notice provided for herein is consistent with Section 2(b) of the Sale Guidelines.  As described above, the Debtors intend to provide additional notice of the Auction, Sale, and Sale Hearing once a Bidding Procedures Order is entered.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order and the Sale Order granting the relief requested herein and that it grant the Debtors such other and further relief as is just and proper.

Dated: May 10, 2018                   Respectfully submitted,
      New York, New York

**DLA PIPER LLP (US)**

*/s/ Thomas R. Califano*
Thomas R. Califano (6144)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
E-mail:  thomas.califano@dlapiper.com

*Proposed Counsel to the Debtors and Debtors in Possession*