Thomas R. Califano, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
thomas.califano@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No: 18-_____(AST) |
| | : | |
| Debtors. | x | (Jointly Administered) |

-------------------------------------------------------------------

**MOTION OF DEBTOR NEW YORK NETWORK MANAGEMENT, L.L.C. FOR
ENTRY OF ORDERS (A)(I) EXTENDING THE BIDDING PROCEDURES RELATING
TO THE SALE OF CERTAIN ASSETS; (II) APPROVING BID PROTECTIONS;
(III) APPROVING THE FORM AND MANNER OF NOTICE OF CONTINUED
AUCTION; (IV) ESTABLISHING PROCEDURES FOR NOTICING AND
DETERMINING CURE AMOUNTS; (V) SCHEDULING A HEARING ON THE
PROPOSED SALE; AND (VI) GRANTING RELATED RELIEF; AND
(B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING
THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS; (II) AUTHORIZING
THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION,
SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

New York Network Management, L.L.C. ("NYNM Management" or "Seller"), by and through its proposed counsel, DLA Piper LLP (US), hereby submits this motion (the "Motion") and respectfully represents as follows:

## RELIEF REQUESTED

Pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Bankruptcy Rules for the Eastern District of New York (the "Local Bankruptcy Rules") and the Sale Guidelines, adopted as Administrative Order No. 557 of the United States Bankruptcy Court for the Eastern District of New York (the "Sale Guidelines"), NYNM Management seeks entry of an order, substantially in the form attached hereto as Exhibit A (the "Second Bidding Procedures Order"), (i) approving the extension of the procedures set forth in the First Bidding Procedures Order (as defined below), unless otherwise modified herein, to the sale of the NYNM Assets (as defined below); (ii) approving the Break-Up Fee and Expense Reimbursement (as defined below); (iii) scheduling a final hearing (the "Sale Hearing") on the NYNM Sale (as defined below) and setting objection deadlines with respect thereto; (iv) approving the form and

manner of notice of the continued auction for the NYNM Assets (the "Continued Auction"); and (vi) granting related relief.

Additionally, NYNM Management also requests the entry of an additional order (i) authorizing and approving the Asset Purchase Agreement (the "Agreement")[1] annexed to this Motion as Exhibit B between NYNM Management and HealthTek Solutions, LLC (the "Stalking Horse" or "HealthTek") (or such other asset purchase agreement as may be selected at the Continued Auction as the highest or best offer); (ii) authorizing the sale of the NYNM Assets free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement (the "NYNM Sale"); (iii) authorizing the assumption and assignment of the Assumed Contracts and Leases; and (iv) granting related relief.

In support of this Motion, NYNM Management respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008, and Local Bankruptcy Rule 6004-1.

## BACKGROUND

A.      **General Background**

4.      On March 16, 2018 (the "Petition Date"), Orion HealthCorp, Inc., Constellation Healthcare Technologies, Inc., NEMS Acquisition, LLC, Northeast Medical Solutions, LLC,

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

NEMS West Virginia, LLC, Physicians Practice Plus, LLC, Physicians Practice Plus Holdings, LLC, Medical Billing Services, Inc., Rand Medical Billing, Inc., RMI Physician Services Corporation, Western Skies Practice Management, Inc., Integrated Physician Solutions, Inc., NYNM Acquisition, LLC, Northstar FHA, LLC, Northstar First Health, LLC, Vachette Business Services, Ltd., MDRX Medical Billing, LLC, Vega Medical Professionals, LLC, Allegiance Consulting Associates, LLC, Allegiance Billing & Consulting, LLC, and Phoenix Health, LLC (collectively, the "Initial Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The chapter 11 cases of the Initial Debtors are jointly administered for procedural purposes only [D.I. 34].

5.       The Initial Debtors continue to be in possession of their assets and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.       On April 4, 2018, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 82].  As of the date hereof, no trustee or examiner has been appointed in the Initial Debtors' chapter 11 cases.

7.       On July 5, 2018, NYNM Management (together with the Initial Debtors, the "Debtors") filed with this Court a voluntary petition for relief under the Bankruptcy Code.

8.       NYNM Management continues to be in possession of its assets and to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner or committee has been appointed in NYNM Management's chapter 11 case.

9.      Contemporaneously herewith, the Debtors have filed, among other motions, (i) a motion for the joint administration of NYNM Management's chapter 11 case with the chapter 11 cases of the Initial Debtors; and (ii) a motion seeking entry of an order extending certain of the existing orders entered by the Court in the Initial Debtors' chapter 11 cases to NYNM Management.

10.     Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions* [*In re Orion HealthCorp, Inc.*, Case No. 18-71748 (AST), D.I. 2] (the "First Day Declaration") and the *Supplemental Declaration of Timothy J. Dragelin in Support of Chapter 11 Petition of New York Network Management, L.L.C. and Motions Filed Contemporaneously Therewith* (the "Supplemental Declaration," and together with the First Day Declaration, the "Declarations").

### B.      Overview of the Proposed NYNM Sale

11.     As discussed in the First Day Declaration, Debtor Orion HealthCorp, Inc. owns all of the equity interests in Debtor NYNM Acquisition, LLC.  Debtor NYNM Acquisition, LLC, in turn, is the sole member of NYNM Management.  NYNM Management, in turn, owns all of the equity interests in New York Network IPA, Inc., New York Premier IPA, Inc., Brooklyn Medical Systems IPA 3, Inc., Brooklyn Medical Systems IPA 4, Inc. and Brooklyn Medical Systems IPA 5, Inc. (collectively, the "IPA Entities"), which operate an independent practice association business, as well as an additional non-debtor entity.

12.     By this Motion, NYNM Management seeks to sell (i) all shares of capital stock and other equity interests in the IPA Entities (the "IPA Equity"), (ii) those contracts of NYNM Management that are shown as "Assigned Contracts" on Schedule 1.3 to the Agreement (the

"NYNM Contracts"), and (iii) the cash in that certain bank account ending in 3730 at JPMorgan Chase Bank, N.A. owned by NYNM Management into which Preferred Provider Organization payments are made under the NYNM Contracts (the "NYNM PPO Lockbox Cash" and together with the IPA Equity and NYNM Contracts, the "NYNM Assets").

