**<u>EXHIBIT B</u>**

Agreement

**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**HEALTHTEK SOLUTIONS, LLC,**

**as Purchaser,**

**and**

**NEW YORK NETWORK MANAGEMENT, L.L.C.,**

**Debtor-in-Possession**

**as Seller**

**Dated as of July 5, 2018**

# TABLE OF CONTENTS

**Page**

ARTICLE 1    PURCHASE OF ASSIGNED ASSETS ............................................................ 1

1.1    Purchase and Sale of NYNYM Assets................................................................. 1

1.2    Assumption of Certain Liabilities ........................................................................ 1

1.3    Assignment of Certain Contracts ......................................................................... 3

1.4    Instruments of Conveyance, Assumption or Assignment..................................... 4

1.5    "AS IS" TRANSACTION .................................................................................... 4

ARTICLE 2    PURCHASE PRICE ............................................................................................ 5

2.1    Purchase Price ...................................................................................................... 5

2.2    Payment of the Purchase Price............................................................................. 5

2.3    Allocation of the Purchase Price .......................................................................... 6

ARTICLE 3    EXCLUDED ASSETS ........................................................................................ 7

3.1    Excluded Assets ................................................................................................... 7

3.2    Purchaser Agreement ........................................................................................... 9

ARTICLE 4    SELLER'S REPRESENTATIONS AND WARRANTIES ............................ 9

4.1    Organization and Corporate Power....................................................................... 9

4.2    Title and Related Matters .................................................................................... 9

4.3    Necessary Property ............................................................................................... 9

4.4    Litigation............................................................................................................. 10

4.5    Insurance ............................................................................................................. 10

4.6    Absence of Certain Changes .............................................................................. 10

4.7    Compliance with Laws ...................................................................................... 11

4.8    Transactions with Related Persons; Outside Interests ....................................... 13

4.9    Officers, Directors, Managers, Employees, Consultants and Agents; Compensation ...................................................................................................... 13

4.10   ERISA and Related Matters............................................................................... 13

4.11   Real Property ...................................................................................................... 14

4.12   Reserved.............................................................................................................. 15

4.13   Reserved.............................................................................................................. 15

4.14   Authorization ...................................................................................................... 15

4.15   No Conflict with Other Instruments or Agreements........................................... 15

4.16    Brokers or Finders.................................................................................. 16

4.17    Taxes ...................................................................................................... 16

4.18    Financial Information.............................................................................. 16

ARTICLE 5        PURCHASER'S REPRESENTATIONS AND WARRANTIES ................. 16

5.1    Organization and Corporate Power......................................................... 16

5.2    Authorization .......................................................................................... 16

5.3    No Conflict with Other Instruments or Agreements............................... 16

5.4    Brokers or Finders.................................................................................. 17

5.5    Funding ................................................................................................... 17

5.6    Adequate Assurance............................................................................... 17

5.7    Governmental or Regulatory Approvals ................................................. 17

5.8    Legal Proceedings.................................................................................. 17

5.9    Brokers ................................................................................................... 17

5.10    Solvency.................................................................................................. 17

5.11    Affiliation with Parmjit Parmar .............................................................. 18

ARTICLE 6        COVENANTS, AGREEMENTS PENDING CLOSING, AND
                 OTHER AGREEMENTS ................................................................. 18

6.1    Conduct of Seller's Business Pending the Closing................................. 18

6.2    Additional Covenants and Agreements of Seller.................................... 19

6.3    Covenants and Agreements of Purchaser ............................................... 20

6.4    Bankruptcy Actions ................................................................................ 21

6.5    Porteck Services Agreement ................................................................... 24

6.6    Employment of Seller's Employees........................................................ 24

6.7    Salaries and Benefits.............................................................................. 25

6.8    ERISA ..................................................................................................... 27

6.9    Reasonable Access to Records and Certain Personnel ........................... 27

6.10    Reserved.................................................................................................. 27

6.11    Cure Amounts ......................................................................................... 27

6.12    NYNM PPO Lockbox.............................................................................. 27

6.13    Acquisition.............................................................................................. 27

6.14    Seller Access .......................................................................................... 28

ARTICLE 7        CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS......... 28

7.1    Conditions Precedent .............................................................................. 28

7.2     Court Approval Required .................................................................................... 29

7.3     Consents to the Transactions ............................................................................. 29

ARTICLE 8      CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS .................. 30

8.1     Representations and Warranties; Performance ................................................... 30

8.2     Orders ................................................................................................................. 30

8.3     Purchaser's Deliveries ....................................................................................... 30

8.4     No Termination ................................................................................................... 30

8.5     No Injunctions .................................................................................................... 30

ARTICLE 9      CLOSING .......................................................................................... 30

9.1     Time, Place and Manner of Closing ................................................................... 30

9.2     Closing Deliveries of Seller ............................................................................... 31

9.3     Closing Deliveries of Purchaser ......................................................................... 32

9.4     Transfer Taxes ................................................................................................... 33

9.5     Proration of Taxes and Charges ......................................................................... 33

9.6     Consummation of Closing .................................................................................. 33

ARTICLE 10      TERMINATION OF AGREEMENT ......................................................... 34

10.1     Termination Events ............................................................................................ 34

10.2     Break-Up Fee; Expense Reimbursement ............................................................ 34

10.3     Effect of Termination ......................................................................................... 35

10.4     Termination Procedure ....................................................................................... 35

ARTICLE 11      FURTHER ASSURANCES ....................................................................... 35

11.1     Separate Agreements Executed in Connection with Closing ............................... 35

11.2     Cooperation of the Parties After Closing ............................................................ 35

11.3     Payroll ............................................................................................................... 36

ARTICLE 12      DEFINITIONS ........................................................................................ 36

ARTICLE 13      MISCELLANEOUS PROVISIONS ........................................................... 44

13.1     Nature and Survival of Representations and Warranties ..................................... 44

13.2     Exhibits and Schedules ...................................................................................... 44

13.3     Assignment ........................................................................................................ 44

13.4     Governing Law and Jurisdiction ........................................................................ 44

13.5     Severability ........................................................................................................ 44

13.6     Notices ............................................................................................................... 44

13.7     Public Announcements ....................................................................................... 46

13.8    Expenses ............................................................................................................... 46

13.9    Third Parties........................................................................................................ 46

13.10   Time of the Essence ........................................................................................... 46

13.11   Construction........................................................................................................ 46

13.12   Counterparts; Electronic Signatures; Effectiveness of this Agreement .............. 46

13.13   Remedies Cumulative ......................................................................................... 47

13.14   Entire Agreement; Amendment; Waiver ............................................................ 47

13.15   Disclaimer; Non-Recourse.................................................................................. 47

13.16   Bulk Sales Laws.................................................................................................. 48

13.17   No Right of Set-Off ............................................................................................ 48

## <u>SCHEDULES</u>

| | | |
|---|---|---|
| Schedule 1.3 | - | Assigned Contracts |
| Schedule 3.1.18 | - | Excluded Assets |
| Schedule 4.2 | - | Title |
| Schedule 4.4 | - | Litigation |
| Schedule 4.6.1 | - | Absence of Certain Changes |
| Schedule 4.6.2 | - | Notice of Termination |
| Schedule 4.7.1 | - | Compliance with Laws |
| Schedule 4.7.2 | - | Material Permits |
| Schedule 4.7.5 | - | Notices from Governmental Authority; Obligation to Mitigate |
| Schedule 4.8 | - | Transactions with Related Persons; Outside Interests |
| Schedule 4.10 | - | ERISA and Related Matters |
| Schedule 4.14 | - | Authorization |
| Schedule 4.15 | - | No Conflict with Other Instruments or Agreements |
| Schedule 4.16 | - | Brokers' or Finders' Fees |
| Schedule 4.17 | - | Taxes |
| Schedule 5.1 | - | Authorization |
| Schedule 6.6.2 | - | Active Business Employees to be Hired |
| Schedule 12 | - | Permitted Encumbrances |
| | | |
| Exhibit A | - | Form of NYNM Bid Order |

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made as of July 5, 2018, by and between HEALTHTEK SOLUTIONS, LLC, a Delaware limited liability company or an assignee acceptable to Seller (hereinafter referred to as the "**Purchaser**") and NEW YORK NETWORK MANAGEMENT, L.L.C., a New York limited liability company ("**Seller**").

## RECITALS

A.     Seller has commenced with certain of its Affiliates jointly administered cases (collectively, the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Bankruptcy Code, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**"), thereby creating the estates (the "**Bankruptcy Estates**") in accordance with Bankruptcy Code Section 541 et seq., and have continued in the possession of their assets and in the management of their business under Sections 1107 and 1108 of the Bankruptcy Code.

B.     Seller, subject to the receipt of any higher or better offer received by it for the NYNYM Assets, desires to sell to Purchaser the NYNYM Assets pursuant to the terms and conditions of this Agreement and Purchaser desires to so purchase and acquire such assets from Sellers (the "**Acquisition**") in accordance with Sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all liens, interests, claims or encumbrances;

NOW THEREFORE, IN CONSIDERATION OF THE PROMISES MADE HEREIN, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES AGREE AS FOLLOWS:

## ARTICLE 1
## PURCHASE OF ASSIGNED ASSETS.

1.1     Purchase and Sale of NYNYM Assets.  Subject to the terms and conditions set forth in this Agreement, including without limitation the receipt of any higher or better offer received by it for the NYNYM Assets, at the Closing, Seller shall sell, convey, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, for the Purchase Price, all right, title and interest in and to the NYNYM Assets.  Subject to the terms and conditions of this Agreement, the NYNYM Assets shall be sold free and clear of all liens, interests, claims or encumbrances.

1.2     Assumption of Certain Liabilities.

1.2.1     Upon the terms and subject to the conditions of this Agreement, at the Closing, on the Closing Date, Purchaser shall assume only the following liabilities (the "**Assumed Liabilities**"):

1.2.1.1     the obligations of Seller under the Assigned Contracts to the extent such obligations are applicable to and accrue solely with respect to periods subsequent to the Effective Time; for the avoidance of doubt, Purchaser shall not be liable for any accounts

1

payable for goods or services due prior to the Effective Time and such payables shall be the responsibility of Seller;

            1.2.1.2      Taxes that relate to the ownership or operation of the NYNYM Assets or the NNNI Business with respect to any Tax period or portion thereof beginning after the Closing Date;

            1.2.1.3      all Assumed Cure Amounts with respect to the Assigned Contracts; and

            1.2.1.4      all Liabilities arising from the ownership of NYNYM Assets, or operation of the NNNI Business arising after the Closing Date.

Purchaser shall not assume, incur, guarantee, or otherwise be obligated with respect to any liability whatsoever of Seller other than the Assumed Liabilities.  With respect to any of the Assumed Liabilities, such assumption by Purchaser is for the benefit only of Seller and shall not expand, increase, broaden, or enlarge the rights or remedies of any other party, nor create in any other party any right against Purchaser that such party would not have against Seller if this Agreement had not been consummated.

        1.2.2      Except as provided in <u>Section 1.2.1</u>, Purchaser does not hereby and will not assume or become liable for and shall not be obligated to pay or satisfy any obligation, debt or liability whatsoever, whether fixed, contingent or otherwise, of Seller or any other Person, including, without limitation any Cure Amounts (other than the Assumed Cure Amounts), Indebtedness or other claim, liability, obligation or Tax arising out of the ownership or operation of the NYNYM Assets and/or the NNNI Business or circumstances or occurrences or the operations of Seller or transactions contemplated by this Agreement or Seller or any other Person in each case prior to the Closing Date and whether or not disclosed on the Schedules attached hereto, and regardless of when or by whom asserted (collectively, the "**Excluded Liabilities**"). Without limiting the foregoing and for the avoidance of doubt, the Assumed Liabilities shall in no event include, and the Excluded Liabilities shall include (but not be limited to), the Specifically Excluded Liabilities.  The Excluded Liabilities shall remain the responsibility and obligation of Seller after Closing, and Seller shall pay and discharge all such liabilities as and when due.

        1.2.3      For purposes of this Agreement, "**Specifically Excluded Liabilities**" means (i) Seller's liabilities or obligations under this Agreement; (ii) Seller's liabilities or obligations for any fees and expenses incident to or arising out of the consummation of the transactions contemplated hereby (including all transaction related bonuses or benefits payable to any officer, director, manager, employee, shareholder, member or Affiliate of Seller); (iii) any liability or obligation of Seller for Taxes for any taxable period or year, except as otherwise specifically provided in <u>Section 9.4</u> or <u>Section 9.5</u>; (iv) Seller's liabilities or obligations with respect to Indebtedness; (v) liabilities or obligations of Seller arising by reason of any violation or alleged violation of any Law; (vi) Seller's liabilities or obligations arising out of or related to any breach or alleged breach by Seller of any Contract, in each case, regardless of when any such liability or obligation is asserted; (vii) Seller's liabilities or obligations for tort claims, known or unknown, and any related claims and litigation with respect to Seller's operation of the NYNNI

2

Business prior to the Closing Date; (viii) Seller's liabilities or obligations relating to any Action arising out of or in connection with Seller's conduct of the NNNI Business or otherwise (including the Actions set forth on **Schedule 4.4**), or any other conduct of Seller or Seller's respective officers, directors, managers, employees, consultants, agents or advisors prior to the Closing; (ix) except as otherwise provided in Section 1.2.1, Seller's liabilities or obligations relating to employees relating to the period prior to Closing, including, without limitation, any employees who are offered employment by Purchaser in accordance this Agreement but who decline to accept such offer (except for the obligations of Seller for any accrued and unused vacation or paid time off for the Hired Active Business); (x) any liabilities, obligations or responsibilities relating to or arising under any Benefit Plan, any "employee benefit plan" (as defined ERISA) or any other employee benefit plan, program or arrangement at any time maintained or contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any liability or potential liability; (xi) any liabilities or obligations with respect to any of the Excluded Assets; (xii) any liability of Seller to any Affiliate of Seller (including any shareholder of such Affiliate); (xiii) any liability to indemnify, reimburse or advance amounts to any officer, director, manager, employee or agent of Seller; (xiv) any liability to distribute to any of member or other securityholder of Seller or otherwise apply all or any part of the consideration received hereunder, including any liability of Seller arising as a result of the exercise by any of its shareholders or members of such Person's right (if any) to dissent from the transactions contemplated hereby and seek appraisal rights; (xv) any liability under any Contract not included as an Assigned Contract, including any liability arising out of or relating to any employment or similar Contract to which Seller is a party or otherwise bound; (xvi) any liability of Seller not related to the ownership of the IPA Entities, the Assigned Contracts or the NYNM PPO Lockbox Cash; and (xvii) any other liability or obligation of Seller not expressly assumed by Purchaser pursuant to Section 1.2.

