**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Charles E. Simpson, Esq.
Jeffrey C. Hoffman, Esq.
Tel: (212-237-1000
Email: csimpson@windelsmarx.com
       jhoffman@windelsmarx.com

*Attorneys for Parmjit Singh Parmar and the
Parmar Entities*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x

| In re: | Chapter 11 Case |
|---|---|
| ORION HEALTHCORP, INC. | No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LL | No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | No. 18-71756 (AST) |
| RMI PHYSICIANS SERVICES CORPORATION | No. 18-75757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | No. 18-75758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | No. 18-75759 (AST) |
| NYNM ACQUISITION, LLC | No. 18-75760 (AST) |
| NORTHSTAR FHA, LLC | No. 18-75761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | No. 18-75762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | No. 18-75763 (AST) |
| MDRX MEDICAL BILLING, LLC | No. 18-75764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | No. 18-75765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | No. 18-75766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | No. 18-75767 (AST) |
| PHOENIX HEALTH, LLC | No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, LLC | No. 18-74545 (AST) |

                    Debtors.            (Jointly Administered)

--------------------------------------------------------------------------------x

The Application ("Application") of Parmjit Singh Parmar ("Parmar") and the entities

owned and/or managed by Parmar (the "Parmar Entities"), by their attorneys, Windels Marx

Lane & Mittendorf, LLP, for an Order, pursuant to Sections 1104(a), (c) and (e) and 1106(a)(3),

{11609098:1}

(4) and (b) of the United States Bankruptcy Code (the "Bankruptcy Code"), 11 U.S.C.

§§1104(a)(c) and (e) and 1106(a)(3), (4) and (b) appointing a trustee ("Trustee") or an examiner

("Examiner") "for cause", to conduct an investigation of the above-captioned Debtors, their

Board of Directors, pre- and post-petition management and Bankruptcy Court-appointed advisors

(A) for "fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by

current management" before and after the commencement of this Chapter 11 case and (B) the

acts, conduct, assets, liabilities and financial condition of the Debtor, and the operation of the

Debtors' businesses during the pendency of this Chapter 11 case, provides as follows:

**INTRODUCTION**

1.      This Application for and the appointment of a Trustee or an Examiner by this

Bankruptcy Court is necessitated by (A) the actions of the Debtors, the Debtors' Board of

Directors and both pre- and post-petition management, (B) the dishonest and fraudulent actions

of the principal entities and agents of the controlling shareholder of the Debtors' parent

company: Mr. Chinh Chu ("Chinh Chu"), CC Capital Management LLC and CC Capital CHT

Holdco LLC (hereinafter CC Capital Management LLC and CC Capital CHT Holdco LLC shall

be jointly referred to as "CC Capital") and CHT Holdco LLC ("CHT Holdco") and various other

individuals acting on their behalf as identified below, and (C) their participation as part of an

ongoing large, complex and fraudulent scheme orchestrated by Chinh Chu, with the objective of

artificially devaluing and stealing valuable assets of the Debtors, Parmar and the Parmar Entities,

secured and unsecured creditors and the interests of the former public shareholders of the

Debtors, Constellation HealthcareTechnologies, LLC and its numerous wholly-owned Debtor

subsidiaries (jointly referred to as "CHT").  To date, it has been assumed in this Bankruptcy

Court that Parmar and the Parmar Entities were guilty of the fraudulent activities that resulted in

the Debtors' Chapter 11 filing.  However, Parmar and the Parmar Entities, as well as the

Debtors' creditors and public shareholders are each victims of Chinh Chu's, CC Capital's and

CHT Holdco's fraudulent activities, orchestrated through their manipulation, coercion, extortion

and bribery of (a) CHT's Board of Directors, (b) pre-petition and post-petition management and

their control over two (2) fraudulently conducted sales of the Debtors' assets in the Bankruptcy

Court.

2.      Parmar and the Parmar Entities, who are shareholders and creditors of CHT, have

suffered immense losses and damages of approximately $309 million,  by the pattern of illegal

activity by CHT's Board of Directors, CHT, Chinh Chu, CC Capital and CHT Holdco that began

pre-petition in or around January 2016 and continues to date.  The illegal activities engaged in by

the aforesaid entities encompasses the following:

    A.    Bank Fraud;
    B.    Wire Fraud;
    C.    Extortion;
    D.    Bankruptcy Fraud; and,
    E.    Obstruction of Justice.

3.      As a direct result of the pattern of illegal activities listed above and set forth

below in greater detail, the public shareholders, secured and unsecured creditors of the Debtors

and Parmar and the Parmar Entities have suffered and will continue to suffer immense damages

as a result of the pre- and post-petition actions of CHT's Board of Directors, management, Chinh

Chu, CC Capital and CHT Holdco which resulted in the intentional devaluation of CHT and the

fraudulent sales in the Bankruptcy Court of CHT's assets, which sales resulted in the Chapter 11

estate of CHT realizing $29.1 million, less than ten (10%) percent of the actual value of those

assets ($553 million), to the detriment of CHT's creditors, including Parmar and the Parmar

Entities, and the former public shareholders.

4.      To correct the above-stated crimes and recover the stolen CHT assets for the benefit of CHT's creditors and shareholders, Parmar and the Parmar Entities respectfully submit that either a Trustee or an Examiner should be appointed by this Bankruptcy Court to conduct an independent investigation of the pre- and post-petition activities with respect to the Debtors' operations and finances and the actions of Chinh Chu, CC Capital, CHT Holdco and CHT's pre-petition Board of Directors and current management and report the findings to this Bankruptcy Court so that necessary actions can be taken by the Bankruptcy Court, including the possible referral to the U.S. District Court for the Eastern District of New York or the United States District Court for the District of New Jersey, to recover the Debtors' stolen assets and protect them for the benefit of the Debtors' Chapter 11 estate.

5.      The areas at a minimum, that should be investigated by the Trustee or Examiner appointed by this Bankruptcy Court, include the following:

A.      Identifying the enterprise which conducted the various frauds and how and through which entities and individuals they were able to consummate the fraud;

B.      The acts and non-actions of CHT's Board and pre- and post-petition management which allowed the fraud to proceed;

C.      The reports by various financial advisors and law firms who investigated the operations of CHT and submitted fairness opinions, reports and proposals on the valuation of CHT's assets and an appraisal of the bids submitted by CC Capital and CHT Holdco and other bidders for the Debtors' assets; and,

D.      The actions and damages sustained by the CHT Chapter 11 estate as a result of the fraudulent activities described in detail below.

## JURISDICTION and VENUE

6.     This Application is brought pursuant to Sections 1104(a), (c) and (e) and 1106

(a)(3) and (4) and (6) of the United States Bankruptcy Code.

7.     This Bankruptcy Court has jurisdiction over this Application pursuant to 28

U.S.C. §§157 and 1334 because the relief sought herein, the appointment of a Trustee or an

Examiner, arises in the above-captioned Chapter 11 cases.

8.     This is a core proceeding under 28 U.S.C. §157(b)(2).

9.     Venue is proper pursuant to 28 U.S.C. §1409(a) because this proceeding is related

to the Chapter 11 cases, which are currently pending before this Bankruptcy Court.

## I.

## THE PARTIES

10.     The Parties whom the Trustee or Examiner, were one or the other to be appointed

by this Bankruptcy Court, should focus their investigation on are listed below:

> A.     Chinh Chu;
> B.     CC Capital;
> C.     CHT Holdco;
> D.     CHT's pre-petition Board of Directors and its two (2) Independent and
>        Special Committees;
> E.     CHT's post-petition management, and advisors; and,
> F.     Parmar and the Parmar Entities.

**A.     Chinh Chu**

11.     Chinh Chu, a former twenty-five (25) years veteran of the private investment firm

Blackstone, is the Senior Managing Director and Founder of CC Capital.  Before launching CC

Capital, Chinh Chu was known as a "master deal maker" and closed a number of significant

deals while at Blackstone resulting in his becoming a Billionaire and acquiring a duplex

apartment in Trump World Tower and a large yacht.  While Chinh Chu credits his success to an

"ability to transcend adversity", as in this Chapter 11 case, Chinh Chu's methods of transcending

adversity are not always legal or ethical. Apparently, regardless of the vast sums of money often

required, he, Chinh Chu must win at all costs. Including, withholding "insider" obtained

information from public shareholders, employing threats to coerce compliance with his wishes

and engaging in Bankruptcy Fraud.

12.    Often, as in the instant case, to accomplish his goals Chinh Chu engages his team

of individuals who have extreme loyalty to him.[1] These individuals, who include (i) John

Altorelli, Esq., Chinh Chu's "clean-up guy" (ii) Truc To, a former KPMG partner and Chinh

Chu's "go-to" person at KPMG to perform due diligence for his acquisitions, including CHT and

(iii) Douglas Newton. Information on certain of the members are as follows:

A.    John Altorelli ("Altorell") was once a high-powered corporate lawyer at

Dewey LeBoeuf and one of the partners who fled that firm just before it collapsed. After

leaving Dewey LeBoeuf, Altorelli joined DLA Piper, but because of a relationship with a

Russian Spy and the resulting negative publicity, he could no longer generate the same

volume of business as he had previously while at Dewey LeBoeuf, and in May 2016

Altorelli left DLA Piper, started his own solo practice, working almost exclusively for

Chinh Chu and CC Capital. Although known as Chinh Chu's "clean-up guy"[2], during the

course of Altorelli's converstaions with Parmar, as directed by Chinh Chu, Altorelli tried

to convince Parmar to retain him to usher Parmar through the CHT problem! As he said

to Parmar, "we're brothers from another mother." In furtherance of that oath of loyalty

and brotherhood, Parmar directed CHT's CFO, Sam Zaharis, to give Altorelli "full access

---

[1] Upon information and belief, Chinh Chu purchases these individuals' loyalty through a variety of methods, but not limited to, arranging for sex parties with topless and very young models, drugs and alcohol in his apartment and on his yacht, in addition to compensation for their actions.
[2] Among the Chinh Chu threats communicated to Parmar by Altorelli was a threat where Altorelli stated to Parmar, "where do you sleep nowadays Paul… Are you afraid that someone will put a bullet in the back of your head…?"

to every transaction, every contract, every money detail…" of CHT."…Sam, John is your

boss… ."  Altorelli then forwarded all of this "inside information" to Chinh Chu for his

use in stealing CHT's assets.

       B.      Truc To, like Chinh Chu, is a Vietnamese immigrant.  The most important

value of Truc To to Chinh Chu is that Truc To's loyalty to Chinh Chu took priority over

his loyalty to KPMG or his ethical and legal obligations.  To keep Truc To on track,

whenever he traveled from his home in Atlanta, Georgia to New York to provide services

for Chinh Chu, he would receive lavish treatment including staying as a guest in Chinh

Chu's mansion.  As a result, Truc To's due diligence/valuation reports were guaranteed

to reflect whatever was in Chinh Chu's best interest for them to reflect, as opposed to a

fair, honest, fact-based and non-biased report.  It is important to note that following the

closing of the "go-private" transaction for CHT, Truc To was appointed by Chinh Chu as

the Chief Financial Officer of CHT.

       C.      Douglas Newton (Senior Managing Director at CC Capital), as well as

Arvind Walia ("Walia"), Orion's CEO, and Roger Aguinaldo, also played substantial

roles in Chinh Chu's enterprise.

**B.**    **CC Capital**

13.    CC Capital CHT Holdco was formed in 2016 for the purpose of acquiring a

controlling interest in CHT and deregistering CHT's stock, at the time listed on the London AIM

Exchange[3], in a "going private" transaction through an equity subscription allegedly amounting

to $88.7 million in the capital of CHT Holdco.[4]  The intent was for CHT and its subsidiaries to

become privately held corporations with CC Capital owning a 50.7% interest in CHT's stock and

---

[3] Officially, the London Stock Exchange's Alternative Investment Market (the "London AIM).
[4] Once the payments to Chinh Chu and his non-CHT advisors were deducted, the actual value of the equity subscription amounted to approximately $55 million.

the remaining 49.3% being owned by Parmar and the Parmar Entities through Alpha Cepheus, LLC, and its shareholders, First United Health, LLC, Constellation Health, LLC, NAYA Constellation Health, LLC and Constellation Health Investment, LLC.

C.    **CHT**

14.    In 2012, Parmar, the Parmar Entities and other investors acquired Orion Healthcorp Inc. ("Orion"), a medical billing, collections and practice management service company, and merged it into CHT.  Parmar served as the CEO of CHT and developed CHT into a sophisticated platform to provide physicians back office services at a lower price.  This was achieved by implementing a strategy of acquiring smaller service providers in order to gain access to their customer lists and relationships which would then be serviced by CHT's platform. Before and after "going public" on the London AIM, CHT and Parmar followed a particular formula to acquire and incorporate the new subsidiaries into CHT.

