Michael D. Hynes, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
Email:  michael.hynes@us.dlapiper.com

Rachel Nanes, Esq. (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8500
Facsimile:  (305) 423-8501
Email:  rachel.nanes@us.dlapiper.com

*Counsel to the Liquidating Trustee*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No. 18-74545 (AST) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------------ x

HOWARD M. EHRENBERG,                                  :   Adv. Pro. No. _____
LIQUIDATING TRUSTEE OF THE ORION LIQUIDATING TRUST,   :
                                                      :
                         Plaintiff,                   :
        v.                                            :
                                                      :
KRISS & FEUERSTEIN LLP,                               :
                                                      :
                         Defendant.                   :
------------------------------------------------------------------------ x

## COMPLAINT

Howard M. Ehrenberg, the duly appointed liquidating trustee of the Orion Liquidating Trust (the "Liquidating Trustee"), by and through his undersigned counsel, DLA Piper LLP (US), alleges for his complaint against Kriss & Feuerstein LLP ("K&F" or "Defendant"), as follows:

## NATURE OF ACTION

1.      This is an action for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, aiding and abetting conversion and unjust enrichment against the Defendant related to the diversion of over $31 million of the Debtors'[1] funds for Former Management's personal luxury real estate transactions.

2.      As detailed in prior pleadings in the Debtors' chapter 11 cases, the Debtors are the victims of a fraudulent scheme (the "Scheme") perpetrated by their former management team, Parmjit "Paul" Parmar ("Parmar"), Sotirios "Sam" Zaharis ("Zaharis") and Ravi Chivukula ("Chivukula," and together with Parmar and Zaharis, "Former Management").

3.      The Scheme proceeded in three stages:  (i) first, Former Management created phantom companies using fabricated or plagiarized financial statements, diligence reports, websites, invoices, and customer lists; (ii) second, pretending that these entities were real, Former Management raised millions of dollars in secondary stock offerings for the purpose of "acquiring"

---

[1]      "Debtors" shall refer collectively to the entities listed in the above case caption.

them; and (iii) third, Former Management used their ill-gotten gains to, among other things, purchase, in cash, high-end residential real estate properties for their personal benefit.

4.       Defendant was instrumental in the third part of the Scheme.  In particular, between approximately January 2016 and August 2017, Defendant facilitated Former Management's diversion of millions of dollars of ill-gotten funds for the following personal luxury real estate transactions (collectively, the "Real Estate Transactions"):

      a.       The $3,800,000 purchase of (i) that certain Adjustable Rate Note dated as of January 25, 2008 (the "Note") made by Parmar and payable to a banking institution (the "Bank") in the original principal amount of $23,700,000 and (ii) that certain Mortgage dated as of January 25, 2008 (the "Mortgage") given by Parmar in favor of the Bank encumbering the real property owned by Parmar located at 18 and 19 Colts Gait Lane, Colts Neck, New Jersey (the "Colts Neck Property") as well as the related action to foreclose on the Note and Mortgage (the "Colts Neck Transaction");

      b.       The purchase of certain real property located at 50 Riverside Boulevard, Unit 21B, New York, New York (the "50 Riverside Condo") for $14,800,000 (the "50 Riverside Transaction"); and

      c.       The purchase of certain real property located at 40 Broad Street, Unit 20FG, New York, New York (the "40 Broad Street Condo") for $1,623,600 (the "40 Broad Street Transaction").

5.       Each of the Real Estate Transactions was named in a civil forfeiture action brought by the United States Attorney for the District of New Jersey on May 16, 2018, captioned *U.S. v. The Real Properties Known as 50 Riverside Boulevard, Unit 21B, New York, New York; 2 River*

*Terrace, Unit 12J, New York, New York; 40 Broad Street, Unit 20FG, New York, New York; and 18 and 19 Colts Gait Lane, Colts Neck, New Jersey*, D. N.J. No. 18-cv-09293 (the "Forfeiture Complaint").  The Forfeiture Complaint describes Former Management's fraudulent use of the Debtors' assets in connection with the Real Estate Transactions.  The Forfeiture Complaint also describes the material contributions by Defendant, which is referred to therein as "Law Firm 2", with respect to the Real Estate Transactions.