### C.  The Initial Debtors' Sale Process

13.     On May 10, 2018, the Initial Debtors filed the *Motion of the Debtors for Entry of Orders (A)(I) Approving Bidding Procedures Relating to the Sale of Certain of the Debtors' Assets; (II) Approving Bid Protections; (III) Approving the Form and Manner of Notice of Sale by Auction; (IV) Establishing Procedures for Noticing and Determining Cure Amounts; (V) Scheduling a Hearing on the Proposed Sale; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain of the Debtors' Assets; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [D.I. 191] (the "Bidding Procedures Motion"), seeking to establish certain bidding procedures and sell the Debtors' revenue cycle management business (the "RCM Assets") to Medical Transcription Billing, Corp. ("MTBC").

14.     In response to the Bidding Procedures Motion, objections were filed by (i) Pediatric Associates of Dayton, Inc., Children's Medical Center, Inc., and Pediatric Group Associates Inc. [D.I. 213] (the "Physician Groups Objection"); (ii) the Official Committee of Unsecured Creditors [D.I. 214] (the "Committee Objection"); (iii) Arvind Walia and TG Capital LLC [D.I. 216] (the "TG Objection"); and (iv) GSS Infotech Limited [D.I. 226] (the "GSS Objection" and together with the Physician Groups Objection, the Committee Objection, and the TG Objection, the "Objections").

15.     On May 24, 2018, the Court held a hearing with respect to the Bidding Procedures Motion, which resulted in the Court overruling the Objections and entering the *Order (I) Approving Bidding Procedures Relating to the Sale of Certain of the Debtors' Assets; (II) Approving Bid Protections; (III) Approving the Form and Manner of Notice of Sale by Auction; (IV) Establishing Procedures for Noticing and Determining Cure Amounts; (V) Scheduling a Hearing on the Proposed Sale; and (VI) Granting Related Relief* [D.I. 273] (the "First Bidding Procedures Order").  The First Bidding Procedures Order approved, among other things, certain bidding procedures, certain bidding protections, procedures for the assumption and assignment of certain executory contracts and unexpired leases and scheduled an auction (the "Initial Auction") and sale hearing for the sale of the RCM Assets.  The Court also directed the Initial Debtors to consider establishing bidding procedures with respect to a proposed sale of the NYNM Assets.

16.     Thereafter, the Initial Debtors noticed the potential sale of substantially all of the Debtors' assets, including the NYNM Assets, at the Initial Auction by service of the First Bidding Procedures Order.  Further, and as part of its continued search to identify potential buyers, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the Debtors' investment banker, performed a review of the marketplace and noticed potential buyers of the NYNM Assets that they should submit bids or provide an indication of their value range by the June 19, 2018 deadline established by the First Bidding Procedures Order.  HealthTek expressed sufficient interest to execute non-disclosure agreements and conduct preliminary due diligence on all of the Debtors' assets, including the NYNM Assets.  The other potential bidders expressed interest solely in the RCM Assets.

17.     As a result, on June 19, 2018, the Initial Debtors received the Agreement from the Stalking Horse for the purchase of substantially all of the Debtors' assets, including the NYNM Assets, in the amount of $23.0 million (the "Initial Offer").  After receiving the Initial Offer, the Debtors and the Stalking Horse engaged in extensive negotiations regarding the details of a transaction whereby the Stalking Horse would acquire certain of NYNM Management's assets subject to higher and/or better bids pursuant to section 363 of the Bankruptcy Code.   The Stalking Horse disclosed to NYNM Management that Arvind Walia, who previously managed the Debtors' RCM Business, will be a minority investor (approximately 10%) in the Stalking Horse.

18.     On June 25, 2018, the Initial Debtors commenced the Initial Auction in accordance with the First Bidding Procedures Order.  In connection with the Initial Auction, the Initial Debtors asked HealthTek to bifurcate its Initial Offer and increase its offer for the NYNM Assets.  In response, HealthTek bifurcated its Initial Offer into an offer for the RCM Business for $10.6 million and an offer for the NYNM Assets for $16.5 million.

19.     As a result of the Initial Debtors' discussions with HealthTek, the Initial Debtors and HealthTek agreed to adjourn the Initial Auction with respect to the NYNM Assets and seek Court approval to, among other things, (i) establish HealthTek as the Stalking Horse, (ii) establish a timeline for the sale of the NYNM Assets and (iii) schedule the Continued Auction.

20.     In order to assure that the highest and/or best transaction is achieved with respect to the NYNM Assets, the Debtors will continue to market the NYNM Assets to other potential purchasers and hold the Continued Auction solely with respect to the NYNM Assets prior to the Sale Hearing before the Court.

### D.    The Proposed Timeline and Deadlines

21.    As further discussed below, NYNM Management requests that the Court set the following timeline and deadlines in connection with the proposed NYNM Sale process:[2]

| | |
|---|---|
| **Hearing on the Motion:** | **July 9, 2018 at 11:00 a.m. ET** |
| **NYNM Sale Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Contract/Lease Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Continued NYNM Bid Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Continued Auction** | **July 18, 2018 at 10:00 a.m. ET** |
| **Supplemental Objection Deadline** | **July 20, 2018 at 4:00 p.m. ET** |
| **Sale Hearing** | **July 23, 2018 at 11:00 a.m. ET** |

22.    NYNM Management submits that, in light of the marketing process already undertaken and the additional efforts that will be made going forward prior to the Continued Auction and Sale Hearing, the timing of the NYNM Sale of the NYNM Assets proposed herein is reasonable under the circumstances to effectuate a sale to either the Stalking Horse under the terms of the Agreement or, alternatively, to a higher and better bidder for the NYNM Assets.

23.    The Stalking Horse has also imposed certain deadlines on NYNM Management under the Agreement in order to accomplish the NYNM Sale.  The principal deadlines set forth in the Agreement are summarized below:

- Schedule the deadline to submit competing bids on the NYNM Assets for no later than July 18, 2018 at 4:00 p.m. (prevailing Eastern Time);

- Conducting the Continued Auction (if necessary) by July 20, 2018;

- Schedule the Sale Hearing to approve the Sale of the NYNM Assets for no later than July 23, 2018;

---

[2] All dates proposed herein are subject to the Court's availability.

- Entry of an order approving the Sale by no later than two (2) days after the Sale Hearing; and

- Consummate the NYNM Sale by no later than July 31, 2018.

24.     NYNM Management believes that the process set forth herein provides sufficient additional time to fully expose the NYNM Assets for sale in the hope of receiving additional qualified bids and achieving a competitive bidding process prior to the Continued Auction.

E.      **The Proposed NYNM Sale**

25.     NYNM Management believes that it is in the best interests of its estate to enter into the Agreement.  The following sub-paragraphs summarize key provisions of the Agreement, but are qualified in their entirety by reference to the actual Agreement:

(a) Purchase Price.   The aggregate consideration for the sale and transfer of the NYNM Assets (the "Purchase Price") shall be in the amount of $16.5 million.