       1.3     Assignment of Certain Contracts. At the Closing, Purchaser shall succeed to the rights and privileges of Seller, and shall assume the express obligations of Seller to the extent such obligations (A) are applicable to and accrue with respect to periods subsequent to the Effective Time and (B) are accompanied by a correlated duty of performance or payment on the part of the other parties thereto, pursuant to those Contracts of Seller that are shown as "Assigned Contracts on **Schedule 1.3** hereto (the "**Assigned Contracts**"), as and in the form of the copies thereof (or, if oral, as and in the form of the written statements of the terms thereof) furnished or made available to Purchaser. Purchaser, in its sole discretion, may amend **Schedule 1.3** prior to the hearing on the approval of the NYNM Sale Order. Purchaser shall be responsible for the payment and satisfaction of all cure amounts as determined by the Bankruptcy Court pursuant to Section 365(b) of the Bankruptcy Code with respect to the Assigned Contracts (the "**Cure Amounts**"), but solely to the extent that a Cure Amount (i) is an Assumed Liability and (ii) does not exceed the corresponding Cure Amount set forth on **Schedule 1.3** with respect to each such Assigned Contract (the "**Assumed Cure Amounts**"). Seller shall be responsible for any other Cure Amounts.

       1.4     Instruments of Conveyance, Assumption or Assignment. The sale, conveyance, transfer, assignment and delivery of the NYNYM Assets, and the assumption of the Assigned Contracts and the Assumed Liabilities, as herein provided, shall be effected by bills of sale, assignments, deeds, consents, endorsements, drafts, stock powers or other instruments in such reasonable and customary form as shall be mutually agreed by Purchaser and Seller, and Seller

shall at any time and from time to time after the Closing, upon reasonable request, execute, acknowledge, and deliver such additional bills of sale, endorsements, assignments, deeds, drafts, checks, stock powers or other instruments and take such other actions as may be reasonably required to vest title to the NYNYM Assets in Purchaser and otherwise effectuate the transactions contemplated by this Agreement.

        1.5      "AS IS" TRANSACTION.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER MAKE NO (AND SELLER EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSIGNED ASSETS OR ANY OTHER MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ASSIGNED ASSETS, THE PHYSICAL CONDITION OF ANY PART OF THE ASSIGNED ASSETS OR ANY OTHER ASSET WHICH IS THE SUBJECT OF ANY CONTRACT TO BE ASSUMED BY PURCHASER AT THE CLOSING, TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY WHICH IS THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY PURCHASER AT THE CLOSING, THE VALUE OF THE ASSIGNED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE ASSIGNED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE ASSIGNED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE ASSIGNED ASSETS OR ANY PORTION OF THE ASSIGNED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ASSIGNED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSIGNED ASSETS.  PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSIGNED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSIGNED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSIGNED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, SUBJECT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT, PURCHASER WILL ACCEPT THE ASSIGNED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY (I) CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE, SPECULATIVE, EXEMPLARY, TREBLE DAMAGES OR DAMAGES FOR ANY LOST PROFITS OR BUSINESS, LOST BUSINESS OPPORTUNITY, DIMINUTION IN VALUE OR LOSS OF USE, (II) DAMAGES OR LOSSES BASED ON OR USING CALCULATION OF LOSS OF FUTURE REVENUE, INCOME OR PROFITS OR DIMINUTION OF VALUE OR (III) DAMAGES BASED ON A MULTIPLE OF EARNINGS OR OTHER METRIC OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY FOR ANY REASON WITH RESPECT TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER

BASED ON STATUTE, CONTRACT, TORT, OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S SOLE, JOINT, OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT.

ARTICLE 2
PURCHASE PRICE.

2.1     Purchase Price.

2.1.1     Purchase Price.  In consideration for the sale, conveyance, transfer, and delivery of the NYNYM Assets, upon the terms and subject to the covenants and conditions set forth in this Agreement, including without limitation the receipt of any higher or better offer received by it for the NYNYM Assets, Purchaser shall assume the Assigned Contracts and the Assumed Liabilities related to the NYNYM Assets and Purchaser shall pay to Seller the Purchase Price.

2.1.2     Withholding.  Notwithstanding any provision hereof to the contrary, Purchaser and the Escrow Agent shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts they are required to deduct and withhold pursuant to any provision of Law, including those related to Taxes.  To the extent that amounts are so withheld by Purchaser under any provision of this Agreement, such withheld amounts (i) shall be remitted to the applicable Governmental Authority in accordance with applicable Law and (ii) shall be treated for all purposes of this Agreement as having been paid to the recipients in respect of which such deduction and withholding was made.  Assuming that Seller deliver all items described in Section 9.2, Purchaser acknowledges that as of the date hereof, Purchaser has no knowledge that withholding will be required pursuant to this Section 2.1.

2.2     Payment of the Purchase Price.

2.2.1     Purchaser has delivered to Fidelity National Title Company as designated escrow agent for Seller (the "Escrow Agent") an amount equal to Five Hundred Thousand U.S. Dollars ($500,000.00) in immediately available funds (the "**Cash Deposit**").

2.2.2     Within 48 hours of execution of this Agreement, Purchaser, Seller and the Escrow Agent will execute and deliver an escrow agreement (the "**Escrow Agreement**").  Any fees or costs payable to the Escrow Agent or in connection with the Escrow Agreement shall be divided evenly and payable one-half by Purchaser and one-half by Seller.  The Cash Deposit shall be held by the Escrow Agent in a non-interest-bearing account reasonably acceptable to Purchaser and Seller.  The Cash Deposit shall be held by the Escrow Agent and be released as follows:

2.2.2.1     If the Closing occurs, Seller and Purchaser shall jointly instruct the Escrow Agent to, on the Closing Date, deliver the Cash Deposit by wire transfer of immediately available funds, to Seller, as provided in Section 2.2.2.3 in accordance with the instructions provided to the Escrow Agent.  Such amount shall be applied as a credit toward payment of the Purchase Price, as set forth in Section 2.2.4.

5

           2.2.2.2          If this Agreement is terminated by Seller pursuant to Section 10.1.6 and Seller is not then in breach of Seller's obligations pursuant to this Agreement, the Escrow Agent shall deliver the Cash Deposit in accordance with the terms of the Escrow Agreement and if such deposit is delivered to, or becomes deliverable to, anyone other than Purchaser such deposit will constitute liquidated damages.  Because it would be impractical and extremely difficult to determine the extent of any damages that might result from a breach of, or default under, this Agreement by Purchaser prior to the Closing, it is understood and agreed that such liquidated damages (in an amount equal to the Cash Deposit) represent Purchaser's and Seller's reasonable estimate of actual damages, such liquidated damages do not constitute a penalty and such deposit will constitute Seller's sole and exclusive remedy for any breach of, or default under, this Agreement by Purchaser prior to the Closing.

           2.2.2.3          If this Agreement is terminated for any reason other than as set forth in Section 2.2.2.2, the Escrow Agent shall deliver the Cash Deposit to Purchaser.

        2.2.3        Reserved.

        2.2.4        At the Closing, Purchaser shall make a cash payment, by wire transfer of immediately available funds to such account as Seller shall designate, of the "**Closing Payment**" which shall equal the Purchase Price, <u>minus</u> the Cash Deposit.

      2.3        <u>Allocation of the Purchase Price</u>.  Seller and Purchaser agree that the Purchase Price and the Assumed Liabilities as well as any other items constituting a portion of the amount realized with respect to the sale of the NYNYM Assets for Tax purposes (the "**Allocable Consideration**") will be allocated among the NYNYM Assets in a manner consistent with Section 1060 of the Tax Code and Treasury regulations promulgated thereunder.  Purchaser will, no later than ninety (90) days following the Closing Date, prepare and deliver to Seller a schedule setting forth the allocation of the Allocable Consideration in accordance with the preceding sentence (the "**Allocation Schedule**").  Seller shall have fifteen (15) days to review and provide written comments to Purchaser with respect to the Allocation Schedule.  If Seller provide written comments to Purchaser in accordance with the preceding sentence, Purchaser and Seller will endeavor for a period of not less than thirty (30) days to resolve any such comments.  If Seller do not provide written comments within such fifteen (15) day period or if Purchaser and Seller resolve all such comments, (i) the Allocation Schedule, as revised, if applicable, shall be final and binding on the parties hereto, (ii) neither Purchaser nor Seller will take any position that is contrary to or inconsistent with the Allocation Schedule for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns) and (iii) in the event that the Allocation Schedule is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other parties and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation Schedule. Notwithstanding any provision of this <u>Section 2.3</u> to the contrary, if Purchaser and Seller are not able to resolve all written comments made by Seller within the applicable fifteen (15) day period, each party shall be allowed to use that party's own allocation of the Purchase Price and the Assumed Liabilities.

ARTICLE 3
EXCLUDED ASSETS.

      3.1      <u>Excluded Assets</u>.  The NYNYM Assets to be acquired by Purchaser hereunder do not include the following (hereinafter referred to as the "**<u>Excluded Assets</u>**"):

      3.1.1      any cash on hand, in banks, and any cash equivalents (other than the NYNM PPO Lockbox Cash);

      3.1.2      all claims, rights and causes of action of Seller arising under or relating to Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) including, without limitation, any such claims and actions arising under Sections 544, 545, 547, 548, 549 or 551 of the Bankruptcy Code, and commercial tort claims;

      3.1.3      Seller's rights under this Agreement (including the right to receive the Purchase Price) and under any of the ancillary agreements to be entered into in connection with the transactions contemplated hereby;

      3.1.4      all shares of capital stock or other equity interests of Seller or any of its Affiliates, all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of Seller or any of its Affiliates, and all securities owned and held by Seller, whether equity or debt or a combination thereof, other than the IPA Equity;

      3.1.5      all Tax Returns and Tax records of Seller and its Affiliates;

      3.1.6      all Tax refunds, credits, abatements or similar offsets against Taxes of Seller and its Affiliates that relate to Specifically Excluded Liabilities;

      3.1.7      all Tax attributes of Seller and its Affiliates;

      3.1.8      the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller or any of its Affiliates, and all personnel records or other records of Seller that are required by Law to be retained;

      3.1.9      all claims arising on or prior to the Closing Date under any directors and officers liability insurance policies owned by Seller;

      3.1.10      all claims and causes of action arising on or before the Closing Date that Seller has against any current or former Affiliate, insider of Seller or any third party (and any recovery on account thereof), including claims for breaches of fiduciary duty, fraud or similar cause of action, rights of recoupment and avoidance, except to the extent that such claims or causes of action (i) may constitute a counterclaim, defense, offset, or recoupment right with respect to affirmative claims (if any) that such third party may assert against Purchaser or its Affiliates, (ii) arise under any rights under warranties (express or implied), representations and guarantees made by any third party to Seller in connection with the NYNYM Assets or the

7

NNNI Business, (iii) arise under the Assigned Contracts assumed and assigned to Purchaser, or (iv) relate to the NYNYM Assets; provided, however, nothing in this Section 3.1.10 shall in any event be deemed to eliminate from the Excluded Assets any other asset expressly designated as such pursuant to this Article 3;

      3.1.11     professional retainers paid by Seller;

      3.1.12     any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller;

      3.1.13     all customer deposits;

      3.1.14     all Benefit Plans, and any other "employee benefit plan" (as defined in ERISA) or any other employee benefit plan, program or arrangement, including, in each case, any underlying assets, agreements, policies and rights in connection therewith;

      3.1.15     all insurance policies (except to the extent relating to the NYNYM Assets), all directors and officers liability insurance policies and errors and omissions insurance policies and all rights to assert claims with respect to any such policies; all unearned insurance premiums and all accrued insurance refunds or rebates; all unearned insurance premiums and all accrued insurance refunds or rebates; all rights with respect to an occurrence under any insurance policy prior to the Closing Date;

      3.1.16     all Contracts that are not Assigned Contracts, and all Contracts that have terminated or expired prior to the Closing in the Ordinary Course of Business;

      3.1.17     any documents or communications of Seller that are subject to Seller's attorney-client privilege and/or the work-product immunity doctrine;

      3.1.18     those assets, if any, listed on **Schedule 3.1.18**; and

      3.1.19     all assets of Seller other than the IPA Equity, the Assigned Contracts and NYNM PPO Lockbox Cash.

    3.2     Purchaser Agreement.  Purchaser expressly agrees and understands that Seller shall not sell, assign, transfer, convey or deliver to Purchaser any of the Excluded Assets.

ARTICLE 4
SELLER'S REPRESENTATIONS AND WARRANTIES.