15.    First, CHT would form a new subsidiary LLC ("shell").  Second, CHT would execute a merger agreement between the new subsidiary LLC and the new acquisition.  Third, CHT would place the new subsidiary into that shell.  During the time that CHT was a public traded company the majority of the shells were filled by acquisitions in the aforesaid manner. Although three (3) raise ups did not result in the immediate acquisition of new companies, the values of the intended additions were more than compensated for by acquisitions made at later dates (Vachette, ACA, ABC and NYNM).  An additional acquisition, National ACO ("NACO"), was available but the deal did not close for reasons explained below.  These activities comported with CHT's "forward-looking" plans.[5]

---

[5] Forward-looking statements or plans represent "financial models" using assumptions, formulas, predictions and forecasts, and are common in the Registration or Recommended Acquisition Statement released prior to a "go-private" transaction or an Initial Public Offering (IPO").  See page 19 of the Recommended Acquisition announcement by CHT and News by Collier Creek Holdings Registration Statement for their proposed IPO annexed

16.     CHT's actions were overseen by its Board of Directors, with input from management and financial and legal advisors.  In addition, to facilitate the "go-private" transaction, CHT's Board formed an initial "Independent Committee" and later, after the Independent Committee had been disbanded due to a lack of offers to acquire CHT, a reconstituted second "Special Committee" was formed to investigate Chinh Chu's and CHT's proposals and  advise the Board as to the actions the Board should take in response to Chinh Chu's and CC Capital's bids and other bids that were received for CHT.  The Board was fully aware and advised with respect to the shells and the "forward-looking" transactions and strategy revolving around their use for the new acquisitions.

**D.     CHT Holdco**

17.     Following the "go private" transaction, CHT Holdco became the holder of one hundred (100%) percent of the equity interests in CHT, the sole owner of Orion and its subsidiaries.  CHT Holdco itself is owned 50.7% by CC Capital and 49.3% by Parmar and the Parmar Entities through Alpha Cepheus, LLC.  In accordance with the terms of a November 24, 2016 Irrevocable Proxy, CHT Holdco had authority over decision making for all matters concerning CHT, in effect, for governance purposes, CHT Holdco, CC Capital and Chinh Chu were the sole owners of CHT.

**E.     CHT's Board of Directors and Independent and Special Committees**

18.     CHT's Board of Directors, pre-petition, consisted of the following individuals:

    A.     Parmar;
    B.     Mark Feuer ("Feuer");
    C.     Sam Zaharis ("Zaharis");
    D.     Pavan Bakshki ("Bakshki");
    E.     John Johnston ("Johnston");
    F.     Shawn Zimberg, M.D. ("Zimberg");

hereto as Exhibits "A" and "B".  Note that one of the founders of Collier Creek Holdings is Chinh Chu!  So clearly Chinh Chu was aware of the use of "forward-looking" plans and statements.

       G.     David Clark ("Clark"); and,

       H.     Sir Rodney Aldridge ("Aldridge").

19.     With the exceptions of Parmar, Zaharis and Feuer, all of the remaining Board members (Bakshki, Johnston, Zimberg, Clark and Alridge) were members of the Independent Committee and Special Committee at the times that they were constituted.  Parmar recused himself from the Independent Committee as he was a member of the purchasing group and Feuer recused himself at the direction of the Board due to his negotiations with Chinh Chu for Chinh Chu's purchase of a company Feuer owned during the same period that the Special Committee was considering Chinh Chu's and CC Capital's proposal to acquire CHT.

**F.**     **CHT's Post-Petition Management**

20.     In September 2017, Chinh Chu and CHT retained FTI Consulting Inc. ("FTI") to conduct investigative, advisory and restructuring tasks regarding CHT.  In furtherance thereof, Tim Draeglin, FTI's Senior Managing Director became CEO of CHT, Daniel Jones, an FTI Managing Director, acted as Chief Restructuring Officer, while fifteen (15) other members of FTI provided services and filled other management positions at CHT both pre- and post-petition. Pursuant to a May 29, 2018 Retention Order of the Bankruptcy Court, FTI was retained by the Debtors to provide management services during this Chapter 11 case.

21.     It was CHT's post-petition management, counsel, DLA Piper, and Houlihan Lokey Inc., the Debtors' post-petition consultant, who brought before the Bankruptcy Court the two (2) sales of the Debtors' assets which realized $29.1 million for the CHT Chapter 11 estate on assets valued a year prior at a minimum $500-$553 million.

## II

## FACTUAL BACKGROUND SUPPORTING
## APPOINTMENT OF A TRUSTEE OR EXAMINER

**A.**      **CC Capital Seeks to Acquire CHT**

22.      Parmar and Chinh Chu first met through mutual friends in September, 2015 on

Chinh Chu's yacht.  At the time, Parmar was considering taking CHT off the London AIM

through a "going private" transaction and engaged in discussions with Chinh Chu with respect

thereto.  However, Chinh Chu expressed a lack of interest in CHT as to Chinh Chu it was "too

small".  However, in January 2016, Chinh Chu reversed his position and began to show an

interest in acquiring CHT.  He reviewed public data from CHT for a 6-8 weeks period and then

made a verbal offer to Parmar of £1.77/share, which he shortly thereafter followed up with a

term sheet.

23.      In response to the Chinh Chu proposal and term sheet, CHT's Board hired Stifel

Bank as its financial adviser to advise on the "going private" process.  Stifel advised the Board

that Chinh Chu's bid was very low and they recommended bringing in additional players to bid.[6]

24.      Thereafter, Parmar and Chinh Chu met to discuss Chinh Chu raising his bid to

£1.92; however, Chinh Chu wanted Parmar to personally contribute $10 million of the $61.2

million he and the Parmar Entities were slated to receive, towards the purchase.  When this

proposal was presented to the CHT Board, the Board advised Parmar that if he intended to

contribute to Chinh Chu's bid, Parmar must recuse himself from all bid evaluation discussions,

as he would be part of the buying group.  Parmar agreed and recused himself from all Board bid

evaluation discussions.  From approximately April 2016 going forward, Parmar removed himself

---

[6] This was remarkable as Stifel was formed by Chinh Chu while he was at Blackstone.

from the decision-making process on CHT's side of the negotiations and the Board formed an

Independent Committee and then a Special Committee to evaluate all bids.

25.    Mark Feuer was then elected Chairman of the Independent Committee and

Kirkland & Ellis, LLP ("Kirkland") was hired as attorneys and advisors to the Independent

Committee.  CHT then hired Duff & Phelps Corp. ("D&P") to perform an independent

evaluation and to write a fairness opinion thereafter on Chinh Chu's bid.

26.    At the same time and as per Chinh Chu's direction, CC Capital hired KPMG to

perform their due diligence on the acquisition of CHT.  Chinh Chu directed the hiring of

associate and then-KPMG partner Truc To to head CC Capital's due diligence efforts,[7] which

CC Capital alleges to have paid various parties $7 million to conduct.  Immediately, Chinh Chu

began manipulating the "going private" process by attempting to influence the paperwork that

was being prepared for D&P to review.  Chinh Chu directed CHT to provide a watered-down

model with no acquisitions, no projected growth, and an increase in anticipated future costs.

Chinh Chu made no secret of his desire to ensure that D&P's valuation of CHT be as low as

possible,[8] including keeping CHT and its management , including Parmar, separated from the

banks and CC Capital's management of the information flow.

27.    About this time, Chinh Chut sent Roger Aguinaldo to see Parmar and to explain

to Parmar how the CC Capital enterprise operates.  He explained very succinctly that "in Chinh's

world, nothing reaches Chinh."  People below take the fall for all mistakes and they cannot allow

Chinh's prestigious career to be blackmarked."  Sensing that CC Capital and Chinh Chu seemed

to operate more outside the norms of an investment firm, Parmar informed Douglas Newton, CC

---

[7] For more information on Truc To's and Chinh Chu's relationship, see paragraph 12B. above.
[8] For example, Chinh Chu became enraged when he discovered that someone had put a draft financial model on the DropBox server that showed 5% growth for CHT and demanded that this be lowered to an implausibly low 1.2% annual growth.

Capital's senior manager, that he did not want to proceed with the deal. Parmar advised Newton

that problems existed and, as Roger Aquinaldo had advised him, he did not want to risk putting a

black mark on Chinh Chu's record.

28.    On August 17, 2016, D&P submitted their "initial report" to the Independent

Committee, entitled "Discussion Materials Prepared for the Special Committee of the Board of

Directors", a copy of which is annexed hereto as Exhibit "C". This report contains several errors

or omissions which effectively resulted in an undervaluation of CHT:

a.    The analysis of the "Total Enterprise Value" lists CHT with $28.3

million of debt in the form of loans; however, these loans had already been repaid

on July 11, 2016 at Chinh Chu's direction to avoid a potential audit by the lender,

but also at Chinh Chu's direction, the loans were left on the CHT valuation report

as debts resulting in a diminution of CHT's enterprise value.[9]

b.    On page 7 of the initial report, in a chart entitled "Historical and

Projected Financial Performance," D&P outlined CHT's annual revenues, growth

and EBITDA from 2012 to the present, with projections through 2021. Although

CHT had shown significant growth from 2013 through 2016, the projections for

future growth were set extraordinarily low, at 1.2% projected annual growth,

rather than the 35-50% ordinarily expected from a growth company. The 2017

projected revenue was an artificially low $140.4 million.

c.    At the time, CHT was in the process of acquiring Allegiance Consulting

Associates, LLC ("ACA") and Allegiance Billing & Consulting, LLC ("ABC") using its

---

[9] On information and belief, this error may have been influenced by Chinh Chu, as he wrote in an email to Parmar "Let's chat when you are free. I have an idea regarding the loan." This email was sent on July 14, 2016, three (3) days after the loans were paid off.

internal cash.[10]  In addition, CHT was also in the process of acquiring NYNM, which also

would have expanded the forward-looking, projected revenue of CHT, but was also not

included.[11]  Also, the acquisition of the far larger NACO was in process and would have

added $250 million of revenue to CHT on a yearly basis and $60 million plus, for the 4th

Quarter of 2016.  NACO was projected to add $400 million plus of revenue for 2018 at a

price of $45 million.

29.     However, notwithstanding the above errors and omissions, the D&P report

showed that the value of CHT was still far greater than Chinh Chu wanted to pay.[12]

30.     On August 23, 2016, the Independent Committee held a conference call to discuss

the D&P report.  Parmar was a brief participant at the beginning of the call to present his views,

but was then excused from the deliberations in accordance with his recusal.  The Independent

Committee discussed with D&P "that the Proposal was not fair based on the standalone value of

the Corporation as reflected in management's forecasts and that Mr. Feuer should reiterate to the

buyer group that the Proposal remains too low and that the Committee would not approve a

transaction at the price of the current Proposal."

31.     At that same time, Parmar was continuing his desperate search for a way to

gracefully exit the buyers' group and Chinh Chu, and end the "going private" process.  Parmar

---

[10] This acquisition, which closed within thirty (30) days of the submission of the "initial report", in September 2016, expanded the revenue of CHT, and thus also increased the value of CHT, should have been included as a "forward-looking statement" but was omitted from the D&P report.
[11] Ultimately, this acquisition was delayed at Chinh Chu's direction until after the closing of the go-private.
[12] On page 12 of the initial report, D&P provided their valuation ranges ($500 million to $700 million) using several different valuation methods on a chart, annotating Chinh Chu's and CC Capital's bid with a red line, well below any calculated valuation range.  Chinh Chu's and CC Capital's bid of £2.1/ share was over 25% less than the lowest end of the valuation range using the discounted cash flow method of £2.83.  Because CC Capital's offer was so far below any price on which D&P could issue a fairness opinion, they suggested many alternative buyers on page 21-27.  (Although these numbers were unacceptable at the time, the offer would have become even less palatable as time went on, because of the decreasing exchange rate of British Pounds to Dollars.)  The public shareholders were never made aware of these facts at the time they sold their shares to CC Capital based upon a $266 million valuation.

still believed that it was in CHT's best interests to "go private", but that he needed more time and a buyer other than Chinh Chu to make it work for CHT.[13]

32.    Parmar believed that if he could delay the "going private" process long enough for CHT to close on the ACA, ABC and NYNM acquisitions to fill the shells and satisfy the forward-looking statements, then the D&P valuation of CHT would increase significantly and CHT would have been in a much stronger negotiating position, without any of the vulnerabilities that currently existed.

33.    Based upon the above, Parmar communicated to Chinh Chu that the deal was dead.

## B.    Chinh Chu Revives the CHT Deal

34.    Disappointed by the turn of events, Chinh Chu dispatched Newton to visit Parmar at Parmar's home in Colts Neck, New Jersey to convince Parmar to revive the "go private" transaction with Chinh Chu and CC Capital.  As is Chinh Chu's apparent practice, Newton informed Parmar that Chinh Chu was offering the use his yacht to Parmar and insisted that Parmar use the yacht for the next several days as an office during the day to work on reviving the "go-private" transaction and have parties at night.