6.     The fraudulent Real Estate Transactions at issue here would not have occurred without Defendant's substantial and knowing involvement.  Enough information was available to Defendant for it to realize that Parmar and Zaharis were the Debtors' executives, that these Real Estate Transactions were for the personal benefit of Parmar and his associates, and that the transactions were being funded (and Defendant was being paid) by the Debtors.  Defendant either knew this to be true or, if it did not, it should have undertaken the minimal investigation necessary to learn this information.  Any diligent attorney would have done so when confronted with the myriad red flags in these transactions.

7.     In connection with the fraudulent Real Estate Transactions, a total of at least $31 million was routed through Defendant's IOLA account from the Debtors, certain Parmar-affiliated entities and Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("Robinson Brog"), outside counsel to the Debtors and Former Management.

8.     Defendant's knowing and substantial involvement in the fraudulent Real Estate Transactions constitutes aiding and abetting Former Management's fraud, breach of fiduciary duty, and conversion of the Debtors' assets.  Additionally, Defendant's receipt of payment for services rendered in connection with the Real Estate Transactions constitutes unjust enrichment.

9.      As a result of the harm caused to the Debtors by Former Managements' Scheme and the Defendant's assistance in its execution, the Debtors defaulted on their obligations to creditors, and, on March 16, 2018 and July 5, 2018, respectively, the Debtors commenced chapter 11 cases (collectively, the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

10.      Defendant's actions caused extensive and long-lasting economic harm to the Debtors and all of their stakeholders, including creditors, institutional lenders, and former shareholders.

11.      Consequently, the Liquidating Trustee seeks damages to compensate the Debtors' estates for the losses proximately caused by the actions and omissions of the Defendant, including damages related to the diversion of the ill-gotten money for Former Management's personal luxury real estate purchases and for payment of Defendant's legal fees.

## THE PARTIES

12.      Plaintiff is the duly appointed Liquidating Trustee of the Orion Liquidating Trust formed pursuant to the *Debtors' Third Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 645] (as further modified, amended and/or supplemented from time to time, the "Plan")[2] and that certain Liquidating Trust Agreement by and among the Liquidating Trustee and the Debtors.

13.      Pursuant to the Plan, the Orion Liquidating Trust was established to, among other things, prosecute all of the Debtors' Causes of Actions and the Assigned Causes of Action. Accordingly, the Liquidating Trustee has standing and authority to bring the instant claims on

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

behalf of the Orion Liquidating Trust.  The Orion Liquidating Trust is the successor in interest to the Debtors.

14.     Defendant K&F is a law firm and limited liability partnership organized and existing under the laws of the State of New York with its principal place of business in New York County.

15.     Jerold C. Feuerstein ("Feuerstein") is a lawyer licensed to practice in the State of New York and a named partner of K&F.  Mr. Feuerstein's legal practice relates to commercial lending (including real estate, construction and business lending) and other bank and lender related matters, including mortgage foreclosures, workouts and bankruptcies.

## JURISDICTION AND VENUE

16.     On March 16, 2018, certain of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York (the "Court").

17.     On July 5, 2018, New York Network Management, L.L.C., one of the Debtors, filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

18.     The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 because the action arises under, arises in, and/or relates to the Debtors' Chapter 11 Cases.

19.     This adversary proceeding is a core proceeding to which the Court may enter a final judgment under 28 U.S.C. §§ 157(b)(2)(A) and (B).

20.     In the alternative, this adversary proceeding is a non-core proceeding under 28 U.S.C § 157(c)(1) that is related to the Debtors' Chapter 11 Cases.

21.     This Court has personal jurisdiction over the Defendant.  The Defendant has substantial business interests and transacts business within this District.

22.     Venue of this adversary proceeding in this Court is proper pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND

### A.  The Debtors' Corporate History

23.     In 1984, the Debtor entity that is currently named Orion HealthCorp, Inc. ("Orion") was incorporated in Delaware under the name Technical Coatings Incorporated.  On September 10, 1984, its name was changed to Technical Coatings, Inc.  On July 11, 1999, its name was changed to Surgicare, Inc. and, in 1999, it was registered for trading on U.S. exchanges.

24.     In 2004, Surgicare Inc.'s name was changed to "Orion HealthCorp, Inc." and it subsequently acquired Integrated Physician Solutions, LLC ("IPS") and Medical Billing Services, Inc. ("MBS").  In 2006, Orion acquired Rand Medical Billing, Inc. ("Rand").  In 2007, Orion delisted from NASDAQ.  In 2008, Orion acquired RMI Physicians Services Corp. ("RMI") and Western Skies Practice Management, Inc. ("Western Skies").