(b) Purchased Assets.    Under the Agreement, the purchased assets include, collectively, (i) all shares of capital stock and other equity interests in the IPA Entities owned by NYNM Management, (ii) those contracts of NYNM that are shown as "Assigned Contracts" on Schedule 1.3 to the Agreement, and (iii) the cash in that certain bank account ending in 3730 at JPMorgan Chase Bank, N.A. owned by NYNM Management into which Preferred Provider Organization payments are made under the Added Contracts to which NYNM Management is a party.

(c) Assumed Liabilities.  Under the Agreement, the Stalking Horse will assume the following liabilities (the "Assumed Liabilities"): (i) the obligations of Seller under the NYNM Contracts to the extent such obligations are applicable to and accrue solely with respect to a NYNM Contract with respect to periods subsequent to the Effective Time[3]; (ii) Taxes that relate to the ownership or operation of the NYNM Assets with respect to any Tax period beginning after the Closing Date; (iii) all Assumed Cure Amounts with respect to the NYNM Contracts; and (iv) all Liabilities arising from the ownership of the NYNM Assets or operation of the IPA Entities arising after the Closing Date.

(d) Excluded Assets.  Excluded Assets consist of the following: (i) any cash on hand, in banks, and any cash equivalents (other than the NYNM PPO Lockbox Cash); (ii) all claims, rights and causes of action of Seller arising under or relating to

---

[3]  Pursuant to the Agreement, the Stalking Horse shall not be liable for any accounts payable for goods or services due prior to the Effective Time and such payables shall be the responsibility of Seller.

Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) including, without limitation, any such claims and actions arising under Sections 544, 545, 547, 548, 549 or 551 of the Bankruptcy Code, and commercial tort claims; (iii) Seller's rights under the Agreement (including the right to receive the Purchase Price) and under any of the ancillary agreements to be entered into in connection with the transactions contemplated hereby; (iv) all shares of capital stock or other equity interests of Seller or any of its Affiliates, all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of Seller or any of its Affiliates, and all securities owned and held by Seller, whether equity or debt or a combination thereof, other than the IPA Equity; (v) all Tax Returns and Tax records of Seller and its Affiliates; (vi) all Tax refunds, credits, abatements or similar offsets against Taxes of Seller and its Affiliates that relate to Specifically Excluded Liabilities; (vii) all Tax attributes of Seller and its Affiliates; (viii) the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller or any of its Affiliates, and all personnel records or other records of Seller that are required by Law to be retained; (ix) all claims arising on or prior to the Closing Date under any directors and officers liability insurance policies owned by Seller; (xi) all claims and causes of action arising on or before the Closing Date that Seller has against any current or former Affiliate, insider of Seller or any third party (and any recovery on account thereof), including claims for breaches of fiduciary duty, fraud or similar cause of action, rights of recoupment and avoidance, except to the extent that such claims or causes of action (a) may constitute a counterclaim, defense, offset, or recoupment right with respect to affirmative claims (if any) that such third party may assert against Purchaser or its Affiliates, (b) arise under any rights under warranties (express or implied), representations and guarantees made by any third party to Seller in connection with the NYNYM Assets or the NNNI Business, (c) arise under the Assigned Contracts assumed and assigned to Purchaser, or (d) relate to the NYNYM Assets; provided, however, nothing in this Section 3.1.10 shall in any event be deemed to eliminate from the Excluded Assets any other asset expressly designated as such pursuant to this Article 3; (x) professional retainers paid by Seller; (xii) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller; (xiii) all customer deposits; (xiii) all Benefit Plans, and any other "employee benefit plan" (as defined in ERISA) or any other employee benefit plan, program or arrangement, including, in each case, any underlying assets, agreements, policies and rights in connection therewith; (xiv) all insurance policies (except to the extent relating to the NYNYM Assets), all directors and officers liability insurance policies and errors and omissions insurance policies and all rights to assert claims with respect to any such policies; (xv) all unearned insurance premiums and all accrued insurance refunds or rebates; all unearned insurance premiums and all accrued insurance refunds or rebates; all rights with respect to an occurrence under any insurance policy prior to the Closing Date; (xvi) all

Contracts that are not Assigned Contracts, and all Contracts that have terminated or expired prior to the Closing in the Ordinary Course of Business; (xvii) any documents or communications of Seller that are subject to Seller's attorney-client privilege and/or the work-product immunity doctrine; (xviii) those assets, if any, listed on <u>Schedule 3.1.18</u>; and (xix) all assets of Seller other than the IPA Equity, the Assigned Contracts and NYNM PPO Lockbox Cash.

(e)  <u>Excluded Liabilities</u>.  Seller shall retain all liabilities and obligations that are not Assumed Liabilities, as described in the Agreement.

(f)  <u>Books and Records.</u>  Organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller or any of its Affiliates, and all personnel records or other records of the Seller that are required by Law to be retained are Excluded Assets.  Moreover, pursuant to Section 6.4.6 of the Agreement, Stalking Horse shall make available to Seller copies of all books, files, documents and records included as part of the NYNM Assets as Seller may reasonably request for a period of eighteen (18) months post-Closing.  If Seller desires copies of any of such documents or records, all copying costs shall be borne by Seller. Additionally, pursuant to section 6.9 of the Agreement, so long as the Bankruptcy Cases are pending, following the Closing, Purchaser shall provide Seller and Seller's counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents and records relating to the NYNM Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of Seller's professionals to copy, at Seller's expense, such documents and records as Seller or Seller's may request in furtherance of the purposes described above, and (b) Purchaser's copying and delivering to Seller or Seller's professionals such documents or records as Seller or Seller's professionals may request, but only to the extent Seller or Seller's professionals furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and Seller reimburse Purchaser for the reasonable costs and expenses thereof.

(g)  <u>Closing and Other Deadlines</u>.  The Closing is subject to certain customary conditions.  *See* Agreement, Articles 7 and 8.

(h)  <u>Termination</u>.  The rights of Seller and the Stalking Horse to terminate the Agreement are set forth in Article 10 of the Agreement.

(i)  <u>Break-up Fee</u>.  If the Agreement is terminated pursuant to Section 10.1.2, 10.1.4, 10.1.5(a), 10.1.6 (where Purchaser is the non-breaching party), 10.1.7 or 10.1.8 (other than through the failure of Purchaser to have complied fully with its obligations under the Agreement), in each case where Purchaser is not then in default under the Agreement and an Alternative Transaction is consummated

within twelve (12) months of such termination, then Purchaser shall be entitled to receive a break-up fee in the amount equal to $495,000 (the "Break Up Fee"), as provided in Section 6.4.2.2.