As a material inducement to Purchaser to enter into this Agreement and purchase the NYNYM Assets, Seller warrants and represents to Purchaser on the date hereof:

    4.1     Organization and Corporate Power.

      4.1.1     Seller is duly formed, validly existing and in good standing under the laws of the State of New York.  Seller is in good standing and qualified to do business in every jurisdiction in which its ownership of property or conduct of business requires it to qualify,

except where the failure to do so has not had and would not cause a Material Adverse Effect. Except as a result of the commencement of the Bankruptcy Cases, Seller has all requisite power and authority and all material licenses, permits, and authorizations necessary to own and operate its properties and to carry on its business as now conducted. Seller has made available to Purchaser true, complete and correct copies of the charters and governing documents of Seller and each of the IPA Entities, as currently in effect. Each of the IPA Entities is duly formed, validly existing and in good standing under the laws of the State of New York. Each of the IPA Entities is in good standing and qualified to do business in every jurisdiction in which t ownership of property or conduct of business requires it to qualify, except where the failure to do so has not had and would not cause a Material Adverse Effect

        4.1.2       None of the IPA Entities is engaged in any business other than the NNNI Business. None of the NNNI Business is conducted by any Person other than IPA Entities, and none of the NYNYM Assets is owned or held by any Person other than Seller.

      4.2       <u>Title and Related Matters</u>. Except as set forth on **Schedule 4.2**, Seller owns and has good and marketable title to all NYNYM Assets, free and clear of all Encumbrances, except for Permitted Encumbrances, and there exists no material restriction on the use or transfer of such property.

      4.3       <u>Necessary Property</u>.

        4.3.1       Upon the Closing, the NYNYM Assets shall be vested in Purchaser free and clear of all liens, interests, claims and encumbrances.

      4.4       <u>Litigation</u>. Except as set forth on **Schedule 4.4** and except for the Bankruptcy Cases, (a) there is no suit, claim, litigation, proceeding (administrative, judicial, or in arbitration, mediation or alternative dispute resolution), Governmental Authority or grand jury investigation, or other action (any of the foregoing, "**Action**") pending or, to the Knowledge of Seller, threatened against Seller, any of the IPA Entities, the NNNI Business, or any of the NYNYM Assets or Assumed Liabilities, that would cause a Material Adverse Effect, other than any Action that is stayed by operation of Section 362(a) of the Bankruptcy Code; (b) (i) as of the date hereof, there is no Action pending or, to the Knowledge of Seller, threatened against Seller, any of the IPA Entities, the NNNI Business, any of the NYNYM Assets or Assumed Liabilities, challenging, enjoining, or preventing this Agreement or the consummation of the transactions contemplated hereby, and, (ii) as of the Closing Date, there will be no Action pending or, to the Knowledge of Seller, threatened against Seller, the NNNI Business, any of the NYNYM Assets or Assumed Liabilities, challenging, enjoining, or preventing this Agreement or the consummation of the transactions contemplated hereby, other than any Action that is stayed by operation of Section 362(a) of the Bankruptcy Code; and (c) (i) as of the date hereof, Seller is not currently subject to any material judgment, order, writ, injunction, or decree of any court or other Governmental Authority ("**Order**") that would apply to Purchaser or Purchaser's operation of the NNNI Business or NYNYM Assets from and after the Closing, other than Orders of general applicability or any Order that is stayed by operation of Section 362(a) of the Bankruptcy Code, and, (ii) as of the Closing Date, Seller will not be subject to any material Order that would apply to Purchaser or Purchaser's operation of the NNNI Business or NYNYM Assets from and after

the Closing, other than Orders of general applicability or any Order that is stayed by operation of Section 362(a) of the Bankruptcy Code.

4.5     <u>Insurance</u>.  To the Knowledge of Seller and except as would not cause a Material Adverse Effect, (i) Seller's insurance policies covering or relating to the properties or operations of Seller and the IPA Entities are in full force and effect (with respect to the applicable coverage periods), and (ii) neither Seller nor any of the IPA Entities is in default with respect to any of its obligations under any of such insurance policies.

4.6     <u>Absence of Certain Changes</u>.

4.6.1     Except as set forth on **<u>Schedule 4.6.1</u>**, since the Petition Date, Seller has not taken or allowed to occur any of the following actions or events, or agreed or committed, in writing or otherwise, to do or allow to occur any of such actions or events and no such events have occurred:

4.6.1.1     To the Knowledge of Seller, the termination of any material Contract of (i) any IPA Entity or (ii) Seller that is related to the NNNI Business, except for any termination pursuant to the express terms of any such agreement permitting termination for convenience after a specified notice period (and, for clarification, not for cause or in connection with a breach or default by the other party thereto);

4.6.1.2     Any sale or other disposition of any material assets of Seller or an IPA Entity used in or related to the NNNI Business; or

4.6.1.3     The damage or destruction by fire or other casualty of any material asset of Seller or an IPA Entity used in or related to the NNNI Business, or any part thereof, if such asset has not been replaced or repaired.

4.6.2     Except as set forth on **<u>Schedule 4.6.2</u>**, Seller has not received written or verbal notice of breach or termination of any Assigned Contract, except for any termination pursuant to the express terms of any such agreement permitting termination for convenience after a specified notice period (and, for clarification, not for cause or in connection with a breach or default by the other party thereto).

4.7     <u>Compliance with Laws</u>.

4.7.1     Neither the execution of this Agreement nor the Closing will constitute or result in any default, breach or violation under or with respect to any (i) Applicable Laws, (ii) the provisions of any material permits, franchises, or licenses issued by any Governmental Authority, or (iii) the provisions of Seller's or any of the IPA Entities' organizational documents (collectively, clauses (i) through (iii), the "**<u>Legal Requirements</u>**"), except with respect to any default, breach or violation under or with respect to any Legal Requirements which would not, individually or in the aggregate, be material to Seller or the IP Entities, when taken as a whole. To the Knowledge of Seller, no event has occurred, and no condition or circumstance exists, that constitutes or result directly in a violation by Seller or any IP Entity of, or a failure on the part of Seller or any IP Entity to comply with, any Legal Requirement, except with respect to any violation or failure to comply with Legal Requirements which would not, individually or in the

aggregate, be material to Seller or any IP Entity, when taken as a whole. Except as set forth on **Schedule 4.7.1**, Seller has not received any written notice or other written communication from any Governmental Authority or any other Person regarding (i) any actual, alleged, or potential violation of, or failure to comply with, any Legal Requirement of Seller or any IP Entity, or (ii) any actual, alleged, or potential obligation on the part of Seller or any IP Entity to undertake, or to bear all or any portion of the cost of, any remedial, corrective or response action of any nature, except with respect to any actual, alleged or potential violation of, or failure to comply with, any Legal Requirements or obligations to undertake, or bear all or any portion of costs of any remedial, corrective or response action of any nature which would not, individually or in the aggregate, be material to Seller or the IP Entities, when taken as a whole.

       4.7.2      To the Knowledge of Seller, each material authorization, license or permit required to conduct the NNNI Business as the same is presently conducted is listed on **Schedule 4.7.2** (the "**Material Permits**"), and is valid and in full force and effect.  Neither the execution of this Agreement nor the Closing do or will constitute or result in a default under or material violation of any such Material Permit.

       4.7.3      To the Knowledge of Seller, none of Seller, any IP Entity or any officer, director, manager, member, agent, employee or independent contractor of Seller or any IP Entity, in the scope of its employment or engagement with Seller or an IP Entity, as applicable, has submitted any claims for reimbursement that are in material violation of, nor has engaged in any activity that is in material violation of (i) the federal Medicare or federal or state Medicaid statutes, the federal TRICARE statute (10 U.S.C. § 1071 et seq.), (ii) the civil False Claims Act of 1863 (31 U.S.C. § 3729 et seq.), (iii) criminal false claims statutes (e.g., 18 U.S.C. §§ 287 and 1001), (iv) the federal health care program Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) (criminal penalties for acts involving Federal health care programs), commonly referred to as the "Federal Anti-Kickback Statute," or (v) the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. § 3801 et seq.), Section 14 of Public Law 100-93, the anti-fraud and related provisions of the Health Insurance Portability and Accountability Act of 1996 (commonly referred to as "**HIPAA**") as amended by the Health Information Technology for Economic and Clinical Health Act (commonly referred to as the "**HITECH Act**"), or related regulations or other related or similar Applicable Laws (collectively, "**Healthcare Laws**"), including, without limitation, the following:

       4.7.3.1      making or causing to be made a materially false statement or representation in any application for any benefit or payment;

       4.7.3.2      making or causing to be made a materially false statement or representation for use in determining rights to any benefit or payment;

       4.7.3.3      soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or kind (A) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under any federal health care program, or (B) in return for purchasing, leasing or ordering, or arranging for or recommending purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in part under any federal health care program;

4.7.3.4        offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such Person (A) to refer an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or in part under a federal health care program, or (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in part under a federal health care program; or

4.7.3.5        any other activity that materially violates any Legal Requirements, relating to prohibiting fraudulent, abusive or unlawful practices directly connected with the provision of health care items or services or the billing for such items or services provided to a beneficiary of any federal health care program.

4.7.4        <u>Privacy Laws</u>.

4.7.4.1        Reserved.

4.7.4.2        To the Knowledge of Seller, Seller and each IPA Entity has complied in all material respects with all privacy policies and guidelines relating to Personal Information.  True and correct copies of any privacy and security policies and guidelines of Seller and each IPA Entity has been made available to Purchaser. To the Knowledge of Seller, Seller and each IPA Entity has made all notices and disclosures to customers required by applicable Orders and Laws, except with respect to any notice or disclosure that would not, individually or in the aggregate, be material to Seller or the IPA Entities when taken as a whole. To the extent applicable, Seller and each IPA Entity has taken steps reasonably necessary (including implementing and monitoring compliance with respect to technical, administrative and physical safeguards) to protect Personal Information and systems from which Personal Information can be created, viewed, displayed, accessed, retrieved, stored or transmitted, against loss or destruction, and against unauthorized access, use, transfer, modification, or disclosure or other misuse and to otherwise comply in all material respects with applicable Orders and Laws. There has been no unauthorized disclosure, access to or transfer of or other misuse of Personal Information required to be reported to any customer of Seller or any IPA Entity, affected individual or Governmental or Regulatory Authority and neither Seller nor any IPA Entity been required to provide any breach notification or report any security incidents to any customer of Seller or any IPA Entity, as appliable, affected individual or Governmental or Regulatory Authority as required under any applicable Order or Law.

4.7.5        Except as set forth on **<u>Schedule 4.7.5</u>**, Seller has not received, in the past three (3) years, any written notice from any Governmental Authority or any other Person regarding any actual or suspected material violation by Seller or any IPA Entity of, or failure to materially comply by Seller or any IPA Entity with, HIPAA, the HITECH Act or applicable state privacy and data security Laws to the extent applicable as business associates.  To the Knowledge of Seller, no breach has occurred with respect to any unsecured Protected Health Information maintained by Seller or any IPA Entity that is subject to the notification requirements of 45 C.F.R. part 164, Subpart D, and no information security or privacy breach event has occurred that would require notification under any comparable state Laws applicable to Seller or any IPA Entity as business associates.  Except as set forth on **<u>Schedule 4.7.5</u>**, with

12

regard to compliance with HIPAA, the HITECH Act, or applicable state privacy and data security Laws, neither Seller nor any IPA Entity has any obligation to undertake, or to bear all or any portion of the cost of, any mitigation, notifications or any remedial, corrective or response action of any nature. To the Knowledge of Seller, the services and products provided by Seller or any IPA Entity materially comply with HIPAA, the HITECH Act and applicable state privacy and data security Laws to the extent applicable.

4.8     <u>Transactions with Related Persons; Outside Interests</u>. To the Knowledge of Seller, neither any Affiliate of Seller or any IPA Entity nor any director, manager, officer or employee of Seller or any IPA Entity is a party to any Assigned Contract, or has any interest in any of the NYNYM Assets, except as specifically disclosed on **Schedule 4.8**.

4.9     <u>No Liabilities</u>. To the Knowledge of Sellers, none of the IPA Entities (i) has any Indebtedness or other Liabilities other than Indebtedness incurred pursuant to the Credit Agreement (which shall be released at Closing pursuant to the NYNM Sale Order) and payables to parties to the Payor Agreements, Provider Agreements or any management agreement pursuant to which NYNM or any of the IPA Entities receive fees, or (ii) is party to any contract that is not a Payor Agreement, Provider Agreement or any management agreement pursuant to which NYNM or any of the IPA Entities receives fees.