35.    Parmar went to Chinh Chu's yacht, along with Sam Zaharis, where he and Zaharis met with Newton and Pavan Bakshki ("Bakshki").  Newton and Bakshki spent all day trying to convince Parmar to revive the "go-private" transaction.  Parmar was honest with Newton and

---

[13] In particular, Parmar knew the following: ( a) CHT's agreements to acquire ACA and ABC were set to close in September 2016 and that these acquisitions would more than make up for the difference of any forward-looking statements about the shells, Phoenix and Northstar; (b) CHT was very close to finalizing an agreement to acquire NYNM, which was significantly more valuable than any forward-looking statements about MDRX (however, Chinh Chu was pressuring Parmar to delay this deal until after the closing of the "going private"); (c) although the D&P report contained a small amount of inflated revenue, it had otherwise been manipulated to understate the value of CHT and an accurate total enterprise value would have been at or above $600 million; (d) Chinh Chu's and CC Capital's desired price for the "going private" transaction was les than 50% of CHT's actual value, and Chinh Chu was using the inaccurate statements about MDRX, Phoenix and Northstar as leverage to pressure Parmar into closing the deal at such an unreasonably low price.

told him that he wanted time to resolve the CHT issues and finish a few more acquisitions before CHT was ready to be sold. Parmar estimated that this would take approximately 18-24 months. Newton responded that Chinh Chu did not want to drop the deal and that Chinh Chu would be happy to work out any of CHT's issues with Parmar once they became partners.

36.    The following day, Chinh Chu invited Parmar to his office to look at another deal he was working on. During this visit, Chinh Chu took Parmar aside to explain to him why his low offer would still be very profitable to Parmar personally. Chinh Chu promised Parmar the following to revive the "go-private" transaction.

    a.    CC Capital would commit to $400 million in additional financing for CHT without any dilution to shareholders.

    b.    CC Capital would provide CHT with access to a large number of new clients.

    c.    Chinh Chu would also make Parmar a partner in CC Capital.

    d.    Chinh Chu would make Parmar a partner in a new $10 billion fund that Chinh Chu was forming called (ironically) Northstar.

37.    To obtain the above, Chinh Chu demanded that Parmar assist in pushing the "go-private" through at Chinh Chu's and CC Capital's current bid price. Parmar responded by informing Chinh Chu of the objections that D&P had already raised to the fairness of the bid and that Kirkland and D&P had advised the Independent Committee that they believed that they could find new bidders willing to pay more than double Chinh Chu's offer.

38.    In recognition of the fact that the D&P report had created a larger problem than one that could be solved by influencing Parmar alone, Chinh Chu set out to improperly and corruptly influence members of the Independent Committee. First, Chinh Chu began to feign

interest in acquiring an unrelated company that was owned by Mark Feuer, the Chairman of the

Independent Committee. Chinh Chu and Feuer engaged in extensive negotiations for this

potential acquisition. Chinh Chu's actions were designed to and, in fact did cause, a serious

ethical violation and conflict of interest to ensure that Feuer would support Chu's bid.

39.      Second, during the same period, Parmar received a telephone call from Newton,

this time asking Parmar to consider increasing the compensation paid to the Independent

Committee members for their services. Parmar responded immediately that the Independent

Committee members were already being highly compensated at approximately One Hundred

Thousand ($100,000.00) Dollars each for their participation in six (6) meetings. Newton then

explained that he had been speaking with one of the committee members, John Johnston, about

the "go-private" transaction and that Johnston had expressed to Newton his desire for additional

compensation for members of the Independent Committee, including $2,000.00 per member per

conference call.

40.      Despite Chinh Chu's efforts to improperly influence the Independent Committee,

it was also clear to him that a deal was not possible unless D&P and Kirkland were no longer

involved as advisors to CHT and the Independent Committee.

41.      To accommodate Kirkland's and D&P's removal, Chinh Chu hatched a plan to

withdraw CC Capital's bid, at which point, Parmar would necessarily have to dissolve the

Independent Committee and terminate Kirkland and D&P, as there would be no active bids to

consider. Thereafter, Chinh Chu and CC Capital would submit a new proposal and CHT could

then form a new committee with new advisors.

42.      With his corrupt plan set, Chinh Chu had CC Capital withdraw its offer for CHT.

As CHT then officially had no bids to evaluate, Parmar dissolved the Independent Committee

and terminated D&P and Kirkland. On September 12, 2016, Parmar emailed Chinh Chu, saying

that he "wanted to inform both you and CC Capital that Special Committee was disbanded." The

next day, September 13, 2016, at Chinh Chu's direction, Parmar emailed a copy of the D&P

report to Andrew Barnett, an analyst at CC Capital.[14]

43.    With the first Independent Committee dissolved, Chinh Chu set his sights on

ensuring that the new independent committee would bend to his will.  He had Bakshki introduce

Parmar to representatives from SunTrust Robinson Humphrey ("SunTrust") and McGuire Woods

as potential advisors for the next independent committee.  Bakshki brought Tarun Mehta

("Mehta"), a Sun Trust executive, to meet with Parmar in Colts Neck to review the D&P report.

After review, Mehta stated to Parmar that he saw no issues with presenting a new report with a

valuation in the range that Chinh Chu desired.[15]

44.    Mehta explained to Parmar that much of Chinh Chu's power comes from his

access to funds to execute large transactions and a large stable of people who work for various

banks and other institutions who are loyal to him because of the fees that he generates for them,

as long as they go along with his plans.  Mehta further intimated that the "fees" were not limited

to the normal, legal and ethical fees associated with "go-private" transactions, but rather included

gifts, kickbacks, bribes, and other improper forms of compensation.[16]

---

[14] Upon learning that the D&P report had been emailed, and therefore could be tracked, Chinh Chu became apoplectic, screaming at Parmar that this action alone has derailed the deal, as CC Capital could be subject to a class action lawsuit for being privy to the valuation methodology and analysis prior to winning the bid.  After consulting with his attorneys, Chinh Chu informed Parmar that once the deal had been finalized, Parmar must "accidentally" drop a copy of the D&P report into the repository where all documents generated by the transaction are available to all parties.  This way, Chinh Chu and CC Capital could falsely, but plausibly, claim that that was where they got access to the document, after the deal was final.

[15] Mehta also told Parmar stories of Chinh Chu and his reputation for vindictiveness to harm anyone who does not go along with him.  Mehta explained that this is why everyone on Wall Street will not bid against Chinch Chu, when they see that he has made an unusually low bid.  (This may also explain the lack of bidders for the RCM and NYNM assets in the Bankruptcy Court auctions!)

[16] Mehta's explanation of how Chinh Chu manipulated other institutions was consistent with Parmar's observations, as Chinh Chu had explained to Parmar that Bank of America ("BofA") and Merrill Lynch did not want to finance the CHT deal at all, but Chinh Chu offered to make them managers on a new Special Purpose Acquisition Company

## C.    Chu Pushes the Deal Through

45.    On or about September 14, 2016, Chinh Chu and CC Capital submitted a new

offer to purchase CHT.  In response, CHT organized a Board meeting to discuss the following

three (3) issues:

      a.    CC Capital's new offer, which was only a few pennies per share higher

than the previous offer, but still less than 50% of the lowest price D&P had reported as

fair.

      b.    CHT had repaid its outstanding $23 million in loans and bought back its

outstanding warrants.  The repayment of the loans, etc. increased the value of CHT by

$23 million above the valuations calculated by D&P.

      c.    CHT was then in the process of acquiring Allegiance Consulting

Associates, LLC and Allegiance Billing & Consulting, LLC using internal cash.  These

acquisitions would significantly increase the revenue to CHT, and, therefore, would also

increase the value of CHT by an additional approximately $30 million above the D&P

valuations.

46.    The impact of the repayment of the above loan and the acquisitions should have

increased the minimum fair price for CHT from D&P's minimum estimate of $500 million to

$553 million.  However, CC Capital's offer was in the $275 million range.  This disparity caused

significant debate among the Board of CHT.

---

("SPAC"), which gave BofA $38 million in fees, if they agreed to finance the CHT deal on his terms.  Chinh Chu explained that the team at BofA that he was dealing with all owed their jobs to him and that he was responsible for them generating over $798 million in fees for BofA on Chinh Chu's transactions for 2015 alone.  The likelihood of Chinh Chu's statements having occurred is bolstered by the fact that the entire Credit Agreement and Commitment Letters from BofA were negotiated directly with Chinh Chu and the BofA Commitment Letters were included in CC Capital bids as early as July 2016, well before the due diligence process had made any significant progress.  As discussed more fully below, BofA conducted no audit, even though the Credit Agreement required one, the Credit Agreements were never disclosed to Parmar, despite Parmar's signature appearing on them, and BofA had absolutely no communications with Parmar or anyone else at CHT until April 2017, well after the due diligence had been completed and the deal had closed.

47.    Mark Feuer, conflicted by Chinh Chu's attempt to purchase his company, nevertheless advocated for the CC Capital deal and argued that the D&P valuations were never officially presented to the Board and therefore were not binding. Other Board members responded that, notwithstanding the lack of official presentment, they had heard the numbers and felt duty bound not to accept any offer below the D&P estimate. Although D&P had been terminated, the Board refused to entertain any lower offer, unless they were presented with a new, formal fairness report, prepared by a consultant with equal competency and reputation to D&P.[17]

48.    Bakshi took this opportunity to recommend SunTrust and McGuire Woods to the Board as advisors to the new "Special Committee". The Board agreed and formed a new Special Committee with SunTrust and McGuire Woods as advisors.

49.    On September 14, 2016, Parmar, as part of the buyer's group, emailed Mehta to inform him that CHT had received a bid from Chinh Chu and CC Capital and to inquire whether SunTrust was interested in being retained as the independent advisor and to provide a fairness opinion. Mehta responded within twenty (20) minutes that SunTrust was interested, and, in his response, Mehta revealed that he knew much more about the Chinh Chu/CC Capital proposal than Parmar had disclosed to him in his introductory email, by noting that since Parmar was an "interested party", SunTrust must deal directly with the Special Committee. CHT retained SunTrust the next day, September 15, 2016.

50.    Ironically, the Board then appointed John Johnston as the Chairman of the Special Committee, the same former Independent Committee member who had previously discussed increasing Special Committee members compensation with Newton. Johnston was almost

---

[17] Mark Feuer's advocacy on Chinh Chu's behalf resulted in him being accused of being conflicted by the other Board members. Although Feuer denied any conflict of interest, he offered to resign.

removed from the Committee for this reason, but the Board ultimately decided to leave him in his position with instructions not to have any additional discussions with Newton, Chinh Chu or CC Capital about his compensation.  Dr. Zimberg and David Clark were appointed as co-chairs of the Special Committee.

51.    Four (4) days after SunTrust was retained by the buyer's group, Mehta called Parmar for an urgent face-to-face meeting.  When they met later that day, Mehta explained to Parmar that Sun trust was not able to provide a fairness report in the range that Chinh Chu desired ($266 million) and that Sun Trust's initial calculations revealed that their estimate would actually be approximately 30% higher than D&P's, with a minimum fair value for CHT of in excess of $600 million.[18]  Mehta stated that SunTrust's position was complicated by the fact that Johnston had put on the record what the D&P's estimates were and the fact that this estimate did not account for the repaid loan or the ABC/ACA acquisitions.

52.    Mehta explained to Parmar that Sun Trust would rather resign than submit a report that would upset Chinh Chu, but he wanted to give Parmar the courtesy of a heads-up and to explain the true reasoning before making SunTrust's resignation public.

53.    Parmar requested that Mehta delay announcing Sun Trust's resignation so that he could speak with Chinh Chu and figure out how to deal with this development.  Mehta responded that it would be impossible for SunTrust to continue without having to disclose at least preliminary findings.  Parmar then requested Mehta to stop all meetings with the Special Committee and to give him two (2) days to discuss the matter with Chinh Chu, which Mehta agreed to do.

---

[18] Both D&P and Sun Trust reports failed to include the NYNM acquisition and the CHT Board-approved NACO acquisition, which would have significantly increased the value of CHT above their valuations.

54.    Parmar consulted with Chinh Chu, who directed Parmar to demand an immediate vote on Chinh Chu's and CC Capital's offer by the Board.  Parmar did as Chin Chu directed but, predictably, the Board members rejected the offer, reiterating their belief that accepting such a low offer would violate their fiduciary duties to CHT and its shareholders.