25.     In April 2013, Constellation Healthcare, LLC ("CHLLC"), a non-debtor, was formed as an investment vehicle by Parmar and Southport Lane Asset Management, LLC specifically for the purpose of acquiring Orion and its operating subsidiaries and to pursue an acquisition strategy in the revenue cycle management market.

26.     On June 17, 2013, CHLLC acquired all of the issued share capital of Orion.  As of that date, Orion was the parent of IPS, MBS, Rand, RMI, and Western Skies.

27.     On March 31, 2014, NEMS Acquisition LLC ("NEMS Acquisition"), whose sole member is Orion, acquired North East Medical Solutions LLC ("NEMSLLC") and NEMS West Virginia, LLC ("NEMSWV" and together with NEMSLLC, "NEMS").

28.     In June 2014, investment entities managed by Parmar acquired all of the ownership interests of CHLLC.

29.     On September 3, 2014, Constellation Healthcare Technologies, Inc. ("CHT"), a Debtor and the direct or indirect parent of all of the remaining Debtors, was formed to become the holding company for Orion and its subsidiaries.

30.     Parmar was the Chief Executive Officer of CHT, Zaharis the Chief Financial Officer, and Chivukula the Controller.   Parmar, Zaharis, and Chivukula each served on CHT's board of directors.

31.     By virtue of their positions at CHT, Parmar, Zaharis, and Chivukula each owed CHT a fiduciary duty.

32.      Former Management formed CHT for the purpose of a public listing on the London Stock Exchange's Alternative Investments Market ("AIM").   According to the Application for Admission to AIM, which, based upon information and belief, was filed in connection with CHT's listing on the AIM, CHT was to acquire all of the issued share capital of Orion immediately prior to CHT's admission to trading on the AIM.   Immediately after its admission to trading on the AIM, CHLLC was to become the controlling shareholder of CHT, holding approximately 68.1 percent of the voting rights of CHT.

33.     On December 8, 2014, CHT was admitted to trading on AIM on the London Stock Exchange (the "Going Public Transaction").   At the time of the Going Public Transaction, CHT was the immediate holding company of Orion, which was in turn the direct or indirect parent company of eight (8) subsidiaries that formed the enterprise at the time, including IPS, MBS, Rand, RMI, Western Skies, NEMS Acquisition, NEMSLLC, and NEMSWV.

**B. Overview of the Fraudulently Generated Capital Used In The Fraudulent Real Estate Transactions**

34.     The first steps in Former Management's Scheme were to (1) use fraudulent documents to create the public impression that CHT, and various companies which were purportedly acquisition targets of CHT, were significantly more valuable than they were, and (2) use that public impression to raise funds through secondary offerings on AIM.

35.     As discussed in greater detail in the *Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions* filed in the Chapter 11 Cases [ECF No. 2], Former Management's fraudulent acquisitions included:

a.      CHT's September 16, 2015 acquisition of NorthStar First Health, LLC for a total of $11,520,000;

b.      CHT's purported December 7, 2015 stock purchase of MDRX Medical Billing ("MDRX") for $28,000,000 and the March 31, 2016 acquisition by MDRX of Apex Healthcare Systems for $31,800,000;

c.      CHT's purported September 14, 2015 purchase of assets from Sage Group Consulting by Phoenix Health, LLC, a subsidiary of Orion, for approximately $10,500,000;

d.      CHT's September 1, 2016 purchase of Vega Medical Professionals LLC for $24,000,000; and

e.      The January 30, 2017 transactions whereby a combination of $88.6 million in cash from a private investor, $130 million in syndicated debt arranged by a national bank, and approximately $40 million in unsecured promissory notes issued by CHT were used to purchase the outstanding stock of CHT

and convert it into a private company valued at $309.4 million (the "<u>Go-Private Transaction</u>").

36.    Using falsified documents, Former Management was able to raise millions of dollars through secondary equity offerings on AIM for CHT, based on their false assurances that the money was going to be used to acquire legitimate businesses.  In reality, a number of those entities either did not exist or had only a fraction of the operating income attributed to them.