(j)    Expense Reimbursement.    If the Agreement is terminated by Purchaser under certain circumstances, then Purchaser shall be entitled to Purchaser's reasonably documented actual out-of-pocket fees and expenses (including legal, accounting, escrow and other fees and expenses) not to exceed $450,000 (the "Expense Reimbursement"), with such amount being payable by the Seller on or before the tenth (10th) Business Day after such termination.

(k)    Non-Solicitation.    The Agreement does not provide limitations on NYNM Management's ability to solicit offers for the NYNM Assets.

26.    NYNM Management believes that the NYNM Sale will provide the best means to maximize value for all of its constituencies.  The Initial Debtors commenced marketing the NYNM Assets upon entry of the First Bidding Procedures Order and continue to negotiate with all potential purchasers, including the Stalking Horse, in an effort to achieve maximum value for the benefit of all of their constituents.

27.    NYNM Management, after efforts to maximize value, a review of various reorganization, liquidation and sale options and discussions with its professionals, determined in the exercise of its reasonable business judgment that the most effective way to maximize the value of NYNM Management's estate for the benefit of all stakeholders would be (i) to enter into the Agreement subject to higher and better bids and (ii) to proceed with the Sale process for NYNM Assets.

28.    NYNM Management has had discussions with both its prepetition and post-petition financing lenders and the Committee regarding the marketing process and proposed Sale and believe that these constituencies will support the NYNM Sale of the NYNM Assets.

**F.    Notice of Continued Auction and Sale Hearing**

29.    As noted above, the NYNM Management proposes that the Continued Auction occur on **July 18, 2018 at 10:00 a.m**. **(prevailing Eastern Time)** and that the Sale Hearing

occur on **July 23, 2018 at 11:00 a.m**. **(prevailing Eastern Time)**.    NYNM Management

proposes that objections, if any, to the Sale Motion be filed **on or before 4:00 p.m. on July 17,**

**2018 (prevailing Eastern Time).**

  30.  NYNM Management requests that the Court approve the manner of the notice of

the proposed sale of the NYNM Assets (the "Continued Auction and Hearing Notice"), attached

as Annex 1 to the Second Bidding Procedures Order, which NYNM Management will serve,

together with the Second Bidding Procedures Order, no later than two (2) business days

following entry of the Second Bidding Procedures Order by first class mail, postage prepaid on

the following parties:  (a) the Office of the United States Trustee for the Eastern District of New

York; (b) counsel to the Committee; (c) counsel to NYNM Management's prepetition and post-

petition lenders; (d) all taxing and regulatory authorities having jurisdiction over any of the

NYNM Assets subject to the sale, including the Internal Revenue Service and the Securities and

Exchange Commission; (e) the state/local environmental agencies in the jurisdictions where

NYNM Management owns or leases real property; (f) all parties that have requested special

notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bidding

Procedures Order; (g) all persons or entities known to NYNM Management that have or have

asserted a lien on, or security interest in, all or any portion of the NYNM Assets; (h) all

counterparties to executory contracts or unexpired leases with NYNM Management; (i) counsel

to the Stalking Horse; (j) all Attorneys General for the states in which NYNM Management

conducts business; and (k) all potential bidders or parties interested in purchasing assets of

NYNM Management, including but not limited to the NYNM Assets, as previously identified or

otherwise known to NYNM Management (collectively, the "Notice Parties").

  31.  In addition, NYNM Management requests that the Court approve the form of the

notice to creditors (the "Creditor Notice"), attached as Annex 2 to the Second Bidding Procedures Order. Within two (2) business days of entry of the Second Bidding Procedures Order, NYNM Management will serve copies of the Creditor Notice upon all other known creditors and parties in interest. The Creditor Notice will provide that any party that has not received a copy of the Motion, the Agreement, the Second Bidding Procedures Order, or any other document referenced in the Creditor Notice can obtain such copies on the Court's website at www.ecf.nyeb.uscourts.gov or (without charge) at http://dm.epiq11.com/orionhealthcorp.

32.     Within two (2) days after entry of the Order, NYNM Management will also cause the Creditor Notice to be published on the website of NYNM Management's claims and noticing agent.

### G.     Sale Hearing

33.     The Successful Bid and the Backup Bid (or the Stalking Horse's Agreement in the event the Continued Auction is not held) will be subject to approval by the Court at the Sale Hearing free and clear of all liens, claims, interest, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the liens and interests permitted under the Agreement) with all such liens, claims, interests, and encumbrances to attach to the proceeds of the NYNM Sale of the NYNM Assets, except as otherwise provided with the same validity and in the same order of priority as they attached to the NYNM Assets prior to the NYNM Sale. Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the earlier of (i) consummation of the NYNM Sale pursuant to the Successful Bid or (ii) September 1, 2018 per the Agreement.

34.     NYNM Management requests that the Court schedule the Sale Hearing on **July 23, 2018 at 11:00 a.m. ((prevailing Eastern Time)**, which is the next omnibus hearing date in the Debtors' chapter 11 cases. NYNM Management further requests that Objections, if any, to

the NYNM Sale (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures) and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Stalking Horse, Baker Botts LLP, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel C. Grillo [emanuel.grillo@bakerbotts.com]), and (i) any other party requesting notice in this case

(collectively, the "Objection Parties"), so that it is actually received by each of the foregoing parties by **4:00 p.m. (prevailing Eastern Time) on July 17, 2018** (the "Sale Objection Deadline").

35.     In the event NYNM Management selects a Successful Bidder or Backup Bidder other than the Stalking Horse at the Continued Auction, or the terms of the proposed NYNM Sale are modified at the time of the Continued Auction, NYNM Management requests that the objection deadline solely with respect to NYNM Management's choice of such alternative Successful Bidder or Backup Bidder, the modifications to the terms of the NYNM Sale to the Successful Bidder, or adequate of assurance of future performance by the alternative Successful Bidder or Backup Bidder shall be on **July 20, 2018 at 11:00 a.m.**  Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties.

### H.        Break-Up Fee and Expense Reimbursement

36.     In recognition of the Stalking Horse's substantial expenditure of time, energy and resources, and the benefits to NYNM Management's estate of securing a "stalking horse" or guaranteed minimum bid, NYNM Management seeks approval to pay (a) a breakup fee (the "Break-Up Fee") of 3% of the Purchase Price ($495,000) to the Stalking Horse in the event that the Stalking Horse is not the Successful Bidder at the Continued Auction and NYNM Management consummates an Alternative Transaction, and (b) an expense reimbursement not to exceed $450,000 (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections") if the Agreement is terminated for that reason or otherwise as provided for in the Agreement.