4.10     <u>ERISA and Related Matters</u>. **Schedule 4.10** identifies each "employee benefit plan," as such term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), that is maintained or otherwise contributed to by Seller or any IPA Entity or with respect to which Seller or any IPA Entity otherwise has any liability and each material plan, arrangement, or policy, qualified or non-qualified, whether or not written or considered legally binding, not subject to ERISA maintained or otherwise contributed to by Seller or any IPA Entity or with respect to which Seller or any IPA Entity otherwise has any liability and providing for pension, thrift, savings, retirement, profit sharing, deferred compensation, bonuses, stock option, stock purchase, phantom stock, incentive compensation, equity compensation, "fringe" benefits, vacation, severance, disability, medical, hospitalization, dental, life, accidental death and dismemberment, tuition, company car, club dues, income tax preparation, sick leave, maternity, paternity, family leave, child care, education or cafeteria plan benefits, or employee insurance coverage or any similar compensation or welfare benefit arrangement including, without limitation, any voluntary employees' beneficiary associations or related trusts (each a "**Benefit Plan**" and, collectively, the "**Benefit Plans**"). **Schedule 4.10** identifies each (i) any employee benefit plan subject to Title IV of ERISA or Section 412 of the Tax Code, or (ii) a Multiemployer Plan, in each case that is currently maintained or contributed to by Seller or any IPA Entity, its Affiliates, or any members of Seller's or any IPA Entity's current or former "Controlled Group" (within the meaning of Sections 4 14(b), (c), (m) or (o) of the Tax Code) ("**ERISA Affiliates**"), or which could reasonably be expected to result in any Liability to the Purchaser as a result of the purchase of the Target Assets. Each Benefit Plan has been maintained, funded and administered at all times substantially in compliance with its terms and all Applicable Laws, including ERISA and the Tax Code, applicable to such Benefit Plan, except where the failure to do so would not cause a Material Adverse Effect. Each Benefit Plan that is an employee pension benefit plan within the meaning of section 3(2) of ERISA that is intended to be a qualified plan under section 401(a) has received a favorable determination letter or opinion letter (a copy of which has been provided to Purchaser), each related trust has been

13

determined to be exempt from taxation under Section 501(a) of the Tax Code, and nothing has occurred that could reasonably be expected to cause the loss of such qualification or exemption. Other than as required by Applicable Laws, neither Seller nor any IPA Entity has any obligation to provide any benefits in the nature of severance pay or any post-retirement medical, health, life insurance or other post-retirement welfare benefits for retired or terminated employees, their spouses or their dependents.  No representations have been made to any current or former employee of any Seller or any IPA Entity or its Affiliates with respect to benefits to be provided under a Benefit Plan that are materially inconsistent with the terms of such Benefit Plan.  Except as disclosed on **Schedule 4.10**, the consummation of the transactions contemplated by this Agreement will not either alone or in connection with another event (i) entitle any current or former employee of the Seller or any IPA Entity to severance pay, or any other similar payment, except as expressly provided in this Agreement, (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any such employee or former employee, or (iii) give rise to the payment of any amount that could subject (whether alone or in connection with another payment) a current or former employee of the Seller or any IPA Entity to tax penalties under Section 4999 of the Tax Code.

4.11    Real Property.  The IPA Entities do not own, lease or occupy any Real Property.

4.12    Reserved.

4.13    Reserved.

4.14    Authorization.  Seller has, and on the Closing Date will have, full power, authority and legal right to execute and deliver this Agreement and all other agreements contemplated hereby to which Seller is a party, subject to the Bankruptcy Court's entry of the Bankruptcy Orders.  Except as set forth on **Schedule 4.14** and subject to the Bankruptcy Court's entry of the Bankruptcy Orders, no approvals or consents of any other persons, entity or governmental authority having jurisdiction are necessary in connection with the execution, delivery, and performance of Seller's obligations under this Agreement.  This Agreement and all other agreements contemplated hereby, when executed and delivered by Seller, and, subject to the Bankruptcy Court's entry of the Bankruptcy Orders, will constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its and their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, and similar statutes affecting creditors' rights generally and judicial limits on equitable remedies.

4.15    No Conflict with Other Instruments or Agreements.  Except as set forth on **Schedule 4.15**, the consummation by Seller of the transactions contemplated by this Agreement will not result in or constitute: (i) a default or an event that, with the giving of notice or lapse of time, or both, would constitute a default, breach, or violation of the organizational documents of Seller or any IPA Entity; (ii) to the Knowledge of Seller, a default or an event that, with the giving of notice or lapse of time, or both, would constitute a material default, breach, or violation of any Assigned Contract to which Seller or any IPA Entity is a party or by which Seller or any IPA Entity or any of its property is bound; (iii) to the Knowledge of Seller, the violation of any Law; (iv) to the Knowledge of Seller, an event that would permit any counter party to terminate any Assigned Contract or to accelerate the maturity of any Indebtedness or other obligation of Seller or any IPA Entity; or (v) to the Knowledge of Seller, the creation or imposition of any

Encumbrance on any of the assets of Seller or any IPA Entity (including the NYNYM Assets); except in the case of clauses (ii), (iii), (iv) and (v) for defaults, breaches, violations, terminations, accelerations, liens, charges or encumbrances that (x) are excused by the Bankruptcy Court or the applicability of any provision of the Bankruptcy Code or (y) are set forth on **Schedule 4.15**.

4.16    <u>Brokers or Finders</u>.  Except as set forth on **Schedule 4.16**, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Seller or any IPA Entity that are payable by Purchaser.

4.17    <u>Taxes</u>.  Except as set forth on **Schedule 4.17**, and in each case, with respect to the NNNI Business and the NYNYM Assets, there are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the NYNYM Assets.

4.18    <u>Financial Information</u>.  Seller has provided Purchaser the financial books and records with respect to the IPA Entities and the NNNI Business to the extent available to Seller as of the date of this Agreement.


ARTICLE 5
PURCHASER'S REPRESENTATIONS AND WARRANTIES.

As a material inducement to Seller to enter into and perform its obligations under this Agreement, Purchaser represents and warrants to Seller on the date hereof:

5.1    <u>Organization and Corporate Power</u>.  Purchaser is duly formed, validly existing and in good standing under the laws of the state of its formation.  Purchaser is in good standing and qualified to do business in every jurisdiction in which its ownership of property or conduct of business requires it to qualify.  Purchaser has all requisite power and authority and all material licenses, permits, and authorizations necessary to own and operate its properties and to carry on its business as now conducted.  Purchaser has made available to Seller true, complete and correct copies of the charter and governing document of Purchaser, as currently in effect.

5.2    <u>Authorization</u>.  The execution, delivery, and performance by Purchaser of this Agreement and all other agreements contemplated hereby to which Purchaser is a party have been duly and validly authorized by all necessary company action of Purchaser, and except as set forth on **Schedule 5.2**, no approvals or consents of any other Person or Governmental Authority having jurisdiction are necessary in connection with it.  This Agreement and each such other agreement, when executed and delivered by Purchaser, will constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, and similar statutes affecting creditors' rights generally and judicial limits on equitable remedies.

5.3    <u>No Conflict with Other Instruments or Agreements</u>.  The consummation by Purchaser of the transactions contemplated by this Agreement will not result in or constitute a default or an event that, with the giving of notice or lapse of time, or both, would constitute a default, breach, or violation of the organizational documents of Purchaser or any Contract to

which Purchaser is a party or by which Purchaser or any of its property may be bound and which would be material to Purchaser's performance of this Agreement, or the violation of any Law.

5.4     Brokers or Finders.  There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Purchaser.

5.5     Funding.  Purchaser has sufficient liquid assets and available credit for Purchaser to pay the anticipated Purchase Price on the Closing Date and to pay and perform the Assumed Liabilities as they become due and to perform its obligations under this Agreement and the agreements contemplated by this Agreement, and has provided to Seller a copy of Purchaser's financial statements and such other financial information reasonably available to Purchaser requested by Seller to demonstrate its ability to do so.

5.6     Adequate Assurance.  Purchaser shall take commercially reasonable steps to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts, and shall provide a copy of Purchaser's financial statements and such other financial information reasonably available to Purchaser that is required by the Bankruptcy Court to demonstrate Purchaser's ability to assume, or to take an assignment of, the Assigned Contracts; provided, however, that any such financial information and related testimony and exhibits, other than information that is otherwise publicly available or is ordinarily provided by Purchaser to potential contracting parties, shall be distributed subject to appropriate confidentiality arrangements and shall be filed or otherwise introduced in the Bankruptcy Court only under seal.

5.7     Governmental or Regulatory Approvals.  Except as set forth in Schedule 5.7, no Governmental or Regulatory Approval on the part of Purchaser is required in connection with the execution and delivery by Purchaser of this Agreement, the agreements contemplated by this Agreement or the consummation of the transactions contemplated hereby and thereby.

5.8     Legal Proceedings.  There are no Actions pending or, to the Knowledge of Purchaser, threatened in writing against Purchaser or any of its assets or properties that would reasonably be expected to result in the issuance of an Order restraining, enjoining or otherwise prohibiting, delaying or making illegal the purchase of the NYNYM Assets or the assumption of the Assumed Liabilities by Purchaser under this Agreement or the performance by Purchaser of its obligations under this Agreement or the agreements contemplated by this Agreement.

5.9     Brokers.  No broker, finder or agent acting on behalf of Purchaser or its Affiliates is entitled to any fee or commission with respect to the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby that would be payable by Seller or its Subsidiaries.

5.10    Solvency.  As of the Closing and immediately after consummating the transactions contemplated by this Agreement, Purchaser reasonably believes it will not (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its probable Liability on its debts as they become absolute and matured),

(b) have unreasonably small capital with which to engage in its business, including the NNNI Business and the NNNI Business (it being understood that nothing herein requires Purchaser to operate the NNNI Business for any specified period of time), or (c) have incurred or planned to incur debts beyond its ability to repay such debts as they become absolute and matured.

       5.11     <u>Affiliation with Parmjit Parmar</u>.  Parmjit Parmar is not (i) affiliated, directly or indirectly, with Purchaser or any Affiliate of Purchaser, or a representative of Purchaser or any Affiliate of Purchaser, (ii) an officer, director, partner, member or beneficial owner of any equity of, Purchaser or any Affiliate of Purchaser, or (iii) a relative or spouse of any such Person.

ARTICLE 6<br/>COVENANTS, AGREEMENTS PENDING CLOSING, AND OTHER AGREEMENTS.

       6.1     <u>Conduct of Seller's Business Pending the Closing</u>.

       6.1.1     From the date of this Agreement until the Closing, except as otherwise consented to or approved by Purchaser in writing or as may be limited or modified as a result of the filing of the Bankruptcy Cases and to the extent Purchaser is the Successful Bidder at the Auction, Seller covenants and agrees with Purchaser as follows:

       6.1.1.1     Seller will carry on its operations and the operations of the IPA Entities and the NNNI Business only in the Ordinary Course of Business (subject to any limitations required by the Bankruptcy Cases) and in compliance with Law in all material respects and use commercially reasonable efforts to maintain its relationships with customers, suppliers and others having business dealings with Seller and the IPA Entities, and use commercially reasonable efforts to keep in full force and effect liability insurance comparable in amount and scope of coverage to that currently maintained and shall not terminate any employees and shall not place any employees on leave or suspension of any kind.

       6.1.1.2     All NYNYM Assets now owned or used by Seller or any of the IPA Entities and will be used, preserved and maintained in the Ordinary Course of Business and in compliance with Laws in all material respects, to the same extent and in the same condition as said NYNYM Assets are on the date of this Agreement, ordinary wear and tear excepted.

       6.1.1.3     Seller will keep or cause to be kept in effect and undiminished the insurance now in effect on its NYNYM Assets, and will purchase such additional insurance, at Purchaser's cost, as Purchaser may request.

       6.1.1.4     Seller will pay all of its obligations, and cause to be paid all of the obligations of the IPA Entities, incurred on or after the Petition Date in the Ordinary Course of Business as they become due (subject to any limitations required by the Bankruptcy Cases) and will timely perform its obligations under Section 365(d)(3) of the Bankruptcy Code.

       6.1.1.5     Seller will not cause or allow any Encumbrance to be placed on any NYNYM Asset (except for Permitted Encumbrances) or make any commitments or allow any IPA Entities to make any commitments relating to such NYNYM Asset beyond the Closing Date, including, without limitation: (i) incurring any material obligations or liabilities,

whether fixed or contingent that would constitute an Assumed Liability; (ii) entering into any material Contract that would constitute an Assigned Contract; (iii) modifying or terminating any Assigned Contract except in the Ordinary Course of Business; or (iv) waiving any rights in respect of an Assigned Contract of material value to Seller or any IPA Entity; (v) selling or otherwise disposing of any NYNYM Asset;

        6.1.1.6      Seller will not increase the compensation, severance or fringe benefits of any officer or employee of Seller or any IPA Entity, except for such increases in salary or wages of employees of Seller or any IPA Entity in the Ordinary Course of Business;

        6.1.1.7      Seller will not (a) terminate, sublet (or similar arrangement) or amend any Assigned Contract, or (b) enter into, terminate or amend any other Contract material to the NNNI Business, except, in each case, in the Ordinary Course of Business; and

        6.1.1.8      Seller will not authorize any of, or commit or agree to take any of the foregoing actions.

    6.2    <u>Additional Covenants and Agreements of Seller</u>.  From the date of this Agreement until the Closing, and except as otherwise consented to or approved by Purchaser in writing or as may be limited or modified as a result of the filing of the Bankruptcy Cases and to the extent Purchaser is the Successful Bidder at the Auction, Seller further covenants and agrees with Purchaser as follows:

        6.2.1      Seller will use its commercially reasonable efforts to obtain as promptly as practicable the satisfaction of the conditions to the Closing described in <u>Article 7</u> of this Agreement and shall facilitate the Acquisition pursuant to which the NYNYM Assets will be sold free and clear of all liens, interests, claims and encumbrances.

        6.2.2      The Seller will promptly supplement or amend the Schedules (i) with respect to any matter hereafter arising to the Knowledge of Seller that, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in any Schedule or (ii) that is necessary to correct any information in such Schedules that, to the Knowledge of Seller, is inaccurate on account of the occurrence of an event described in subpart (i).

        6.2.3      The Seller will promptly notify Purchaser of:

        6.2.3.1      Any Material Adverse Effect;

        6.2.3.2      Any fact, condition, change or event that, to the Knowledge of Seller, causes or constitutes a breach, in any material respect, of any of the representations or warranties or covenants of Seller hereunder made as of the date hereof; or

        6.2.3.3      The damage or destruction by fire or other casualty of any material NYNYM Asset or part thereof.

    The Seller hereby acknowledge that Purchaser does not and shall not waive any right it may have hereunder solely as a result of any Schedule update pursuant to <u>Section 6.2.2</u> or such

notifications, and any Schedule update or notification given pursuant to <u>Section 6.2.2</u> or this <u>Section 6.2.3</u> (including any supplement to the Schedules to this Agreement) shall (i) not have any effect for purposes of Purchaser's determining satisfaction of the conditions set forth in <u>Article 7</u> of this Agreement, and (ii) not in any way limit Purchaser's exercise of its rights hereunder.