55.    SunTrust resigned on September 26, 2016 and, as a result, no fairness opinion was ever obtained from Sun Trust.

56.    Undeterred, Chinh Chu made several further attempts to push the deal through. First he amended the offer to the shareholders by including 7-year promissory notes for an additional $40 million, which would have effectively raised the purchase price for CHT to $315 million, although still well below the D&P valuation.  Next, Chinh Chu recommended that Parmar not pursue any other potential investors.  But, when Parmar tried to present one of Chinh Chu's new offers to the Board, they unanimously reject it and all Board members offered to resign.

57.    After Chinh Chu submitted another proposal with a slight increase of 2 cents per share, McGuire Woods informed Chinh Chu that they would not allow any more votes by the Board unless Chinh Chu agrees to give them both indemnity.  Chinh Chu then revised the CC Capital offer to include a full release and indemnity for McGuire Woods and all of the Board members.  The Board then indicated that if Chinh Chu revised the offer further to include additional compensation for the Committee members, they will accept the offer.  Chinh Chu made the suggested changes and the Board then voted to accept the offer for CC Capital to purchase CHT.

D.    **Problems in the Due Diligence Process**

58.    Simultaneous with the above described transactions, Truc To, then with KPMG was conducting due diligence on the deal.  Through their due diligence, there were several documents produced which reveal that Chinh Chu and Truc To had actual knowledge that at the time of the "go-private" transaction closing, the empty shells had no assets, revenue or employees and were part of Parmar's and CHT's forward-looking statements, projections and strategy.

59.    On July 21, 2016, Chinh Chu and the team at CC Capital and McKinsey were given a demonstration and access to PARCS, CHT's proprietary internal database management software system used to bridge different processes and accurately track all data, collections and fees.  All the data in PARCS is accurate and was available to CC Capital, Chinh Chu and Truc To throughout the due diligence process.

60.    On or about mid-August 2016, Truc To sent CHT a request for detailed collections data.  Truc To then sent another request for all data on two (2) randomly selected months, December 2015 and June 2016, to perform an in depth audit.  On August 25, 2017, Melodie Kraljev, head of operations for Orion, delivered the requested data to Truc To for the selected months.  As the Phoenix and MDRX empty shells had not yet been filled with the ACA/ABC or NYNM acquisitions, no collections data existed and none was provided with respect to them.

61.    The total collections from the spreadsheets for the two (2) selected months was $177,702,244.31 for December 2015 and $134,498,514.52 for June 2016.  As CHT's contracts with the various medical offices provided for 2-7.5% of these collections, with a companywide average of about 5%, the results in monthly revenues to CHT were $8,885,112.22 for December

2015 and $6,724,925.73 for June 2016. CC Capital, coordinating with Ted Brindamour of CHT, conducted detailed visits and meetings with CHT personnel and operations in various offices in the U.S. (primarily Houston, Texas and Hazlet, New Jersey) and India. They reviewed the Houston call center and IT infrastructure (Pegasus Data) and in India the processing for CHT's entire business. CC Capital's representatives also meet with over fifty (50) plus CHT clients chosen by CC Capital, but never requested to visit MDRX, its clients or management.

62. Once CHT provided the above complete and accurate data to Truc To and his team at KPMG, they had actual knowledge that the annual revenue of CHT was less than $100 million. While Truc To and his team at KPMG asked many follow-up questions to verify the data they received from CHT, they never asked any questions about the lack of any data from MDRX and Phoenix or the fact that the total revenue seemed unaffected by the alleged MDRX and Phoenix acquisitions; even though MDRX was the largest subsidiary of CHT and comprised of over forty (40%) percent of CHT.

63. Several other indications Truc To and Chinh Chu knew that the empty shells were indeed empty include:

      a.     CHT provided payroll records for every subsidiary except the empty shells.

      b.     CHT provided lease documents and other information on the physical offices of every subsidiary except the empty shells.[19]

      c.     CHT provided tax returns and other tax filings for every subsidiary except the empty shells.

      d.     The insurance policies provided did not cover any of the empty shells.

---

[19] This point should have been even more glaring to the highly experienced and highly paid team from KPMG, as a simple google search for the address listed for MDRX, 166 High Street, Akron Ohio does not even exist. The closest address, 166 S. High Street, is Akron's City Hall, where the Mayor's office is located.

64.     On August 5, 2016, Chinh Chu met with Walia, CEO of Orion, and Melodie

Kraljev to discuss CHT's operations and all subsidiaries.  During this meeting, Walia informed

Chinh Chu that, as CEO, he had no knowledge of Phoenix or MDRX, as these subsidiaries of

Orion had never been put under his control.

65.     Despite many requests as part of the buyer's team, Chinh Chu never permitted

Parmar to review the final KPMG report.

66.     However, in or about August 2016, a reporter at the Financial Times began asking

questions about the legitimacy of the acquisitions of Phoenix, Northstar and MDRX, the empty

shells.  Thinking that there now was no possible way for the deal to be consummated, Parmar

was again shocked to learn that Chinh Chu wasn't going to let this derail the deal.

67.     Without ever explicitly acknowledging what Chink Chu knew to be true about the

empty shells, that the empty shells were projections which included filling the empty shells with

the acquisitions of Vachette, ABC and ABA, and subsequently NYNM without additional fund

raises, and forward-looking statements, Chinh Chu directed his public relations firm to try to kill

the Financial Times story and let the deal proceed to closing.

68.     Chinh Chu told the reporters at the Financial Times that he was "comfortable"

with the "go-private" transaction, having spent $7 million and three (3) months work on due

diligence alone.  While these statements delayed Financial Times from reporting the obvious

flaws in CHT, ultimately it did not stop the public disclosure of these issues just prior to the

closing.

**E.     Sham "Go-Shop" Period**

69.     The "go-private" transaction was approved by CHT's Board on November 24,

2016, with CHT Holdco purchasing CHT at a price of $2.93 per share in cash, plus $0.43 per

share in promissory notes, for a total of approximately $309.4 million for the shares held by the

public shareholders, Parmar and the Parmar Entities, Destra and Bakshi. CHT Holdco was, and

still is, owned 50.3% by CC Capital and 49.7% by Alpha Cepheus. The transaction was financed

by a loan to CHT Holdco and Orion of up to $145 million by BofA and Merrill Lynch

("BAML"), with the remainder being paid in cash by CC Capital ($82,502,158.97) and CHT

($5,000,000.00) and Parmar and the Parmar Entities contributing shares and notes valued at

$80,164,492.93. Parmar and the Parmar Entities' portion was deducted from the proceeds of the

sale of their shares of CHT.

70.     Early in the process, the Special Committee began to express concerns over the

Fairness Opinion process and their desire to protect themselves from potential claims that they

had violated their fiduciary duty by accepting indemnification to vote on Chinh Chu's and CC

Capital's unreasonably low offer. The Special Committee wanted to add a "go-shop" period to

the "go-private" transaction, to ensure that they were getting the best offer on the market.

71.     Chinh Chu reluctantly agreed to the "go shop" provision, but immediately set

about dictating the terms to ensure that no legitimate competing bids could ever be presented or

considered. He emailed the Special Committee on July 19, 2016, saying:

> "We understand and agree with the point that you made
> regarding the Board's fiduciary responsibility. Regarding this
> point, we would be amenable to a 4 week "Go-Shop" period post
> the execution of the Purchase Agreement (terms of such Go-Shop
> to be contained in the signed transaction) -- enables the company
> to entertain other potential offers for Constellation. As you may
> appreciate, we would not be amenable to the company initiating a
> market check prior to us executing a transaction – if the Company
> pursues a market check, we will stop our work and withdraw our
> offer at that time. The rationale is that a Go Shop enables the
> Board to exercise its fiduciary duty and a market check will be
> very disruptive to the Company as the company barely has the
> bandwidth to handle our diligence."

"Deals are based on momentum and we do not want to put the deal at risk with lengthy delays.  We are incurring millions of dollars of expense as part of our due diligence process and welcome expeditious progress in reaching a conclusion to our process."

72.    After the D&P report revealed the inadequacy of Chinh Chu and CC Capital's offer, the Special Committee, advised by attorneys at Kirkland wanted to perform a market check. Chinh Chu countered with a "modified market check."  He first sent his proposal to Parmar on August 23, 2016, before refining it to send to the Special Committee on August 25, 2016.

73.    On September 6, 2016, Chinh Chu pushed for an answer to his proposed "modified market check" and attorneys from Kirkland & Ellis confirmed that it had been rejected by the Special Committee.  Attorneys from Kirkland & Ellis, as counsel to the Special Committee, objected to Chinh Chu's extraordinary demands and explained that it would not be a legitimate "go shop", as the terms desired by Chinh Chu had been set up to dissuade anyone from submitting a legitimate bid.  (This is why Kirkland & Ellis was terminated along with Duff & Phelps.)

74.    However, the provisions of the "go shop" period were set up by Chinh Chu for just that purpose; to ensure that no other buyer could outbid him.  In furtherance thereof, a breakup fee of $20 million was set, to be paid to CC Capital if CHT accepted any other offer and CC Capital was given the right to counter any competing bids.  This put CC Capital in a very protected position, as any other bidder would have to beat CC Capital by over $20 million.  For example, if another party bid $400 million, CC Capital's counter would only need to exceed $380 million.  Finally, as sought by Chinh Chu, an extraordinarily short period of 30-days was set, insufficient time for any other bidder to complete any of the due diligence research required to submit a competent bid.

75.     Even subject to the above conditions, within two (2) weeks CHT received much higher offers from two (2) credible bidders: (i) Pamplona Capital, a healthcare specialty fund with major healthcare investments, and (ii) Flexpoint Ford, a private equity fund. On December 24, 2016, CHT received an offer from Flexpoint Ford, at a total enterprise value of $365 million in cash and was prepared to bid higher.

76.     The Flexpoint Ford offer was only communicated to CHT's Special Committee, not Chinh Chu, CC Capital or Parmar, but within hours Chinh Chu sent a message to Parmar through a mutual contact, Tomer Vardi ("Vardi")[20], that Chinh Chu was aware of the offer and its terms and that he didn't think it was "too big of a concern." This was news to Parmar, as he had not heard about the Flexpoint Ford offer and he was a Board member. (Apparently Chinh Chu could get information on competing bids before Parmar could.)

77.     To prevent the Board from accepting the two (2) higher and better offers, Chinh Chu sent a letter to the Board instructing them that he interpreted Flexpoint Ford's bid as not being superior, and falsely claimed that Flexpoint Ford "does not have committed financing." (Emphasis added.) In reality, Flexpoint Ford is a six-times, far larger private equity firm than CC Capital and required no financing to close its proposed CHT deal and thus, was "not subject to a financing contingency," as the CC Capital Merger Agreement required.

78.     Chu's efforts to improperly and corruptly influence the bidding process was fruitful, as his originally accepted bid, which lacked a fairness opinion, is the one that was

---

[20] In March 2018, upon information and belief, Chinh Chu used Vardi to pass another message to Parmar; "Do not think this will end with jail, but in jail Chinese Mafia will kill Paul as [Chinh Chu] took equity investments from the Chinese Mafia".

{11609098:1}                28

ultimately closed on, notwithstanding Flexpoint Ford's substantially higher (by $100million)

bid.[21]

**F.**    **Bank of America Financing**

79.     Separately, Chinh Chu interfaced directly with BofA to obtain financing for the

transaction.  BofA sent commitment letters ("Commitment Letters"), as early as August 9, 2016

committing to provide up to $120 million in principle financing and another $15 million

revolving credit facility.  These Commitment Letters were issued before KPMG had made any

significant progress on the due diligence review and without BAML conducting any due

diligence of its own. BAML never communicated with Parmar, or any other member of CHT.

This lack of communication and due diligence by BAML is especially curious, considering that

the Commitment Letters made clear that BofA intended for CHT to be the borrower, not CC

Capital.

80.     Adding to the curiosity is that in the five (5) months following BofA's initial

commitment letter, no audit of CHT's operations was ever performed, even though it was a

requirement of the executed Credit Agreement.  Also, BofA made no effort to conduct any due

diligence on CHT, and had no communications with Parmar or anyone else at CHT.

81.     On information and belief, this extraordinary lack of inquiry, and BofA's

willingness to lend such a substantial sum of money to an entity with which they never

communicated, was because of a secret deal that Chinh Chu had negotiated with BofA regarding

the $38 million fee on the Fidelity & Guaranty Life Insurance $1.84 billion deal!

---

[21] Knowing that the D&P and Sun Trust valuations valued CHT at $500 million to $600 million, while CC Capital's proposal was $266 million, and that these valuations did not include the huge NYNM deal and the even larger upcoming NACO deal, had they known the public shareholders would almost certainly not have approved the "go-private" transaction.  But Chinh Chu knew these non-public facts.

82.     During the process, there were several versions of the Credit Agreement prepared and reviewed by BofA and CC Capital, however, Parmar and CHT were excluded from this process.  A couple of early drafts of the Credit Agreement had been emailed to Parmar, but with the caveat that these drafts were missing substantial portions of what would be added to the final Agreement.