37.    Former Management caused CHT to raise approximately $50 million through two secondary equity offerings: specifically, in June 2015, CHT raised approximately $15.8 million in a secondary stock offering on AIM (the "<u>2015 Secondary Offering</u>"), and in or around January 2016, CHT raised approximately $36 million in another secondary stock offering on AIM (the "<u>2016 Secondary Offering</u>," and together with the 2015 Secondary Offering, the "<u>Secondary Offerings</u>").

**C.  Former Management's Creation of Bank Accounts to Hold the Fraudulently Generated Capital**

38.    Based upon information and belief, Former Management opened several bank accounts with M&T Bank in order to syphon off the funds generated through certain of the sham acquisitions identified above:

    a.  An account at ending in 5647 in the name of CHT ("<u>M&T Account 5647</u>");

    b.  An account at ending in 8132 in the name of CHT ("<u>M&T Account 8132</u>");

    c.  An account ending in 1472 in the name of Ranga Bhoomi LLC (the "<u>Ranga Bhoomi Account</u>"); and

    d.  An account ending in 1456 in the name of Aquila Alpha LLC.

**D. Former Management's Diversion of Funds to the Real Estate Transactions.**

39.    With the help of Defendant, Former Management used the funds generated through their sham acquisitions to close on the Real Estate Transactions, each described further below:

**a.    The Colts Neck Transaction**

40.    Parmar acquired the Colts Neck Property in the early 2000s.  He then took out several mortgages on the Property, including the $23,700,000 Mortgage.

41.    On or about May 6, 2010, the Bank filed a Notice of Lis Pendens for foreclosure of the Mortgage, and in late 2015 and 2016 entered into negotiations with Parmar regarding a potential short sale of the Colts Neck Property.

42.    In early 2016, Parmar concocted a plan through which he would be relieved of his obligations under the Note and Mortgage by: (i) using an entity he formed to purchase the Note and Mortgage from the Bank at a steep discount using funds derived from the sham transactions above, and then (ii) foreclosing on the Colts Neck Property, thereby ensuring that he or his associates would maintain control over the Colts Neck Property.

43.    In furtherance of this plan, Robinson Brog incorporated Aquila Alpha LLC ("Aquila Alpha") at Parmar's request.  At about the time when Aquila Alpha was incorporated, Parmar requested that an account be opened in the name of Aquila Alpha at M&T Bank. According to Parmar, the account operators would be Zaharis and "Tomer Vardi."  Parmar indicated that the bank account, was "to be used by me to acquire assets."

44.    Based upon information and belief, the members of Aquila Alpha were a trust controlled by Parmar or one of his relatives, and "Tomer Vardi."

45.    For the plan to work, Parmar needed a law firm to represent Aquila Alpha in connection with the purchase of the Note and Mortgage from the Bank and subsequent foreclosure on the Mortgage encumbering the Colts Neck Property to create the illusion that Aquila Alpha was

an independent entity acting in an arms'-length transaction.  Robinson Brog recommended K&F as counsel for Aquila Alpha.

46.     Based upon information and belief, Mitchell Greene, a partner at Robinson Brog, approached Feuerstein to refer Aquila Alpha to K&F as a potential client that was purportedly interested in purchasing the Note and Mortgage from the Bank and then initiating foreclosure proceedings.  Tomer Vardi was introduced to K&F as the point of contact for Aquila Alpha.

47.     K&F agreed to represent Aquila Alpha in connection with the purchase of the Note and Mortgage from the Bank.  Based upon information and belief, K&F undertook no due diligence on Aquila Alpha, its members, or Tomer Vardi.

48.     After K&F was retained, it received $6,000 from CHT.  This payment consisted of a flat $5,000 retainer charged by K&F for residential transactions, and $1,000 for the deposit in connection with the agreement to purchase the Mortgage.

49.     Had K&F taken this opportunity to conduct a quick internet search for CHT, it would have learned (if it did not already know) that Parmar, the mortgagor of the Mortgage, was CHT's CEO.  This information should have raised at least two red flags.  First, it indicated that Parmar was on both sides of the Colts Neck Transaction.  Second, it indicated that Parmar was using the Debtors' funds for what was clearly a personal transaction—the effective cancellation of the Note and Mortgage on his personal residence.

50.     But K&F did not undertake such a search, or otherwise question in any way why K&F was being paid for its services by CHT, an entity that was not its client nor a party to the Colts Neck Transaction.