37.     The Break-Up Fee and Expense Reimbursement are required by the Agreement. NYNM Management believes that the Break-Up Fee and Expense Reimbursement are fair and

reasonable, given the benefit to its estate of having a definitive Agreement and the risk to the Stalking Horse that a third-party offer ultimately may be accepted, and are necessary to preserve and enhance the value of NYNM Management's estate.  Additionally, the Break-Up Fee and Expense Reimbursement are consistent with those offered to MTBC in connection with the sale of the Debtors' RCM business.

38.    The Agreement and the Stalking Horse's monetary offer will form the basis upon which other bids will be submitted and evaluated.  The establishment of the Break-Up Fee and Expense Reimbursement permits NYNM Management to insist that competing bids for the NYNM Assets be higher or otherwise better than the Purchase Price under the Agreement, which is a clear benefit to NYNM Management's estate.  Thus, even if the Stalking Horse is ultimately not the Successful Bidder, and is paid the Break-Up Fee and Expense Reimbursement, NYNM Management will still have benefited significantly from the Agreement, due to the floor established by the Stalking Horse leading to an improved bid and increasing the likelihood that the NYNM Assets will be sold at the highest value to NYNM Management's estate.

## I.    Closing

39.    The closing shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Court at the Sale Hearing.

## J.    Corporate Action

40.    NYNM Management requests that no further corporate action of NYNM Management or approval of any of its equity security holders shall be required to authorize NYNM Management to consummate the transactions contemplated by the Agreement.  Except as expressly permitted by any Orders granting this Motion, NYNM Management requests that all holders of claims against and interests in, and equity security holders of NYNM Management be forever barred, estopped and enjoined from commencing, prosecuting or continuing in any

manner any action or other proceeding of any kind against NYNM Management's employees, officers or directors, or its professionals and advisors, on account of or related to the Agreement or the transactions contemplated thereby, *provided*, *however*, that nothing in any Order granting this Motion shall prevent any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

**BASIS FOR RELIEF REQUESTED**

**I.    THE ORDER SHOULD BE ENTERED**

      **A.    The Bidding Procedures Should be Extended**

41.    Continuation of the Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, established in the First Bidding Procedures and extended to the Second Bidding Procedures Order will ensure that NYNM Management's estate receives the greatest benefit available from the sale of the NYNM Assets.  The Bidding Procedures were structured to attract the maximum number of Qualified Bids while allowing NYNM Management the flexibility to select the bid or bids that provide the greatest overall value to NYNM Management's estate.  During the course of NYNM Management's marketing process, it appeared obvious that there was a market for the NYNM Assets.  The Bidding Procedures as continued by the Second Bidding Procedures Order will set out a time frame that will allow potential purchasers sufficient time to construct and submit informed Qualified Bids on the NYNM Assets, while still providing for the expeditious sale of the NYNM Assets.

42.    Thus, NYNM Management submits that the Bidding Procedures as described in established in the First Bidding Procedures and extended to the Second Bidding Procedures Order, as modified therein, should be approved because they are reasonably designed to ensure

that NYNM Management's estate receives the maximum benefit available from the sale of assets, and therefore warrant extension to the NYNM Asset-focused sale process.

**B.    The Break-Up Fee and Reimbursement
        Amount are Reasonable and Appropriate**

43.    Bid incentives such as the Break-Up Fee and Expense Reimbursement encourage a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process.  NYNM Management submits that approval of the Break-Up Fee and Expense Reimbursement are justified by the facts and circumstances of these cases, whether considered under the business judgment rule or as an administrative expense of the estate.

44.    Courts in this Circuit have approved break-up fees under the "business judgment rule," which proscribes judicial second-guessing of good-faith decisions made by a corporation's board of directors exercising its business judgment.  *See*, *e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014); *In re Integrated Resources, Inc.*, 147 B.R. 746, 752 (Bankr. S.D.N.Y. 1992)("[T]he business judgment of the Debtor is the standard applied under the law in this district"); *In re Ray Realty Fulton, Inc.*, No. 1-09-41225-DEM, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009) (break-up fee held reasonable and appropriate under business judgment rule because it offered the best means of maximizing value for benefit of debtor's estate); *see also In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal citation omitted).

45.    Courts in this Circuit have held that break-up fees should be approved as long as three questions are answered in the negative:  (a) is the relationship between the parties who negotiated the fee tainted by self-dealing or manipulation; (b) does the fee discourage bidding; and (c) is the amount of the fee unreasonable relative to the proposed purchase price.  *In re Integrated Resources, Inc.*, 147 B.R. at 657; *In re APP Plus, Inc.*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (citing *Integrated Resources* but adding a fourth factor taking into account "whether the proposed [break-up fee] is unduly burdensome to the estate in view of the specific facts and circumstances of [the] case and whether it is in the best interests of the estate, creditors, and equity holders.").  On this point, courts within the Second Circuit have repeatedly recognized the benefits to a debtor's estate resulting from the presence of an established stalking horse bid.  *See, e.g.*, *Gey Assocs. Gen. P'Ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34 (2d Cir. 2003) (noting that presence of stalking horse bid may encourage later bidders, and break-up fee compensates stalking horse "for the risk it shoulders in being first bidder"); *In re APP Plus, Inc.*, 223 B.R. at 874 (discussing rationale for break-up fees); *Metaldyne*, 409 B.R. at 670 ("Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer.").  NYNM Management submits that all requisite elements for approval of the Bid Protections are met here.

46.    In this case, the Break-Up Fee and Expense Reimbursement were the product of efforts by NYNM Management's investment banker to market the NYNM Assets to all potentially interested buyers, and resulted from arm's-length negotiations conducted in good faith between NYNM Management and the Stalking Horse.  The Break-Up Fee and Expense Reimbursement reflect the time spent, efforts made, and resources expended by the Stalking

Horse and its advisors in the due diligence and negotiation process that culminated in the Agreement. In light of the relatively limited interest from the market at large, and the extensive diligence efforts required to value the NYNM Assets, the Bid Protections were essential to securing the Stalking Horse's commitment to participate in the Continued Auction as the "stalking horse bidder." The amount of the Break-Up Fee (3% of the Purchase Price) and Expense Reimbursement (not to exceed $450,000) is appropriate in light of the Purchase Price, and is not so high that it would cause any chilling effect on other prospective purchasers. The Break-Up Fee and Expense Reimbursement are reasonable and within "market" for such fees.