6.2.4    Prior to the Closing, Purchaser and its counsel, accountants and other representatives in connection with this transaction shall have full access during normal business hours to all properties and other assets, books, accounts, records, contracts and other documentation of, or relating to, the IPA Entities, the NNNI Business and the NYNYM Assets. Prior to the Closing, Seller shall promptly furnish or cause to be furnished to Purchaser, or the representatives of Purchaser hereunder, all data, documentation, processes and other information concerning the business, finances and properties of the IPA Entities, the NNNI Business and the NYNYM Assets that may reasonably be requested related to the IPA Entities, the NNNI Business and/or the NYNYM Assets, including, on a weekly basis, updated reports covering the cash flows and disbursements of NYNM, and shall otherwise provide such support as is reasonably requested by Purchaser relative to its transition planning such as, without limitation, coordinating meetings with key personnel.

6.2.5    <u>Governmental Approvals</u>.  Seller will cooperate with the reasonable requests of Purchaser and its representatives and at the expense of Purchaser (a) with respect to all filings and notifications that Purchaser elects to make or is required to make in connection with the transactions contemplated by this Agreement; (b) in identifying and obtaining any governmental authorizations required by Purchaser to own and operate the NNNI Business or the NYNYM Assets from and after the Closing Date, and (c) in obtaining all consents identified in **<u>Schedule 4.14</u>** and waivers of the conflicts or defaults identified in **<u>Schedule 4.15</u>**. Each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under Applicable Law and regulations to consummate and make effective the transactions contemplated by this Agreement, including all necessary or appropriate waivers, consents and approvals to effect all necessary registrations, filings and submissions and to lift any injunction or other legal bar to the consummation of the transactions contemplated by this Agreement (and, in such case, to proceed with the transactions contemplated by this Agreement as expeditiously as possible). Each party shall promptly inform the other parties hereto of any oral communication with, and provide to counsel for the other party copies of written communications with, any Governmental Authority regarding any filings made pursuant to this <u>Section 6.2.5</u>. Seller (or Purchaser, as the case may be) shall not agree to participate in any meeting with any Governmental Authority in respect of any such filings, investigation or other inquiry unless it consults with Purchaser (or Seller) in advance and, to the extent permitted by such Governmental Authority, gives Purchaser (or Seller) the opportunity to attend, direct and participate at such meeting.

6.3    <u>Covenants and Agreements of Purchaser</u>.  From the date of this Agreement until the Closing, Purchaser covenants and agrees with Seller as follows:

6.3.1    Purchaser will use its commercially reasonable efforts to execute and deliver any documents and instruments that may reasonably be required to assist Seller in obtaining any necessary consents or waivers under or amendments to agreements by which

Seller is bound and which are conditions to the Closing described in this Agreement; provided, however, that Purchaser shall not be obligated hereunder to incur any cost or expense relating thereto or to execute any guaranty, assumption of liability or other document or instrument requiring Purchaser to assume obligations not contemplated by this Agreement.

6.3.2    Promptly after the date of this Agreement, and in any event within the applicable time period prescribed by statute or regulations, Purchaser will use its commercially reasonable efforts to promptly make all filings and notifications required by Law to be made by it in connection with the transactions contemplated by this Agreement. Purchaser will use its commercially reasonable efforts to cooperate with Seller and its representatives (a) with respect to all filings and notifications Seller elect to make or are required to make in connection with the transactions contemplated by this Agreement, (b) in identifying and obtaining any governmental authorizations required by Purchaser to own and operate the NNNI Business and/or the NYNYM Assets from and after the Closing Date, and (c) in obtaining all consents identified in **Schedule 5.1**.

6.4    Bankruptcy Actions.

6.4.1    NYNM Sale Order.

6.4.1.1    Within one (1) Business Day after the execution of this Agreement, Sellers shall serve and file a motion (the "**NYNM Sale Motion**") in the Bankruptcy Cases requesting that the Bankruptcy Court (i) schedule the a hearing on approval of the NYNM Bid Order on a date no later than fourteen (14) days following the filing of the Sale Motion, (ii) enter the Bidding Procedures Order no later than four (4) days following the filing of the Sale Motion and (iii) enter the NYNM Sale Order at the final hearing on the Sale Motion (the "**Sale Hearing**") on a date no later than twenty-one (21) days following the filing of the Sale Motion.

6.4.1.2    Purchaser and Seller acknowledge and agree that the entry of the NYNM Sale Order shall be required in order to consummate the Acquisition, and that the requirement that the NYNM Sale Order be entered is a condition to the Closing that cannot be waived by any party.

6.4.1.3    Seller will provide Purchaser with a reasonable opportunity to review and comment upon the NYNM Sale Order contemplated by this Agreement prepared by Seller prior to the filing thereof with the Bankruptcy Court, which shall be in a final form reasonably acceptable to Purchaser.

6.4.2    NYNM Bid Order. Seller shall obtain the entry of an order in the Bankruptcy Cases approving procedures for solicitation and consideration by the Bankruptcy Court of bids from third parties for the NYNYM Assets, substantially in the form of Exhibit A, with such changes thereto as may be reasonably acceptable to Purchaser and Seller (the "**NYNM Bid Order**"). The NYNM Bid Order shall be entered by the Bankruptcy Court no later than July 11, 2018. The NYNM Bid Order shall:

6.4.2.1    (i) schedule the hearing to approve the NYNM Sale Order for no later than July 23, 2018; (ii) schedule an auction (the "**Auction**") no later than July 20, 2018; (iii) require, as a precondition to participation in the Auction, the submission of a

competing bid for all of the NYNYM Assets no later than 4:00 p.m. Eastern Time on July 18, 2018; (iv) provide that Seller sale process be conducted consistent with the NYNM Bid Order; and (v) provide for procedures for the assignment of the Assigned Contracts substantially in the form of the Assignment Procedures; and

    6.4.2.2   provide that (a) if this Agreement is terminated pursuant to Article 10, then, subject to and in accordance with Section 10.2, Purchaser shall be entitled to (i) the Expense Reimbursement, and (ii) in the event Seller consummates a NYNMA Alternative Transaction on or prior to the date that is twelve (12) months after the date of such termination, the Break-Up Fee, with such amount being payable upon the closing or consummation of such NYNM Alternative Transaction, and (b) that Seller is authorized without further Bankruptcy Court action to pay any amounts that become due and payable to Purchaser pursuant to this Agreement (including the Break-up Fee and Expense Reimbursement), and that such amounts shall have the priority specified in Section 10.2.3; provided that, for the avoidance of doubt, notwithstanding any provisions of this Agreement to the contrary, Seller shall not be obligated to pay, and Purchaser shall not be entitled to receive, the Break-Up Fee if Seller terminate this Agreement pursuant to Section 10.1.6 as a result of Purchaser's breach of this Agreement.

    6.4.3   Assignment Motion and Order.  Consistent with the Assignment Procedures , Seller has notified or shall notify all parties to the Assigned Contracts of the proposed assignment of the Assigned Contract and that if they do not timely file an objection to the assumption and assignment of an Assigned Contract, or to the proposed Cure Amount associated therewith, such parties shall waive and be estopped from asserting any objection to such assumption and assignment or to the establishment of such Cure Amount.  If Purchaser is the Successful Bidder at the Auction, Seller shall file and serve on all parties to the Assigned Contracts the Auction Results Notice and the Further Assignments Notice (each as defined in the Assignment Procedures) in accordance with the Assignment Procedures.  Seller shall not file any motion seeking to assume or reject any Assigned Contract under Section 365 of the Bankruptcy Code without the prior written consent of Purchaser.  To the extent that the assignment to Purchaser of any Assigned Contract or transfer to Purchaser of any NYNYM Asset pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the NYNM Sale Order, the Assignment Order or other related Order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or NYNYM Asset or any right or interest therein unless and until such consent is obtained; provided, however, that the parties shall use their commercially reasonable efforts, before the Closing, to obtain all such consents; provided, further, that if any such consents are not obtained prior to the Closing Date, Seller and Purchaser shall reasonably cooperate with each other in any lawful and commercially feasible arrangement designed to provide Purchaser with the benefits and obligations of any such Contract or NYNYM Asset, Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Seller on or after the Closing Date to the extent set forth in this Agreement, and, unless reimbursed by Purchaser, Seller shall not be required to expend any monetary funds in connection with such efforts or arrangements.

    6.4.4   Notice and Reasonable Efforts.  Seller shall provide appropriate notice of the hearings to approve the NYNM Bid Order and the Sale Motion and the Auction, as is required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure to all parties

entitled to notice, including, but not limited to, all parties to the Assigned Contracts and all taxing and environmental authorities in jurisdictions applicable to Seller and the IPA Entites. Thereafter, Seller shall undertake all reasonable efforts in support of the Sale Motion and the assignment of the Assign Contracts, and Purchaser agrees to cooperate in such efforts.

6.4.5    Defense of Orders.  If the NYNM Sale Order, the Assignment Order, or any other Order of the Bankruptcy Court relating to this Agreement (collectively, the "**Bankruptcy Orders**") shall be appealed (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller shall take all steps as may be appropriate to defend against such appeal, petition or motion, and Purchaser agrees to cooperate in such efforts, and each of Seller and Purchaser hereto shall endeavor to obtain an expedited resolution of such appeal.

6.4.6    Books and Records.  Purchaser shall make available to Seller copies of all books, files, documents and records included as part of the NYNYM Assets as Seller may reasonably request for a period of eighteen (18) months post-Closing.  If Seller desire copies of any of such documents or records, all copying costs shall be borne by Seller.

6.4.7    Right to Market.  Seller and Purchaser acknowledge and agree that until the termination of this Agreement in accordance with its terms, Seller and its Subsidiaries, officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives shall be permitted to solicit inquiries, proposals, offers or bids from, and negotiate with, any Person other than Purchaser relating to the direct or indirect sale, transfer or other disposition, in one or more transactions, of all or substantially all of the assets of Seller and may take any other affirmative action (including entering into any agreement or letter-of-intent with respect thereto) to cause, promote or assist with any Alternative Transaction.  Without limiting the foregoing, Seller and its Subsidiaries and their respective officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives shall be permitted to supply information relating to Seller, the NNNI Business, the NYNYM Assets and/or the Assumed Liabilities to prospective purchasers and their representatives that have executed a confidentiality agreement with Seller or its Subsidiaries.  None of Seller nor any of its respective Subsidiaries shall have any liability to Purchaser, either under or relating to this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of such definitive agreement for an Alternative Transaction pursuant to this Section 6.4.7; provided, that Purchaser is paid any amounts due Purchaser pursuant to Section 10.2.1 and 10.2.2 at the time provided for therein.  Seller and Purchaser agree to comply in all material respects with the terms of the NYNM Bid Order or any Order of the Bankruptcy Court with respect to the Acquisition, as applicable, and agree that to the extent there is a conflict between this Agreement and the NYNM Bid Order or any Order of the Bankruptcy Court with respect to the Acquisition, the NYNM Bid Order or the Order of the Bankruptcy Court with respect to the Acquisition shall govern in all respects.

6.5    Reserved.

6.6    Employment of Seller's Employees.  Purchaser has no obligation to offer employment to any employee of Seller or the IPA Entities.  Purchaser shall have no wage, severance or other obligations with respect to anyone who is/was an employee of Seller on the

day immediately preceding the Closing Date but who does not become a employee of the Purchaser and all such obligations, if any, shall be the responsibility of Seller.  Purchaser shall not be liable to Seller or any of Seller or any of the IPA Entities employees with respect to any Benefit Plans, with respect to any accrued vacation or other paid time off or with respect to any other benefit obligations, whether accrued prior to or continuing after the Closing.

6.7     Reserved.

6.8     ERISA.  Purchaser shall not have any responsibility, liability or obligation, whether to active, former employees, their beneficiaries or to any other person, with respect to any Benefit Plans, practices, programs or arrangements maintained by Seller and shall have no fiduciary obligations or duties with respect to such Benefit Plans.

6.9     Reasonable Access to Records and Certain Personnel.  So long as the Bankruptcy Cases are pending, following the Closing, Purchaser shall provide Seller and Seller's counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents and records relating to the NYNYM Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of Seller's professionals to copy, at Seller's expense, such documents and records as Seller or Seller's may request in furtherance of the purposes described above, and (b) Purchaser's copying and delivering to Seller or Seller's professionals such documents or records as Seller or Seller's professionals may request, but only to the extent Seller or Seller's professionals furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and Seller reimburse Purchaser for the reasonable costs and expenses thereof.

6.10     Reserved.

6.11     Cure Amounts.  On or prior to the Closing, pursuant to Section 365 of the Bankruptcy Code and the NYNM Sale Order, (i) Purchaser shall pay any and all Assumed Cure Amounts with respect to the Assigned Contracts and (ii) Seller shall pay any and all Cure Amounts (other than the Assumed Cure Amounts).

6.12     NYNM PPO Lockbox.    Following the Closing, Seller shall permit and facilitate Purchaser's access to the NYNM PPO Lockbox and shall, on the last business day of each month, transfer to Purchaser any NYNM PPO Lockbox Cash for a period of six (6) months (or such shorter period as Purchaser may require such access, as notified in writing by Purchaser to Seller).  Any and all costs associated with maintaining the NYNM PPO Lockbox during such period (including, if necessary, maintaining the limited liability existence of Seller) shall be at the sole cost and expense of Purchaser.

6.13     Acquisition.    The Closing shall occur no later than July 31, 2018.  Seller shall not commence bankruptcy proceedings for any of the IPA Entities at any time prior to the Closing.