83.     On the day before closing, Parmar was emailed a packet solely of signature pages, which, after he executed them, were individually attached to all of the documents required for closing.  One of these signature pages was for the Credit Agreement, which Parmar had never read and he was never provided with a final copy of the Credit Agreement until months after the closing.  The latest version which was provided to Parmar was annotated as "v7," whereas the executed copy was annotated "v12."  Incredibly, the copy executed by Parmar contains an additional 83 pages of Schedules that were never provided to Parmar or anyone else at CHT for review.

84.     Even more incredibly, these additional 83 pages demonstrate that Chinh Chu and CC Capital were fully aware that MDRX, Phoenix and Northstar had not been filled by Vachette, ACA/ABC or NYNM and were still empty shells.  For example, the Schedules establish that Chinh Chu and CC Capital were (i) fully aware that MDRX, Phoenix and Northstar did not have any offices, (ii) fully aware that MDRX, Phoenix and Northstar had no insurance, and (iii) MDRX, Phoenix and Northstar did not have any revenue ("change in the carrying value of the earnouts for PPP, Northstar, Phoenix & MDRX" has no value annotated).

85.     Although CHT and Orion received no financial benefit from the BofA financing, Chinh Chu somehow found a way to have BofA list Orion as the "Borrower", thus saddling CHT

with crushing debt of $145 million with no consideration, and then Chinh Chu purchased CHT/Orion's assets, valued at $500-$533 million.

**G.**    **The Last Minute Delays**

86.    On December 27, 2016, a shareholder derivative action was filed in the Delaware Chancery Court by Destra Targeted Unit Investment Trust ("Destra"), one of the pre-"go private" shareholders of CHT, alleging fraud and unlawful dilution of their interest in CHT. Ordinarily, with a lawsuit such as that being filed a month prior to the scheduled closing date, the "go-private" closing would have been adjourned and an audit and "in depth" due diligence conducted.  Upon receipt of service, Parmar went to Chinh Chu and requested that the closing be delayed so that he could try to resolve the issues with Destra, but Chinh Chu refused, no audit was conducted and the closing date remained in place.

87.    Ultimately, anticipating the "go-private" transaction's closing, the Chancery Judge presiding over the Destra litigation ordered that, in the event the "go-private" transaction closed, $56.25 million of the sale proceeds were to be placed into escrow to protect Destra's interests.  As a result of the Chancery Judge's order, Parmar again asked Chinh Chu to delay the closing for four (4) months, so that he could resolve the outstanding issues.  Chinh Chu again refused and advised Parmar that he wanted to bring in another attorney, his clean-up guy, John Altorelli, to negotiate with Destra.  But, those discussions resulted in no progress being made. However, as a result of the allegations raised in the Destra lawsuit, reporters from the Financial Times intensified their inquiries into the Chinh Chu/CC Capital and CHT transaction and the empty shells.

88.    Altorelli's inability to quickly resolve the Destra matter, along with the intensifying inquiries from the Financial Times, led Parmar to reiterate his request to Chinh Chu

to delay the closing.  However, Chinh Chu was unwilling to accept anything other than the

immediate closing of the deal, but did agree to a very short delay, so long as the closing would

go forward within the next 3-4 days.  A simple announcement was put out on January 26, 2017

that the closing was delayed because all of the conditions had not yet been met.

89.    Despite the best efforts of Chinh Chu and the public relations firms hired by CC

Capital and CHT, the Financial Times published an article on January 26, 2017, a copy of which

is annexed hereto as Exhibit "D", the same day that the delay was announced, entitled "The

Curious Case of Constellation Health and Blackstone's Former Top Deal Maker."[22]  This article

exposed the empty shells, detailing how they had been incorporated shortly before acquisition,

that press releases touted their significant revenue over time periods before they were even

incorporated, and the complete lack of any internet footprint prior to the acquisition

announcements.  However, the article also noted Chinh Chu's history with Blackstone and

closed by saying "[i]f anyone is/was in a position to kick Parmar's proverbial tyres, it was Chu.

We must assume he knows what he's doing."  In addition, a second statement cites "Mr. Chu

says he's 'comfortable' proceeding, having spent $7 million and three months on due diligence

alone.  He clearly knows what he is doing and is well aware of his new business partner's

colorful past."[23]

90.    Late that same night, Parmar received a call from Newton stating that Chinh Chu

was "freaking out" about the bad press and needs to close the deal immediately.  Parmar

responded that this was a mistake and was not fair, but Newton was immoveable.  Shortly

---

[22] Subsequently, Investors Chronicle, a British journal, also printed an article mimicking the Financial Times article and raising the same issues and questions concerning Chinh Chu and the CHT "go-private" transaction's due diligence.

[23] The article noted that "the cat's cradle of corporate entities and generalized opacity across Constellation's operations could be seen as a red flag to potential investors and financial journalists alike."  However, notwithstanding the Financial Times' article, on the day the deal was announced, CHT's Board nor CC Capital investigated the allegations concerning MDRX and its lack of assets or revenue.

thereafter, Parmar received a call from Chinh Chu, during which Chinh Chu told Parmar that he was going to give Parmar an additional $3.3 million in fees to close CHT's "go-private" transaction with Chinh Chu stating that he had figured out a way to pay Parmar to fix his problem, but the deal needed to close immediately.

**H.    The "Go-Private" Deal Closes**

91.    On January 30, 2017, over the objections of Parmar, the CHT "go private" transaction closed, resulting in Chinh Chu and CC Capital gaining a 50.7% interest in CHT and Parmar and the Parmar Entities, through Alpha Cepheus, retaining a 40.3% interest.

92.    At the closing, the final funds flow document, a copy of which is annexed hereto as Exhibit "E", revealed a very different flow of funds by Chinh Chu than was anticipated in the prior documents, and very different from what the "go-shop" bidders thought they were bidding against:

a.    The cash contributed by CC Capital was lowered from $88,687,476.20 to $82,502,160.25.[24]

b.    Of the $212,502,160.25 in cash contributed to CHT at closing by CC Capital and BofA, $14,519,935.90 was used by Chinh Chu and CC Capital for various supposed deal related fees, many of which are of questionable legitimacy.  For example:

i.    $2,555,023.91 was paid to Winston & Strawn, LLP, a law firm that provided no legal services to CHT but represented Chinh Chu and CC Capital, which amount was also several times larger than reasonable for a transaction of this size and complexity.[25]

---

[24] Upon information and belief, the $6,185,315.95 difference was pocketed by Chinh Chu, to prevent Parmar and the Parmar Entities share from going up to $70.5 million and Parmar earning the $3.3 million fee.
[25] Remarkably, Winston & Strawn filed a proof of claim in CHT Chapter 11 case for an additional $3 million but provided no legal services to CHT.

     ii.    $575,000 was paid to Altorelli, Chinh Chu's personal attorney and "clean-up guy," who has admitted on a number of occasions that he performed no services for CHT as part of the deal.

     iii.    $5,000,000 was contributed from CHT assets but was never contemplated, discussed or approved by CHT's Board.

     iv.    "Sources and Uses" stated 92.1 million shares, but CHT had only issued 89 million shares.

     v.    $350,000 was paid to Richards, Layton & Finger who had nothing to do with the "go-private" transaction or CHT but were Chinh Chu's and CC Capital's attorneys in the Destra litigation in Delaware.

     vi.    $3,098,019.50 was paid to BofA.

     vii.    $30,000 was paid to Parth Mehrota, a friend of Chinh Chu's, who was never hired by or performed services for CHT.

     viii.    $54,799.31 was paid to Finsburg, who no one can identify or explain why they were being paid.

(As a result of the above payments and others that followed, CC Capital's actual contribution was approximately $55 million.)

93.    CC Capital was able to purchase a controlling interest in CHT through CHT Holdco for ten (10%) percent of the actual value of the company because Chinh Chu and Truc To were fully aware of the irregularities in CHT's bookkeeping and value, but actively concealed their knowledge from everyone, including public shareholders, investors and the banks. Although Chinh Chu is the founder and managing director of CC Capital, he did not invest any of his own money in this "go-private" transaction, instead utilized the money from his investors

and the clients of CC Capital. Chinh Chu also saddled CHT and Orion with an enormous amount of bank debt (at the time $131 million, plus CHT's $5 million cash contribution), although CHT received no consideration for that debt or the $5 million contribution.

## I.    Chinh Chu in Charge, Parmar Out After Closing

94.    Beginning the day after the "go-private" closing, Parmar received the cold shoulder from Chinh Chu and the other members of CC Capital. Unbeknownst to Parmar at the time, Chinh Chu had already begun to grill other members of CHT's management to determine whether they were aware of any problems with CHT's books and records, or if they were aware of any fraud.[26]

---

[26] These are inquiries that Chinh Chu should have made during the due diligence phase or, at a minimum, prior to closing. However, in retrospect it is clear that Chinh Chu was fully aware prior to closing of the forward-looking transactions projected acquisitions and empty shells, but needed a pretext to pretend that he only discovered them after closing. In fact, Parmar and Chinh Chu had a conversation regarding Parmar's funding the NACO transaction and plugging the alleged revenue hole and the EBITDA. The conversation was as follows:

**Chen (sic):** "Are you proposing that you are gonna fund the national ACO deal with your equity and contribute it to the company or lend the money to the company...I don't understand that aspect.

**Paul:** Okay, so what I was offering Chen is I will buy national ACO with my own company, my own funds. I've been trying to line up funds to acquire it and I'm pretty positive I will be able to line them up and contribute it with no dilution to any of the shareholders and the other side of it is [I am] also willing to give additional collateral to the company, or to you Chen, til I plug this hole of the revenue any better.

**Chen:** And then, and Paul so, just make sure I understand cause I think I understand it...You would fund the deal with capital that you have or from your investors, you would contribute it at no cost to the company until the hole is plugged. And then the additional collateral...So is the first part of that statement correct then...additional collateral is what? Under what form? I'm not sure I understand that.

**Paul:** So the additional collateral, which includes my current equity, as well as if you need additional collateral so that you know I am very sincere in making this happen, Chen that's why I'm offering. Til you don't have to believe that National ACO deal will perform til I have plugged the revenue hole and the EBIDA hole, you can hold on to the additional collateral.

**Chen:** I see, so the additional collateral we can talk about at a later time. Paul, first of all, thank you for coming to John and thank you for clarifying some of these statements.

**Paul:** So Chen, Chen-

**Paul:** Chen, you know when incidents like this happen that there's a very low trust factor, but when the dust settles on this, I told John that I want his help to see if we can make that contract perform. And if we can make that contract perform, then that will be the best. But if we cannot in the mean time this is, I think, a solution that I'm willing to offer.

**Paul:** And I hope that because it's a lot of people's livelihood and a lot of people's personal wealth. I know Pav put in significant portions of his money, Tomer put in significant portions of his money, John and a lot of my family and those are all their entire livelihood, they have kids.

**Paul:** I'm being very sincere when I'm saying I can get NACO with my capital, and contribute it to Constellation. And another part that I offered to John was if we can strip out all the assets, including NACO, and put it into a new CO, I would be willing to hold the old CO under my personal name so none of the investors have any liability.

**Chen:** I, I-

95.     That same day, Chinh Chu informed Parmar that they needed to create a CEO search committee to identify Parmar's replacement and they needed to hire Truc To as CFO of CHT. Both of these pronouncements were shocking to Parmar, as Parmar had previously negotiated extensively with Chinh Chu about his compensation and term to remain as CEO of CHT. There was even an Employment Agreement. See, Exhibit "F". Although Chinh Chu initially sought to give Parmar a 33% pay cut, they eventually agreed that Parmar would remain as CHT's CEO, at the same compensation as when CHT was a public company.

96.     However, Chinh Chu's edict to hire Truc To as CFO of CHT was far more baffling and ominous, as Truc To, who may have performed well in his job at KPMG, was underqualified to serve as CFO of CHT. Moreover, the compensation package that Chinh Chu sought to give Truc To was greater than that given to Parmar – equal salary, but Truc To would also receive stock options.[27]

97.     In July 2017, while Parmar was traveling to Los Angeles for meetings related to the potential acquisition of NACO, Parmar received a call from Chinh Chu, demanding an immediate meeting. Parmar informed Chinh Chu that he was working on the NACO acquisition and would be back in New York in a few days. Initially, Chinh Chu was satisfied with Parmar's answer to his demand, but then Chinch Chu called back a few hours later and directed Parmar to cancel the trip and return to New York immediately for a meeting.

98.     Upon his return, Parmar met with Chinh Chu, who tersely informed Parmar that he "accepts" Parmar's resignation. Chinh Chu went on to explain to Parmar that he was going to

---

**Paul:** So those are all the parts of my proposal for the board to consider. But in the meantime, Chen, I want you to make all the decisions in the right way and I do not want to be in the way. So that's why I would like to offer my resignation from the board. The company's board, so that you are able to make effective restructuring decisions without having to either excuse me from the meeting or it being a difficult subject for me to be there."