51.    The Bank eventually agreed to sell the Note and Mortgage to Aquila Alpha for $3,800,000 pursuant to a Note Sale Agreement, dated as of March 2, 2016 (the "Note Sale Agreement").

52.    Based upon information and belief, K&F negotiated the Note Sale Agreement on behalf of Aquila Alpha.  The Note Sale Agreement contained an arm's length transaction provision pursuant to which Aquila Alpha covenanted that "[n]o hidden terms or special understandings exist between the [p]urchaser and the [b]orrower."

53.    The Note Sale Agreement was purportedly signed by Tomer Vardi as manager of Aquila Alpha.  The $3,800,000 payment for the Note and Mortgage was made using the Debtors' funds and was derived from proceeds of the fraudulent stock offerings that were orchestrated by Former Management.  Bank records indicate that proceeds from the Secondary Offerings in the amount of $36,876,684.14 were transferred into M&T Account 5647 on January 8, 2016.  That same day, those funds were then transferred from M&T Account 5647 into M&T Account 8132.  Then, on March 30, 2016, $3,800,000 of those funds were transferred back from M&T Account 8132 to M&T Account 5647.  That same day, a wire in the amount of $3,800,000 was made from M&T Account 5647 to Defendant's escrow account.

54.    Feuerstein knew the payment for the Note and Mortgage had come from one of CHT's accounts.  On March 31, 2016, K&F's bookkeeper forwarded to Feuerstein a funds transfer confirmation, indicating the payment was on account of "Aquila Alpha – DB Debt Purchase," and identifying CHT as the party transferring the funds.

55.    Again, Feuerstein was untroubled by the fact that an unrelated third party—the same one that had paid K&F's initial retainer—was providing millions of dollars for Aquila Alpha and/or Tomer Vardi to acquire the Note and Mortgage on Parmar's personal residence.  In fact,

Feuerstein replied to K&F's bookkeeper within one minute, advising her to send the payment directly to the Bank.

56.     Once Aquila Alpha acquired the Note and Mortgage, K&F prepared a foreclosure complaint (the "Foreclosure Complaint") seeking to foreclose on the Mortgage on the Colts Neck Property on Aquila Alpha's behalf.

57.     The draft Foreclosure Complaint named certain individuals and entities having a potential claim to the Colts Neck Property, including Parmar.

58.     After preparing the Foreclosure Complaint, K&F attempted to contact Tomer Vardi several times seeking authorization to file the Foreclosure Complaint.  After receiving no response for at least a month, Feuerstein received an email from Tomer Vardi's e-mail account on October 6, 2016, in which Tomer Vardi (or the person purporting to be Tomer Vardi) advised Feuerstein that he wanted to move ahead with the foreclosure "in the most expeditious manner possible" and that "we had a preliminary discussion with Mr. Parmar and his attorney Mitch Greene as well."

59.     Many things about this email should have surprised Feuerstein.  First, the email did not indicate who else (besides Tomer Vardi) was meant by "we."   Second, Mr. Feuerstein was being told that his client (and apparently others) had engaged in discussions with the first defendant named in the draft Foreclosure Complaint—Parmar—and Parmar's counsel regarding whether and when to file the draft Foreclosure Complaint prepared by K&F.  Third, Mr. Feuerstein was also being told (if he did not know already) that Parmar was represented in this matter by Mitchell Greene, the lawyer who had referred Aquila Alpha and Tomer Vardi to K&F.

60.     A few days later, Feuerstein received a second email that was also troubling.  This email came from Mitchell Greene, to whom Tomer Vardi had forwarded the earlier exchange with

Feuerstein.   Greene asked Feuerstein whether he was "moving to expedite this foreclosure," echoing the language used by Tomer Vardi.

61.    Feuerstein did not stop to ask why Greene and Parmar had been communicating with Feuerstein's client in Feuerstein's absence about the Foreclosure Complaint, nor did he inquire as to the content of the discussions.  Furthermore, Feuerstein did not ask why the defendant was the one asking for the lawsuit to be filed nor did he express surprise that Parmar, the primary defendant, was Greene's client.  Instead, he responded to Greene in two minutes, advising Greene that he had sent "the client" a copy of the Foreclosure Complaint and would file it when he received authorization to do so.