47. NYNM Management's ability to offer the Break-Up Fee and Expense Reimbursement enables NYNM Management to ensure the sale of the NYNM Assets to a contractually-committed bidder at a price NYNM Management believes to be fair while, at the same time, providing NYNM Management with the potential of an even greater return to the estate. NYNM Management and the Stalking Horse are not related,[4] and each has acted in good faith and negotiated at arm's length throughout this process.

48. Indeed, the Break-Up Fee and Expense Reimbursement induced the Stalking Horse to submit a bid that will serve as a minimum floor for the NYNM Assets on which NYNM Management, its creditors and other bidders may rely. Approval of the Bid Protections is all the more appropriate where, as here, NYNM Management will be afforded the ability to shop the NYNM Assets for a higher or better offer without risk of losing the Stalking Horse. *In re Global Crossing, Ltd.*, 295 B.R. 726, 745-46 (Bankr. S.D.N.Y. 2003). NYNM Management's ability to do so would be eliminated, however, if NYNM Management is not authorized to pay the Break-Up Fee and Expense Reimbursement. Absent authorization of the payment of the Break-Up Fee

---

[4] The Stalking Horse disclosed to NYNM Management that Arvind Walia, who previously managed the Debtors' RCM Business, will be a minority investor (approximately 10%) in the Stalking Horse

and Expense Reimbursement, NYNM Management might lose the opportunity to obtain the highest and best available offer for the NYNM Assets and the downside protection that will be afforded by the Agreement.

49.     Courts have considered break-up fees to be administrative expenses of debtor's estate, as they are "an actual and necessary cost and expense of preserving the debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code." *See In re Ray Realty Fulton, Inc.*, Case No. 09-41225, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009); *see also In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2008) (break-up fee, if triggered, deemed an actual and necessary cost and expense of preserving Debtor's estate, within the meaning of section 503 of the Bankruptcy Code); *In re Fortunoff Fine Jewelry and Silverware, LLC*, No. 08–10353, 2008 WL 618983, at *2 (Bankr. S.D.N.Y. Feb. 22, 2008) (purchasers granted an allowed administrative claim in Debtors' chapter 11 cases in an amount equal to the break-up fee).

50.     Here, NYNM Management's customers and employees will take comfort that the Stalking Horse's bid will ensure the continuation of NYNM Management's business.  Moreover, the Stalking Horse has provided a material benefit to NYNM Management and its creditors in the form of a baseline value for the NYNM Assets, which increases the likelihood that the Continued Auction will yield the best possible price.  Both NYNM Management and the Stalking Horse, as parties to the Agreement, agree that the protections afforded by the Break-Up Fee and Expense Reimbursement are an integral part of the bargain.  Accordingly, approval of the Bidding Procedures, including the Break-Up Fee and Expense Reimbursement, is a bargained-for condition to the Stalking Horse's obligation to proceed with the transaction contemplated in the Agreement.

51.     For the foregoing reasons, NYNM Management requests (1) that the payment of the Break-Up Fee and the Expense Reimbursement under the conditions set forth in the Agreement be approved as a superpriority administrative expense with priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, and (2) that the Court approve and authorize payment of the Break-Up Fee and Expense Reimbursement pursuant to the terms of the Agreement.

### C.     The Continued Auction and Sale Hearing Notice Should be Approved

52.     Pursuant to Bankruptcy Rules 2002(a) and 6004, NYNM Management is required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.  NYNM Management provided notice of the Sale of the NYNM Assets upon service of the First Bidding Procedures Order on June 7, 2018.  *See* Affidavit of Service [D.I. 301].

53.     Further, the Initial Debtors' Bidding Procedures set forth that the Initial Auction may be continued until a successful bidder is chosen from the bids submitted at the Initial Auction.  *See* Bidding Procedures Order, Annex 1 at p. 8 ("If an Auction is conducted, it shall continue until the Debtors determine, in consultation with the Committee and the DIP Agent, which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction").  Amongst the qualified bids submitted at the Initial Auction was the Stalking Horse's bid for the NYNM Assets.  The Continued Auction and Hearing Notice and the Creditor Notice, as applicable, set forth all the information a potential bidder and any other party in interest should require about the continued bidding process for the NYNM Assets, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the

Bid Deadline; the time, date, and location of the Continued Auction; and the time, date and location of the Sale Hearing.

54.     NYNM Management submits that the Continued Auction and Hearing Notice and the Creditor Notice as proposed comply with Bankruptcy Rule 2002 and the Sale Guidelines, and constitute good and adequate notice of the Continued Auction and the sale of the NYNM Assets. Because NYNM Management proposes to serve the Continued Auction and Hearing Notice upon all Notice Parties and the Creditor Notice upon all other known creditors and parties in interest, NYNM Management submits that the notice requirements of Bankruptcy Rules 2002(a)(2) and 6004 are satisfied.  Therefore, NYNM Management respectfully requests that the Court approve the Continued Auction and Hearing Notice and the Creditor Notice and the notice procedures proposed above.

## II.     THE SALE ORDER SHOULD BE ENTERED

### A.     There is a Compelling Business Justification for the Sale Because It Will Maximize Value to NYNM Management's Estate

55.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Section 105(a) of the Bankruptcy Code in turn provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.   *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).

56.     Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and elsewhere hold that the sale or use of property outside the ordinary course of business should be approved where NYNM Management can articulate a business justification for the transaction.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re CPJFK, LLC*, 496 B.R. 290, 304 (Bankr. E.D.N.Y. 2011) (adopting *Lionel Corp.* standard for sound business justification); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 680 (Bankr. S.D.N.Y. 1989).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  *Lionel*, 722 F.2d at 1071.

57.     NYNM Management submits that sound business justification exists to sell the NYNM Assets to the Stalking Horse pursuant to the Agreement or the Successful Bidder pursuant to the Bidding Procedures.  As explained in the Supplemental Declaration, NYNM Management commenced its chapter 11 case to, among other things, effectuate a sale of its assets in the belief that doing so will maximize value for all stakeholders.  Since the filing of this case the loss of key clients and management personnel for NYNM have made the reasons for a sale on the proposed timeline even more compelling.  Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of NYNM Management's estate for the benefit of all stakeholders.

58.     Under these circumstances, a compelling business justification exists for the expeditious sale of the NYNM Assets outside the ordinary course of business and prior to confirmation of a plan of reorganization.  Accordingly, NYNM Management submits that the

proposed sale of the NYNM Assets pursuant to section 363 of the Bankruptcy Code should be approved.