6.14     Seller Access.    From the date hereof until the earlier of (x) the Closing and (y) any termination of this Agreement pursuant to Article 10, upon reasonable notice, Seller shall, and shall cause each of its officers, directors, employees, auditors and agents to, (i) afford the

officers, employees and representatives of Purchaser reasonable access, during normal business hours, to the offices, properties, books and records of Seller relating to the NYNYM Assets, and (ii) furnish to the officers, employees and representatives of Purchaser such additional financial and operating data and other information regarding the operations of Seller relevant to the NYNYM Assets as are then in existence and as Purchaser may from time to time reasonably request; provided, however, that such activities of Purchaser shall not unreasonably interfere with the operations of Seller.

6.15    Radnet Contracts.    On or prior to the date that is three (3) business days prior to the Sale Hearing, Seller shall provide to Purchaser a true and correct copy of each Radnet Contract that it has in its possession, provided that the Seller shall use reasonable efforts to obtain copies of all of the Radnet Contracts and provide copies of such contracts to Purchaser.

ARTICLE 7
CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS.

The obligation of Purchaser to consummate the Acquisition contemplated by this Agreement is subject to the satisfaction (or waiver by Purchaser), prior to or at the Closing of each of the following conditions:

7.1    Conditions Precedent.

7.1.1    Representations and Warranties.  Each of the representations and warranties made herein by Seller shall be true and correct in all material respects (except for those representations and warranties already qualified by materiality, which shall be true and correct in all respects) as of the Closing with the same effect as though made at that time except for changes contemplated, permitted or required by this Agreement.

7.1.2    Performance.  Seller will have performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement to be performed and complied with by it prior to the Closing.

7.1.3    Certificate.  Purchaser will have received, at the Closing, a certificate of Seller, signed by an authorized officer of Seller, stating that the preconditions specified in Sections 7.1.1 and 7.1.2 above have been satisfied or waived.

7.1.4    No Material Adverse Effect.  Between the date hereof and the Closing Date, there shall not have occurred any Material Adverse Effect.

7.1.5    No Violation of Applicable Law.  No provision of any applicable Law shall prohibit the consummation of the Closing.

7.1.6    No Termination.  This Agreement shall not have been terminated pursuant to Article 10.

7.1.7    Seller's Deliveries.  The Purchaser shall have received the deliveries of Seller set forth in Section 9.2.

24

  7.2  <u>Court Approval Required</u>.

    7.2.1  <u>NYNM Sale Order</u>. The Bankruptcy Court shall have entered the NYNM Sale Order and such Order shall have become a Final Order. Notwithstanding the foregoing, nothing in this Agreement shall preclude the parties hereto from consummating the transactions contemplated herein if Purchaser, in its sole discretion, agrees to waive the requirement that the NYNM Sale Order shall have become a Final Order. No notice of such waiver of this condition or any other condition to the Closing need be given except to Seller, it being the intention of the parties that Purchaser shall be entitled to, and is not waiving, the protection of section 363(m) of the Bankruptcy Code, the equitable mootness doctrine and any similar statute or body of Law if the Closing occurs in the absence of the NYNM Sale Order becoming a Final Order.

    7.2.2  <u>No Injunctions</u>. There shall be no effective injunction, writ or preliminary restraining Order or any Order of any nature issued or Applicable Law passed by a Governmental Authority to the effect that the Closing may not be consummated.

  7.3  <u>Consents to the Transactions</u>. All Licenses, consents and approvals set forth on **Schedule 7.3** will have been obtained by Seller and delivered to Purchaser; <u>provided, however</u>, that Seller shall not be required to obtain any consent, waiver, or agreement to the consummation of the Acquisition to the extent the NYNM Sale Order provides that such consent, waiver, or agreement is not required or otherwise as contemplated by <u>Section 6.4.3</u>.

ARTICLE 8
CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS.

  Each and every obligation of Seller to consummate the Acquisition contemplated by this Agreement is subject to the satisfaction (or waiver by Seller), prior to or at the Closing of each of the following conditions:

  8.1  <u>Representations and Warranties; Performance</u>. Each of the representations and warranties made herein by Purchaser shall be true and correct in all material respects as of the Closing with the same effect as though made at that time except for changes contemplated, permitted or required by this Agreement; Purchaser will have materially performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed and complied with by it prior to the Closing; and Seller will have received, at the Closing, a certificate of Purchaser, signed by an authorized officer of Purchaser, stating that each of the representations and warranties made herein by Purchaser is true and correct in all material respects as of the Closing except for changes contemplated, permitted, or required by this Agreement and that Purchaser has materially performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed and complied with by it prior to the Closing.

  8.2  <u>Orders</u>. The Bankruptcy Court shall have entered the NYNM Sale Order, the NYNM Bid Order and the Assignment Order, and such Orders shall not have been reversed, modified, amended or stayed.

8.3     Purchaser's Deliveries.  Seller shall have received the deliveries of Purchaser set forth in Section 9.3.

8.4     No Termination.  This Agreement shall not have been terminated pursuant to Article 10.

8.5     No Injunctions.  No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Applicable Law that is in effect on the Closing Date and which prohibits consummation of the Closing.

ARTICLE 9
CLOSING.

9.1     Time, Place and Manner of Closing.  Unless this Agreement has been terminated according to Article 10 hereof, and provided that the conditions to the Closing set forth in Article 7 and Article 8 are satisfied or waived, the closing of the transactions contemplated in this Agreement shall occur as follows:

9.1.1     the closing of the transactions contemplated by this Agreement (the "**Closing**") will be held at the offices of Seller's counsel in New York, New York upon satisfaction or waiver of all the conditions set forth in Article 7 and Article 8 (or as soon thereafter as practicable after the satisfaction or waiver of all such conditions), other than conditions that, by their nature, will be satisfied at the Closing and completion of the Acquisition process as described in Section 6.13 and pursuant to the requirements of Applicable Law, but in any event not later than July 31, 2018, (the "**Closing Date**").

9.1.2     At the Closing, the parties to this Agreement will exchange certificates and other instruments and documents in order to determine whether the terms and conditions of this Agreement have been satisfied.  At the Closing, Seller will deliver to Purchaser such bills of sale, assignments, deeds, consents, endorsements, drafts or other instruments as are necessary or appropriate to vest in Purchaser title to the NYNYM Assets in accordance with the terms of this Agreement.  After the Closing, Seller will use commercially reasonable efforts to execute, deliver, and acknowledge all such further instruments of transfer and conveyance and will perform all such other acts as Purchaser may reasonably request to effectuate the transfer of the NYNYM Assets to Purchaser.

9.2     Closing Deliveries of Seller.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser:

9.2.1     a bill of sale for the NYNYM Assets, duly executed by Seller;

9.2.2     an assignment and assumption agreement for the Assigned Contracts and the Assumed Liabilities, duly executed by Seller;

9.2.3     the Licenses, consents and approvals set forth on **Schedule 7.3**; provided, however, that Seller shall not be required to obtain any such License, consent or approval to the extent the NYNM Sale Order provides that such License, consent or approval is not required or as contemplated by Section 6.4.3;

9.2.4      a copy, certified by an authorized officer of Seller to be true, complete and correct as of the Closing Date, of the resolutions of Seller, authorizing and approving the transactions contemplated hereby;

9.2.5      the certificate required by <u>Section 7.1.3</u>, duly executed by officers of each of Seller;

9.2.6      a properly completed and executed Internal Revenue Service Form W-9 from Seller (provided Purchaser's sole remedy for failure to provide such forms shall be withholding the amounts required to be withheld in accordance with applicable Law);

9.2.7      a non-foreign affidavit with respect to Seller (or if Seller is classified as a disregarded entity for U.S. federal income tax purposes, from the regarded sole owner of Seller), dated as of the Closing Date, issued pursuant to Section 1445 of the Tax Code and the Treasury regulations promulgated thereunder, stating that Seller (or its owner, as applicable) is not a "foreign person" as defined in Section 1445 of the Tax Code (provided Purchaser's sole remedy for failure to provide such forms shall be withholding the amounts required to be withheld in accordance with applicable Law);

9.2.8      the written release of all Encumbrances (other than Permitted Encumbrances and Encumbrances otherwise eliminated by the Sale Order) on the assets of the IPA Entities, executed by the holder of or parties to each such Encumbrances, in form and substance satisfactory to Purchaser and its counsel;

9.2.9      Reserved;

9.2.10     Reserved; and

9.2.11     a certificate representing the shares of the IPA Equity, duly endorsed for transfer on Seller's books or accompanied by appropriate stock transfer powers duly executed in blank or an assignment in a form reasonably acceptable to Purchaser and Seller evidencing the transfer of the IPA Equity to Purchaser.

9.3      <u>Closing Deliveries of Purchaser</u>.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller:

9.3.1      a bill of sale for the NYNYM Assets, duly executed by Purchaser and any other documents, instruments and writings (either executed counterparts or otherwise) required or reasonably requested by Seller to be delivered by Purchaser pursuant to this Agreement for Seller to transfer and assign the NYNYM Assets and Assumed Liabilities to Purchaser and for Purchaser to assume the NYNYM Assets and Assumed Liabilities, each in form and substance reasonably satisfactory to Seller and Purchaser;

9.3.2      a copy, certified by an authorized officer of Purchaser to be true, complete and correct as of the Closing Date, of the resolutions of Purchaser, authorizing and approving the transactions contemplated hereby;

9.3.3      the certificate required by <u>Section 8.1</u>, duly executed by an officer of Purchaser; and

9.3.4      the Closing Payment and, to the extent not already paid, the Assumed Cure Amounts.

9.4      <u>Transfer Taxes</u>.  All transfer, documentary, sales, use, stamp, registration and other similar Taxes and all conveyance fees, recording chargers and other fees and chargers (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement ("**<u>Transfer Taxes</u>**") shall be payable by Purchaser. Purchaser will file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and if required by applicable Law, Seller will join in the execution of any such Tax Returns and other documentation.  Purchaser and Seller agree to use their best efforts to obtain any certificate, including a resale certificate, or other document from any Governmental Authority as may be necessary to mitigate, reduce or eliminate any Transfer Tax.

9.5      <u>Proration of Taxes and Charges</u>.

9.5.1      Any real or personal property Taxes or similar ad valorem Taxes attributable to the NYNYM Assets ("**<u>Property Taxes</u>**") with respect to a Tax period commencing on or prior to, and ending after, the Closing Date (a "**<u>Straddle Period</u>**") shall be prorated between Seller and Purchaser on a per diem basis.  Seller shall be responsible for the amount apportioned to periods prior to the Closing Date and Purchaser shall be responsible for the amount apportioned to periods on or after the Closing Date.  The party required by Law to pay any such Straddle Period Property Taxes (the "**<u>Paying Party</u>**"), to the extent such payment exceeds the obligation of the Paying Party hereunder, shall provide the other party (the "**<u>Non-Paying Party</u>**") with proof of payment, and the Non-Paying Party shall reimburse the Paying Party for the Non-Paying Party's share of such Straddle Period Property Taxes. The party required by Law to file a Tax Return with respect to Straddle Period Property Taxes shall do so within the time prescribed by Law.

9.5.2      Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practical, such information (including reasonable access to books and records, Tax Returns and Tax filings) and assistance as is reasonably necessary for the filing of any Tax Return, the conduct of any Tax audit, and for the prosecution or defense of any claim, suit or proceeding relating to any Tax matter related to the NYNYM Assets. Purchaser and Seller shall cooperate with each other in the conduct of any Tax audit or other Tax proceedings and each shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this <u>Section 9.5</u>.

9.6      <u>Consummation of Closing</u>.  All acts, deliveries, and confirmations comprising the Closing, regardless of chronological sequence, shall be deemed to occur contemporaneously and simultaneously upon the occurrence of the last act, delivery, or confirmation of the Closing and none of such acts, deliveries, or confirmations shall be effective unless and until the last of the same shall have occurred.  Regardless of when the last act, delivery, or confirmation of the Closing shall take place, however, the transfer of the NYNYM Assets shall be deemed to occur

as of the start of business at the principal office of Seller on the date of the Closing (the "**Effective Time**").

9.7     Payment of Cure Amounts.  After the Closing, Seller shall provide Purchaser with evidence reasonably satisfactory to Purchaser of the satisfaction of all Cure Amounts (other than the Assumed Cure Amounts).

9.8     Assignment of Additional Contracts.  After the Closing, Seller shall cooperate with Purchaser to assign any Provider Contracts to which Seller or any of its Subsidiaries is a Party or Payor Contracts to which Seller or any of its Subsidiaries is a Party that is not an Assigned Contract and transfer all rights thereunder the Purchaser in accordance with Applicable Law.

ARTICLE 10
TERMINATION OF AGREEMENT.