[27] The outsized compensation package for an unqualified Truc To, who had been the head of the due diligence team from KPMG, reeked of impropriety. On information and belief, Truc To received this job as a result of an unethical, corrupt, and illegal pact between Truc To and Chinh Chu as a reward for improperly manipulating the due diligence process to fit with Chinh Chu's larger fraudulent scheme.

give Parmar a very favorable severance package, including a 3-year consulting contract with compensation of $1 million per year and that he wanted Parmar to continue to assist CHT with the projected merger and acquisitions.

99.    However, Chinh Chu did not wait for Parmar to agree to the above terms and immediately cut him off from all lines of communication with CHT.  Chinh Chu, Truc To and Altorelli then began conducting CHT Board meetings while excluding Parmar.  When Parmar inquired as to why he was being excluded, even though he had not yet resigned or been terminated, Chinh Chu responded to Parmar that he, Chinh Chu, wanted to be more involved in CHT's operations going forward.[28]

100.    During this same time-period, multiple employees of CHT contacted Parmar to inform him that they had been approached by Truc To, who informed them that CHT was aware that Parmar and Zaharis had been stealing money and faking the books and inquiring as to any information that they might have.  When Parmar asked Chinh Chu about Truc To's actions, Chinh Chu lied and claimed that this was not happening.  Parmar followed up by showing Chinh Chu text messages he had with Truc To, where Truc To not only admitted to doing the inquiries, but stated that he was only following orders from and had been given the script by Chinh Chu. Chinh Chu was visibly embarrassed by the revelation, apologized to Parmar and attempted to blame Altorelli for directing Truc To to make the inquiries.

101.    Next, Altorelli instructed Parmar to resign from the Board.  By this time, Parmar was represented by counsel and had informed Altorelli of this fact.  However, notwithstanding, Altorelli continued to communicate directly with Parmar.  Altorelli threatened Parmar that if he

---

[28] This was very odd as Parmar and the Parmar Entities held 49.3% of the shares of CHT Holdco, the 100% owner of CHT.  And while CC Capital held Alpha Cepheus' voting and governance proxy, see Exhibit "G", Alpha Cepheus was not excluded from governance of CHT as a result.

did not listen to him, Parmar would be terminated for cause. When Parmar asked what the cause was, Altorelli simply replied "you will see."

102.    At the next Board meeting, Chinh Chu announced that Parmar had resigned as CEO and that he had accepted Parmar's resignation. Altorelli, who was supposed to prepare an exit agreement for Parmar, which would detail the severance pay and consulting terms, as well as confidentiality and other restrictive terms, in accordance with Chu's promise to Parmar, never prepared any of those documents.

## J.    Attempts by Chinh Chu to Extort Parmar and Steal Complete Ownership of CIIT

103.    Instead of fullfilling the severance terms that he promised to Parmar, Chinh Chu instead shifted his focus to efforts to steal the remaining equity in CHT Holdco held by Alpha Cepheus.

104.    Chinh Chu hired Eric Edel, a former fund manager, as the new CEO for CHT. Despite his limited experience, Mr. Edel claimed that within three (3) days of joining CHT, that he had discovered what KPMG and CC Capital claimed they could not find in a year of extensive due diligence – that MDRX and Phoenix were empty shells. Mr. Edel then turned in his cell phone and ceased all communications with Chinh Chu and CHT.

105.    This revelation, genuine or manufactured, gave Chinh Chu the pretext he wanted to act on his plan for Parmar's exit based on the empty shells. In furtherance thereof, Chinh Chu sent Altorelli to Parmar's home one night at 11:30 p.m. to speak to Parmar and offer to work out a resolution. Parmar offered to resolve the issue by completing the pending acquisition of NACO, but using his personal funds. Parmar advixsed Altorelli that NACO's actual revenue exceeded the forward-looking revenue analysis attributable to the empty shells in CHT's financial model, which would result in CHT being more valuable than it would have been if the

empty shells had already been filled.  Also, Parmar again offered to let Chinh Chu and CC

Capital hold his and Alpha Cepheus' equity in CHT and CHT Holdco as collateral until Chinh

Chu and CC Capital were satisfied that the revenue matched CHT's financial model and what

they had expected.  Altorelli responded that he did not think this would be an issue and hinted

that a better solution may be for Parmar and the Parmar Entities to give Chinh Chu some of their

equity and for Parmar to "move on"!

106.    The next day, Altorelli called Parmar to meet at CC Capital's office.  Soon after

Parmar arrived and engaged with Altorelli, a CC Capital employee walked over and handed

Altorelli $20.00.  Altorelli explained to Parmar that Chinh Chu had lost his bet that Parmar

would not show up.  This meeting turned into the first of a week of proposals and threats.

107.    While many proposals were tossed around by Parmar and Chinh Chu, the bottom

line remained the same.  Chinh Chu wanted Parmar to transfer to him all of Alpha Cepheus'

interest in CHT Holdco and for Parmar to pay Chinh Chu several million dollars in addition, in

consideration for Parmar's submission of financial records for CHT which Chinh Chu stated

contained alleged misstatements with regard to the empty shells.  At one point, Parmar asked

Chinh Chu how was it possible that he, his lawyers and advisors did not know the truth about the

empty shells, considering the fact that Chinh Chu purchased CHT at a 50% discount from the

expert valuations?  In response, Chinh Chu and Altorelli rattled off more threats against Parmar,

including that they would have Parmar arrested and charged criminally if he did not submit to

their extortionate demands.

108.    During a subsequent communication, Chinh Chu became even more explicit in

connecting his financial demands of Parmar to the threat of criminal prosecution. In November

2017, following the DOJ's seizure of funds belonging to the Parmar Entities deposited in an

escrow account of Robinson Brog, Parmar's attorneys, Chinh Chu told Parmar that if he paid what was requested, Chinh Chu would have the FBI stop their investigation. It was also during this period of time that Parmar received multiple death threats from associates of Chinh Chu, which threats continue to date! *See, footnote "29".*

109.    First, Chinh Chu told Tomer Vardi, Parmar's friend, that "this thing is not going to end with Paul just going to jail but will end with his death in jail as I have taken investment money from the Chinese Mafia and they will chase him in jail." Chinh Chu made this communication for the express purpose of having the threat relayed to Parmar and to intimidate Parmar into bending to Chinh Chu's will.

110.    Two (2) weeks later, Parmar was walking through Battery Park with Zaharis when two (2) Asian men approached them and one asked Parmar what time it was. When Parmar reached into his pocket to get his phone and check the time, the other man said "Paul, you don't have a watch"? and walked on without waiting to hear what time it was![29]

---

[29] Chinh Chu has hired individuals, who pretend to be private investigators and conduct surveillance outside of Parmar's home in Colts Neck, N.J. Chinh Chu has maintained a three-car surveillance detail outside of Parmar's home. However, while normal licensed private investigators would make efforts to be discreet, Chinh Chu's men have made no such efforts. On the contrary, they are using an intimidation technique known as an "open tail," where they made it a point to ensure that Parmar, his relatives, employees and friends are fully aware that they were being watched and followed. One followed Parmar's girlfriend as she drove to another town, following her onto private property and, upon being confronted, laughed and spun his tires, throwing gravel at her.

On information and belief, these men are not licensed private investigators, possess criminal records, and are hired by Chinh Chu for the express purpose of intimidating Parmar and his family in the hopes that this will coerce Parmar into pleading guilty in criminal and civil proceeding in the U.S. District Court for the District of New Jersey and to not disclose Chinh Chu's machinations in the Bankruptcy Court. At least one of Chinh Chu's thugs has a felony record for extortion and is still on probation for that offense.

Parmar has also discovered that someone has been hacking into his home's server and has illegally downloaded a large amount of data from his system. A forensic analysis is being performed to determine what specifically was taken, but it appears that Chinh Chu may be after Parmar's privileged communications, in an effort to get advanced information about Parmar's legal strategy. These incidents have been reported to law enforcement officials.

The most recent Chinh Chu effort at witness intimidation occurred on Wednesday, October 10, 2018, in Hazlet, New Jersey as Parmar, after meeting with Timothy Parlatore, Esq., one of his New Jersey attorneys, and returning home by train, got off the train and walked across the car park to the main road to be picked up from the main road as opposed to entering the station which was crowded. Parmar noticed two (2) men following him and who called

111.    Later, Altorelli introduced Chinh Chu to his former partner at DLA Piper, Bankruptcy and Restructuring partner Tom Califano, Esq. ("Califano"). The addition of Califano to Chinh Chu's team set into motion Chinh Chu's plan to steal the remainder of CHT and defraud the public shareholders, the banks and investors through the filing and prosecution of a fraudulent bankruptcy proceeding.

**K.    Chinh Chu and CC Capital Hire FTI to Manipulate the Data**
**and Make CHT Appear Insolvent**

112.    In September 2017, FTI was engaged by CC Capital, ostensibly to conduct multiple investigative, advisory, and restructuring tasks regarding CHT. The scope of FTI's initial engagement focused on the following areas:

a.    The financial condition of CHT at the time of the "going private transaction" in January 2017, in which CC Capital, a special purpose entity acquired a controlling interest in CHT Holdco, the ownership entity of CHT ("the Merger.");

b.    The accuracy of the financial information prior to the "going-private" transaction, provided to CC Capital by CHT, Parmar, Zaharis, Chivukula, and other individuals acting on behalf of CHT and/or the sellers; and,

---

his name. A brief 2 to 3 minutes interaction followed with these two (2) unknown strangers, which Parmar described as "the most intense, intimidating interaction I have ever had in my life."

Mr. Parlatore conference called Parmar into the Hazlet PD and he spoke to the officer on duty who said he would have a detective call Parmar at home. The next day, Parmar received a call from a detective from Hazlet PD who took down the entire incident that happened at the train station. Later that night, Hazlet PD detective again called Parmar and said the Colts Neck PD and Holmdel PD will increase their frequency of driving by Parmar's and his sister's houses. In addition, Parmar's counsel filed an Emergency Application for a Preliminary Injunction against Chinh Chu and his associates to stop this pattern of illegal activity, a copy of which is annexed hereto as Exhibit "H", in the Parmar Entities RICO action against Chinh Chu and his associates, a copy of which is annexed hereto as Exhibit "I", pending in the U.S. District Court for the District of New Jersey. See also, Chinh Chu's "Declaration...In Support...[of] Opposition to Plaintiff's Motion For a Preliminary Injunction" annexed hereto as Exhibit "J" and his admissions therein.

     c.    The circumstances surrounding certain merger and acquisition transactions (involving the shells), announced by CHT prior to the Merger.

113.    On information and belief, at Chinh Chu's direction, FTI began preparing false and misleading forensic accounting reports for the purpose of both supporting false claims to be filed in the subsequent CHT bankruptcy, as well as to present a false narrative to DOJ to support Chinh Chu's effort to have Parmar arrested.

114.    Despite the above, in January 2018, Tim Dragelin ("Dragelin") FTI's manager and recent CEO of CHT, stated in a meeting words to the effect that "the company has a good cash generating engine and [he] intends to keep it humming." When talking with Parmar, Dragelin stated with respect to FTI: "We don't have any illusions that you're the best person to formulate the strategy for…[CHT], you're the best person to take this company from where it is today to the next level. We don't think Eric can do that job as well as you can. …I don't have any ability or desire…" When Parmar sought to be bought out by CHT, Dragelin further stated to Parmar "…if I bought you out Paul, I lose your genius. I absolutely lose your genius, and I need you to be involved in the business somehow…you own a massive stake in this…I want your brain, I want your value added and part of the reason I did this deal was to get your brain. If I cash you out;…I would be the stupidest guy in the world."

**L.**    **Fraudulent Chapter 11 Case**

115.    On Friday, March 16, 2018, the parties, including CHT, Destra, Parmar and the Parmar Entities and CC Capital, among others, appeared in the Chancery Court in Delaware to discuss whether the funds escrowed in accordance with the Chancery Court's order, should remain under the control of the Delaware restraining order, or if they should be released to the DOJ. Attorneys who jointly represented CHT and CC Capital argued that the funds should be

released to the DOJ, whereas DLA Piper's attorneys, representing Destra, argued that the funds should remain in Delaware and not be released to the DOJ. At approximately 3:00 pm that Friday afternoon, the Chancery Court Judge ruled that if the DOJ served a seizure warrant, the escrowed funds were to be released by the escrow agent to the DOJ without the need for further permission from the Chancery Court.