62.    K&F filed the Foreclosure Complaint on November 4, 2016.

63.    On November 17, 2016, Adam Greene, a partner at Robinson Brog and Mitchell Greene's son, emailed Feuerstein an acknowledgement of service of the Foreclosure Complaint on Parmar.  Greene copied Parmar and Zaharis to this email, using their CHT email addresses.

64.    Accordingly, when Feuerstein received this email, he would have been informed (if he did not already know) of Parmar's affiliation with CHT.  And he would have understood that (i) Parmar was on both sides of the Colts Neck Transaction; and (ii) CHT had funded the Colts Neck Transaction, including K&F's retainer, despite the fact that it related to a mortgage Parmar held in his own name.

65.    In August 2018, Defendant withdrew from its representation of Aquila Alpha in connection with the foreclosure action because Vardi had stopped paying his legal bills and communicating with the Defendant altogether.

66.    CHT received no benefit from the Colts Neck Transaction.  However, it suffered a loss of at least $3,806,000, comprising of the sum of the purchase price under the Note Sale Agreement and the retainer fee paid to K&F.

67.    By diverting CHT's funds for his personal use in the Colts Neck Transaction, Parmar committed fraud, breach of fiduciary duty, and conversion.

68.    Defendant substantially assisted with the Colts Neck Transaction by preparing the legal documents necessary for it to be effectuated, by making the Colts Neck Transaction appear to be arms' length and by a transfer of the Debtors' funds to close on the Note Sale Agreement.

69.    Based upon the circumstances of the Colts Neck Transaction, Defendant knew or should have known of Parmar's conversion, breach of fiduciary duty, and fraud.

70.    Defendant was also unjustly enriched in the amount of the payment it received for handling the Colts Neck Transaction because the Debtors received no benefit from the services performed by the Defendant.

### b.  The 50 Riverside Transaction

71.    On February 6, 2017, Parmar emailed a New York City real estate broker and made an offer to purchase the 50 Riverside Condo for $14,800,000 in cash.

72.    On February 8, 2017, the broker informed Parmar that his cash offer of $14,800,000 for the 50 Riverside Condo had been accepted by the seller.

73.    On February 9, 2017, Zaharis sent an email to Robinson Brog, copying Parmar, regarding arrangements for the transfer of $16 million "from 2 of the Deal closing escrow accounts" to an account belonging to Ranga Bhoomi, LLC ("Ranga Bhoomi").  Robinson Brog had incorporated Ranga Bhoomi at about the same time as Aquila Alpha.  Upon information and belief, Parmar and Zaharis were among the authorized managers and account operators of the Ranga Bhoomi Account.

74.     Zaharis requested that the money be moved to the Ranga Bhoomi Account in two wire transfers, the first in the amount of $8,765,997.44, and the second in the amount of $7,234,002.56.

75.     On February 15, 2017, an email was sent from K&F to Tomer Vardi's email account regarding the details of the 50 Riverside Condo purchase.  The K&F employee began the email by addressing Tomer Vardi by name.  A response was then sent to K&F and the email was signed "Regards, Sam Zaharis."

76.     Accordingly, at this point (if not sooner), K&F had reason to believe that Zaharis and potentially Parmar were impersonating Tomer Vardi in connection with the Real Estate Transactions.  And, through its experience in the Colts Neck Transaction, K&F knew or should have known by this point that (i) Zaharis and Parmar were affiliated with CHT; and (ii) Parmar and Tomer Vardi had engaged in self-dealing with respect to the Colts Neck Transaction and misused CHT's funds.

77.     Nevertheless, K&F participated in the 50 Riverside Transaction.  Three transfers were made to K&F from the Ranga Bhoomi Account in connection with the 50 Riverside Transaction: (1) $3,705,000 on February 23, 2017; (2) $11,100,000 on March 20, 2017, and (3) $60,000 on April 6, 2017.

78.     On April 7, 2017, an entity named 21B One River Park LLC purchased the 50 Riverside Condo for $15,074,100.  The address listed on the deed for the buyer was K&F's address.

79.     The sole member of 21B One River Park LLC was Aquila Alshain LLC, of which Salil Sharma ("Sharma"), Parmar's brother-in-law, was the managing member.

80.     The property records for the 50 Riverside Condo, including the unit deed and real property transfer report, list Sharma as the grantee.