### B. The NYNM Sale is Proposed in "Good Faith" as Contemplated By Section 363(m) of the Bankruptcy Code

59.    The Agreement is the product of extensive arm's length negotiations between NYNM Management and the Stalking Horse.  In addition, NYNM Management intends to negotiate any other asset purchase agreement at arm's length and in good faith and, thus, believes that any Successful Bidder, including the Stalking Horse, should be entitled to the protections of section 363(m) of the Bankruptcy Code.

60.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b)…of this section of a sale…of property does not affect the validity of a sale…under such authorization to an entity that purchased…such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale…were stayed pending appeal.

11 U.S.C. § 363(m).

61.    Section 363(m) of the Bankruptcy Code thus protects a good faith purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the NYNM Assets.

62.    The Second Circuit instructs that a party would have to show fraud or collusion between a purchaser and the debtor-in-possession or trustee to demonstrate a lack of good faith. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 273 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser's] good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders

or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (internal citations omitted); *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998). No such facts exist here.

63.     To the contrary, NYNM Management submits, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Agreement was an arm's-length transaction, in which the Successful Bidder acted in good faith. The Continued Auction is an open sale process, with the NYNM Assets to be sold to the bidder who submits the highest and best bid per the terms set forth in the Sale Guidelines, and NYNM Management will have its own advisors to negotiate on its behalf throughout the Continued Auction and the NYNM Sale. Accordingly, NYNM Management requests that the Court make the finding at the Sale Hearing that the Successful Bidder has purchased the NYNM Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**C.     The NYNM Sale Satisfies the Requirements of
         Bankruptcy Code Section 363(f) for a Sale Free
         and Clear of Liens, Claims, Interests, and other Encumbrances**

64.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if any of the following criteria are met:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv.,*

*Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met); *see also In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

65.     In addition, several courts have held that section 363(f) grants bankruptcy courts the power to convey assets free and clear of all pre-petition claims.  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) (collecting cases and discussing need to extinguish pre-petition claims in order to facilitate sale of assets for maximum value).  Furthermore, other courts, concluding that section 363(f) does not empower them to convey assets free and clear of pre-petition claims, have nonetheless held that Bankruptcy Code section 105(a) provides them with the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See, e.g.*, *In re General Motors Corp.*, 407 B.R. 463, 499-504 (Bankr. S.D.N.Y. 2009) (discussing Second Circuit precedent permitting sale of assets "free and clear" of successor liability claims pursuant to section 363(f) and 105(a)) (internal citations omitted); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

66.     NYNM Management expects that proposed sale of the NYNM Assets will satisfy, at minimum, the second and/or fifth requirement of section 363(f) of the Bankruptcy Code, if not others as well.  Holders of liens, claims or interests in or against the NYNM Assets will be adequately protected because their liens, claims and/or interests will attach to the proceeds of the sale with the same force, effect, and priority as their prior liens, claims and/or interest in the

NYNM Assets, subject to any defenses NYNM Management may possess with respect thereto. Moreover, such holders of liens, claims or interests may consent to the sale of the NYNM Assets. Accordingly, the sale of the NYNM Assets free and clear of all adverse interests is warranted and the Sale should be approved under section 363(f) of the Bankruptcy Code.

## III. "EXTRAORDINARY PROVISIONS" OF THE SALE UNDER THE SALE GUIDELINES

67.     The Agreement contains certain provisions designated "extraordinary" under the Sale Guidelines. In each instance, as explained more fully below, NYNM Management believes that the "extraordinary provisions" are necessary components of the NYNM Sale and will serve to ensure that the NYNM Assets are sold through a process that is both prompt and for the highest possible value. The Agreement contains the following "Extraordinary Provisions" as per the Sale Guidelines:[5]

### A.     Record Retention.

68.     Organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller or any of its Affiliates, and all personnel records or other records of the Seller that are required by Law to be retained are Excluded Assets. Moreover, pursuant to Section 6.4.6 of the Agreement, Stalking Horse shall make available to Seller copies of all books, files, documents and records included as part of the NYNM Assets as Seller may reasonably request for a period of eighteen (18) months post-Closing. If Seller desires copies of any of such documents or records, all copying costs shall be

---

[5]     This list of possible "Extraordinary Provisions" (as such term is defined in the Sale Guidelines) is not intended to be an admission that any of these provisions are unusual relief in sales transactions of this nature conducted pursuant to section 363 of the Bankruptcy Code.

borne by Seller.    Additionally, pursuant to section 6.9 of the Agreement, so long as the Bankruptcy Cases are pending, following the Closing, Purchaser shall provide Seller and Seller's counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents and records relating to the NYNM Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of Seller's professionals to copy, at Seller's expense, such documents and records as Seller or Seller's may request in furtherance of the purposes described above, and (b) Purchaser's copying and delivering to Seller or Seller's professionals such documents or records as Seller or Seller's professionals may request, but only to the extent Seller or Seller's professionals furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and Seller reimburses Purchaser for the reasonable costs and expenses thereof.    NYNM Management will have reasonable access to its books and records to enable administration of its chapter 11 case.

### B.    <u>No Successor Liability for the Successful Bidder</u>

69.    NYNM Management requests that the Court enter an order authorizing the NYNM Assets to be sold free and clear of all liens, claims, interests and encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code.  In addition, NYNM Management submits that the NYNM Assets may be sold free and clear of claims, including successor liability claims, if any, as no Successful Bidder will, as a result of any action taken in connection with the purchase of the NYNM Assets:  (a) be a successor to NYNM Management; (b) have, *de facto* or otherwise, merged with or into NYNM Management; or (c) be a continuation or substantial continuation of NYNM Management or any enterprise of NYNM Management.  To the contrary, as explained in the Supplemental Declaration, NYNM Management has commenced its chapter 11 proceeding for, among other reasons, the purpose of selling all or substantially all of

its assets to an outside buyer prior to a liquidation of any remaining Excluded Assets and the wind-up of any remaining operations.  The NYNM Assets will pass to the Successful Bidder and any employees of NYNM Management who join the Successful Bidder following the NYNM Sale will do so on terms acceptable to the Successful Bidder and only the Successful Bidder.

70.     The ability to acquire the NYNM Assets free and clear of any successor liability claims is a critical component of the bargain reflected in the Agreement; it will bring stability and finality to the purchase of NYNM Assets via the NYNM Sale, and thus enhances the ultimate value of the NYNM Assets to the Successful Bidder, and, by extension, to the estate.