10.1     Termination Events.  Subject to Section 10.2 of this Agreement, by notice given prior to or at the Closing, this Agreement may be terminated as follows:

10.1.1     by mutual consent of Purchaser and Seller;

10.1.2     by Seller, if Purchaser is not the Successful Bidder or Backup Bidder at the Auction;

10.1.3     by Purchaser, if the Bankruptcy Court does not approve the Breakup Fee and Expense Reimbursement in an Order from the Bankruptcy Court on or before July 11, 2018;

10.1.4     by Purchaser if Seller's bankruptcy case is dismissed or converted to one under Chapter 7 of the Bankruptcy Code, if a trustee or an examiner with expanded powers is appointed in such bankruptcy case, or if a motion for relief from the automatic stay is granted with respect to a material portion of the NYNYM Assets;

10.1.5     (a) by Purchaser if satisfaction of any condition in Article 7 hereof on or before July 31, 2018, or such later date as the parties may agree upon, becomes impossible (other than through the failure of Purchaser to comply with its obligations under this Agreement), or (b) by Seller if satisfaction of any condition in Article 8 hereof on or before July 31, 2018 becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement);

10.1.6     by the non-breaching party upon a material breach of any provision of this Agreement provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of ten (10) Business Days;

10.1.7     subject to Section 10.2, by Seller if, incident to the NYNM Bid Order, Seller accepts and closes on a competing bid for the purchase of all or part of the NYNYM Assets; or

29

10.1.8    by Purchaser or Seller, if the Closing has not occurred on or before July 31, 2018 (other than through failure of any party seeking to terminate this Agreement to have complied fully with its obligations under this Agreement)

10.2    Break-Up Fee; Expense Reimbursement.

10.2.1    Break-Up Fee.  If this Agreement is terminated pursuant to Section 10.1.2, 10.1.4, 10.1.5(a), 10.1.6 (where Purchaser is the non-breaching party), 10.1.7 or 10.1.8 (other than through the failure of Purchaser to have complied fully with its obligations under this Agreement), in each case where Purchaser is not then in default under this Agreement and an Alternative Transaction is consummated within twelve (12) months of such termination, then Purchaser shall be entitled to receive a break-up fee in the amount equal to $495,000 (the "**Break-Up Fee**"), as provided in Section 6.4.2.2.

10.2.2    Expense Reimbursement.  If this Agreement is terminated pursuant to pursuant to Section 10.1.2, 10.1.4, 10.1.5(a), 10.1.6 (where Purchaser is the non-breaching party), 10.1.7, or 10.1.8 (other than through the failure of Purchaser to have complied fully with its obligations under this Agreement),  then Purchaser shall be entitled to Purchaser's reasonably documented actual out-of-pocket fees and expenses (including legal, accounting, escrow and other fees and expenses) not to exceed $450,000 (the "**Expense Reimbursement**"), with such amount being payable by Seller on or before the tenth (10th) Business Day after such termination.

10.2.3    Priority and Effect of Payment.  The Break-Up Fee and the Expense Reimbursement shall be entitled to administrative priority under Sections 503(b)(1)(A) and 507 of the Bankruptcy Code.  The obligation to pay in full in cash when due any amount owed by Seller to Purchaser under this Agreement, including the Break-Up Fee and the Expense Reimbursement, shall not be discharged, modified or otherwise affected by any plan of reorganization or liquidation for Seller or by any other Order of the Bankruptcy Court.  Notwithstanding anything to the contrary contained in this Agreement, upon payment of the Break-Up Fee and the Expense Reimbursement in accordance with this Agreement, Seller and its Affiliates shall be fully released and discharged from any liability under or resulting from this Agreement and, neither Purchaser nor any other Person shall have any other remedy or cause of action under or relating to this Agreement, including for reimbursement of expenses.

10.3    Effect of Termination.  Each party's right of termination according to Section 10.1 of this Agreement is in addition to any other right it may have under this Agreement or otherwise, and the exercise of a party's right of termination will not constitute an election of remedies.  If this Agreement is terminated according to Section 10.1, this Agreement will be of no further force or effect; provided, however, that (i) Section 2.2 and this Section 10.3 will survive the termination of this Agreement and will remain in full force and effect, (ii) the obligation of Seller to pay the Break-Up Fee and Expense Reimbursement pursuant to Section 10.2 will survive the termination of this Agreement and will remain in full force and effect, and (iii) the termination of this Agreement will not relieve any party from any liability for any breach of this Agreement occurring prior to termination.

10.4     Termination Procedure.  Any party desiring to exercise its right to terminate this Agreement shall deliver to the other party notice of termination in accordance with Section 13.6, stating with a reasonable degree of specificity the reason relied upon for such termination.

ARTICLE 11
RESERVED

ARTICLE 12
FURTHER ASSURANCES.

12.1     Separate Agreements Executed in Connection with Closing.  The parties shall abide by, and otherwise perform under the terms and conditions of each and every agreement deemed executed and delivered contemporaneously with the Closing.

12.2     Cooperation of the Parties After Closing.  Upon the request of any party hereto after the Closing, any other party will use commercially reasonable efforts to (i) take all action, (ii) execute all documents and instruments, and (iii) provide any supplemental information and further assurances necessary or desirable to consummate and give effect to the transactions contemplated by this Agreement.

12.3     Payroll.  Purchaser will furnish to Seller such payroll and employee information as Seller may reasonably require in connection with the preparation or examination of payroll Tax Returns, workers' compensation reports and audits, and qualified plan administration records.

ARTICLE 13
DEFINITIONS.

"**Acquisition**" has the meaning set forth in the recitals of this Agreement.

"**Action**" has the meaning set forth in Section 4.4.

"**Administrative Agent**" means Bank of America, N.A., in its capacity as Administrative Agent (and any other capacity) under the Credit Agreement.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of more than fifty percent (50%) of the outstanding voting power of such Person or the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"**Allocable Consideration**" has the meaning set forth in Section 2.3.

"**Allocation Schedule**" has the meaning set forth in Section 2.3.

31

"**Applicable Law**" means, with respect to any Person, any Law applicable to such Person or its business, properties or assets.

"**Assigned Contracts**" has the meaning set forth in Section 1.3.

"**Assignment Order**" means an Order authorizing the assumption and assignment of the Assigned Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code (which may be included in the NYNM Sale Order), which shall be in form and substance reasonably acceptable to Purchaser.

"**Assignment Procedures**" means the Assignment Procedures attached to the NYNM Bid Order.

"**Assumed Cure Amounts**" has the meaning set forth in Section 1.3.2 of this Agreement.

"**Assumed Liabilities**" has the meaning set forth in Section 1.2.1.

"**Auction**" shall have the meaning ascribed in Section 6.4.2.1.

"**Backup Bidder**" has the meaning set forth in the NYNM Bid Order.

"**Bankruptcy Cases**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Estates**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Orders**" has the meaning set forth in Section 6.4.5.

"**Benefit Plan(s)**" has the meaning set forth in Section 4.10.

"**Business Day**" any day of the year, excluding Saturday, Sunday and any other day on which national banks are required or authorized to close in Pennsylvania.

"**Cash Deposit**" has the meaning set forth in Section 2.2.1.

"**Claim Notice**" has the meaning set forth in Section 11.3.2.

"**Closing**" has the meaning set forth in Section 9.1.2.

"**Closing Date**" has the meaning set forth in Section 9.1.2.

"**Closing Payment**" has the meaning set forth in Section 2.2.2.

"**Contract**" means any written or oral contract, agreement, commitment, purchase order, license, lease, release, consent, indenture, or evidence of indebtedness.

"**Credit Agreement**" means that certain Credit Agreement, dated as of January 30, 2017 (as amended, modified, or supplemented from time to time), by and among Orion, the guarantors party and hereto, the lenders party thereto from time to time and Bank of America, N.A., as Administrative Agent, L/C Issuer and Swingline Lender.

"**Cure Amounts**" has the meaning set forth in Section 1.3.

"**Disclosure Statement of Private Information**" means the disclosure statement dated as of the date hereof, delivered by Seller to Purchaser.

"**Effective Time**" has the meaning set forth in Section 9.6.

"**Encumbrance**" means any lien, mortgage, deed of trust, deed to secure debt, pledge, restriction on transfer, proxy and voting or other agreement, claim, charge, security interest, easement, right of way, encroachment, servitude, right of first option, right of first refusal, preemptive right or similar restriction, use restriction, or other encumbrance, option or defect in title of every type and description, whether imposed by law, agreement, understanding or otherwise, including, without limitation, all liens, encumbrances, and interests in property as set forth in Section 363 of the Bankruptcy Code.

"**ERISA**" has the meaning set forth in Section 4.10.

"**ERISA Affiliate**" has the meaning set forth in Section 4.10.

"**Escrow Agreement**" has the meaning set forth in Section 2.2.2.

"**Escrow Agent**" has the meaning set forth in Section 2.2.1.

"**Excluded Assets**" has the meaning set forth in Section 3.1.

"**Excluded Liabilities**" has the meaning set forth in Section 1.2.2.

"**Final Order**" means an Order of the Bankruptcy Court, the operation or effect of which has not been stayed, and which is not subject to any pending appeal, request for leave to appeal or request for reconsideration and as to which the time for any such appeal, request for leave to appeal or request for reconsideration has expired.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**Governmental Authority**" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any United States or foreign federal, state or local government, including any governmental authority (including any bilateral or multilateral governmental authority), agency, branch, department, board, commission or

instrumentality of such government or any political subdivision thereof, and any tribunal, court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"**Highest or Best Bid**" has the meaning set forth in Section 6.4.2.8.

 "**Indebtedness**" shall mean, without duplication (i) all indebtedness for borrowed money, whether current or funded, secured or unsecured including, without limitation, all indebtedness outstanding pursuant to the Credit Agreement, (ii) that portion of obligations with respect to capital leases that is properly classified (or should be properly classified) as a liability on a balance sheet in conformity with GAAP (as hereinafter defined); (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (for the avoidance of doubt, excluding any trade accounts payable and checks payable to Seller, which have been endorsed by Seller for collection in the Ordinary Course of Business); (iv) all amounts drawn under outstanding letters of credit; (v) all interest rate swap, derivative or similar arrangements; (vi) all obligations for the deferred purchase price of any property or services (other than trade accounts payable and checks payable to Seller which have been endorsed by Seller for collection in the Ordinary Course of Business); (vii) guaranties securing indebtedness for borrowed money; (viii) all deferred compensation obligations, including (A) all payment obligations under any non-qualified deferred compensation plan of Seller and (B) any underfunded pension or post-retirement liabilities of Seller; (ix) all costs and obligations incurred in connection with a change of control of Seller or the sale of the NNNI Business; (x) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by Seller (even though the rights and remedies of the seller or lender under such agreement in the event of a default may be limited to repossession or sale of such property); (xi) all obligations secured by a purchase money mortgage or other Encumbrance to secure all or part of the purchase price of property subject to such mortgage or Encumbrance; (xii) all obligations secured by Encumbrances on property acquired by Seller, whether or not such obligations were assumed by Seller at the time of acquisition of such property; (xiii) all obligations in respect of dividends, distributions or similar payments payable to members; (xiv) all obligations of a type referred to in clauses (x) - (xiii) which is directly or indirectly guaranteed by Seller or which Seller has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a credit against loss, and (xv) any refinancings of the foregoing, including principal, interest, prepayment penalties and similar obligations thereto and Taxes associated with the payment of any such amount, all as the same may be payable upon the complete and final payoff thereof, regardless of whether such payoff occurs prior to, simultaneous with or following the Closing.

"**IPA Entity**" means each of New York Network IPA, Inc., New York Premier IPA, Inc., Brooklyn Medical Systems IPA 3, Brooklyn Medical Systems IPA 4 and Brooklyn Medical Systems IPA 5

"**IPA Equity**" means all shares of capital stock and other equity interests in each of the IPA Entities.

"**Knowledge of Seller**" means the actual or constructive knowledge of the following individuals (after due inquiry): Timothy Dragelin, Truc To, Arvind Walia, John Esposito and Mark Bellisimo.

"**Law**" means any federal, state or local law (including common law), statute, code, ordinance, rule, regulation, treaty, convention, decree, order, judgment, injunction, directive, technical standard or other requirement enacted, promulgated, issued, entered or enforced by a Governmental Authority.

"**Liability**" means any direct or indirect debt, liability, commitment or obligation (whether known or unknown, matured or not matured, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, incurred or consequential and due or to become due), including any liability for Taxes, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in Bankruptcy Code section 101(5)), whether imposed by agreement, understanding, law, equity or otherwise.

"**Licenses**" means all licenses, permits, consents, registrations, certificates and other governmental or regulatory permits, authorizations, approvals or agreements issued by or with any Governmental Authority that regulates, licenses or otherwise has or asserts jurisdiction over the NNNI Business, the NYNYM Assets, or Seller and used in the operation of the NNNI Business as presently conducted.

"**Material Adverse Effect**" means (a) any event, change, or matter in respect of the NNNI Business that, individually or in the aggregate, results in or would be reasonably expected to result in a material adverse effect on the results of operations, revenues, assets or condition (financial or otherwise) or liabilities of the NNNI Business, any IPA Entity or Seller, excluding any such event, change or matter to the extent resulting from or arising in connection with the filing of the Bankruptcy Cases; (b) Radnet Contracts representing 50% or greater of the revenue of all revenue from the Radnet Contracts are terminated, become unenforceable as a whole or in any material respect (including, but not limited to, any restrictive covenant) or are materially breached or (c) any event, condition or matter that would have a material adverse effect on the legality, validity or enforceability of this Agreement and the agreements and instruments to be entered into in connection herewith, or prevents, materially delays or materially impedes the consummation of the transactions contemplated hereby, or the realization of the rights and remedies hereunder; provided, that, solely with respect to clause (a), a "Material Adverse Effect" shall not include circumstances, facts, developments, changes, events, effects or occurrences (individually or taken together) resulting from or arising out of (i) changes or conditions generally affecting the industries or markets in which Seller and any of its Subsidiaries operate; (ii) any change in the financial, banking or securities markets or any change in the general international, national or regional economic conditions, including as a result of terrorist activity, acts of war or acts of public enemies; (iii) the execution of this Agreement or announcement or pendency of the transactions contemplated hereby or any actions expressly required to be taken pursuant to or in accordance with this Agreement; (iv) the announcement of this Agreement or the transactions contemplated hereby; (v) changes after the date hereof in any industry standards, Law, GAAP or regulatory accounting requirements, or changes in the official interpretation thereof; (vi) earthquakes, hurricanes, floods, acts of God or other natural disasters, except to the extent any such occurrence causes physical damage to the NYNYM Assets; (vii) the failure or inability of Seller or any IPA Entity to meet any internal or public projections, forecasts or estimates of revenues or earnings with respect to the NNNI Business (it being understood that the facts or circumstances giving rise to or contributing to such failure may be deemed to

35

constitute, or be taken into account in determining whether there has been or will be, a Material Adverse Effect); or (viii) any action taken by Seller at the request of, or with the express written consent of, Purchaser; provided that the exceptions described in clauses (i), (ii), (iii) and (v) shall apply only to the extent that the changes described therein do not have a disproportionate impact on Seller and its Subsidiaries who operate the NNNI Business, as compared to other Persons in the same industry in which Seller and such Subsidiaries operate with respect to the NNNI Business.