116.    Five (5) hours later, that same Friday night, Chinh Chu and CC Capital caused DLA Piper to have CHT and most of its subsidiaries to file Chapter 11 petitions, prepared days or weeks prior, in the Bankruptcy Court. A letter was prepared and then sent to the escrow agent in Delaware informing them of the filing and directing them, pursuant to the automatic stay imposed by section 362 of the Bankruptcy Code (the "automatic stay"), not to release the funds to DOJ – a 180 degree reversal of the position advanced by CC Capital and CHT just hours earlier.

117.    Perhaps the most stunning reversal was that in the afternoon of that day, attorneys from DLA Piper had appeared in the Delaware Court on behalf of Destra to oppose CC Capital and CHT's application to release the funds subject to DOJ seizure to the DOJ, while the Chapter 11 petitions filed just hours later were filed by DLA Piper on behalf of CHT. No question; DLA Piper had a conflict of interest![30]

118.    Amazingly, although CC Capital, CHT, and DLA Piper clearly knew that the Chapter 11 petitions would be filed within hours and that they would be advancing the argument that the automatic stay prevented the funds from being transferred to DOJ, not one of them informed the Chancery Court Judge of this fact. Instead, they allowed the Court to conduct a

---

[30]DLA Piper was also conflicted in the Chapter 11 case by its representation of BofA. However, the Destra conflict of interest was resolved by the retention of Hahn & Hessen as conflicts counsel.

lengthy hearing, with ten (10) different attorneys appearing, without informing anyone that whatever the Chancery Court Judge decided would be moot as a result of the Chapter 11 filing.

119.    The Chapter 11 petitions were also fraudulent in many respects:

a.    The Petitions were filed in the Eastern District of New York, which has minimal, if any jurisdiction over CHT and its subsidiaries as, with the exception of a small office of Orion, CHT operated out of New Jersey. (Altorelli explained to Parmar that this was done by DLA Piper to steer the Chapter 11 case to a person in the U.S. Trustee's Office in Central Islip who would be favorable to CIIT.)

b.    The Petitions listed Winston & Strawn, LLP as the largest unsecured creditor at $3,000,000; however, Winston & Strawn, who provided legal services to Chinh Chu and CC Capital, never provided any services to CHT, was paid a grossly inflated $2,555,023.91 from the CC Capital equity infusion at the closing of the "going-private" transaction for its representation of CC Capital, although they never submitted any invoices to CHT for legal work allegedly performed.

c.    CHT's Schedules filed with the Bankruptcy Court failed to list Parmar and several companies controlled by Parmar as creditors of CHT, who were owed $96 million, under various consulting agreements.

d.    The financial statements which were later submitted, revealed that CHT and its subsidiaries were turning a significant profit and were more than capable of paying creditors and the BofA loan payments.

120.    However, with the Chapter 11 case now in place, Chinh Chu then put into motion his elaborate plan to steal all of CHT's assets through the orchestration of two (2) bankruptcy sale auctions. Both of these auctions were set up the same way:

i.      First, Chinh Chu would put forward a straw purchaser to make an extremely low opening "stalking horse" bid and agree to act as the "stalking horse" bidder.  Although each of the "stalking horses" seemed to be independent, they are both believed to be funded and controlled by Chinh Chu through one or more entities controlled by him.

ii.      Second, at Chinh Chu's direction, DLA Piper, CHT's attorneys, established bidding procedures which were designed to protect the "stalking horse" bid and prevent or discourage any legitimate bidders from entering the auction.

iii.      Third, CHT, its counsel and advisors then ignored the numerous pre-and post-petition valuations, offers and proposals that exceeded the "stalking horse" bids.

iv.      Fourth, Chinh Chu's "stalking horse" bidders would then win the auctions unopposed, and then purchase all of CHT's assets out of the Bankruptcy Court at $29.1 million; a mere fraction of their actual value, and additionally, free of the $140 million, plus, BofA debt and other debts owed, including the $96 million debt owed to Parmar and the Parmar Entities.

**MTBC**

121.      On May 10, 2018, CHT, controlled by Chinh Chu, presented the Bankruptcy Court with proposed bidding procedures and timelines for the sale of CHT's RCM assets. CHT's attorneys informed the Bankruptcy Court that this opening bid of $10 million was based on a non-binding letter of intent that Medical Transcription Billing Corp ("MTBC") had issued on April 10, 2018.

122.    However, MTBC is a publicly traded company that over the previous five (5) years operated at a net loss every single year, with total losses of over $26 million accrued since 2014 and, upon information and belief, without Chinh Chu's or one of Chinh Chu's related entity's financing would have been unable to make a legitimate offer of $10 million for CHT's RCM assets.  In fact, approximately two (2) years prior, MTBC had attempted to raise Twenty Five Million ($25,000,000.00) Dollars through a public offering but was only able to raise Five Million ($5,000,000.00) Dollars.  However, this did not deter Chinh Chu.[31]

123.    On April 4, 2018, just six (6) days prior to issuing their non-binding letter of intent, MTBC announced a $10.5 million public offering of non-convertible preferred stock. See, Exhibit "K".  Two (2) days later, on April 6, 2018, MTBC announced that it had closed this $10.5 million public offering, see Exhibit "L", with its CEO, Stephen Snyder, stating:

> "This upsized raise puts us in an excellent position to execute the Company' growth initatives.  As of today, we have approximately $13 million of cash, an untapped $5 million line of credit with Silicon Valley Bank, as well as positive cash flow from operations."

124.    On information and belief, this MTBC public offering was orchestrated and purchased by one or a series of Chinh Chu controlled or related entities, so that he could set up MTBC as the "stalking horse" bidder.

125.    On May 17, 2018, TG Capital, LLC ("TG Capital"), an entity associated with Arvind Walia, the CEO of Orion, submitted a competing bid for $11,000,000, but MTBC countered to win the auction, buying assets that been acquired fourteen (14) months prior for $269 million and that produced $50-60 million EBITDA annually, debt free, for $12.6 million.

---

[31] Apparently Chinh Chu's motivation was centered on his acquiring the CHT assets for $29.1 million which, when added to the approximately $55 million paid into CHT from his investors, brought the total actual investment to approximately $85 million but free and clear of all claims and encumbrances which totaled $140 million with BofA debt alone.  A far more lucrative investment than the one made at the "go-private" closing.

126.    When MTBC acquired Orion's assets, its shares were trading at $3.43/share. Within three (3) months of Chinh Chu's investment, MTBC's stock price almost doubled, rising to $5.25/share.  On August 16, 2018, after MTBC released their unexpectedly high second quarter earnings, analysts began predicting that MTBC could reach $10/share by the end of the year, and exceed their projection for 2018 of $42.3 million in revenue and $3.6 million in adjusted EBITDA.  See, NASDAQ: MTBC, August 16, 2018, "Zacks Small Cap Research", annexed hereto as Exhibit "M".  (Chinh Chu's plan utilizing MTBC will likely net him several million dollars in profit at the expense of CHT's creditors and shareholders.)

**NYNM**

127.    On July 5, 2018, CHT presented the Bankruptcy Court with an Application to sell the assets of NYNM, which CHT had closed on a year earlier, the remaining assets of CHT. This time, Chinh Chu selected HealthTek Solutions, LLC ("HealthTek") as his straw purchaser "stalking horse" bidder with an initial bid of $16.5 million.  HealthTek, incorporated sixteen (16) days earlier on June 19, 2018 by TG Capital, is also a bidder associated with Arvind Walia, and with Walia as a 10% shareholder.  In its Application, CHT explained to the Bankruptcy Court that when TG Capital initially submitted a competing bid in the first auction, it was a bid for $23 million to purchase all the CHT assets, including those reserved for this second auction.  After negotiations with CHT, TG Capital bifurcated its bid to $10.5 million on the RCM auction and $16.5 million on the NYNM auction.[32]

---

[32] The value of TG Capital/Healthtek's bid is curious because as the Chapter 11 petitions were being filed on March 16, 2018, Altorelli met with Parmar and explained to him that Chinh Chu had attempted to give $26 million to another person to act as a "stalking horse" bidder/straw purchaser and make a $26 million bid on all of the CHT assets.  Unfortunately for Chinh Chu, his straw purchaser didn't follow Chinh Chu's plan and offered less than $10 million, which was rejected by CHT's counsel, DLA Piper, and by BofA, and forced CHT to proceed with the Chapter 11 case or, as Altorelli called it, "phase 2."  Altorelli told Parmar that now that the bankruptcy has been filed, they were in "phase 2," where "the whole thing can officially go for less than $30 million now."

128.    On information and belief, TG Capital/HealthTek's bids were also orchestrated and funded by Chinh Chu.

129.    As there were no competing bidders, HealthTek purchased CHT's NYNM assets for $16.5 million.  These were new assets, as CHT had purchased them in February 2017 for $60-95 million to be paid over three (3) years, depending on revenue.  These assets were acquired by CHT immediately after the going private transaction had closed and Chinh Chu was running CHT.

## M.    Both of the Bankruptcy Sales and the Filings Were Fraudulent as CIIT had Pre-petition Offers that Would Have Satisfied All Creditors

130.    At the time CC Capital, Chinh Chu and CHT advanced MTBC as the "highest and best offer" for the RCM assets, and HealthTek as the "highest and best offer" for the NYNM assets, they had one current offer in hand, which offer had been made months before the filing of the Chapter 11 and which was re-offered to them on several occasions; once in this Bankruptcy Court.  This offer, by GSS Infotech Ltd. ("GSS"), a copy of which is annexed hereto as Exhibit "N", was to purchase all of the assets of CHT, Orion and its twenty (20) subsidiaries for $245.5 million, plus the assumption of Orion's liabilities under a Chapter 11 Plan of Reorganization.  GSS' offer was backed by commitment letters from three (3) international known funding sources.  However, notwithstanding the fact that CHT had additional purchase offers on the table, since before the filing, which would have satisfied all secured claims[33], CC Capital, Chinh Chu, CHT and its Bankruptcy Court-appointed advisors and counsel, fraudulently misrepresented to the Bankruptcy Court that MTBC's and HealthTek's bids were the "highest and best offer in terms of value for the estates."

---

[33] Flexpoint Ford, Pamplona, GSS and even Parmar made offers to acquire the CHT assets for in excess of $100 million.  (Flexpoint Ford's $365 million offer is annexed hereto as Exhibit "O".)

131.    Neither GSS, nor its three (3) funding sources were owned or controlled by Parmar, but they did have limited relationships with Parmar,[34] to the extent that it was Parmar who arranged for this superior bid, in an attempt to ensure that CHT's creditors, including BofA, and public shareholders were made whole and that CHT would not be destroyed, as Cinh Chu planned to do.

132.    In fact, prior to the filing of the Chapter 11 case, DLA Piper had asked GSS if they were interested in acting as the "stalking horse" bidder for CHT's assets when the sale came to auction. GSS quickly responded in the affirmative that they would. DLA Piper ceased communicating with GSS.

133.    On information and belief, DLA Piper and CHT's financial consultant, Houlihan Lokey,[35] were directed by Chinh Chu to cease communications with GSS, because, while DLA Piper was attempting to get the highest sale price for CHT's assets, Chinh Chu wanted to sell CHT to the lowest bidder that he could control. GSS's bid represented a devastating threat to Chinh Chu's corrupt design.

134.    Chinh Chu, CC Capital and CHT intentionally structured the Chapter 11 sales for separate assets and into smaller tranches so that they could ignore GSS's bid, which like TG Capital's, was for the entirety.

135.    As a result of these two (2) sales to Chinh Chu's straw purchasers, the entirety of CHT's assets have been sold for $29.1 million. The costs thus far of the Chapter 11 case for legal fees, FTI, CBIZ, Houlihan Lokey and other Administrative expenses, including a BofA

---

[34] CHT/Orion is indebted to GSS for approximately $3.5 million for services GSS rendered. GSS has sought to collect their debt from Parmar personally.
[35] Houlihan Lokey is seeking approval for compensation for its services rendered on the MTBC and NYNM bankruptcy sales of approximately $2.5 million; equal to 8% of the $29.1 million realized!

DIP Loan, leaves nothing to repay creditors, [36] whereas the GSS offer would have resulted in

100% payment to all of the creditors on their claims, while also significantly reducing the

Administrative expenses.