81.     Upon information and belief, the Debtors' funds were used to purchase the 50 Riverside Condo for the personal benefit of Sharma and/or Parmar or other of his associates.

82.     The Debtors did not benefit from the 50 Riverside Transaction.

83.     Upon information and belief, the Defendant received payment in exchange for its assistance in executing this portion of Former Management's Scheme.

84.     By diverting CHT's funds from the Ranga Bhoomi Account for the 50 Riverside Transaction, Parmar and Zaharis committed fraud, breach of fiduciary duty, and conversion.

85.     Based upon information and belief, Defendant substantially assisted with the 50 Riverside Transaction by preparing the legal documents necessary for it to be effectuated and by facilitating a transfer of the Debtors' funds to purchase the 50 Riverside Condo.

86.     At the time of the 50 Riverside Transaction, Defendant knew or should have known of Former Management's improper use of the Debtors' funds for personal real estate purchases.

87.     Defendant was also unjustly enriched in the amount of the payment it received for handling the 50 Riverside Transaction because the Debtors received no benefit from the services performed by the Defendant.

**c.   The 40 Broad Street Transaction**

88.     On June 2, 2017, an email was sent from Tomer Vardi's email account to K&F, outlining details for a proposed purchase of the 40 Broad Street Condo.  The email stated that any questions should be directed to a phone number, which was identified as Zaharis's number on various bank account statements.

89.     In a second email dated June 2, 2017, Parmar instructed Zaharis to name the purchasing entity for the 40 Broad Street Transaction "Dioskouroi Kastor Polydeuces LLC" ("DKP").

90.     According to the agreement forming DKP, Parmar's brother, Harmohan Parmar, was the manager and sole member of DKP.

91.     On July 13, 2017, following correspondence among K&F, Tomer Vardi's email account, and an email account belonging to a person claiming to be Harmohan Parmar, Zaharis sent an email to Parmar and Robinson Brog with instructions to wire $1,623,600 to K&F for the purchase of the 40 Broad Street Condo.

92.     Following Zaharis's instructions, $1,623,600 was transferred to K&F from Robinson Brog's IOLA account.

93.     The money transferred from Robinson Brog's IOLA account was the Debtors' funds, and specifically were the proceeds from the Go-Private Transaction.

94.     New York City property records show that DKP purchased the 40 Broad Street Condo for $1,640,000 on August 8, 2017 (a day after a $41,053.79 transfer to K&F and 3.5 weeks after a $1,623,000 transfer to the same), and K&F is listed on the deed as its counsel.

95.     The Debtors had no interest in DKP and received no benefit on account of the 40 Broad Street Transaction.

96.     Upon information and belief, the Defendant received payment in exchange for its assistance in executing this portion of Former Management's Scheme.

97.     By diverting CHT's funds from Robinson Brog's IOLA Account for the 40 Broad Street Transaction, Parmar and Zaharis committed fraud, breach of fiduciary duty, and conversion.

98.     Based upon information and belief, Defendant substantially assisted with the 40 Broad Street Transaction by preparing the legal documents necessary for it to be effectuated and by facilitating a transfer of the Debtors' funds to purchase the 40 Broad Street Condo.

99.     At the time of the 40 Broad Street Transaction, Defendant knew or should have known that (i) Zaharis and Parmar were affiliated with CHT; and (ii) Parmar and Tomer Vardi had engaged in self-dealing with respect to the Colts Neck Transaction and misused CHT's funds.

100.     Defendant was also unjustly enriched in the amount of the payment it received for handling the 40 Broad Street Transaction because the Debtors received no benefit from the services performed by the Defendant.

## COUNT I – AIDING AND ABETTING FRAUD

101.     The Liquidating Trustee repeats and incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

102.     Former Management orchestrated a widespread scheme to defraud the Debtors and their Creditors out of hundreds of millions of dollars.

103.     Defendant knew or should have known that it assisted Former Management's diversion of the Debtors' funds to acquire or retain substantial real estate holdings by helping to conceal the fact that Parmar and/or his associates were using the Debtors' funds for these transactions.

104.     Defendant knew or should have known that Former Management was fraudulently diverting the Debtors' funds for their personal use or the personal use of their associates.

105.     Without the assistance of Defendant, Former Management would not have been able to engage in this aspect of the fraudulent Scheme.