### C.    Any Actions Against the Successful Bidder Arising Out of the NYNM Sale Should be Enjoined

71.     NYNM Management requests that, as part of the Sale Order, the Court order that all persons and entities be forever barred and permanently enjoined from taking any actions against the ultimate buyer or its affiliates (as they existed immediately prior to closing) to recover any claim which such person has against NYNM Management.  Notwithstanding the foregoing, NYNM Management does not seek any order (1) preventing such persons or entities from pursuing an action against the Successful Bidder under the terms of any applicable agreement or related documents for purchase of the NYNM Assets; or (2) barring any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

72.     The foregoing injunction provisions are an integral part of the bargain reflected in the Agreement.  In the interests of bringing greater stability and finality to the transfer of the NYNM Assets pursuant to the NYNM Sale, NYNM Management submits that entry of an order in the form described above is justified in the interest of maximizing the value of the NYNM Assets to the estate.

### D.    Deadlines that Limit Notice

73.    The deadlines set forth in the Agreement will be within twenty-one (21) days of the entry of the Order.  However, entry of these deadlines does not effectively limit notice to interested parties because NYNM Management previously provided notice of the sale of substantially all of NYNM Management's assets, including the NYNM Assets, at an auction upon service of the First Bidding Procedures Order as directed by this Court.  *See* Affidavit of Service [D.I. 301].

74.    Further, the Bidding Procedures set forth that the Initial Auction may be continued until a successful bidder is chosen from the bids submitted at the Initial Auction.  *See* Bidding Procedures Order, Annex 1 at p. 8 ("If an Auction is conducted, it shall continue until the Debtors determine, in consultation with the Committee and the DIP Agent, which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction").  Amongst the qualified bids submitted at the Initial Auction was the Stalking Horse's bid for the NYNM Assets.  Accordingly, NYNM Management submits that notice of the Continued Auction is not effectively limited and sufficient notice has been provided for the Continued Auction and the Sale Hearing in accordance with Bankruptcy Rules 2002(a) and 6004, Local Bankruptcy Rule 6004-1 and Section 2 of the Sale Guidelines.

### E.    The Proposed NYNM Sale Does Not Constitute a Fraudulent Transfer

75.    NYNM Management requests a finding in the Sale Order that the Agreement (or any alternative agreement between NYNM Management and a Successful Bidder) was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and that neither NYNM Management nor the Stalking Horse is entering into the NYNM Sale transaction fraudulently.

76.     As set forth herein, NYNM Management has structured the proposed Bidding Procedures and sale process to ensure that the resulting NYNM Sale will be an arm's-length transaction yielding the highest and best value for the NYNM Assets.  In addition, NYNM Management and its advisors has undertaken a comprehensive review of the market to identify all potentially interested buyers so as to ensure the maximum number of participants in the Continued Auction.  Accordingly, NYNM Management submits that good cause exists for a finding that the proposed NYNM Sale does not constitute a fraudulent transfer.

F.     **The Successful Bid is Fair Consideration for the NYNM Assets and Receipt of the Assumed Contracts and Leases**

77.     NYNM Management requests a finding in the Sale Order that the consideration provided by the Successful Bidder to NYNM Management for its purchase of the NYNM Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act.  As set forth herein, NYNM Management has structured the Bidding Procedures and sale process to ensure that the resulting NYNM Sale will be an arms-length transaction yielding the highest and best value for the NYNM Assets.  The eventual sale price for the NYNM Assets will have been twice subjected to a market check; first by way of Houlihan Lokey's marketing of the NYNM Assets and efforts to identify potential bidders, a process that resulted in the identification of the Stalking Horse and the negotiation of the Stalking Horse bid, and second, through the open and competitive Continued Auction process.  NYNM Management submits that these steps will ensure that the eventual price paid by the Successful Bidder will constitute the highest and best value for the NYNM Assets, and thus fair consideration.

78.     In addition, a finding that the Purchase Price constitutes fair consideration is an important part of the bargain reflected in the Agreement; it will bring stability and finality to the

purchase of the NYNM Assets via the NYNM Sale, and thus enhances the ultimate value of the NYNM Assets to the Successful Bidder, and, by extension, to the estate.  For these reasons, NYNM Management submits that good cause exists for a finding that the consideration provided by the Successful Bidder to NYNM Management for its purchase of the NYNM Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

### G.     Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h)

79.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property. . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  NYNM Management hereby requests that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) is waived.

80.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."   10 Collier on Bankruptcy 16th Ed. Rev., ¶ 6004.11.  Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

81.     A prompt closing of the NYNM Sale is of critical importance to the continued stability of NYNM Management's business and the preservation of value for the estate.  Based

on its experience operating the business, NYNM Management believes with good cause that consummating a sale transaction as soon as practicable is necessary to maintain value. Accordingly, NYNM Management hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## NO PRIOR REQUEST

82.     No prior Motion for the relief requested herein has been made to this or any other court.

## NOTICE

83.     Notice of this Motion has been given to the following parties:  (a) the Office of the United States Trustee for the Eastern District of New York; (b) counsel to the Committee; (c) counsel to Bank of America, N.A.; (d) counsel to BMO Harris Bank, N.A.; (e) counsel to Keybank National Association; (f) counsel to Stifel Bank & Trust; (g) counsel to Woodforest National Bank; (h) all taxing and regulatory authorities having jurisdiction over any of the NYNM Assets subject to the sale, including the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the state/local environmental agencies in the jurisdictions where NYNM Management own or lease real property; (k) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date of the filing of this Motion; (l) all persons or entities known to NYNM Management that have or have asserted a lien on, or security interest in, all or any portion of the NYNM Assets; (m) all counterparties to executory contracts or unexpired leases with NYNM Management; (n) counsel to the Stalking Horse; (o) all Attorneys General for the states in which NYNM Management conducts business; and (p) all potential bidders previously identified or otherwise known to NYNM Management.  NYNM Management submit that the notice provided for herein is consistent with Section 2(b) of the Sale Guidelines. As described above, NYNM Management intends to provide additional notice of the Continued

Auction, NYNM Sale, and Sale Hearing once the Second Bidding Procedures Order is entered. In light of the nature of the relief requested herein, NYNM Management submits that no other or further notice is necessary.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

**WHEREFORE,** NYNM Management respectfully requests that this Court enter the Order and the Sale Order granting the relief requested herein and that it grant NYNM Management such other and further relief as is just and proper.

Dated: July 5, 2018  
     New York, New York

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Thomas R. Califano*  
Thomas R. Califano (6144)  
DLA Piper LLP (US)  
1251 Avenue of the Americas  
New York, New York 10020-1104  
Telephone: (212) 335-4500  
Facsimile:  (212) 335-4501  
E-mail:  thomas.califano@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*