"**Material Permits**" has the meaning set forth in Section 4.7.2.

"**Multiemployer Plan**" means a multiemployer plan as defined in ERISA section 3(37)(A).

"**Non-Paying Party**" has the meaning set forth in Section 9.5.

"**NYNM Alternative Transaction**" means the sale, transfer, lease or other disposition of, directly or indirectly (including through an asset sale, stock sale, merger, or other similar transaction or pursuant to a plan of reorganization in the Bankruptcy Cases) all or substantially all of the NNNI Business or the NYNYM Assets in a transaction or a series of transactions with one or more persons other than Purchaser in any circumstance, including in accordance with the Bidding Procedures Order on or prior to the date that is twelve (12) months after the date of termination of this Agreement; provided, however, that the closing or consummation of a transaction with one or more persons other than Purchaser evidenced by a Qualifying Bid shall constitute a NYNM Alternative Transaction, regardless of whether such Qualifying Bid involves all or substantially all of the NNNI Business or the NYNYM Assets.

"**NYNYM Assets**" means, collectively, the IPA Equity, the Assigned Contracts and NYNM PPO Lockbox Cash.

"**NYNM Bid Order**" shall have the meaning ascribed in Section 6.4.2.

"**NYNM PPO Lockbox**" means that certain bank account at JPMorgan Chase Bank, N.A. owned by Seller into which Preferred Provider Organization payments are made under the Added Contracts to which Seller is a party.

"**NYNM PPO Lockbox Cash**" means any cash in the NYNM PPO Lockbox on the date of the Closing and any cash received in the NYNM PPO Lockbox at any time after closing.

"**NYNM Sale Motion**" has the meaning set forth in Section 6.4.1.1.

"**NYNM Sale Order**" shall mean an Order of the Bankruptcy Court, acceptable to Seller and Purchaser, entered pursuant to sections 105, 363, and 365 of the Bankruptcy Code (i) approving this Agreement and the transactions contemplated hereby, (i) approving the sale and transfer of the NYNYM Assets to Purchaser free and clear of all liens, claims and interests, pursuant to section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to Purchaser of the Assigned Contracts and establishing the Cure Amounts; (iv) finding that Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (v) finding that due and adequate notice of the approval of the NYNM

Sale Order and an opportunity to be heard were provided to all Persons entitled thereto, including but not limited to federal, state and local taxing and regulatory authorities; (vi) confirming that Purchaser is acquiring the NYNYM Assets free and clear of all liabilities, other than the Assumed Liabilities; and (vii) providing that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) are waived and there will be no stay of execution of the NYNM Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure.

"**NNNI Business**" means the business of any of the IPA Entities.

"**Order**" has the meaning set forth in <u>Section 4.4</u>.

"**Ordinary Course of Business**" means, subject to any limitations imposed as a result of the filing of the Bankruptcy Cases, only the ordinary course of business engaged in by Seller, consistent with past practices.

"**Orion**" has the meaning set forth in the preamble of this Agreement.

"**Paying Party**" has the meaning set forth in <u>Section 9.5</u>.

"**Payor Contract**" means any contract with a physician or other medical professional or group of physicians or medical professionals, including any participating physician agreement or participating acknowledgement.

"**Permitted Encumbrances**" means (a) all Encumbrances that are disclosed on **Schedule 12** and not otherwise eliminated by the NYNM Sale Order, (b) liens relating to Taxes that are not yet due and payable as of the Closing or that are being contested in good faith and set forth on **Schedule 12(a)**, and (c) mechanic's, materialmen's, repairmen's and other statutory liens arising in the Ordinary Course of Business and securing obligations incurred prior to Closing for amounts owed but not yet delinquent, for which Seller is and will remain responsible for payment and removal of such liens at or after Closing.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations and Governmental Authorities, whether or not legal entities.

"**Petition Date**" means July 5, 2018.

"**Property Taxes**" has the meaning set forth in <u>Section 9.5.1</u>.

"**Provider Contract**" means any contract with a preferred provider network or organization.

"**Purchase Price**" means an amount equal to $16,500,000.

"**Purchaser**" has the meaning set forth in the preamble of this Agreement.

"**Radnet Contracts**" means the contracts between Seller and/or any IPA Entity, on the one hand, and any professional affiliated with Radnet Management, Inc. and/or any of its affiliates, on the other hand.

"**Real Property**" has the meaning set forth in Section 1.1.2.

"**Real Property Leases**" has the meaning set forth in Section 4.11.1.

"**Sale Hearing**" means the hearing before the Bankruptcy Court in respect of the NYNM Sale Order.

"**Seller**" has the meaning set forth in the preamble of this Agreement.

"**Specifically Excluded Liabilities**" has the meaning set forth in Section 1.2.3.

"**Straddle Period**" has the meaning set forth in Section 9.5.

"**Successful Bidder**" has the meaning set forth in the NYNM Bid Order.

"**Tax**" and "**Taxes**" means all taxes, charges, fees, levies, duties or other like assessments, including without limitation, all federal, state, local, or foreign (or any governmental unit, agency, or political subdivision of any of the foregoing) income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Tax Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, unclaimed property and escheat, ad valorem, value added, alternative or add-on minimum, estimated, or any other governmental charges of the same or similar nature, including any interest, penalty, or addition thereto.

"**Tax Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Tax Returns**" means all returns, reports, certificates, audit reports, estimates, claims for refund, information statements, elections, statements of foreign bank and financial accounts and other returns and documents relating to, filed or required to be filed in connection with any Taxes (whether or not a payment is required to be made with respect to such filing), including any schedule or attachment thereto, and including any amendment thereof. Any one of the foregoing Tax Returns shall be referred to sometimes as a "Tax Return."

"**Transfer Taxes**" has the meaning set forth in Section 9.4.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS.

14.1    <u>Nature and Survival of Representations and Warranties</u>.  The parties hereto agree that the representations and warranties of the parties contained in this Agreement and in any certificate delivered pursuant hereto by any party shall not survive the Closing.

14.2     Exhibits and Schedules.  The Exhibits and Schedules (and any supplements thereto) referred to in this Agreement are a part of this Agreement as if fully set forth herein.  All references to this Agreement shall be deemed to include such Exhibits and Schedules, unless the context otherwise requires.

14.3     Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties, provided that Purchaser may assign some or all of its rights hereunder to one or more subsidiaries formed by it prior to Closing, provided that Purchaser remains liable for its obligations hereunder.  Subject to the preceding sentences, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

14.4     Governing Law and Jurisdiction.

14.4.1     The construction, interpretation and enforcement of this Agreement will be governed by the laws of the State of Delaware without regard to any conflicts of laws principles thereof.

14.4.2     The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof.

14.5     Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

14.6     Notices.  All notices, requests, demands and other communications under this Agreement shall be made in writing and will be deemed to have been duly given (i) when hand delivered (with written confirmation of receipt); (ii) when sent by facsimile (with written confirmation of receipt), provided that a copy thereof is sent by another method provided hereunder; or (iii) when received by the addressee, if sent by United States Certified Mail, Return Receipt Requested, postage prepaid, or by nationally recognized express delivery service guaranteeing next Business Day delivery, in each case to the appropriate address(es) and/or facsimile number(s) set forth below (or to such other address and facsimile number as a party may hereafter designate by notice to the other parties):

If intended for Seller:

Orion Healthcorp, Inc.
3200 Wilcrest, Suite 600
Houston, Texas 77042
Attention: Chief Executive Officer and Chief Restructuring Officer

With a copy to:

Timothy J. Dragelin
FTI Consulting Group
214 N. Tryon Street
Suite 1900
Charlotte, NC 28202
Facsimile: (704) 972-4121
Email: tim.dragelin@fticonsulting.com

with a copy (that will not constitute notice) to:

DLA Piper LLP (US)
1251 Avenue of the Americas
27th Floor
New York, New York 10020
Attention: Thomas Califano, Esq. and Alec Fraser, Esq.
Facsimile: (212) 884-8526

If intended for Purchaser:

HealthTek Solutions, LLC
c/o TG Capital LLC
17895 Collins Avenue
Miami, Florida
Attention: Johnathan Robertson

with a copy (that will not constitute notice) to:

Baker Botts LLP
30 Rockefeller Plaza
New York, New York 10112
Attention:  Emanuel C. Grillo
Emanuel.grillo@bakerbotts.com

14.7    <u>Public Announcements</u>.  Any public announcement, including any press release, communication to employees, customers, suppliers, or others having dealings with Seller or Purchaser, or similar publicity with respect to this Agreement or any of the transactions contemplated hereby, will be issued at such time, in such manner, and containing such content as Seller and Purchaser mutually determine; provided however, that the parties acknowledge that Purchaser will, in its reasonable discretion and in consultation with its counsel, provide public notice as and when appropriate to satisfy its obligations under SEC regulations and otherwise communicate material matters to its investors.

14.8    <u>Expenses</u>.  Except as otherwise provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, each of the parties hereto shall pay the fees and expenses of its respective counsel, accountants, and other professionals incident to the negotiation and preparation of this Agreement and the consummation of the transactions contemplated hereby.  All costs and obligations incurred upon a change of control of Seller will be borne by Seller.

14.9     Third Parties.  Nothing in this Agreement, whether express or implied, shall confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it and their respective successors and permitted assignees, nor shall any provision in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

14.10     Time of the Essence.  Time is of the essence in all dates and time periods set forth or referred to in this Agreement.

14.11     Construction.  The headings used in this Agreement are for convenience of reference only and are not a part of this Agreement and do not in any way control, define, limit, or add to the terms and conditions hereof.  In the construction of this Agreement, the singular shall include the plural and the plural, the singular, unless the context otherwise requires.  Further, the use of the masculine, feminine and/or neuter gender shall include each other gender where applicable.

14.12     Counterparts; Electronic Signatures; Effectiveness of this Agreement.

14.12.1     This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

14.12.2     A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, or an image of which shall have been transmitted electronically, will constitute an original signature for all purposes.  The delivery of copies of this Agreement or other documents to be delivered pursuant to this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes.

14.13     Remedies Cumulative.  The rights and remedies of the parties are cumulative and not alternative.

14.14     Entire Agreement; Amendment; Waiver.

14.14.1     This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understandings of the parties, whether written or oral.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties.

14.14.2     No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

14.15     Disclaimer; Non-Recourse.  (A) EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE ASSIGNED ASSETS ARE BEING TRANSFERRED "AS IS,

WHERE IS, WITH ALL FAULTS," AND, WITHOUT LIMITING THE GENERALITY OF SECTION 1.5, SELLER EXPRESSLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ASSIGNED ASSETS OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE BUSINESS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN OR IN THE SELLER TRANSACTION DOCUMENTS, PURCHASER WAIVES, RELEASES AND FOREVER DISCHARGES ALL CLAIMS AND RIGHTS OF ACTION, WHETHER AT LAW OR EQUITY, AGAINST SELLER OR ITS AFFILIATES TO THE EXTENT ARISING WITH RESPECT TO THE BUSINESS OR RELATING TO THE TRANSACTIONS UNDER THIS AGREEMENT, INCLUDING ANY CLAIMS OR RIGHTS OF ACTION UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OR ANY OTHER LAWS. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY (I) CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE, SPECULATIVE, EXEMPLARY, TREBLE DAMAGES OR DAMAGES FOR ANY LOST PROFITS OR BUSINESS, LOST BUSINESS OPPORTUNITY, DIMINUTION IN VALUE OR LOSS OF USE, (II) DAMAGES OR LOSSES BASED ON OR USING CALCULATION OF LOSS OF FUTURE REVENUE, INCOME OR PROFITS OR DIMINUTION OF VALUE OR (III) DAMAGES BASED ON A MULTIPLE OF EARNINGS OR OTHER METRIC OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY FOR ANY REASON WITH RESPECT TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER BASED ON STATUTE, CONTRACT, TORT, OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S SOLE, JOINT, OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT; PROVIDED, THAT, THE FOREGOING CLAUSES (I), (II) AND (III) SHALL NOT BE APPLICABLE TO THE EXTENT THAT ANY SUCH DAMAGES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, LOST PROFITS) ARE THE REASONABLY FORESEEABLE RESULT OF A BREACH OF THIS AGREEMENT.

14.16   Bulk Sales Laws.  Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement or any agreement contemplated by this Agreement.

14.17   No Right of Set-Off.  Except as set forth in this Agreement, Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and, irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its respective Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

*Signature Page Follows*

*IN WITNESS WHEREOF*, the parties hereto have duly executed this Agreement, as of the day and year first above written.

**PURCHASER:**

HEALTHTEK SOLUTIONS, LLC

By: _____
    Name:  Johnathan Robertson
    Title:  Authorized Signatory

*IN WITNESS WHEREOF,* the parties hereto have duly executed this Agreement, as of the day and year first above written.

**SELLER:**

NEW YORK NETWORK MANAGEMENT,
L.L.C.

By: _____
    Name: Timothy Dragelin
    Title: Chief Restructuring Officer

*[Signature Page to Asset Purchase Agreement]*