## THE APPOINTMENT OF A TRUSTEE OR EXAMINER

136.    Sections 1104(a), (c) and (e) and 1106(a)(3), (4) and (b) of the Bankruptcy Code

provides as follows:

### §1104. Appointment of trustee or examiner

(a)  At any time after the commencement of the case but
before confirmation of a plan, on request of a party in
interest or the United States trustee, and after notice and a
hearing, the court shall order the appointment of a trustee-
(1)  for cause, including fraud, dishonesty,
incompetence or gross mismanagement of the affairs of the
debtor by current management, either before or after the
commencement of the case, or similar cause, but not
including the number of holders of securities of the debtor
or the amount of assets or liabilities of the debtor; or
(2)  if such appointment is in the interests of creditors,
any equity security holders, and other interests of the estate,
without regard to the number of holders of securities of the
debtor or the amount of assets or liabilities of the debtor.
     *          *          *
(c)  If the court does not order the appointment of a
trustee under this section, then at any time before the
confirmation of a plan, on request of a party in interest or
the United States trustee, and after notice and a hearing, the
court shall order the appointment of an examiner to conduct
such an investigation of the debtor as is appropriate,
including an investigation of any allegations of fraud,
dishonesty, incompetence, misconduct, mismanagement, or
irregularity in the management of the affairs of the debtor
of or by current or former management, of the affairs of the
debtor of or by current or former management of the
debtors, if-

---

[36] Unless CHT succeeds in its adversary cases against certain creditors, including Robinson Brog, Parmar and the
Parmar Entities and/or works out an agreement with DOJ for part or all of the funds seized by DOJ, unsecured
creditors and shareholders will receive nothing and their claims will be discharged!

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

(e) The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting.

## 1106. Duties of trustee and examiner

(a) A trustee shall-

    \*                \*                \*

(3) except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(4) as soon as practicable-

(A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and

(B) transmit a copy or a summary of any such statement to any creditors' committee or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates;

    \*                \*                \*

(b) An examiner appointed under section 1104(d) of this title shall perform the duties specified in paragraphs (3) and (4) of the subsection (a) of this section, and except to the extent that the court orders otherwise, any other duties of the trustee that the court orders the debtor in possession not to perform.

    \*                \*                \*

137.    Section 1104 provides for the appointment of an Examiner by the Bankruptcy Court at "any time after the commencement of the case if a party in interest so requests" and "where the current management of the debtor has been fraudulent or dishonest, or has grossly mismanaged the company…. . A Trustee would not necessarily be needed…because an examiner appointed under this section might well be able to serve that function adequately without displacing the current management." See, House Report (Reform Act of 1978).

A.    **This Application**

138.    In the instant Chapter 11 case, current management of the Debtors, both pre- and post-petition, under the direction and control of Chinh Chu have managed the Debtors' businesses in a "fraudulent" and "dishonest" manner solely for the benefit of Chinh Chu and CC Capital.

139.    By this Application, Parmar and the Parmar Entities request that this Bankruptcy Court appoint either a Trustee or, preferably an Examiner, to conduct an investigation in accordance with and within the scope of such an investigation which under sections 1104 and 1106 authorizes the Bankruptcy Court to so order. This request by Parmar and the Parmar Entities is limited to those actions and activities of Chinh Chu and his agents, CC Capital, CHT Holdco, CHT and its pre-petition Board and Independent and Special Committees and pre- and post-petition management, inclusive of its Bankruptcy Court appointed advisors, solely on matters related to this Chapter 11 case and the actions preceding the filing and those actions taken by the aforementioned parties following the filing, but each evidencing the "fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the affairs of the debtor" controlled by Chinh Chu and those parties. It is the manipulation of the Bankruptcy process as a tool to achieve the abovementioned and aforesaid goals, all of which undermines

and calls into question the integrity of this Bankruptcy Court, which must be uncovered, disclosed and sanctioned by this Bankruptcy Court.  The basis for this request are as follows:

1.    The "Go-Private" Transaction – This transaction evidences Chinh Chu's and CC Capital entry into CHT's and Orion's operations.  A review of Chinh Chu's and CC Capital's inducements to the members of CHT's Board members, Independent and Special Committee members and Parmar should be investigated which, if done, will reveal CHT's loss of approximately $250 million of value attributed to its operations by well respected entities such as D&P, Sun Trust, Kirkland & Ellis and McGuire Woods and, additionally the offers of Pamplona, Flexpoint Ford, GSS Infotech and others based upon similar valuations of CHT's value, due to Chinh Chu's actions, which if confirmed would provide CHT and its Chapter 11 estate with a cause of action for the effects of and the losses its estate suffered attributable to Chinh Chu's and CC Capital's activities. These activities include the bribery of CHT Board Members Mark Feuer, John Johnston and others by Chinh Chu to accomplish the closing of the "go-private" transaction to the detriment of the CHT estate, creditors and shareholders.

2.    CC Capital's and BofA's Collaborations – The collaboration of these entities in the "go-private" transaction should be investigated to determine the extent to which Chinh Chu, CC Capital and BofA were aware or should have been aware of the "financial model" forward-looking plan process employed by CHT to create shells and fill them with subsequent acquisitions typical of forward-looking transactions and plans. Also, to the extent CC Capital and BofA, with knowledge or lack of such, due to their failure to conduct due diligence as is conducted in the normal course of business or transactions similar to CHT's "go-private" transaction, were active participants in Chinh

Chu's plan to steal CHT's assets and, therefore, their actions or non-action place them in the category of collaborators as opposed to victims or claimants. Such a finding and report by an Examiner to the Bankruptcy Court could result in the dismissal or subordination of the claims of these entities to all other claims of whatever nature in this Chapter 11 case.

3.    Breach of Fiduciary Duties by Pre- and Post-Petition CHT Board Members – Clearly an Examiner should review the actions taken by CHT's pre- and post-petition Board Members, whether on the Independent or Special Committees, with regard to approving an offer to purchase CHT in the "go-private" transaction for a price that was not only 50% of the valuation provided by D&P but substantially less than the other offers to purchase CHT's assets. Were these Board Members acting on behalf of CHT or on behalf of Chin Chu and CC Capital? And, if so, what damage did their actions do to CHT's Chapter 11 estate? Should they compensate the CHT estate, creditors and shareholders for the losses they sustained as a result of the Board Members providing Chinh Chu and CC Capital with the opportunity to manipulate the Chapter 11 process to steal CHT's assets, free of all claims and encumbrances, and walk away with $500 million of value for a paltry $29.1 million in comparison.

4.    FTI's and Houlihan Lokey's Contributions to Chinh Chu's Fraudulent Plans – The issue of whether FTI conducted a true investigation, accurate evaluations and gave accurate advice to CHT both pre- and post-petition is also an issue which requires investigation. Did FTI's reports on CHT's financial condition reflect CHT's operations or were those reports crafted to satisfy Chinh Chu's demands? Also with respect to Houlihan Lokey, just what did they do to solicit bidders for the two (2) sales of CHT's

assets? And, why were the previous bidders in amounts ten (10) or more times the MTBC and HealthTek bids ignored? This applies with specifity to the proposals of GSS Infotech and Flexpoint Ford! Was Houlihan Lokey actually soliciting offers or just appearing to satisfy the Bankruptcy Code while actually acting as one of Chinh Chu's minions?

     5.    <u>Fraudulent Bankruptcy Sales</u> – Prior to commencement of this Chapter 11 case numerous valuations and proposals to acquire CHT's assets were made. Reputable financial advisors and attorneys, corporate entities engaged in the same line of work as CHT and CHT's former Chairman of the Board and President, all with knowledge of CHT's operations and forward-looking projections either valued or made offers to acquire CHT's assets based on a valuation range of $245.5 million to $700 million. However, notwithstanding the initial acquisition of 50% of CHT, the owner of those assets, by Chinh Chu and CC Capital for $269 million and the subsequent addition of NYNM, the two (2) auctions conducted by CHT's bankruptcy counsel and advisors realized a relative paltry $29.1 million! Barely enough to cover CHT's Administrative expenses in its Chapter 11 case. Why?

        While a number of things can be said about Chinh Chu, as stated above, one thing is without argument. Chinh Chu is an astute deal maker. There is no way that Chinh Chu would have agreed to a "go-private" purchase price requiring his investors to pony-up $88 million and his bank, BofA, to loan his acquisition entities, CC Capital, and CHT, $140 million, if CHT's value was one-tenth of those two (2) combined contributions. CHT had revenues, EBITDA and projected income that supported the aforesaid and above valuations; all reviewed by Chinh Chu over two (2) years of

operation. Also, in the year prior to CHT's Chapter 11 filing there were a number of

entities who expressed an interest in acquiring CHT in addition to Chinh Chu. So how

did the two (2) Bankruptcy Court auction sales come to realize such a small comparative

amount? An Examiner needs to be appointed to investigate this!

Issues such as did Chinh Chu's control through pay-offs and other means

of CHT's management, advisors and BofA play a roll? Were the DLA Piper, FTI, BofA

and other conflicts of interest pertinent to the quirks occurring during the course of the

Bankruptcy sales? Did Chinh Chu actually hatch a plan to utilize the Bankruptcy Court

to acquire CHT's assets free and clear of all debts, claims and encumbrances for the same

$88 million his investors contributed as equity but obtaining these assets without

liabilities for approximately 10% of what he had paid for them without NYNM a year

earlier? Why was BofA content to rely on CHT's and DOJ's ability to seize assets from

Parmar and Robinson Brog and the clawback of the monies paid to the public

shareholders as the basis for repayment of their loan to CHT? Why has everyone

involved focused on Parmar as the architect of the fraud here when Parmar had no control

over the Board, the Committees, the "go-private" transaction or the two (2) Bankruptcy

auctions? Quite frankly, it's rather foolhardy to believe that Parmar was other than

another individual or entity duped by Chinh Chu. Any acts or activity which defrauded

CHT, also defrauded Parmar more than any one or any other entity.

6.    The Chapter 11 Plan – The anticipated results of this Chapter 11 case are:

(i)    Administrative and priority creditors will be paid in full;

(ii)    Secured Creditors (BofA) will be paid in full from the

Parmar funds seized from the Robinson Brog escrow, the Robinson Brog

adversary proceeding commenced by CHT to collect alleged damages from Robinson Brog's malpractice carrier and certain of its principals and the surplus from any sale of the four (4) Parmar real properties valued at $40-$60 million;

      (iii)    Unsecured creditors realize nothing on their claims; and,

      (iv)    CHT's shareholders, except for CC Capital, receive nothing.

140.    The winners: Chinh Chu, who ends up as the owner of CHT's assets with a $440 million savings, and BofA who is repaid in full for both its Debtor-in-Possession financing and pre-petition "go-private" transaction loan, with the interest accrued, $3 million in fees for the loan and $38 million in fees/commissions from the Fidelity & Guaranty Life Insurance deal.

141.    The losers; everyone else!  Especially the public shareholders on the London AIM and Parmar and the Parmar Entities.

## REUQEST FOR RELIEF

142.    Based on the above, Parmar and the Parmar Entities request that this Bankruptcy Court appoint an Examiner to investigate/examine the actions of the above-referenced individuals, entities, transactions and their effects on their Chapter 11 case in accordance with the applicable provisions of sections 1104 and 1106 of the Bankruptcy Code and solely with respect to the above-captioned Chapter 11 case in this Bankruptcy Court.  It should be noted that any claims of involvement on the part of CC Capital, Chinh Chu and Parmar in the above cited activities are also the subject of the following actions in the U.S. District Court for the District of New Jersey:

      a.    Criminal case against Parmar for alleged fraudulent acts;

      b.    Forfeiture case against real properties owned by Parmar or individuals and entities controlled by Parmar;

c.      Civil case against Parmar commenced by the U.S. Securities & Exchange

Commission for securities fraud; and,

d.      Civil case commenced by Parmar against Chinh Chu and his agents for

operating CC Capital as related to the "go-private" transaction and this Chapter 11 case

as a Racketeering Influenced Corrupt Organization (RICO).

143.    This Application does not seek to have an Examiner, if one is appointed by this

Bankruptcy Court, to conduct the requested investigation into areas covered by the above

proceedings except and to the extent that any such matter has had an adverse effect on the

integrity and process of this Chapter 11 case in this Bankruptcy Court.

**WHEREFORE**, Parmjit Singh (Paul) Parmar and the entities owned and/or managed by

Parmar respectfully request that this Bankruptcy Court, in accordance with Sections 1104(a), (c)

and (e) and 1106 (a), (3), (4) and (6) of the United States Bankruptcy Code, 11 U.S.C. §§1104(a)

(c) and (e)  and 1106(a) (3), (4) and (b), (i) appoint an Examiner "for cause", to conduct an

**INTENTIONALLY LEFT BLANK**

investigation of the above-captioned Debtors as set forth above; and (ii) such other and further

relief as to this Bankruptcy Court is deemed necessary, for all of which no previous application

has been made.

Dated:  New York, New York
        October 31, 2018

                         Respectfully submitted,

                         **WINDELS MARX LANE & MITTENDORF, LLP**

                         By:    /s/ Charles E. Simpson
                                  Charles E. Simpson, Esq.
                                  Jeffrey C. Hoffman, Esq.
                                  Members of the Firm

                         156 West 56th Street
                         New York, New York 10019
                         Tel: (212) 237-1000
                         Email: csimpson@windelsmarx.com
                                     jhoffman@windelsmarx.com

                         *Attorneys for Parmjit (Paul) Singh Parmar and*
                         *the Parmar Entities*