106.     As a direct and proximate result of Defendant's substantial assistance, the Debtors have suffered damages in an amount to be determined at trial, but no less than $31,000,000, plus interest, costs and fees.

## COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

107.    The Liquidating Trustee repeats and incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

108.    As detailed in this pleading, Former Management breached the fiduciary duties of candor, loyalty, and care that they owed to the Debtors.  As a result of their improper engagement in self-interested and deceitful transactions, Former Management deprived the Debtors of significant assets to which they are entitled.  Further, Former Management's concealment of their self-dealing prevented the Debtors from recognizing their Scheme earlier and taking action to mitigate damages.

109.    Defendant knew or should have known that it assisted Former Management's diversion of the Debtors' funds to acquire substantial real estate holdings by, among other things, preparing the necessary legal paperwork to effectuate the Real Estate Transactions.

110.    Upon information and belief, Former Management paid K&F's legal fees using the Debtors' funds.

111.    Upon information and belief, Defendant knew or should have known that Former Management owed fiduciary duties to the Debtors, and that its actions helped Former Management breach those duties.

112.    As a direct and proximate result of Defendant's substantial assistance, the Debtors have suffered damages in an amount to be determined at trial, but no less than $31,000,000, plus interest, costs and fees.

## COUNT III – AIDING AND ABETTING CONVERSION

113.    The Liquidating Trustee repeats and incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

114.    The Debtors raised significant funds through the Secondary Offerings.

115.    At all relevant times, the Debtors had a right to immediate possession of these funds, some or all of which were held in Robinson Brog's IOLA account.

116.    At all relevant times, Former Management was able to exert control over these funds.

117.    Exercising such control, Former Management interfered with the Debtors' right to immediate possession of their property by, among other things, misappropriating, commingling, and otherwise misusing the Debtors' funds for various improper and illegal purposes.

118.    As part of their Scheme, Former Management converted the Debtors' funds by, among other things, using them for personal gain in the Real Estate Transactions.

119.    Defendant knew or should have known that it assisted Former Management's diversion of the Debtors' funds to acquire substantial real estate holdings by preparing the necessary legal paperwork to effectuate the Real Estate Transactions and by facilitating transfers of the Debtors' funds to close on the Real Estate Transactions.

120.    Upon information and belief, Former Management paid K&F's legal fees from the Debtors' funds.

121.    As a direct and proximate result of Defendant's substantial assistance, the Debtors have suffered damages in an amount to be determined at trial, but no less than $31,000,000, plus interest, costs and fees.

## <u>COUNT IV – UNJUST ENRICHMENT</u>

122.    The Liquidating Trustee repeats and incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

123.    Upon information and belief, the Defendant received payments for its contributions to the fraudulent Scheme that led to the Debtors' demise.

124.    As a result of Former Management's fraudulent scheme, Defendant has been unjustly enriched.  Equity and good conscience require restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, the Liquidating Trustee respectfully requests judgment be entered in his favor and against the Defendant as follows:

A.    On Count I, monetary damages in an amount to be determined at trial, but no less than $31,000,000;

B.    On Count II, monetary damages in an amount to be determined at trial, but no less than $31,000,000;

C.    On Count III, monetary damages in an amount to be determined at trial, but no less than $31,000,000;

D.    On Count IV, monetary damages in the amount of the fees paid to Defendant in connection with the Real Estate Transactions which shall be determined at trial; and

E.    Pre-judgement and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems just and proper.

*[Remainder of page intentionally blank]*

Dated:    February 4, 2022                  Respectfully submitted,
          New York, New York
                                            **DLA PIPER LLP (US)**

                                            */s/ Michael D. Hynes*
                                            Michael D. Hynes
                                            DLA Piper LLP (US)
                                            1251 Avenue of the Americas
                                            New York, New York 10020-1104
                                            Telephone: (212) 335-4500
                                            Facsimile:  (212) 335-4501
                                            E-mail:  michael.hynes@us.dlapiper.com

                                            - and -

                                            Rachel Nanes (admitted *pro hac vice*)
                                            DLA Piper LLP (US)
                                            200 South Biscayne Boulevard, Suite 2500
                                            Miami, Florida 33131
                                            Telephone: (305) 423-8500
                                            Facsimile:  (305) 423-8501
                                            Email: rachel.nanes@us.dlapiper.com

                                            *Counsel to the Liquidating Trustee*